No. 23-55714

# In the United States Court of Appeals for the Ninth Circuit

CHAYA LOFFMAN AND JONATHAN LOFFMAN, ET AL.,
Plaintiffs-Appellants,

v.

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,
Defendants-Appellees.

Appeal from the United States District Court
for the Central District of California
Hon. Josephine L. Staton
(2:23-cv-01832-JLS-MRW)

## OPENING BRIEF OF PLAINTIFFS-APPELLANTS

ERIC C. RASSBACH
  *Counsel of Record*
NICHOLAS R. REAVES
DANIEL L. CHEN
LAURA WOLK SLAVIS
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*erassbach@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Jean & Jerry Friedman Shalhevet High School and Samuel A. Fryer Yavneh Hebrew Academy state that they do not have a parent corporation and do not issue any stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................ ii

TABLE OF AUTHORITIES ..................................................................... vi

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF ISSUES ........................................................................ 1

INTRODUCTION ...................................................................................... 2

STATEMENT OF THE CASE ................................................................... 4

    A. The Individuals with Disabilities Education Act ........................... 4

    B. California's special-education regime ............................................ 9

        1. Placement in nonpublic schools ................................................ 10

        2. Certified nonpublic schools ....................................................... 11

        3. The nonsectarian restriction on nonpublic
           schools ......................................................................................... 14

    C. Parent Plaintiffs attempt to obtain a religious
       education for their Children Plaintiffs
       with disabilities .............................................................................. 16

       *The Loffmans.* ................................................................................ 16

       *The Taxons.* ................................................................................... 17

       *The Peretses.* ................................................................................. 18

    D. School Plaintiffs attempt to support students with
       disabilities ...................................................................................... 19

    E. Proceedings below ......................................................................... 21

STANDARD OF REVIEW ...................................................................... 22

SUMMARY OF ARGUMENT ................................................................. 23

ARGUMENT ...................................................................... 27

I.  California's nonsectarian restriction violates
    the First Amendment by excluding individuals
    and institutions from a public benefit because
    they are religious. ....................................................... 27

    A. *Carson*, *Espinoza*, and *Trinity Lutheran* prohibit
       California's exclusion of religious families and
       schools from Section 1412(a)(10)(B) funding. ............... 28

       1. The *Carson* line of precedent. ............................... 28

       2. California's nonsectarian requirement cannot
          be reconciled with the Carson line of
          precedent. ............................................................ 30

          *Text.* ................................................................... 30

          *"Real Operation."* ................................................ 32

    B. The district court's contrary ruling was error. ............ 35

       1. Nonpublic schools do not provide a public
          education. ............................................................ 35

       2. Plaintiffs cannot be forced to accept second-
          class status because they are religious. ................... 38

II. California's nonsectarian restriction violates
    the First Amendment because it is not generally
    applicable ..................................................................... 41

III. California's restriction fails strict scrutiny. ................... 44

    *Compelling governmental interest* .................................. 44

    *Narrow tailoring* ............................................................ 47

IV. The remaining injunction factors favor relief. ............... 47

A. Plaintiffs will suffer irreparable harm absent relief. ..................................................................... 47

B. The balance of harms and public interest favor injunctive relief. ................................................... 48

V. The district court improperly dismissed Plaintiffs' remaining claims based on its erroneous analysis of *Carson*. ........................................................................ 49

*Equal Protection (Count IV)*. ................................... 49

*Unconstitutional conditions (Count V)*. ................... 50

Tandon *and* Yoder *(Counts II and VI)*. ................. 51

VI. Plaintiffs have standing to pursue their claims. ........... 52

A. Plaintiffs have suffered an injury-in-fact. ............. 52

1. Plaintiffs have sufficiently pleaded a discriminatory classification constituting an injury-in-fact. ..................................... 53

2. The Loffmans have standing. ........................ 55

3. The School Plaintiffs have standing. ............ 58

B. Plaintiffs' injury is traceable to Defendants' conduct and redressable by this Court. ................. 62

CONCLUSION ......................................................... 62

CERTIFICATE OF COMPLIANCE .............................. 64

CERTIFICATE OF SERVICE .................................... 65

ADDENDUM ........................................................... 66

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Aaron Priv. Clinic Mgmt. LLC v. Berry,*
  912 F.3d 1330 (11th Cir. 2019) .......................................... 61

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
  570 U.S. 205 (2013) ...................................................... 40, 50

*Al Saud v. Days,*
  50 F.4th 705 (9th Cir. 2022) ............................................. 49

*Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.,*
  267 F.3d 877 (9th Cir. 2001) .............................................. 6

*Arc of Cal. v. Douglas,*
  757 F.3d 975 (9th Cir. 2014) ............................................. 23

*Baker v. Carr,*
  369 U.S. 186 (1962) ...................................................... 56

*Ball v. Massanari,*
  254 F.3d 817 (9th Cir. 2001) ............................................. 49

*Bd. of Cnty. Comm'rs v. Umbehr,*
  518 U.S. 668 (1996) ...................................................... 50

*Bellflower Unified Sch. Dist. v. Lua,*
  832 F. App'x 493 (9th Cir. 2020) .......................................... 7

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ................................................... 52

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  466 U.S. 485 (1984) ...................................................... 23

*Bras v. Cal. Pub. Utilities Comm'n,*
  59 F.3d 869 (9th Cir. 1995) ...................................... 54, 55, 59

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) ............................................................... 47

*Canaan Christian Church v. Montgomery County*,
   29 F.4th 182 (4th Cir. 2022) ............................................... 42

*Carney v. Adams*,
   141 S. Ct. 493 (2020) ........................................................... 59

*Carroll v. Nakatani*,
   342 F.3d 934 (9th Cir. 2003) ............................................... 59

*Carson v. Makin*,
   142 S. Ct. 1987 (2022) .................................... 2, 3, 4, 21, 24, 25, 26, 27,
   .................................................................. 28, 30, 32, 34, 35, 36, 38,
   ..................................................................... 40, 44, 46, 49, 51, 58

*Carson v. Makin*,
   979 F.3d 21 (1st Cir. 2020) ................................................. 58

*Church of Lukumi Babalu Aye, Inc. v.*
   *City of Hialeah*,
   508 U.S. 520 (1993) ....................................................... 32, 44

*City & Cnty. of San Francisco v. USCIS*,
   944 F.3d 773 (9th Cir. 2019) ............................................... 53

*City of Los Angeles v. Barr*,
   929 F.3d 1163 (9th Cir. 2019) ................................. 54, 55, 59

*Ctr. for Biological Diversity v. Export-Import Bank*,
   894 F.3d 1005 (9th Cir. 2018) ............................................. 59

*Dahl v. Board of Trustees*,
   15 F.4th 728 (6th Cir. 2021) ............................................... 42

*Davis v. Guam*,
   785 F.3d 1311 (9th Cir. 2015) ............................................. 58

*Desert Outdoor Advert., Inc. v. City of Moreno Valley*,
   103 F.3d 814 (9th Cir. 1996) ....................................... 57, 60

*Doug C. v. Hawaii Dep't of Educ.*,
   720 F.3d 1038 (9th Cir. 2013) ............................................. 6

*Dreher v. Amphitheater Unified Sch. Dist.*,
   22 F.3d 228 (9th Cir. 1994) ........................................ 5, 34

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
   11 F.4th 200 (3d Cir. 2021) .............................................. 61

*Emp. Div. v. Smith*,
   494 U.S. 872 (1990) ...................................................... 51

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020) .............................. 25, 29, 31, 45, 46

*Everson v. Bd. of Educ.*,
   330 U.S. 1 (1947) ..................................................... 28, 29

*FEC v. Cruz*,
   596 U.S. 289 (2022) ...................................................... 53

*Fellowship of Christian Athletes v.*
*San Jose Unified Sch. Dist. Bd. of Educ.*,
   82 F.4th 664 (9th Cir. 2023) ................... 22, 23, 24, 25, 41,
   .......................................................... 42, 43, 44, 47, 49

*Friends of the Earth, Inc. v.*
*Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ...................................................... 62

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021) ................... 3, 21, 23, 24, 36, 37, 41, 42, 43, 44

*Gratz v. Bollinger*,
   539 U.S. 244 (2003) ...................................................... 58

*Harrison v. Kernan*,
   971 F.3d 1069 (9th Cir. 2020) ........................... 26-27, 57, 60

*Hernandez v. Sessions*,
   872 F.3d 976 (9th Cir. 2017) ....................................... 22-23

*Honig v. Doe,*
  484 U.S. 305 (1988)............................................................5

*Johnson v. Robison,*
  415 U.S. 361 (1974)......................................................49-50

*Kennedy v. Bremerton Sch. Dist.,*
  142 S. Ct. 2407 (2022)...............................24-25, 43, 44

*Kerr Ctr. Parents Ass'n v. Charles,*
  897 F.2d 1463 (9th Cir. 1990)...................................57

*Lance v. Coffman,*
  549 U.S. 437 (2007).......................................................56

*Leite v. Crane Co.,*
  749 F.3d 1117 (9th Cir. 2014).................................23

*Lucas v. S.C. Coastal Council,*
  505 U.S. 1003 (1992)...............................................59-60

*Massachusetts v. EPA,*
  549 U.S. 497 (2007).......................................................56

*Maya v. Centex Corp.,*
  658 F.3d 1060 (9th Cir. 2011).........................53, 59

*McDaniel v. Paty,*
  435 U.S. 618 (1978).......................................................30

*Mecinas v. Hobbs,*
  30 F.4th 890 (9th Cir. 2022) .........................52, 55

*Meland v. Weber,*
  2 F.4th 838 (9th Cir. 2021) .......................................56

*Namisnak v. Uber Technologies, Inc.,*
  971 F.3d 1088 (9th Cir. 2020)...............................60

*Nat'l Ass'n of Optometrists & Opticians v. Brown,*
  567 F.3d 521 (9th Cir. 2009).....................................55

*Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993) ................................... 54, 58, 60-61, 62

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ................................................................. 50

*Porretti v. Dzurenda*,
    11 F.4th 1037 (9th Cir. 2021) ........................................... 48

*Prince v. Jacoby*,
    303 F.3d 1074 (9th Cir. 2002) ...................................... 49-50

*D. R. ex rel. R. R. v. Redondo Beach Unified Sch. Dist.*,
    56 F.4th 636 (9th Cir. 2022) ............................................. 39

*Real v. City of Long Beach*,
    852 F.3d 929 (9th Cir. 2017) ....................................... 57, 60

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) ............................................................. 54

*Rhoades v. Avon Prods., Inc.*,
    504 F.3d 1151 (9th Cir. 2007) ......................................... 23

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) ............................................................. 47

*Seeboth v. Allenby*,
    789 F.3d 1099 (9th Cir. 2015) ......................................... 49

*Sherbert v. Verner*,
    374 U.S. 398 (1963) ..................................................... 27, 29

*Shurtleff v. City of Boston*,
    142 S. Ct. 1583 (2022) .................................................. 40-41

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ............................................................. 56

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) .................................................. 26, 51

*Thunder Studios, Inc. v. Kazal*,
   13 F.4th 736 (9th Cir. 2021) .............................................. 23

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017).............................. 27, 29-30, 31, 44, 53

*Turner v. Fouche*,
   396 U.S. 346 (1970)............................................................ 54

*Walz v. Tax Comm'n*,
   397 U.S. 664 (1970)............................................................ 40

*Weston Fam. P'ship LLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ............................................... 1

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)...................................................... 26, 51

*Zelman v. Simmons-Harris*,
   536 U.S. 639 (2002)............................................................ 25

**Statutes**

20 U.S.C. § 1400 ...............................................................4-5

20 U.S.C. § 1401 .................................................................. 5

20 U.S.C. § 1412 ..........................3, 6, 7, 8, 9, 10, 11, 23, 24, 25,
   ..............................................28, 30, 31, 34, 35, 39, 40, 46

20 U.S.C. § 1413 ................................................................ 10

20 U.S.C. § 1414 .................................................................. 5

28 U.S.C. § 1291 .................................................................. 1

28 U.S.C. § 1292 .................................................................. 1

28 U.S.C. § 1331 .................................................................. 1

28 U.S.C. § 1343 .................................................................. 1

Cal. Educ. Code § 56028.5.................................................. 16

Cal. Educ. Code § 56031 ..................................................................... 11

Cal. Educ. Code § 56034 ...................................................... 10, 15, 32

Cal. Educ. Code § 56040 ..................................................................... 10

Cal. Educ. Code § 56101 ........................................ 15-16, 24, 43

Cal. Educ. Code § 56363 ..................................................................... 11

Cal. Educ. Code § 56365 .......................... 10, 11, 14, 38, ,43

Cal. Educ. Code § 56366 ...................................... 10, 11, 31

Cal. Educ. Code § 56366.1 ........................................... 14, 15

Cal. Educ. Code § 56366.2 ........................................... 15, 43

Cal. Educ. Code § 56366.4 ............................................... 15

Cal. Educ. Code § 56505.2 ........................................... 14, 15

## Regulations

34 C.F.R. § 300.132 ..................................................................... 8

34 C.F.R. § 300.137 ..................................................................... 8

34 C.F.R. § 300.146 ..................................................................... 7

34 C.F.R. § 300.148 ..................................................................... 7

34 C.F.R. § 300.321 ..................................................................... 6

Cal. Code Regs. tit. 5, § 3001 ........................................ 14, 31

Cal. Code Regs. tit. 5, § 3060 ........................................ 15, 43

Cal. Code Regs. tit. 5, § 3070 ........................................ 37, 38

## Other Authorities

9th Cir. R. 28-2.7 ..................................................................... 2

Stephanie H. Barclay, Brady Earley & Annika Boone,
  *Original Meaning and the Establishment Clause: A
  Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505 (2019)..................46

Nathan Chapman & Michael McConnell, *Agreeing to
  Disagree: How the Establishment Clause Protects
  Religious Diversity and Freedom of Conscience* 119 (2023)...............45

Mark Storslee, *Church Taxes and the Original
  Understanding of the Establishment Clause*,
  169 U. Penn. L. Rev. 111 (2020).........................................................45

*Questions and Answers on Serving Children with
  Disabilities Placed by Their Parents in Private Schools*,
  U.S. Dep't of Educ. (Feb. 2022).............................................................8

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 1292(a)(1). The district court denied Plaintiffs' motion for a preliminary injunction and granted Defendants' motions to dismiss on August 9, 2023. ER-5. On August 14, 2023, Plaintiffs filed their notice of appeal from the entire district court decision. ER-281. On September 19, 2023, the district court entered a final judgment of dismissal, ER-3, perfecting this Court's jurisdiction over Plaintiffs' appeal. *Weston Fam. P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 618 (9th Cir. 2022).

# STATEMENT OF ISSUES

1. Whether California's requirement that "nonpublic schools" verify they are "nonsectarian" in order to receive government certification violates the Free Exercise Clause because it expressly discriminates based on religion.

2. Whether California's requirement that "nonpublic schools" verify they are "nonsectarian" in order to receive government certification violates the Free Exercise Clause's general applicability requirement because it contains a system of discretionary exemptions.

3. Whether California's nonsectarian requirement satisfies strict scrutiny where the Defendants have asserted only disestablishment interests already rejected by the Supreme Court and where, rather than being narrowly tailored, the law categorically excludes religious schools.

4. Whether Plaintiffs are entitled to a preliminary injunction.

5. Whether the district court properly held that Plaintiffs' remaining claims should be dismissed.

6. Whether Plaintiffs have Article III standing to challenge a discriminatory barrier that categorically excludes them from a public benefit.

An Addendum is included at the end of this brief. 9th Cir. R. 28-2.7.

## INTRODUCTION

California excludes Orthodox Jewish children and schools from equal access to special education benefits, for no reason other than that they are religious. That is not just morally wrong, it is unconstitutional.

And not just a little unconstitutional. It runs headlong into two lines of settled Supreme Court precedent. First, in *Carson v. Makin*, the Supreme Court struck down Maine's policy of excluding families from education benefits when they wanted to send their kids to religious schools. The Court held that the Free Exercise Clause forbids government from penalizing religious families and religious schools because they are religious or do religious things. But California does exactly that here—refusing to certify religious schools as "non-public schools," and thus preventing them from providing federally funded special-education services solely because they are religious.

Having trapped itself in the same position as Maine, California now makes the same escape attempt—arguing that the many private schools

that assist children with disabilities are providing a "public education." But that argument is no more valid in California than it was in Maine. In fact, California's own statutes describe placement of a child with disabilities in a private school as an "alternative" to public education, not a variation of it. Nor are religious schools transformed into avatars of the State because they must sign contracts with public school districts to be certified as nonpublic schools. California's exclusion of Jews cannot be reconciled with *Carson*.

Second, California's rule runs afoul of the Supreme Court's decision in *Fulton v. City of Philadelphia.* Under *Fulton*, a law that burdens religion is not generally applicable and triggers strict scrutiny if it allows for discretionary exemptions. Here, Defendants have several ways of granting discretionary exemptions, so strict scrutiny applies.

And there is no way for Defendants to overcome that stringent test. Under *Kennedy v. Bremerton School District*, they have failed to identify a historical practice of preventing public funds from flowing to religious schools. Indeed, *Carson* rejected the same alleged antiestablishment interest Defendants assert here, noting that there is no historic and substantial tradition against aiding private religious schools in this manner. Nor could categorically excluding religious entities ever be construed as "narrow" tailoring.

The district court erred in other ways. Defendants' exclusion of Plaintiffs from the Section 1412(a)(10)(B) benefit also violates the Equal

Protection Clause and the unconstitutional conditions doctrine. And perhaps worst, the district court never addressed Plaintiffs' *Tandon v. Newsom* and *Wisconsin v. Yoder* claims because it wrongly lumped them together with Plaintiffs' *Carson* claim. All of these errors merit reversal.

\* \* \*

At Sinai, G-d charged Jews with instructing their children in the faith. And faithfully teaching their children has been essential to Jews ever since. Indeed, Jewish education has been a central part of maintaining religious traditions and upholding religious commitments through centuries of persecution. California cannot force Jewish children to choose between the Jewish education that is their birthright and the governmental special-education assistance they are entitled to as Americans. The Court should reverse.

## STATEMENT OF THE CASE

### A. The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act (IDEA) is designed to "provide for the education of all children with disabilities" and eradicate the historical discrimination preventing children with disabilities from receiving a mainstream education—or any education at all. 20 U.S.C. § 1400(c)(2), (d)(1)(C). To achieve these goals, IDEA offers federal funding to states to "ensure that all children with disabilities have available to them a free appropriate public education," known as a FAPE, "that

emphasizes special education and related services designed to meet their unique needs." *Id.* § 1400(d)(1)(A).

Part B of IDEA concerns the provision of this substantive right to a FAPE to school-aged children with disabilities. The word "public" in a "free appropriate public education" does not refer to education at public schools, but instead is "a term of art which refers to 'public expense,' whether at public or private schools." *Dreher v. Amphitheater Unified Sch. Dist.*, 22 F.3d 228, 233 n.10 (9th Cir. 1994).

A FAPE is provided by means of an "individualized education program," 20 U.S.C. § 1401(9)(D), or IEP. A student's IEP is "a written statement for each child with a disability" that covers, *inter alia*, a "child's present levels of academic achievement and functional performance," "a statement of measurable annual goals, including academic and functional goals," and "a statement of the special education and related services and supplementary aids and services … to be provided to the child, or on behalf of the child." *Id.* § 1414(d). The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988).

The IEP is developed by an IEP team that consists of the child's parent(s), the child's general education teacher, the child's special education teacher/provider, a Local Education Agency (LEA) representative, and an individual who can interpret the instructional implications of assessment results. *See id.* § 1414(d)(1)(B); 34 C.F.R.

§ 300.321(a)(1)-(5). Parents do not dictate the content of the IEP, but they play a "critical" role in its development and implementation. *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013). They "not only represent the best interests of their child in the IEP development process, they also provide information about the child critical to developing a comprehensive IEP and which only they are in a position to know." *Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.*, 267 F.3d 877, 882 (9th Cir. 2001).

IDEA provides four different methods for obtaining public funding support for a child with a disability: (1) public school placement pursuant to an IEP under 20 U.S.C § 1412(a)(1); (2) private school placement pursuant to an IEP under 20 U.S.C. § 1412(a)(10)(B); (3) private school placement without an IEP but with the possibility of reimbursement under 20 U.S.C. § 1412(a)(10)(C); and (4) private school placement without an IEP or the possibility of reimbursement, under 20 U.S.C. § 1412(a)(10)(A). This case concerns Section 1412(a)(10)(B), the second method.

The first method is through placement of the child at a public school pursuant to an IEP. There, the child is guaranteed a FAPE, and the public school follows the IEP developed by the IEP team to provide special education services tailored to the child's needs, at no cost to the parents. 20 U.S.C. § 1412(a)(1).

The second method is through placement of the child at a private school pursuant to an IEP. 20 U.S.C. § 1412(a)(10)(B). As in public school, the child is guaranteed a FAPE, and the private school follows the IEP developed by the IEP team to provide special education services tailored to the child's needs "[a]t no cost to the parents." 34 C.F.R. § 300.146(a)(2). Thus, such children "ha[ve] all of the rights of a child with a disability who is served by a public agency." *Id.* § 300.146(c).

The third method is through placement of the child at a private school by the parents after an IEP has been developed by the IEP team, but the parents believe the IEP does not provide their child with a FAPE. 20 U.S.C. § 1412(a)(10)(C). The parents then place their child with a private school, pay for tuition and special education services, and seek reimbursement from the LEA through a contested "due process" administrative proceeding. 34 C.F.R. § 300.148(b). While in the private school, the child is not entitled to a FAPE or IEP. A court or hearing officer can order an LEA to reimburse parents for placements in religious schools through this process. *See, e.g.*, *Bellflower Unified Sch. Dist. v. Lua*, 832 F. App'x 493, 496 (9th Cir. 2020) (awarding tuition reimbursement and holding that being a "parochial school does not change this analysis").

The fourth method is placement of the child at a private school by the parents at their own expense without any development of an IEP. 20

U.S.C. § 1412(a)(10)(A).[1] These private schools may "includ[e] religious[] schools." 20 U.S.C. § 1412(a)(10)(A)(i)(III); 34 C.F.R. § 300.132(a). An LEA may provide "equitable services" to these students through "employees of a public agency" or "through contract by the public agency with an individual, association, agency, organization, or other entity." 20 U.S.C § 1412(a)(10)(A)(vi)(I)(aa)-(bb). However, no such child "has an individual right to receive some or all of the special education and related services that the child would receive if enrolled in a public school," including an IEP. 34 C.F.R. § 300.137(a). As a result, "it is possible that some of these parentally-placed private school children with disabilities will not receive any special education and related services." *Questions and Answers on Serving Children with Disabilities Placed by Their Parents in Private Schools*, U.S. Dep't of Educ. (Feb. 2022), https://perma.cc/EN7A-CYUY.

---

[1] Although both the Section 1412(a)(10)(C) and Section 1412(a)(10)(A) methods involve private school placement by parents without the involvement of the LEA, the 10(A) method is typically referred to as "parental placement," and the 10(C) method is typically referred to as "unilateral placement."

The different methods are summarized in the following chart:

| Statute | School type | IEP implemented? | Level of public funding |
|---------|-------------|------------------|-------------------------|
| § 1412(a)(1) | Public | IEP implemented | Full funding of FAPE guaranteed |
| § 1412(a)(10)(B) | Private | IEP implemented | Full funding of FAPE guaranteed |
| § 1412(a)(10)(C) | Private | IEP developed but parents object | No FAPE guaranteed; parents may seek reimbursement |
| § 1412(a)(10)(A) | Private | No IEP developed | No FAPE available; parents may not seek reimbursement; child may be given equitable services |

Thus, the only way for a child to receive the guarantee of a FAPE and the corresponding panoply of individualized IEP services is to be placed in a public school under 20 U.S.C. § 1412(a)(1) or a private school under 20 U.S.C. § 1412(a)(10)(B). Otherwise, children are entitled only to "equitable services"—which may result in no services at all, 20 U.S.C. § 1412(a)(10)(A), or parents must front the expenses of costly services and hope for (often partial) reimbursement after a protracted administrative proceeding, 20 U.S.C. § 1412(a)(10)(C).

**B. California's special-education regime**

California, like every other state, has chosen to participate in IDEA. It therefore annually "submit[s] a plan that provides assurances" that it

will guarantee a FAPE to all eligible "children with disabilities residing in the State between the ages of 3 and 21, inclusive." 20 U.S.C. § 1412(a)(1)(A). IDEA charges California's "[s]tate educational agency"— the California Department of Education (CDE)—with ensuring IDEA compliance at the state level, including through assurances that LEAs comply with IDEA. 20 U.S.C. §§ 1412(a)(11)(A), 1413(a). In return, California receives over a billion dollars every year in federal IDEA Part B funding to supplement its state special-education funding. *See Funding Profile (ID 5936): IDEA 611 Local Assistance Entitlements*, Cal. Dep't of Educ., https://perma.cc/H8LM-TMF5.

### 1. Placement in nonpublic schools

Consistent with IDEA's requirements, California law guarantees the substantive right to a FAPE for all eligible students. Cal. Educ. Code § 56040. And like IDEA, California law states that a FAPE may be provided pursuant to an IEP in "nonpublic" schools "if no appropriate public education program is available." *Id.* § 56365(a).

California defines a "nonpublic" school as a "private" school that "enrolls individuals with exceptional needs pursuant to an individualized education program." Cal. Educ. Code § 56034. Nonpublic schools are intended "as an alternative special education service available to a local educational agency and parents." *Id.* § 56366. Students can be placed in a nonpublic school located either in California or another state. *See id.* § 56365(f)-(i).

Placement in a nonpublic school is facilitated via a "master contract" between the nonpublic school and an LEA like LAUSD. *Id.* § 56366(a). This master contract governs the procedural and substantive requirements to which the nonpublic school and LEA must adhere, including "an individual services agreement for each pupil placed by a local educational agency." *Id.* § 56366(a)(2)(A). In keeping with IDEA's instruction that students placed in a nonpublic school receive services "at no cost to their parents," 20 U.S.C. § 1412(a)(10)(B)(i), California requires the LEA to use public funding to reimburse "the full amount of the tuition" for students in nonpublic schools, as well as the special education and related services in the student's IEP, Cal. Educ. Code § 56365(a), (d); *see also id.* § 56031(a) (defining special education); *id.* § 56363(a) (defining related services); *id.* § 56363(b) (listing included services).

## 2. Certified nonpublic schools

Pursuant to its goal of allowing "alternative special education service[s]" for parents and students with disabilities, *id.* § 56366, California certifies hundreds of nonpublic schools, including 58 located outside California. *Search Results*, Cal. Dep't of Educ., https://perma.cc/KUU7-R25S.

Many certified nonpublic schools have unique elements and practices tailored to the individual needs of their students and families. For example, some out-of-state nonpublic schools, like Oxbow Academy, are designed to meet the needs of students of a particular sex and therefore

11

discriminate on the basis of sex in their admissions. *See, e.g.*, Oxbow Academy, https://perma.cc/39KG-NHUV (certified nonpublic school "specializ[ing] in sex specific treatment for boys between the ages of 10-17").[2] Cherry Gulch, another out-of-state, single-sex institution offering innovative curricula, is a ranch-style therapeutic boarding school for fifth to ninth-grade boys that educates its male students "through the lens of Joseph Campbell's Hero's Journey." *The Heroic Journey*, Cherry Gulch, https://perma.cc/PG4Z-KWN4. [3] Still others, like Intermountain Residential, acknowledge the powerful role religion can play in its students' lives and offer optional programs "to support [their] spiritual and cultural development." *Cultural and Spiritual Program*, Intermountain Residential, https://perma.cc/3YWY-LKNK. [4] This includes providing chaplains and "Jewish Mentors" who "work with Jewish students" and "Non-Jewish students" to help them grow in their understanding of Jewish religious beliefs through "learning and participating in Jewish traditions and celebrations." *Id.*[5]

---

[2] *California School Directory: Oxbow Academy*, Cal. Dep't of Educ., https://perma.cc/6F5C-UZ52.

[3] *California School Directory: Cherry Gulch*, Cal. Dep't of Educ., https://perma.cc/U6QK-WP8Y.

[4] *California School Directory: Intermountain Children's Home & Services*, Cal. Dep't of Educ., https://perma.cc/E6QM-8DS8.

[5] Intermountain Residential does not provide Orthodox Jewish services.

Certified in-state nonpublic schools are similar. For example, Plumfield Academy, Greenacre Homes & School, and Mountain Valley School's Nevada City campus admit only male students.[6]

In-state nonpublic schools also offer varying pedagogical and curricular approaches. Palo Alto Preparatory School emphasizes experiential learning for its students with disabilities by walking in nature, floating in sky-diving simulators, and flying planes. *Experiential Learning*, Palo Alto Preparatory, https://perma.cc/59P7-QNXG. At the Avalon Academy, students engage in a "multisensory curriculum and mindfulness tools," including "mid-day chair yoga … to turn their attention inward to explore their bodies, emotions and sensations with gentle curiosity." *The Program*, The Avalon Academy, https://perma.cc/S5DJ-4RSZ. And Maya Angelou Academy offers "culturally relevant and responsive practices where students learn and discuss power dynamics in relationship to oppressive systems and ideologies around race and [its] intersections." *Maya Angelou Academy*

---

[6] *California School Directory: Plumfield Academy*, Cal. Dep't of Educ., https://perma.cc/CB52-D2QZ; *Program at a Glance*, Plumfield Academy, https://perma.cc/5PH4-NGH3; *California School Directory: Greenacre Homes & School – Gravenstein*, Cal. Dep't of Educ., https://perma.cc/DZA3-B8K8; *Greenacre Homes & School*, https://perma.cc/P3X2-TWDA; *California School Directory: Mountain Valley School,* Cal. Dep't of Educ., https://perma.cc/944T-AQM4; *Boys Program*, Mountain Valley Child & Family Services, Inc., https://perma.cc/K98N-D9CE.

*Handbook 2022-2023*, Maya Angelou Academy, at 11, https://perma.cc/GK4N-4QQ8. Its staff "further engage[] in decolonizing therapeutic practices" with "a social justice lens and a commitment to collective liberation[.]" *Id.*

California thus certifies a broad and diverse range of nonpublic schools that emphasize unique practices, pedagogies, and curricula that are individually suited to their students.

### 3. The nonsectarian restriction on nonpublic schools

In contrast to this otherwise tailored approach to the differing needs of families and students, California categorically prohibits one type of school from obtaining nonpublic-school certification: religious schools.

Under California law, students cannot be placed in a nonpublic school "if the school … has not been certified" by the CDE and the Superintendent. Cal. Educ. Code § 56505.2(a); *see also id.* § 56366.1 (application requirements). But California will only consider certifying schools that are "nonsectarian." *See, e.g., id.* § 56365. CDE regulations define "nonsectarian" as "a private, nonpublic school … that is not owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility and whose articles of incorporation and/or by-laws stipulate that the assets of such agency or corporation will not inure to the benefit of a religious group." Cal. Code Regs. tit. 5, § 3001(p). Consistent with these regulations, the application

to become a certified nonpublic school requires the applicant to "submit a signed assurance statement that the nonpublic school will maintain compliance with … [n]onsectarian status." *Id.* § 3060(d)(6); ER-205. And the "Superintendent may revoke or suspend the certification of a nonpublic, nonsectarian school" for failing to meet this requirement. Cal. Educ. Code § 56366.4(a)(1); ER-214. As a result of this "nonsectarian" requirement, private religious schools are wholly excluded from becoming certified nonpublic schools, and children cannot be placed at such schools as a means of implementing their IEP and receiving a FAPE. Indeed, the child's IEP team cannot even consider an uncertified nonpublic school. Cal. Educ. Code §§ 56034, 56505.2(a).

Nor can a religious school interested in becoming a certified nonpublic school petition for a waiver of the nonsectarian status requirement. *See* Cal. Educ. Code § 56366.2 (permitting waiver of certain requirements, but not the certification requirements contained in § 56366.1); ER-15.

By contrast, an LEA like LAUSD may seek to waive any number of the nonpublic-school certification requirements. Under Section 56366.2(b), certification requirements may be waived if "approved by the board pursuant to Section 56101." *Id.* § 56366.2(b). Section 56101 in turn permits a "public agency" to "request the board to grant a waiver of any provision of this code or regulations adopted pursuant to that provision if the waiver is necessary or beneficial to the content and implementation of the pupil's individualized education program and does not abrogate

any right provided individuals with exceptional needs and their parents or guardians under [IDEA]." *Id.* § 56101(a). The definition of "public agency" includes "special education local plan area[s]" like LAUSD. *Id.* § 56028.5.

### C. Parent Plaintiffs attempt to obtain a religious education for their Children Plaintiffs with disabilities

Parent Plaintiffs Chaya and Jonathan Loffman, Fedora Nick and Morris Taxon, and Sarah and Ariel Perets are Orthodox Jews who sincerely believe that Jewish law—as set forth in the Torah, Talmud, the Shulchan Aruch and other authorities—obligates them to send all their children to schools where they can receive an education both in secular subjects and in their Orthodox Jewish faith. ER-156-57, 163-64, 171-72, 255-57. The Loffmans, Taxons, and Peretses each have multiple children, one of whom has a disability and is also a Plaintiff. ER-156-57, 163-64, 171-72, 257-58, 259-60, 263. But though Parent Plaintiffs have been able to fulfill their religious obligation to provide a Jewish education to their nondisabled children, California's nonsectarian prohibition has forced them to choose between exercising their religion and accessing critical funding needed to provide adequate services to their children with disabilities. ER-158-59, 164-65, 172-76, 258-259, 260-61, 264-65.

***The Loffmans.*** The Loffmans have two children, including their five-year-old son, Plaintiff M.L., who was diagnosed with autism at age 3. ER-156-57, 257. M.L. requires many costly services, including speech,

occupational, and behavioral therapies. ER-157, 258. After his diagnosis, the Loffmans enrolled M.L. in an Orthodox Jewish preschool, where they hoped he would receive an education that nourished his Jewish faith while also providing the support necessary for him to progress developmentally. *Id.* Soon after, the Loffmans learned that California's nonsectarian restriction would make them responsible for the full cost of M.L.'s services if he remained in an Orthodox Jewish school. ER-157, 258-59. Put to the stark choice between exercising their religion and receiving crucial special-education funding, the Loffmans made the difficult decision to keep M.L. enrolled at an Orthodox Jewish school at considerable personal cost. ER-158, 259. They are therefore responsible for paying for M.L.'s 26 hours of weekly therapy and were even forced to discontinue his speech therapy solely due to the exorbitant costs associated with paying for therapies out of pocket. ER-159, 259.

*The Taxons.* The Taxons have three children, including their 15-year-old son, Plaintiff K.T., who was diagnosed with autism around age 2. ER-171-72, 259-60. Consistent with their religious beliefs, the Taxons sent their two nondisabled children exclusively to Orthodox Jewish schools. ER-172, 259-60. The Taxons wished for K.T. to have the same educational and religious opportunities as his brothers, but the nonsectarian restriction prevented the Taxons from following their beliefs with K.T. because they could not afford to fund all his services themselves. ER-173, 260-61. Thus, unlike their other two children who have been educated

exclusively at Orthodox Jewish schools, K.T. has been enrolled exclusively at public schools. ER-173-74, 261.

The Taxons believe that K.T. is not receiving a FAPE in public school, but that he would receive one in an Orthodox Jewish school. ER-174, 262. K.T. misses out on needed special education and related services both for secular and religious holidays and is repeatedly served nonkosher food. *Id.* But California's law prohibits the Taxons from seeking, as part of K.T.'s IEP team, placement in an Orthodox Jewish school pursuant to his IEP. ER-175. Thus, the Taxons must continue not to follow their religious beliefs so that K.T. can receive needed services. ER-172, 175. Every day K.T. spends in public school is a lost opportunity to receive both the religious education and disability services his parents believe are necessary to his faith and development. ER-175.

***The Peretses.*** The Peretses have six children, including their 15-year-old son, Plaintiff N.P., who was diagnosed with autism at age 3 and a WAC gene mutation at age 6. ER-163-64, 263. Consistent with their religious beliefs, the Peretses sent their five nondisabled children exclusively to Orthodox Jewish schools. ER-164, 263-64. But like the Taxons, the Peretses have been prevented from following those beliefs with respect to N.P. because they cannot afford the cost of providing for his special education and related services without IDEA funding. ER-164-65, 264-65, 267. Thus, unlike his five siblings, N.P. has received an education mainly in public school. ER-165, 264-65.

The Peretses believe that N.P. is not receiving a FAPE in public school, but they believe he would receive one in an Orthodox Jewish school. ER-165-66, 265-66. N.P. misses out on special education and related services both for secular and religious holidays and is repeatedly given nonkosher food to eat. ER-166-67, 266-67. School officials have even explicitly questioned the Peretses' interpretation of Jewish law, instructing them to send N.P. to school during the Jewish holiday Sukkot. *Id.* But, like for the Taxons, California's nonsectarian restriction prohibits the Peretses from seeking, as part of the IEP team, to have N.P. placed in an Orthodox Jewish school pursuant to his IEP. ER-167-68, 267. Instead, he remains in public school, where day by day he loses the opportunity to receive an education crucial to nurturing his faith and supporting his disability. ER-167-68.

### D. School Plaintiffs attempt to support students with disabilities

The Jean & Jerry Friedman Shalhevet High School and the Samuel A. Fryer Yavneh Hebrew Academy are co-educational, dual-curriculum Orthodox Jewish schools located in Los Angeles, California. ER-180, 186, 267, 269. They are committed to helping Orthodox Jewish parents fulfill their duty to provide an Orthodox Jewish education to their children. ER-181, 187, 267, 269. As such, alongside secular studies, Shalhevet and Yavneh emphasize Torah values and a passion for Torah. ER-180-81, 186-87, 267, 269.

Shalhevet and Yavneh both believe it is important to create a learning environment open to as many in the Jewish community as possible, including students with disabilities. ER-181-82, 187, 268, 269. "[T]he Torah commands members of the Jewish community to care for the most vulnerable, including those with disabilities," and "this means working to ensure that children who are in need obtain the individualized support that each child requires." ER 181, 268. Yavneh already implements some accommodations for students with disabilities, but it wishes to do more. ER-187, 269. However, accommodating the needs of students with disabilities often requires considerable financial resources, which Shalhevet and Yavneh lack. ER-182, 187-88, 268-69. To obtain these needed resources, Shalhevet and Yavneh feel compelled by their faith to determine whether they can be certified as nonpublic schools and thus provide special-education services to students pursuant to their IEPs. ER-181, 187, 268, 269-70. But these schools cannot even begin the process without being put to an impossible choice: attest that they are nonsectarian (and so give up their religious identity) or forgo altogether the opportunity to provide these services. ER-182, 188, 268-70. Shalhevet and Yavneh refuse to disavow their religious character as Jewish educational institutions, and so Defendants have categorically prohibited them from exploring nonpublic-school certification. *Id.*

### E. Proceedings below

On March 13, 2023, Plaintiffs filed this lawsuit, seeking declaratory and injunctive relief against California's nonsectarian restriction. Plaintiffs brought four Free Exercise Clause claims under *Carson v. Makin* (Count I), *Tandon v. Newsom* (Count II), *Fulton v. City of Philadelphia* (Count III), and *Wisconsin v. Yoder* and *Employment Division v. Smith* (Count VI). Plaintiffs also alleged an Equal Protection Clause claim (Count IV) and a violation of the unconstitutional conditions doctrine (Count V).

On May 22, Plaintiffs moved for a preliminary injunction on Counts I, III, and V of their Complaint. Dkt. 28. On May 23, District Defendants LAUSD and Anthony Aguilar filed a motion to dismiss, Dkt. 29, with State Defendants CDE and Tony Thurmond filing their motion to dismiss the next day. Dkt. 31.

The district court heard oral argument on July 21. On August 9, the court denied Plaintiffs' motion for a preliminary injunction and granted Defendants' motions to dismiss. ER-5. The court held that the Taxons and Peretses had standing because the nonsectarian restriction barred them from seeking placements in Orthodox Jewish nonpublic schools for their children with disabilities. ER-42-44. The court, however, found that the Loffmans and School Plaintiffs lacked standing. ER-37, 40-41.

As to the merits, the court rejected the Taxons' and Peretses' Free Exercise *Carson* claim, concluding that this case was distinguishable

from *Carson* because California's "nonsectarian requirement only affects … [whom] [the government] may contract" with to provide an IEP and that the provision of an IEP through nonpublic schools is the same as receiving a public education. ER-49, 51-52. On this basis, the Court also dismissed all remaining claims under the Free Exercise Clause, the Equal Protection Clause, and the unconstitutional conditions doctrine.[7]

This appeal followed.

## STANDARD OF REVIEW

A preliminary injunction is warranted when a plaintiff shows (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent relief, (3) the equities favor relief, and (4) relief is in the public interest. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683 (9th Cir. 2023) (en banc). "When the balance of equities 'tips sharply in the plaintiff's favor,'" a plaintiff need show only "'serious questions' on the merits—a lesser showing than likelihood of success." *Id.* at 684. Here, Plaintiffs request relief requiring Defendants to conduct nonpublic-school certification "in accordance with constitutional processes," which would "prevent[] future constitutional

---

[7] The district court also held that sovereign immunity barred claims against the California Department of Education and the Los Angeles Unified School District, as well as damages claims against Defendants Tony Thurmond and Anthony Aguilar. ER-24-26. Plaintiffs do not appeal those determinations.

violations, a classic form of prohibitory injunction." *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017).

The district court's denial of a preliminary injunction is reviewed for abuse of discretion. *FCA*, 82 F.4th at 680. A district court abuses its discretion when it makes an error of law, and this Court reviews issues of law *de novo*. *Arc of Cal. v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). Dismissals under Rule 12(b)(1) and Rule 12(b)(6) are also reviewed *de novo*. *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1156 (9th Cir. 2007). Where, as here, the challenge to subject-matter jurisdiction is facial, not factual, a court resolves a jurisdictional challenge as it would a Rule 12(b)(6) motion to dismiss. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). Finally, "[i]n First Amendment cases … [courts] review constitutional facts *de novo*[.]" *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 742 (9th Cir. 2021) (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

## SUMMARY OF ARGUMENT

The district court's decision denying Plaintiffs' motion for a preliminary injunction and granting Defendants' motions to dismiss should be reversed and the case remanded with instructions to enter Plaintiffs' requested injunction.

**I.** California's nonsectarian restriction contravenes the Free Exercise Clause because it excludes individuals and schools from accessing benefits under 20 U.S.C. § 1412(a)(10)(B) of IDEA solely because they are

religious. *Carson v. Makin*, 142 S. Ct. 1987 (2022), and other Supreme Court precedents hold that conditioning the availability of benefits on whether an entity is religious violates the First Amendment. California's categorical disqualification of all religious schools from obtaining nonpublic-school certification—the key to unlocking Section 1412(a)(10)(B) benefits—while certifying a wide array of secular private schools is squarely in conflict with these cases.

**II.** The nonsectarian restriction also violates the Free Exercise Clause because it is not generally applicable under *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), and *Fellowship of Christian Athletes v. San Jose Unified School District Board of Education*, 82 F.4th 664. California law grants discretion to the State Board of Education to waive any certification requirement—indeed, "any provision of this code or regulations adopted pursuant to that provision"—upon the request of a public agency. Cal. Educ. Code § 56101(a). That is precisely the type of "formal mechanism for granting exceptions [that] 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879.

**III.** Defendants cannot mount a strict scrutiny affirmative defense. They have no legitimate, much less compelling, interest in discriminating against religious individuals and institutions, and under the historical inquiry required by *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2427-28 (2022), there is a long historical practice permitting public

funding to flow to religious schools for education. Moreover, any public funds directed to nonpublic schools are tied to a child's placement—a decision made by the child's IEP team based on the child's best interest—so Plaintiffs' proposed remedy fits comfortably within the Supreme Court's precedents in *Carson* and *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002). And finally, Defendants already permit public funds to flow to religious schools when parents place children at private schools under 20 U.S.C. § 1412(a)(10)(A) and (C). A "law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020). Defendants therefore possess no cognizable government interest in enforcing the nonsectarian restriction.

Nor is the restriction narrowly tailored to further any government interest. California chose the *broadest* possible means of achieving its ends—a categorical prohibition on all "sectarian" schools. Narrow tailoring does not permit a hatchet job when a scalpel will do.

**IV.** The remaining injunction factors all strongly favor relief. Discriminating based on religious status and violating constitutional rights are themselves irreparable harms, and the equities and public interest favor protecting religious liberty. *FCA*, 82 F.4th at 694-95.

**V.** The district court erred by dismissing Plaintiffs' remaining claims. Plaintiffs plausibly alleged that the nonsectarian restriction violates the Equal Protection Clause and the unconstitutional conditions doctrine by

discriminating based on religion, violating Plaintiffs' fundamental constitutional rights, and conditioning a benefit based on the forfeiture of constitutional rights. And Plaintiffs' remaining Free Exercise Clause claims under *Tandon v. Newsom,* 141 S. Ct. 1294 (2021), and *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972), are independent of their *Carson* claim. Yet the district court never engaged in an independent analysis of these claims, instead improperly dismissing them by merging them with Plaintiffs' *Carson* claim.

**VI.** All Plaintiffs have Article III standing. They have suffered an injury-in-fact that is fairly traceable to Defendants' conduct, and their injury would likely be redressed by a favorable decision. When a discriminatory classification prevents a plaintiff from competing on an equal footing within a benefits scheme, she has established an injury-in-fact.

The district court correctly held that the Taxons and Peretses had standing. Though this was enough to render the entire case justiciable, the district court nonetheless erred in holding that the Loffmans and School Plaintiffs lacked standing because they did not go through the process of obtaining an IEP or applying for nonpublic-school certification. But this Court's precedents reject these types of exercises in futility when determining whether a plaintiff has suffered an injury-in-fact. *See, e.g.*, *Harrison v. Kernan*, 971 F.3d 1069, 1073-74 (9th Cir. 2020) (requiring

exercises in futility to establish injury-in-fact would be an "absurd result").

**ARGUMENT**

## I. California's nonsectarian restriction violates the First Amendment by excluding individuals and institutions from a public benefit because they are religious.

The Free Exercise Clause "'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws" that disfavor religion. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017). In particular, the Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 142 S. Ct. at 1996.

Here, there is no doubt that California's nonsectarian requirement burdens the free exercise rights of all Plaintiffs. As the Supreme Court has long held, "condition[ing] the availability of benefits upon [an individual's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Sherbert v. Verner*, 374 U.S. 398, 406 (1963). That's precisely what California's nonsectarian requirement does.

**A.** ***Carson***, ***Espinoza***, **and** ***Trinity Lutheran*** **prohibit California's exclusion of religious families and schools from Section 1412(a)(10)(B) funding.**

**1. The *Carson* line of precedent.**

Ever since the Free Exercise Clause was incorporated against the states, the Supreme Court has held that states violate the Constitution when they deny religious entities or individuals an equal opportunity to participate in a government-created benefit based on their religious belief, practice, or character. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947) (States "cannot exclude" individuals "because of their faith, or lack of it, from receiving the benefits of public welfare legislation"). Indeed, in *Carson v. Makin*, the Court struck down a program indistinguishable from California's. 142 S. Ct. at 2002. California's nonsectarian restriction directly violates this line of Free Exercise Clause precedent.

In *Carson*, Maine's tuition-assistance program allowed families living in underserved rural areas to attend private schools at the state's expense—but only if the private schools were "nonsectarian." *Id.* at 2002. Like California here, Maine argued that its program was constitutional because the program simply gave those students "a rough equivalent of the public school education that Maine may permissibly require to be secular." *Id.* at 1995.

The Court roundly rejected this argument. As it explained, Maine decided "*not* to operate schools of its own," but instead paid approved private schools "to provide an education to children who live in certain

parts of its far-flung State." *Id.* at 2000. The Court then compared the "educational experience[]" in these approved private schools to that in state-operated public schools and determined (contrary to Maine's claims) that the two were not "equivalent" at all. *Id.* at 1999. Accordingly, the educational assistance program was not merely a means by which Maine provided rural students with a "public school education"; it was a government program "subject to the free exercise principles governing any such public benefit program—including the prohibition on denying the benefit based on a recipient's religious exercise." *Id.* at 1998, 2000.

The Court grounded this decision in the long line of precedent confirming that a government program "exclude[ing] religious observers from otherwise available public benefits" because of their religion amounts to a "indirect coercion or penalt[y] on the free exercise of religion." *Id.* at 1996 (citing, *inter alia, Everson*, 330 U.S. at 16; *Sherbert*, 374 U.S. at 403-04)).

Other cases in this line of precedent include *Espinoza* and *Trinity Lutheran*. In *Espinoza*, the Court rejected exclusion from a state benefit of schools "owned or controlled in whole or in part by any church, religious sect, or denomination." 140 S. Ct. at 2252. Such a law "impose[s] special disabilities on the basis of religious status" in violation of the Free Exercise Clause. *Id.* at 2254. And in *Trinity Lutheran*, the Court noted that "denying a generally available benefit solely on account of religious identity imposes a penalty on the free exercise of religion that can be

justified only by a state interest 'of the highest order.'" 582 U.S. at 458 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality op.)). Missouri's exclusion of religious schools was unconstitutional because that "policy puts [a religious organization] to a choice: It may participate in an otherwise available benefit program or remain a religious institution." *Id.* at 462. And "when the State conditions a benefit in this way, [precedent] says plainly that the State has punished the free exercise of religion." *Id.*

### 2. California's nonsectarian requirement cannot be reconciled with the *Carson* line of precedent.

Here, Defendants' exclusion of religious families and schools from Section 1412(a)(10)(B) funding directly contradicts *Carson*, *Espinoza*, and *Trinity Lutheran*. Indeed, both the text and real operation of the nonsectarian exclusion are indistinguishable from the exclusion found unconstitutional in *Carson*.

**Text.** In *Carson,* the Supreme Court rejected Maine's argument that the private religious schools were providing the equivalent of a public-school education. The Court held that the state statute's text "d[id] not say" that the program's purpose was to provide "a free public education." *Carson*, 142 S. Ct. at 1998-99 ("no suggestion that the 'private school' must somehow provide a 'public' education'"). Instead, the statute confirmed the program's purpose was to allow parents to send their

children to a "public school or the approved private school of the parent's choice at which the student is accepted." *Id.* at 1998.

The same is true here. California certifies and funds nonpublic schools to provide services to children under Section 1412(a)(10)(B) of IDEA. Yet the statute categorically excludes "sectarian" schools from participating in Section 1412(a)(10)(B)-funded special-education services. Cal. Code Regs. tit. 5, § 3001(p). This means that any school "owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose," is excluded outright, while any secular private school can seek certification. *Id.* This also means that families—like Parent Plaintiffs—can seek, as part of the IEP team, to have their Plaintiff children placed in *secular* nonpublic schools but are unequivocally denied the opportunity to seek placement at a *religious* nonpublic school. ER-43. This rule that "[n]o [religious schools] need apply" is "odious to our Constitution." *Trinity Lutheran*, 582 U.S. at 465, 467. In fact, California's law uses nearly identical language to the Montana statute struck down in *Espinoza*. *Compare* Cal. Code Regs. tit. 5, § 3001(p), *with Espinoza*, 140 S. Ct. at 2252 (denying "any public fund or monies … to aid any church" or other entity "controlled in whole or in part by any church, sect, or denomination").

Also like Maine, California's statutes describe nonpublic schools as different from public schools, not as providing a "free public education."

*Carson*, 142 S. Ct. at 1999. Nonpublic schools offer an "alternative" service "available to … parents" who have children with special needs. Cal. Educ. Code § 56366. This is further confirmed by the statute's definition of a "nonpublic, nonsectarian school" as "a *private*, nonsectarian school that enrolls individuals with exceptional needs pursuant to an individualized education program and is certified by the department." Cal. Educ. Code § 56034 (emphasis added). And that distinction is consistent with the State's nonpublic school application website, which notes that the State's "[c]ertification should not be construed as an evaluation, accreditation, approval, recognition, or endorsement of any nonpublic school or course." *New or Renewal NPS Application*, Cal. Dep't of Educ. (Aug. 1, 2023), https://perma.cc/T9CR-7YRJ.[8]

***"Real operation."*** The "real operation" of California's exclusion likewise closely resembles the exclusion in *Carson*. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993). In *Carson*, the Court considered the "program's operation," and the "educational experience[]" provided by approved schools and pointed out that "private

---

[8] The federal government also describes California's nonpublic schools as private: "nonpublic, nonsectarian special education schools enroll both privately enrolled and public school-placed students and therefore, *are considered a type of private school*." *California State Regulations: Private Schools*, U.S. Dep't of Educ., https://perma.cc/6MB4-8KMM (emphasis added).

schools are different by definition because they do not have to accept all students." 142 S. Ct. at 1999. The Court noted that *some* participating private schools were "exempt" from "many of the State's curricular requirements," did not have to hire state-certified teachers, and could be single-sex. *Id.* The Court then concluded: "it is simply not the case that these schools, to be eligible for state funds, must offer an education that is equivalent … to that available in the Maine public schools." *Id.*

Soo too here. Nonpublic schools can, among other things, (1) be single-sex, (2) impose restrictive admissions criteria, (3) be located outside of California, and (4) teach classes through an ideological lens inconsistent with the neutral, secular, and non-sectarian approach required in public schools. *Supra* 11-14 (describing certified nonpublic schools).[9] Nonpublic schools thus do not "provide a public education that conforms to the State's curriculum and standards." ER-52.

For example, California has certified a nonpublic school that offers a "[c]haplain" and "Jewish Mentors" for its students. "Jewish Mentors are entrusted to work with Jewish students to help them grow in their understanding of Jewish thought and practice." And even "Non-Jewish

---

[9] *See School Directory*, Cal. Dep't of Educ., https://perma.cc/P57W-BD2E.

students … benefit from learning and participating in Jewish traditions and celebrations."[10]

Indeed, if anything, California has less of a "public education" claim to make than Maine did in *Carson*. That is for two reasons. One is because California is complying with a federal statute and disbursing federal funds, all under a rubric that foresees "private" school placements. *See, e.g.*, 20 U.S.C. § 1412(a)(10)(B). And what the federal government has called "private" California cannot call "public," particularly when it is using federal funds to do so.

The other reason California's case is even weaker than Maine's is that the "public" in "free appropriate public education" means public funding, not public schooling. *See Dreher*, 22 F.3d at 233 & n.10 ("public" in a "free appropriate public education" is "a term of art which refers to 'public expense,' whether at public or private schools").

In both word and deed, California treats nonpublic schools as *private* schools. These schools provide personalized and tailored educational and special-needs programs to children with disabilities who were not being served well by the State's public-school system. All Plaintiffs want is the same opportunity to seek placement of *their* children in a school program that similarly meets *their* unique needs. California's exclusion of religious schools violates *Carson*.

---

[10] *What We Do: Cultural and Spiritual Program*, Intermountain Residential, https://perma.cc/3YWY-LKNK.

## B. The district court's contrary ruling was error.

There is no dispute that Plaintiffs are categorically excluded from Section 1412(a)(10)(B) funding based solely on their religious character. ER-13. The district court agreed, but justified Plaintiffs' exclusion in two ways. First, it held that placement in nonpublic schools is not subject to *Carson*, but instead is a "framework for certain private schools to contract with the State to provide the State's public education" to children with disabilities. ER-46. Second, it held that Plaintiffs gave up the opportunity to place their children in a religious school by accepting the State's offer of a FAPE. ER-49. Both arguments fail.

### 1. Nonpublic schools do not provide a public education.

The district court recognized that if placement in nonpublic schools were a "benefit" made available to "children eligible for a FAPE under the IDEA, then this case is on all fours with *Carson* … and the nonsectarian requirement here is unconstitutional." ER-47. Nevertheless, the district court accepted Defendants' argument that excluding "sectarian" schools is acceptable because placement in nonpublic schools is merely "a regime whereby the State contractually delegates its responsibility to educate eligible children to private institutions in accordance with … the same State educational standards." ER-50.

But the relevant question when applying *Carson* is whether the "educational experience[]" at nonpublic schools is "equivalent" to the

educational experience in California's public schools. *Carson*, 142 S. Ct. at 1999. As it turns out, nonpublic schools do not have to provide an education that is even a rough equivalent to that provided in California public schools. *Supra* 11-14. But—rather than focus on the factors addressed in *Carson*—the district court adopted Defendants' focus on the various administrative restrictions and regulations that apply to nonpublic schools. ER-51 ("regulatory and contracting scheme" transforms nonpublic schools into "adjuncts of public education agencies").

The district court first pointed to the master contract that nonpublic schools must enter into with an LEA, claiming this distinguishes them from the schools in *Carson*. ER-14, 46. But this actually proves Plaintiffs' point: LEAs don't contract with their own public schools to provide educational services—they simply control them. And they don't "deem" students to be enrolled in public school for accounting purposes—they *are* enrolled in public school. ER-14. Regardless, the relevant line between a public benefit subject to the First Amendment and the mere implementation of a state program is *not*—as Defendants suggest— whether a contract is involved. *See* ER-117 (claiming *Carson* is distinguishable because the school district there did not "contract with a private entity for such schooling").

If Defendants were right, *Fulton* would have come out differently. There, Philadelphia claimed it was acting pursuant to a contract and

therefore "should have a freer hand [under the First Amendment] when dealing with contractors." *Fulton*, 141 S. Ct. at 1878. The Supreme Court rejected this argument, instead confirming it "ha[d] never suggested that the government may discriminate against religion when acting in its managerial role." *Id*. The fact that nonpublic schools must sign a contract therefore says nothing about whether the State can exclude Plaintiffs.

Moreover, the various contract requirements Defendants point to are hardly unusual. In *Fulton*, the city contract was 89 pages long and similarly imposed burdensome monitoring and auditing requirements. Joint Appendix Vol. II at 623-25, *Fulton*, 141 S. Ct 1868 (2021) (No. 19-123). Despite the city's significant funding and detailed oversight of private foster agencies, the Supreme Court nevertheless rejected the argument that private foster agencies were a mere "mechanism to allow the [city] to meet its obligation to" provide foster care services to kids in need. ER-46. Catholic Social Services instead retained its First Amendment rights. *Fulton*, 141 S. Ct. at 1878 (rejecting argument that entering into detailed government contract stripped Catholic foster agency of its rights). The same is true of Jewish schools.

The district court also repeatedly pointed to Cal. Code Regs. tit. 5, § 3070, which states that the "public education agency which developed the IEP shall award the diploma," as evidence nonpublic schools are essentially extensions of public schools. ER-14, 51. But this regulation refers to an *IEP diploma*—an alternative diploma issued by the state to

signify only that the student has completed their own personalized course of study under the IEP. Cal. Code Regs. tit. 5, § 3070 (confirming "completion of prescribed course of study designated in the pupil's IEP"). Nonpublic schools still issue their own high school graduation diplomas.

Similarly, the district court cited Cal. Educ. Code § 56365, which states that for "all purposes of Chapter 4," students enrolled in nonpublic schools are "deemed" enrolled in public schools. ER-14. But this designation is an accounting mechanism to ensure that nonpublic school students are still counted for federal, state, and local funding purposes. The same provision explains that, based on this designation, the LEA "shall be eligible to receive allowances … for services that are provided to individuals with exceptional needs" and that the LEA in turn "shall pay to the nonpublic, nonsectarian school the full amount of the tuition … for individuals with exceptional needs that are enrolled … pursuant to the contract." Cal. Educ. Code § 56365(b), (d). What is more, part (c) of this same provision specifically notes that nonpublic schools are *not* "state-operated" for purposes of federal funding, further confirming that state law does not treat nonpublic schools as equivalent to public schools. *Id.* § 56365(c).

### 2. Plaintiffs cannot be forced to accept second-class status because they are religious.

Unable to show that nonpublic schools provide students with the equivalent of a public-school "educational experience[]," *Carson*, 142

S. Ct. at 1999, Defendants argued that Plaintiffs could have placed their children in a religious school via the Section 1412(a)(10)(A) method, *supra* at 9, and that by instead enrolling their children with disabilities in the public school system, they "accepted the state's free public education" along with whatever strings the State chose to attach. *See, e.g.*, ER-108, 118, 123. The district court accepted this argument. ER-49-50.

But receiving guaranteed, tailor-made services through an IEP at a private school is far superior to the mere hope of obtaining some amount of "equitable services" under Section 1412(a)(10)(A), or having to attempt post-hoc reimbursement under Section 1412(a)(10)(C) with no guarantee of any reimbursement. Only private school placement at a nonpublic school pursuant to an IEP guarantees access to all the services necessary for students with disabilities to receive an education. *See* ER-47-49 (Section 1412(a)(10)(A) children do not have right to same individualized special education services); ER-251-52 (describing services provided under IDEA); *see also D. R. ex rel. R. R. v. Redondo Beach Unified Sch. Dist.*, 56 F.4th 636, 647 (9th Cir. 2022) (describing the Section 1412(a)(10)(C) process as a "form of discretionary equitable relief").

Defendants' attempt to shunt religious groups into sub-optimal alternative funding methods must fail. Otherwise, governments could always exclude religion from their flagship initiatives as long as a separate-but-inferior program with fewer benefits remained available to

religious groups and individuals. Such "religious gerrymanders" are not allowed under the First Amendment. *Carson*, 142 S. Ct. at 2000 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring)); *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 215 (2013) ("Congress cannot recast a condition on funding as a mere definition of its program in every case, lest the First Amendment be reduced to a simple semantic exercise.").

Defendants' argument also runs headlong into the facts of *Carson*. The plaintiff parents there similarly *opted into* Maine's public school system. Like the Parent Plaintiffs here, they could have sent their children directly to private school, but instead they sought to participate in Maine's publicly funded educational-assistance program and were rejected because the school they chose was religious. *Carson*, 142 S. Ct. at 1994-95. As in *Carson*, the solution is therefore *not* for Plaintiff parents to pull their children out of California's public schools at their own expense; it is to remove the unconstitutional restriction on Section 1412(a)(10)(B) funding that is barring them from participating on account of their religion.[11] Plaintiffs cannot be forced into a second- or

---

[11] Nor does a public benefit need to be open to all citizens to constitute a generally available benefit. In *Carson*, only families living in certain rural parts of the State qualified for the benefit. 142 S. Ct. at 1993. Here, only families for whom nonpublic school placement is determined to be in their child's best interest by their IEP team are eligible. *Supra* 5-6. Regardless of the scope of the program, the constitutional infirmity is the religion-based exclusion.

third-best option simply because of their religion. *Shurtleff v. City of Boston*, 142 S. Ct. 1583, 1595 (2022) (Kavanaugh, J., concurring) ("Under the Constitution, a government may not treat religious persons, religious organizations, or religious speech as second-class.").

## II. California's nonsectarian restriction violates the First Amendment because it is not generally applicable.

California's exclusion of religious schools separately violates the Free Exercise Clause because the nonpublic-school certification process contains "a formal mechanism for granting exceptions [that] invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879 (cleaned up). Indeed, "the mere existence of government discretion is enough to render a policy not generally applicable." *FCA,* 82 F.4th at 685 (citing *Fulton*, 141 S. Ct. at 1879). So long as "a mechanism for individualized exemptions" exists," the law violates one of the "bedrock requirements of the Free Exercise Clause that the government may not transgress, absent a showing that satisfies strict scrutiny." *Id.* at 686; *Fulton*, 141 S. Ct. at 1877, 1881.

*Fulton* and *FCA* control the general applicability question here. In *Fulton*, Philadelphia argued that a religious foster care agency's refusal to certify same-sex couples violated a non-discrimination provision in the City's standard foster care contract with the agency. 141 S. Ct. at 1875. But the City's contracts incorporated "a system of individual exemptions, made … at the 'sole discretion' of the Commissioner," which allowed the

Commissioner to exempt agencies from the contract's non-discrimination requirements. *Id.* at 1878. This "formal system of entirely discretionary exceptions" rendered the "non-discrimination requirement not generally applicable." *Id.* This was so, the Court reasoned, even though the Commissioner had never granted an exemption under the disputed contractual provision, because "[t]he creation of a formal mechanism for granting exceptions … 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." *Id.* at 1879; *see also FCA*, 82 F.4th at 687. In other words, "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Fulton*, 141 S. Ct. at 1877.

In *FCA*, this Court held that a school district's "discretion to grant individualized exemptions" from its student group antidiscrimination policy "on an ad hoc basis" "rendered the policy not generally applicable." *FCA*, 82 F.4th at 687. Other Circuits agree. In *Dahl v. Board of Trustees*, the Sixth Circuit found that a university vaccine policy was "not generally applicable" because the "University retains discretion to extend exemptions in whole or in part." 15 F.4th 728, 733 (6th Cir. 2021) (per curiam); *see also Canaan Christian Church v. Montgomery County*, 29 F.4th 182, 198 (4th Cir. 2022) ("Individualized assessments by the government with a mechanism for granting exceptions also triggers strict scrutiny.").

This case is on all fours with *Fulton* and *FCA*. California's laws governing NPS certification are not generally applicable because they establish a system of individualized exemptions that "invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879 (cleaned up). As explained above, to become a certified nonpublic school, an applicant must satisfy numerous requirements, including attesting to its "[n]onsectarian status." ER-205; Cal. Educ. Code § 56365; Cal. Code Regs. tit. 5, § 3060(d)(6). But similar to the regimes at issue in *Fulton* and *FCA*, California law grants discretion to the State Board of Education to waive any certification requirement—or "any provision of this code or regulations adopted pursuant to that provision" more broadly—upon the request of a public agency. Cal. Educ. Code §§ 56101(a), 56366.2(b). In other words, California has created "a system of individual exemptions, made … at the 'sole discretion' of the [State Board of Education]." *Fulton*, 141 S. Ct. at 1878. It does not matter whether the State Board of Education has ever received a petition to waive the "nonsectarian" requirement; rather, "the mere existence of a discretionary mechanism to grant exemptions" shows that the State's law is not generally applicable, "regardless of the actual exercise." *FCA*, 82 F.4th at 687-88; *Fulton*, 141 S. Ct. at 1879; *Kennedy*, 142 S. Ct. at 2422.

Though the district court opted not to address *Fulton* at all*,* the case cannot be so easily evaded. Where, as here, an undisputed system of

individualized exemptions exists, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Fulton*, 141 S. Ct. at 1877; *FCA*, 82 F.4th at 688 (system of exemptions "removes [the policy] from the realm of general applicability and thus subjects the policy to strict scrutiny").

## III. California's restriction fails strict scrutiny.

Because California's nonsectarian restriction is neither neutral nor generally applicable, it must survive "the strictest scrutiny," *Trinity Lutheran*, 582 U.S. at 458. To pass, laws must serve "interests of the highest order,'" *Fulton*, 141 S. Ct. at 1881, and "be 'narrowly tailored'" to achieve that interest. *FCA*, 82 F.4th at 694 (quoting *Lukumi*, 508 U.S. at 546). Because the district court concluded that *Carson* did not apply and declined to analyze Plaintiffs' claim under *Fulton*, it never reached strict scrutiny. But California's scheme fails strict scrutiny at both hurdles.

***Compelling governmental interest.*** In district court, Defendants invoked antiestablishment interests. ER-123-28; ER-149-52 (invoking *Lemon v. Kurtzman*, 403 U.S. 602 (1971) and its progeny). But the Supreme Court has made clear that any Establishment Clause inquiry must focus on "historical practices and understandings." *Kennedy*, 142 S. Ct. at 2427-28. And in the context of public funding for religious schools, the Court has also explained that "there is no 'historic and substantial' tradition against aiding private religious schools." *Carson*,

44

142 S. Ct. at 2002 (cleaned up). Rather, history demonstrates that financial support for religious education did not constitute an establishment of religion.

"In the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones." *Espinoza*, 140 S. Ct. at 2258. "Far from prohibiting such support, the early state constitutions and statutes actively encouraged this policy," including by making grants to private religious schools for the education of the poor. *Id.*

In fact, "[b]oth before and after the ratification of the First Amendment, the federal government and virtually every state that ended church taxes also funded religious activity—specifically, religious schools of all kinds." Mark Storslee, *Church Taxes and the Original Understanding of the Establishment Clause*, 169 U. Penn. L. Rev. 111, 117 (2020). "Even denominations … which were in the vanguard of disestablishmentarianism … sought and received legislative grants for support of their colleges and seminaries." Nathan Chapman & Michael McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 119 (2023). "[T]he most vocal opponents of the Virginia assessment, for example, supported public subsidies for denominational schools even as they dismantled the old establishment." *Id.* This "pervasive" historical practice clarifies that "where the government's interest in providing funding rested on

something other than financing religion for its own sake," it was "wholly unobjectionable." Storslee, *Church Taxes* at 117, 185-86; *see also* Stephanie H. Barclay, Brady Earley & Annika Boone*, Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 558 (2019) (similar).

Here, California is providing funding to nonpublic schools to educate and provide services to students with disabilities. It is not financing religion for religion's sake. Moreover, nonpublic school funding is tied to a child's placement—a decision made by the child's IEP team based on what is in that child's best interest—and, as the State concedes, a student's parents "must consent" to the proposed placement. ER-125. This funding therefore fits comfortably within the rule of *Carson* and *Zelman*.

Even putting historical practice aside, a "law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Espinoza*, 140 S. Ct. at 2261. That dooms Defendants' compelling interest arguments, as Defendants' purported interest cannot be compelling because California *already* provides funding to religious schools when children with disabilities are placed in those schools under Section 1412(a)(10)(A) or (C). ER-49 (noting California reimburses parents who send children to religious schools). Since California already gives public funding to private religious schools to help disabled children, it can hardly have a compelling interest in excluding religious schools from applying to become nonpublic schools.

***Narrow tailoring.*** Below, Defendants simply asserted, without any support, that "the nonsectarian requirement is narrowly tailored to serve compelling state interests." ER-128 152. Since strict scrutiny is an affirmative defense, that failure to argue the issue in the lower court is by itself enough to find that Defendants have not carried their burden of proving strict scrutiny and to deny their motions. *See, e.g.*, *FCA*, 82 F.4th at 694 ("The District essentially concedes that it cannot meet [strict scrutiny] as it has offered no arguments to the contrary.").

But it also fails on its own terms: categorically excluding religious schools is the bluntest instrument Defendants could possibly employ—a "vastly overinclusive" statute that therefore fails narrow tailoring. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011).

## IV. The remaining injunction factors favor relief.

### A. Plaintiffs will suffer irreparable harm absent relief.

"[I]rreparable harm is relatively easy to establish in a First Amendment case because the party seeking the injunction need only demonstrate the existence of a colorable First Amendment claim." *FCA*, 82 F.4th at 694-65 (cleaned up). That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 694 (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020)).

Plaintiffs more than satisfy this relaxed bar. California categorically excludes religious families and schools from an otherwise-available

public benefit solely because they are religious. That clear-cut First Amendment violation remains imminent and ongoing so long as the nonsectarian restriction exists.

In district court, State Defendants conceded that the loss of First Amendment rights constitutes irreparable harm, but claimed that Plaintiffs' harms were speculative and non-imminent because Shalhevet and Yavneh could continue operating as Jewish Orthodox schools and individual Plaintiffs could still practice their faith. That grossly mischaracterizes Plaintiff's injury, which continues to harm Children Plaintiffs each day they are deprived of the proper placement and School Plaintiffs each day they cannot apply for nonpublic-school certification. There is nothing speculative or non-imminent about this ongoing, definite harm.

## B. The balance of harms and public interest favor injunctive relief.

"The 'balance of equities' concerns the burdens or hardships to [Plaintiffs] compared with the burden on Defendants if an injunction is ordered." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). "The 'public interest' mostly concerns the injunction's impact on nonparties[.]" *Id.* (cleaned up). When the government is the party opposing a preliminary injunction, these two factors "merge into one inquiry," *Id.*, which likewise favors granting a preliminary injunction. When plaintiffs "raise[] serious First Amendment questions, that alone

compels a finding that the balance of hardships tips sharply in [their] favor." *FCA*, 82 F.4th at 695 (cleaned up). Similarly, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* Accordingly, because California law violates Plaintiffs' constitutional rights, the balance of equities and the public interest strongly support granting a preliminary injunction.

## V. The district court improperly dismissed Plaintiffs' remaining claims based on its erroneous analysis of *Carson*.

The district court also erred by granting Defendants' motions to dismiss.

*Equal Protection (Count IV).* The Equal Protection Clause "guarantees that the government will not classify individuals on the basis of impermissible criteria." *Seeboth v. Allenby*, 789 F.3d 1099, 1104 (9th Cir. 2015). Courts must determine whether the classification "burdens a 'suspect' or 'quasi-suspect' class." *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001). Here, that is undoubtedly the case, as the nonsectarian restriction draws categorical distinctions based on religion, and "[r]eligion is a suspect class." *Al Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022). Moreover, the Equal Protection Clause also protects against "burdens [on] the exercise of a constitutional right," *Ball*, 254 F.3d at 823, and the nonsectarian restriction burdens Plaintiffs' free exercise rights such that strict scrutiny is also warranted, *Prince v. Jacoby*, 303 F.3d

1074, 1078 (9th Cir. 2002); *see also Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974) (same).

***Unconstitutional conditions (Count V)***. "[E]ven though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, … [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); *see also AOSI*, 570 U.S. at 214. This is especially true in First Amendment cases, as "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996).

Here, the district court erred by holding that only School Plaintiffs brought the unconstitutional conditions claim, so it did not need to address the question because School Plaintiffs lacked standing. ER-53 n.1. But *all* Plaintiffs raised the claim in the complaint, ER-276-77, and as explained below, School Plaintiffs possess standing. Parent Plaintiffs are unable to seek placement for their children in a religious nonpublic school that best fits their child's needs because of the nonsectarian restriction. And the nonsectarian restriction also forces private religious schools to abandon their religious identity as a prerequisite to applying for NPS certification. This forced surrender of Plaintiffs' free exercise rights violates the unconstitutional conditions doctrine.

**Tandon *and* Yoder *(Counts II and VI).*** The district court dismissed Plaintiffs' *Tandon* and *Yoder* claims without so much as citing either case or acknowledging that neither the State nor District Defendants directly addressed Count II in their briefing. ER-115-28, 144-48. Instead, the court erroneously held that because Plaintiffs' claims under *Carson* failed, so too must their claims under *Tandon* and *Yoder*. ER-53. That legal error alone warrants reversal.

In any event, Plaintiffs have plausibly alleged their claims in Counts II and VI. California's law permits District Defendants to petition for a waiver of the nonpublic-school certification requirements, but the law categorically excludes all religious schools from being able even to seek a waiver. The law thus "treats comparable secular activity"—here running a nonreligious school—"more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296, 1298.

The Complaint also states a claim under *Yoder*. "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Yoder*, 406 U.S. at 214; *see also Emp. Div. v. Smith*, 494 U.S. 872, 881 (1990) ("the right of parents … to direct the education of their children" receives heightened scrutiny). Parent Plaintiffs are obligated to send their children to Orthodox Jewish schools but cannot do so because California's nonsectarian restriction excludes religious schools from the

public funding that would make this a viable choice. And School Plaintiffs cannot offer their religious education to children with disabilities because of California's religious discrimination. The nonsectarian restriction thus effectively forecloses Plaintiffs' ability to choose or offer a religious education for children with disabilities.

The shrift the district court gave these claims was too short. This Court should reverse the dismissal of Counts II, IV, V, and VI.

## VI. Plaintiffs have standing to pursue their claims.

Defendants spilled considerable ink below arguing that no plaintiff had standing to pursue any claim. The district court correctly rejected those arguments with respect to the Taxons and Peretses, ER-41-44, but it reached the opposite and erroneous conclusion as to the Loffmans and School Plaintiffs, ER-33-41. Because the district court correctly concluded the Taxons and Peretses have standing, this Court need not reach the standing of the remaining Plaintiffs. *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."). However, viewing the complaint in the light most favorable to Plaintiffs also demonstrates that each has standing.

### A. Plaintiffs have suffered an injury-in-fact.

To establish standing, Plaintiffs must show "(1) that they have suffered an injury in fact, (2) that their injury is fairly traceable to a defendant's conduct, and (3) that their injury would likely be redressed by a favorable decision." *Mecinas v. Hobbs*, 30 F.4th 890, 896 (9th Cir.

2022). Each element should be supported "with the manner and degree of evidence required at the successive stages of the litigation." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011). "At this very preliminary stage, plaintiffs may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden." *City & Cnty. of San Francisco v. USCIS*, 944 F.3d 773, 787 (9th Cir. 2019) (cleaned up). "And they need only establish a *risk* or *threat* of injury to satisfy the actual injury requirement." *Id.* (cleaned up).

"For standing purposes, [courts] accept as valid the merits of [plaintiffs'] legal claims," *FEC v. Cruz*, 596 U.S. 289, 298 (2022), and "both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party," *Maya*, 658 F.3d at 1068.

## 1. Plaintiffs have sufficiently pleaded a discriminatory classification constituting an injury-in-fact.

Plaintiffs challenge California's nonsectarian restriction because, by explicitly discriminating on the basis of religion, it prevents Plaintiffs from seeking access to special-education benefits on an equal basis with nonreligious individuals and institutions. *See Trinity Lutheran*, 582 U.S. at 463 ("The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a

grant."). "[A]llegation[s] that some discriminatory classification prevent[s] the plaintiff from competing on an equal footing in its quest for a benefit" suffice to show injury-in-fact. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 667 (1993) (*AGC*); *see also City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) ("[The] inability to compete on an even playing field constitutes a concrete and particularized injury.").

The identification of a discriminatory barrier in a benefits scheme suffices to demonstrate standing for potential claimants, even if Plaintiffs cannot show they ultimately would receive that benefit. *AGC*, 508 U.S. at 666; *Barr*, 929 F.3d at 1173; *see also Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) ("[E]ven if Bakke had been unable to prove that he would have been *admitted* in the absence of the special program, it would not follow that he lacked standing."). This is because, even "assum[ing]" that Plaintiffs will not ultimately obtain the benefit, courts must recognize the "federal constitutional right to be considered … without the burden of invidiously discriminatory disqualifications." *Turner v. Fouche*, 396 U.S. 346, 362 (1970). Thus, the injury flows from the "denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Bras v. Cal. Pub. Utilities Comm'n*, 59 F.3d 869, 873 (9th Cir. 1995).

These cases describe Plaintiffs' challenge. California's religious discrimination erects a categorical barrier that allows Plaintiffs to

receive disability benefits only "on an unequal basis." *Id.* As the district court explained, "the nonsectarian requirement prevents parents who think that placement in a religious private school would better suit their child's needs from making that argument, while allowing parents who prefer placement in a secular private school to at least make the argument." ER-43. The same is true of School Plaintiffs: while a secular private school may compete "on an even playing field" with every other private secular school—including out-of-state schools—to become certified as an NPS, religious schools cannot. *Barr*, 929 F.3d at 1173. Under binding precedent, this "denial of equal treatment resulting from the imposition of the barrier" is more than enough for standing. *Bras*, 59 F.3d at 873.

## 2. The Loffmans have standing.

Applying this binding caselaw, the district court had no trouble concluding that the Taxons and Peretses had standing. ER-41-44. That ought to have been the end of the matter, since "in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009); *Mecinas*, 30 F.4th at 897 (same for motion to dismiss).

Nevertheless, the district court assessed the Loffmans' standing separately, concluding that because the Loffmans never sought an IEP or evaluation from LAUSD, they had suffered nothing more than an

"amorphous and hypothetical" injury. ER-40. This conclusion grossly mischaracterizes standing caselaw and the complaint's allegations.

"'[T]he gist of the question of standing' is whether petitioners have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'" *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). The plaintiff need only show that he is affected "in a personal and individual way" by the challenged conduct. *Meland v. Weber*, 2 F.4th 838, 844 (9th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). There can be no doubt that the Loffmans readily meet these criteria. Their son, M.L., has an autism diagnosis, resulting in the need for behavioral, occupational, and speech therapy. ER-157, 257-59. The Loffmans were informed that, without an IEP, they would be forced to pay for these services out of pocket. ER-157-58, 258-59. But they knew that pursuing an IEP would be an exercise in futility, because the nonsectarian restriction means they could never negotiate as part of the IEP team for the placement that they think meets M.L.'s needs. ER-159, 259. They thus continue to pay weekly for his 26 hours of therapy out-of-pocket and have had to discontinue M.L.'s speech therapy due to the exorbitant cost. ER-159, 259. This is hardly an "undifferentiated, generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007). Rather, the Loffmans continue to be

harmed each and every day by a law that unquestionably restricts their ability to seek a placement that will meet their child's educational needs at no cost to the family.

At bottom, the district court faulted the Loffmans for not proceeding through the futile and costly process of obtaining an IEP, even though the district court itself recognized that had they done so, the nonsectarian restriction would have "ma[de] it impossible for [Plaintiffs] to … advocat[e] for possible placement in an Orthodox Jewish school." ER-43. This Court has repeatedly stated that plaintiffs need not engage in futile exercises to establish standing, particularly where constitutional rights are at stake. *See Harrison*, 971 F.3d at 1074 (requiring exercises in futility to establish standing in equal protection challenges would be an "absurd result"); *Real v. City of Long Beach*, 852 F.3d 929, 934 (9th Cir. 2017) ("[Plaintiff] was not required to first apply for, and then be denied, a [permit] to bring this [First Amendment] claim[.]"); *Desert Outdoor Advert., Inc. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir. 1996) (similar); *see also Kerr Ctr. Parents Ass'n v. Charles*, 897 F.2d 1463, 1469 (9th Cir. 1990) ("Exhaustion [under IDEA] is not required where it would be futile[.]").

So too here. The Loffmans need not expend time and resources seeking recourse in a system that inevitably will leave them right back where they started: pressured by California's nonsectarian exclusion to choose between their son's education and their religion. The nonsectarian

restriction has made even applying for an IEP futile, and their decision to forgo nonpublic-school placement entirely because of its undisputed discrimination does not defeat standing.

### 3. The School Plaintiffs have standing.

The district court concluded that School Plaintiffs lack standing because they are not "able and ready" to seek NPS certification. ER-32-37; *see AGC*, 508 U.S. at 666. This holding also misses the mark.[12]

The "able and ready" inquiry addresses "intent," which ensures the presence of a sufficient injury-in-fact. *Gratz v. Bollinger*, 539 U.S. 244, 261-62 (2003). In the *pleading* context, alleging this intent is not a high bar. Indeed, the Supreme Court has already held that general allegations that a discriminatory barrier prevented a plaintiff from even applying to a governmental program met this test. *See AGC*, 508 U.S. at 659. This makes sense, since when "ruling on a motion to dismiss for want of standing," courts "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining

---

[12] This Court need not find that School Plaintiffs have standing to recognize Parent and Children Plaintiffs' standing. As the district court recognized, an Article III injury arises through "the lost opportunity to find a religious secondary education that would qualify for public funding for their children," even where no school has yet been certified. ER-38 (discussing *Carson v. Makin*, 979 F.3d 21, 30-31 (1st Cir. 2020)); *see also Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015) ("[E]qual treatment under law is a judicially cognizable interest that satisfies the case or controversy requirement of Article III, even if it brings no tangible benefit to the party asserting it.").

party." *Maya*, 658 F.3d at 1068. And "general factual allegations of injury resulting from the defendant's conduct may suffice" because courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (cleaned up).

School Plaintiffs satisfy this low threshold. They desire and intend to explore the NPS process as a means of meeting their religious obligations to serve children with disabilities. ER-267-69. Yavneh already serves disabled students in some capacity but wishes to do more. ER-269. They are aware of the nonpublic-school certification requirements and, upon information and belief, believe they are capable of satisfying them. ER-268, 270. But they know that pursuing certification is currently futile because of California's nonsectarian restriction. ER-268-70. Nothing more is required at this stage.

In holding to the contrary, the district court relied almost exclusively on four cases "decided at summary judgment." ER-30 (discussing *Carney v. Adams*, 141 S. Ct. 493, 498 (2020); *Bras*; *Barr*; *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003)). When contrasted with the evidence of intent adduced in those cases, the court concluded that School Plaintiffs came up short. ER-36-37.

This was error. "[A]t the summary judgment stage, a plaintiff must offer *evidence and specific facts* demonstrating each element" of standing. *Ctr. for Biological Diversity v. Export-Import Bank*, 894 F.3d 1005, 1012 (9th Cir. 2018) (emphasis added); *see also Lucas v. S.C. Coastal Council*,

505 U.S. 1003, 1012 n.3 (1992). Thus courts unsurprisingly scour a developed evidentiary record to assess whether a plaintiff is "able and ready" to pursue the benefit. That explains why the vast majority of "able and ready" cases arise on summary judgment. But on a motion to dismiss, Plaintiffs need only "'alleg[e] *facts* demonstrating each element' of standing," including their intent. *Namisnak v. Uber Technologies, Inc.*, 971 F.3d 1088, 1092 (9th Cir. 2020) (emphasis added). Moreover, this Court has repeatedly refused to force plaintiffs to engage in futile exercises before finding they had standing to vindicate their constitutional rights. *Harrison*, 971 F.3d at 1073-74; *Real*, 852 F.3d at 932-34; *Desert Outdoor*, 103 F.3d at 818. It should not begin doing so now. Nothing in this Court's caselaw requires School Plaintiffs to expend exorbitant time and resources satisfying the "extensive" nonpublic-school requirements, ER-34, before they can even approach the courthouse doors.

Here, reading the complaint in the light most favorable to School Plaintiffs, they have adequately alleged that they have evaluated all nonpublic-school requirements and can meet them—just like the hundreds of other schools that have successfully navigated the process. They also allege they have been cut off at the outset by the existence of a facial and categorical barrier that no party disputes and that they intend

to continue moving forward should that barrier be removed. *See AGC*, 508 U.S. at 659. That suffices at this early stage.[13]

Given the ease with which a plaintiff can satisfy the "able and ready" test in its complaint, it is not surprising that the district court cited only two (out-of-circuit) cases applying the "able and ready" test in the pleadings context. *See Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200 (3d Cir. 2021); *Aaron Priv. Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1337 (11th Cir. 2019); ER-31-32, 36. *Ellison* challenged a regime governing medical staff privileges under antitrust laws, 11 F.4th at 203, and *Aaron* concerned claims that licensing restrictions on narcotic treatment facilities led to lost profits, 912 F.3d at 1336-37. Thus, neither "involve[d] an allegation that some discriminatory classification prevented the plaintiff from competing on an equal footing in its quest for a benefit." *AGC*, 508 U.S. at 667; *see also id.* at 667-68 (contrasting what a party must show to have standing when claiming lost "business opportunities and profits" compared to a discriminatory barrier). The district court therefore erred by relying on these cases.

---

[13] The district court faulted School Plaintiffs because they alleged no past history of receiving an NPS certification. ER-36. But how could School Plaintiffs possibly have alleged such history, given California's decades-long persistence in barring them?

## B. Plaintiffs' injury is traceable to Defendants' conduct and redressable by this Court.

Plaintiffs also easily satisfy the remaining standing elements. Indeed, the district court did not even address causality and redressability with respect to the Taxons and the Peretses. ER-41-44. And for good reason. Plaintiffs' injury-in-fact consists of being subject to the unconstitutional nonpublic-school certification process that discriminates against their religious status. That injury is "fairly traceable" to Defendants' actions enforcing the religious exclusion, and Plaintiffs' requested relief—a declaration and injunction against the religious exclusion—would redress the injury alleged. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000) ("[A] sanction that effectively abates that conduct and prevents its recurrence provides a form of redress."); *see also AGC*, 508 U.S. at 666 n.5.

## CONCLUSION

This Court should reverse the judgment of the district court and remand the case with instructions to enter Plaintiffs' requested injunction.

Respectfully submitted,

*/s/Eric C. Rassbach*

ERIC C. RASSBACH
  *Counsel of Record*
NICHOLAS R. REAVES
DANIEL L. CHEN
LAURA WOLK SLAVIS
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*erassbach@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

October 25, 2023

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 13,981 words, excluding the portions exempted by Fed. R. App. P. 32(f). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

*/s/ Eric C. Rassbach*
Eric C. Rassbach

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 25, 2023. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Eric C. Rassbach
Eric C. Rassbach

**ADDENDUM**

Pertinent Constitutional Provisions, Treaties, and Statutes

# Table of Contents

**Page**

First Amendment ......................................................................68

20 U.S.C. § 1412 ....................................................................69

Cal. Educ. Code § 56034.........................................................79

Cal. Educ. Code § 56040.........................................................79

Cal. Educ. Code § 56365.........................................................79

Cal. Educ. Code § 56366.........................................................80

Cal. Educ. Code § 56366.1......................................................80

Cal. Educ. Code § 56505.2......................................................81

Cal. Code Regs. tit. 5, § 3001 .................................................81

Cal. Code Regs. tit. 5, § 3060 .................................................81

Cal. Educ. Code § 56366.2......................................................82

Cal. Educ. Code § 56101 ........................................................82

## First Amendment to the United States Constitution

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

**20 U.S.C. § 1412**
**State eligibility**

**(a) In general**

A State is eligible for assistance under this subchapter for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets each of the following conditions:

**(1) Free appropriate public education**

**(A) In general**

A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school.

\* \* \*

**(10) Children in private schools**

**(A) Children enrolled in private schools by their parents**

**(i) In general**

To the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this subchapter by providing for such children special education and related services in accordance with the following requirements, unless the Secretary has arranged for services to those children under subsection (f):

**(I)** Amounts to be expended for the provision of those services (including direct services to parentally placed private school children) by the local educational agency shall be equal to a proportionate amount of Federal funds made available under this subchapter.

**(II)** In calculating the proportionate amount of Federal funds, the local educational agency, after timely and meaningful consultation with representatives of private schools as described in clause (iii), shall conduct a thorough and complete child find process to determine the number of parentally placed children with disabilities attending private schools located in the local educational agency.

**(III)** Such services to parentally placed private school children with disabilities may be provided to the children on the premises of private, including religious, schools, to the extent consistent with law.

**(IV)** State and local funds may supplement and in no case shall supplant the proportionate amount of Federal funds required to be expended under this subparagraph.

**(V)** Each local educational agency shall maintain in its records and provide to the State educational agency the number of children evaluated under this subparagraph, the number of children determined to be children with disabilities under this paragraph, and the number of children served under this paragraph.

### (ii) Child find requirement

#### (I) In general

The requirements of paragraph (3) (relating to child find) shall apply with respect to children with disabilities in the State who are enrolled in private, including religious, elementary schools and secondary schools.

#### (II) Equitable participation

The child find process shall be designed to ensure the equitable participation of parentally placed private school children with disabilities and an accurate count of such children.

#### (III) Activities

In carrying out this clause, the local educational agency, or where applicable, the State educational agency, shall undertake activities similar to those activities undertaken for the agency's public school children.

#### (IV) Cost

The cost of carrying out this clause, including individual evaluations, may not be considered in determining whether a local educational agency has met its obligations under clause (i).

#### (V) Completion period

Such child find process shall be completed in a time period comparable to that for other students attending public schools in the local educational agency.

### (iii) Consultation

To ensure timely and meaningful consultation, a local educational agency, or where appropriate, a State educational agency, shall consult with private school representatives and representatives of parents of parentally placed private school children with disabilities during the design and development of special education and related services for the children, including regarding—

**(I)** the child find process and how parentally placed private school children suspected of having a disability can participate equitably, including how parents, teachers, and private school officials will be informed of the process;

**(II)** the determination of the proportionate amount of Federal funds available to serve parentally placed private school children with disabilities under this subparagraph, including the determination of how the amount was calculated;

**(III)** the consultation process among the local educational agency, private school officials, and representatives of parents of parentally placed private school children with disabilities, including how such process will operate throughout the school year to ensure that parentally placed private school children with disabilities identified through the child find process can meaningfully participate in special education and related services;

**(IV)** how, where, and by whom special education and related services will be provided for parentally placed private school children with disabilities, including a discussion of types of services,

including direct services and alternate service delivery mechanisms, how such services will be apportioned if funds are insufficient to serve all children, and how and when these decisions will be made; and

**(V)** how, if the local educational agency disagrees with the views of the private school officials on the provision of services or the types of services, whether provided directly or through a contract, the local educational agency shall provide to the private school officials a written explanation of the reasons why the local educational agency chose not to provide services directly or through a contract.

### (iv) Written affirmation

When timely and meaningful consultation as required by clause (iii) has occurred, the local educational agency shall obtain a written affirmation signed by the representatives of participating private schools, and if such representatives do not provide such affirmation within a reasonable period of time, the local educational agency shall forward the documentation of the consultation process to the State educational agency.

### (v) Compliance

**(I)    In general**

A private school official shall have the right to submit a complaint to the State educational agency that the local educational agency did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school official.

**(II) Procedure**

If the private school official wishes to submit a complaint, the official shall provide the basis of the noncompliance with this subparagraph by the local educational agency to the State educational agency, and the local educational agency shall forward the appropriate documentation to the State educational agency. If the private school official is dissatisfied with the decision of the State educational agency, such official may submit a complaint to the Secretary by providing the basis of the noncompliance with this subparagraph by the local educational agency to the Secretary, and the State educational agency shall forward the appropriate documentation to the Secretary.

**(vi) Provision of equitable services**

**(I) Directly or through contracts**

The provision of services pursuant to this subparagraph shall be provided—

**(aa)** by employees of a public agency; or

**(bb)** through contract by the public agency with an individual, association, agency, organization, or other entity.

**(II) Secular, neutral, nonideological**

Special education and related services provided to parentally placed private school children with disabilities, including materials and equipment, shall be secular, neutral, and nonideological.

**(vii) Public control of funds**

The control of funds used to provide special education and under this subparagraph, and title to materials, equipment, and property purchased with those funds, shall be in a public agency for the uses and purposes provided in this chapter, and a public agency shall administer the funds and property.

**(B) Children placed in, or referred to, private schools by public agencies**

**(i) In general**

Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State.

**(ii) Standards**

In all cases described in clause (i), the State educational agency shall determine whether such schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies.

**(C)** **Payment for education of children enrolled in private schools without consent of or referral by the public agency**

**(i)** **In general**

Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

**(ii)** **Reimbursement for private school placement**

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

**(iii)** **Limitation on reimbursement**

The cost of reimbursement described in clause (ii) may be reduced or denied—

**(I)** if—

**(aa)** at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they

were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

**(bb)** 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

**(II)** if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

**(III)** upon a judicial finding of unreasonableness with respect to actions taken by the parents.

## (iv) Exception

Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement—

**(I)** shall not be reduced or denied for failure to provide such notice if—

**(aa)** the school prevented the parent from providing such notice;

**(bb)** the parents had not received notice, pursuant to section 1415 of this title, of

the notice requirement in clause (iii)(I); or

**(cc)** compliance with clause (iii)(I) would likely result in physical harm to the child; and

**(II)** may, in the discretion of a court or a hearing officer, not be reduced or denied for failure to provide such notice if—

**(aa)** the parent is illiterate or cannot write in English; or

**(bb)** compliance with clause (iii)(I) would likely result in serious emotional harm to the child.

\* \* \*

## Cal. Educ. Code § 56034
## Nonpublic, nonsectarian school

"Nonpublic, nonsectarian school" means a private, nonsectarian school that enrolls individuals with exceptional needs pursuant to an individualized education program and is certified by the department. It does not include an organization or agency that operates as a public agency or offers public service, including, but not limited to, a state or local agency, an affiliate of a state or local agency, including a private, nonprofit corporation established or operated by a state or local agency, or a public university or college. A nonpublic, nonsectarian school also shall meet standards as prescribed by the Superintendent and board.

## Cal. Educ. Code § 56040
## Free appropriate public education for individuals with exceptional needs who are eligible to receive special education instruction and related services

(a) Every individual with exceptional needs who is eligible to receive special education instruction and related services under this part, shall receive that instruction and those services at no cost to his or her parents or, as appropriate, to him or her. A free appropriate public education shall be available to individuals with exceptional needs in accordance with Section 1412(a)(1) of Title 20 of the United States Code and Section 300.101 of Title 34 of the Code of Federal Regulations.

\* \* \*

## Cal. Educ. Code § 56365
## Services provided by nonpublic, nonsectarian schools and agencies; contracts; allowances for services; tuition; report; out-of-state programs

(a) Services provided by nonpublic, nonsectarian schools, as defined pursuant to Section 56034, and nonpublic, nonsectarian agencies, as defined pursuant to Section 56035, shall be made available. These services shall be provided pursuant to Section 56366, and in accordance

with Section 300.146 of Title 34 of the Code of Federal Regulations, under contract with the local educational agency to provide the appropriate special educational facilities, special education, or designated instruction and services required by the individual with exceptional needs if no appropriate public education program is available.

\* \* \*

## Cal. Educ. Code § 56366
**Nonpublic, nonsectarian schools; legislative intent; alternative special education service; contracts; warrants; certification; standards**

It is the intent of the Legislature that the role of a nonpublic, nonsectarian school or agency shall be maintained and continued as an alternative special education service available to a local educational agency and parents.

\* \* \*

## Cal. Educ. Code § 56366.1
**Nonpublic, nonsectarian school or agency; application for certification; multiple sites; review and oversight; expansion of services; conditions required for certification; fees; staff credentials; rules and regulations; safety standards**

(a) A nonpublic, nonsectarian school or agency that seeks certification shall file an application with the Superintendent on forms provided by the department[.]

\* \* \*

**Cal. Educ. Code § 56505.2**

**Placement in or services provided by a nonpublic, nonsectarian school; restrictions upon placement; considerations**

(a) A hearing officer may not render a decision that results in the placement of an individual with exceptional needs in a nonpublic, nonsectarian school, or that results in a service for an individual with exceptional needs provided by a nonpublic, nonsectarian agency, if the school or agency has not been certified pursuant to Section 56366.1.

\* \* \*

**Cal. Code Regs. tit. 5, § 3001**
**Definitions**

\* \* \*

(p) "Nonsectarian" means a private, nonpublic school or agency that is not owned, operated, controlled by, or formally affiliated with a religious group or sect, whatever might be the actual character of the education program or the primary purpose of the facility and whose articles of incorporation and/or by-laws stipulate that the assets of such agency or corporation will not inure to the benefit of a religious group.

\* \* \*

**Cal. Code Regs. tit. 5, § 3060**
**Application for Certification**

(a) Any school, person or agency desiring to obtain certification as a nonpublic school or nonpublic agency shall file an application with the SSPI on forms developed and provided by the CDE.

\* \* \*

(d) The applicant shall submit a signed assurance statement that the nonpublic school will maintain compliance with the following:

* * *

(6) Nonsectarian status[.]

* * *

## Cal. Educ. Code § 56366.2
## Waiver of requirements; petition

(a) A local educational agency, nonpublic, nonsectarian school, or nonpublic, nonsectarian agency may petition the Superintendent to waive one or more of the requirements under Sections 56365, 56366, 56366.3, and 56366.6. The petition shall state the reasons for the waiver request, and shall include the following:

(1) Sufficient documentation to demonstrate that the waiver is necessary to the content and implementation of a specific pupil's individualized education program and the pupil's current placement.

(2) The period of time that the waiver will be effective during any one school year.

(3) Documentation and assurance that the waiver does not abrogate any right provided to individuals with exceptional needs and their parents or guardians under state or federal law, and does not hinder the compliance of a local educational agency with the federal Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.), Section 504 of the federal Rehabilitation Act of 1973 (29 U.S.C. Sec. 794), the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12101 et seq.), and federal regulations relating to those acts.

## Cal. Educ. Code § 56101
## Waivers of code or regulations

(a) A public agency, as defined in Section 56028.5, may request the board to grant a waiver of any provision of this code or regulations adopted

pursuant to that provision if the waiver is necessary or beneficial to the content and implementation of the pupil's individualized education program and does not abrogate any right provided individuals with exceptional needs and their parents or guardians under the federal Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.), or affect the compliance of a local educational agency with the federal Individuals with Disabilities Education Act (20 U.S.C. Sec. 1400 et seq.), Section 504 of the federal Rehabilitation Act of 1973 (29 U.S.C. Sec. 794), and federal regulations relating thereto.

(b) The board may grant, in whole or in part, any request pursuant to subdivision (a) when the facts indicate that failure to do so would hinder implementation of the pupil's individualized education program or compliance by a local educational agency with federal mandates for a free appropriate public education for children or youth with disabilities.