No. 23-55714

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CHAYA LOFFMAN, ET AL.,

*Plaintiffs-Appellants,*

*v.*

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellees.*

On Appeal From the United States District Court
for the Central District of California

Case No. 2:23-cv-01832
Hon. Josephine L. Staton

## BRIEF OF THE NATIONAL COUNCIL OF YOUNG ISRAEL, THE RABBINICAL COUNCIL OF NORTH AMERICA, AND TORAH UMESORAH AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLANTS

Katie Rose Talley
GIBSON, DUNN & CRUTCHER LLP
2011 Ross Ave. Suite 2100
Dallas, TX 73201
Tel.: 214-698-3100
Fax: 214-571-2900

Joshua R. Zuckerman
Jonathan C. Bond
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036-5306
Tel.: 202-955-8500
Fax: 202-467-0539
jzuckerman@gibsondunn.com

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), *amici curiae* make the following disclosures:

*Amici* are Jewish 501(c)(3) membership organizations. The National Council of Young Israel is an umbrella organization for more than one hundred synagogues across the United States. The Rabbinical Council of America is comprised of nearly one thousand Orthodox rabbis throughout the United States and other countries. Torah Umesorah's (National Society for Hebrew Day Schools) membership consists of over 800 day schools and yeshivas.

*Amici* state that they have no parent corporations and that no publicly held corporation owns 10% or more of their stock.

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* .............................................................1

INTRODUCTION ...................................................................................2

ARGUMENT ...........................................................................................6

    I.      Jewish Schools Meet Critical Religious Needs That Public Schools Cannot Fulfill.........................................................6

          a.      Orthodox Judaism Mandates a Religious Duty for Children to Learn About Their Faith. .......................................6

          b.      Jewish Schools Enable Orthodox Jewish Children to Succeed Academically and Grow Spiritually. ............................9

          c.      Public Schools Cannot Meet The Religious And Spiritual Needs of Orthodox Jewish Children. .......................................13

    II.     California's Refusal To Fund Special Education at Jewish Schools is Unlawful. .........................................................15

          a.      The First Amendment Allows The Funding of Secular Special-Education Programs at Religious Schools.................16

          b.      California's Discrimination Against Religious Schools Raises The Specter of Unconstitutional Animus Toward Religion. ...............................................................................22

CONCLUSION .....................................................................................27

CERTIFICATE OF COMPLIANCE ...................................................28

CERTIFICATE OF SERVICE .............................................................29

# TABLE OF AUTHORITIES

## Cases

*Carson v. Makin*,
142 S. Ct. 1987 (2022) ...................................................................... 17, 22

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
508 U.S. 520 (1993) ..................................................... 15, 22, 23, 25

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ........................................................................... 20

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ............................................................................. 18

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020) ........................................................... 4, 17, 22

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of
Educ.*, 82 F.4th 664 (9th Cir. 2023) ................................................ 23, 26

*Kennedy v. Bremerton Sch. Dist.*,
142 S. Ct. 2407 (2022) ........................................... 17, 20, 22, 25, 26

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) ........................................................................... 20

*Little Sisters of the Poor Jeanne Jugan Residence v. California*,
141 S. Ct. 192 (2020) ......................................................................... 25

*Little Sisters of the Poor Peter and Paul Home v. Pennsylvania*,
140 S. Ct. 2367 (2020) ....................................................................... 25

*Loffman v. Cal. Dept. of Educ.*,
No. 2:23-cv-01832, slip op. (N.D. Cal. Aug. 9, 2023) ................... 3, 19

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018) ................................................................ 23, 26

*Nat'l Inst. of Fam. and Life Advocates v. Becerra*,
138 S. Ct. 2361 (2018) ....................................................................... 25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) ..................................................................... 6, 9

*S. Bay United Pentecostal Church v. Newsom*,
141 S. Ct. 716 (2021) ......................................................................... 24

*Schuette v. BAMN*,
572 U.S. 291 (2014) ........................................................................... 17

iii

*Tandon v. Newsom,*
   141 S. Ct. 1294 (2021)..................................................................16, 24

*Teamsters v. United States,*
   431 U.S. 324 (1977)...........................................................................19

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   582 U.S. 449 (2017)........................................ 2, 15, 18, 19, 20, 21, 22

*Westchester Day Sch. v. Vill. of Mamaroneck,*
   417 F. Supp. 2d 477 (S.D.N.Y. 2006) ..................................................6

## Statutes

20 U.S.C. § 1414(d)(1)(B) ...................................................................3, 20

Cal. Code Regs. tit. 5, § 3001(p)..............................................................3

Cal. Educ. Code § 56365(a) ................................................................3, 21

## Other Authorities

Alex Baker, *California Office of Emergency Services aware of
   'potential threats' related to Israel, Gaza* (Oct. 12, 2023) .................12

Alex Pomson *et al.*, *Hearts and Minds: Israel in North American
   Jewish Day Schools*, Avi Chai Foundation, at 10 (Apr. 2014)...........11

Anti-Defamation League, *ADL Records Dramatic Increase in U.S.
   Antisemitic Incidents Following Oct. 7 Hamas Massacre* (Oct. 24,
   2023) ..................................................................................................12

Anti-Defamation League, *Support for Hamas Terror at Anti-Israel
   Rallies Across the U.S.* (Oct. 8, 2023) ...............................................12

Arnold Dashefsky & Cory Lebson, *Does Jewish Schooling Matter? A
   Review of the Empirical Literature on the Relationship Between
   Jewish Education and Dimensions of Jewish Identity*, 23
   Contemporary Jewry 96, 111 (2002) ..................................................14

Boruch Werdiger, *Why I Choose a Yeshiva Education for My
   Children*, Lubavitch International Magazine (May 15, 2023) ............8

Bruce A. Phillips, *Re-examining Intermarriage: Trends, Textures and
   Strategies* (1997)................................................................................12

Christina Daly, *Our schools ace the publics in secular studies*, The
   Jewish Star (Dec. 19, 2018)..............................................................10

David Benkoff, *No, Orthodox Jews cannot 'Just send their kids to
   public school,'* Jewish Journal (Feb. 6, 2017).....................................8

Deuteronomy 6:7 (Stone Edition, The Chumash, ArtScroll
   Translation) (1993) ............................................................................6

Eliana Jordan, *Stanford professor suspended for calling Jewish students 'colonisers'*, The Jewish Chronicle (Oct. 13, 2023), ..........12

Fern Chertok *et al.*, *What Difference Does Day School Make? The Impact of Day School: A Comparative Analysis of Jewish College Students*, Brandeis University (2007)................................................10

Gilbert Klaperman, *The Story of Yeshiva University* (1969)....................................15

Jason Bedrick & Jay P. Greene, *The New York Times's Botched Attack on Jewish Schools*, Heritage Foundation (Sept. 20, 2022)..................................10

*Jewish Americans in 2020*, Pew Research Center (May 2021)................................7

*The Jewish Education of Today's Jewish Leadership*, Research Success Technologies Ltd. (2021)......................................13

Joe Hong, *Not on the Menu: Halal, Kosher Options Limited in California School Lunches*, Cal Matters (Oct. 19, 2021), ................13

Marvin Schick, *A Census of Jewish Day Schools in the United States 2003–2004*, Avi Chai Foundation (Jan. 2005) .....................................6

Marvin Schick, *As New York Once Again Targets Religious Schools, A History Lesson in Communal Resistance*, Tablet Magazine (Aug. 12, 2019)................................................11

Mordechai Besser, *A Census of Jewish Day Schools in the United States 2018-2019*, Avi Chai Foundation (Aug. 2020)........................................7

Moshe Krakowski, *What Yeshiva Kids Are Actually Studying All Day*, Forward Magazine (Dec. 26, 2018)........................................7

Rona Sheramy, *The Day School Tuition Crisis: A Short History*, Jewish Review of Books (2013) ..........................................9

Steven M. Cohen *et al.*, *The Impact of Childhood Jewish Education on Adults' Jewish Identity*, United Jewish Cmtys. (Jul. 1, 2004), .....................11

**Rules**

Fed. R. App. P. 29(a)(4)(E)......................................................................1

# INTEREST OF *AMICI CURIAE*[1]

The National Council of Young Israel ("Young Israel") is a Jewish synagogue organization that provides resources and services to more than 100 synagogues and their more than 25,000 member families throughout the United States. Young Israel seeks to advance Torah-true Judaism and promote the values of Judaism, believing that traditional faith is compatible with good citizenship. Young Israel organizes numerous educational and social programs for Jewish youth and college students. It provides synagogue youth groups with a Parsha Nation curriculum that helps youth leaders impart the weekly Torah portion to children through stories and games, trains aspiring rabbis, and organizes regional conferences and an anti-BDS (Boycott, Divestment, and Sanctions) initiative aimed at helping Jewish and other pro-Israel students on college campuses who are constantly faced with a barrage of criticism directed at Israel.

The Rabbinical Council of America ("RCA") is the largest Orthodox Jewish rabbinic membership organization in the United States, comprised of nearly one thousand rabbis throughout the United States and other countries. The RCA

---

[1] All parties have consented to the filing of this *amicus* brief. No counsel for a party authored this brief in whole or in part, and no person other than *amici* and their members contributed any money that was intended to fund preparing and submitting this brief. *See* Fed. R. App. P. 29(a)(4)(E).

supports the work of its member rabbis and serves as a voice for rabbinic and Jewish interests in the larger community.

Torah Umesorah (National Society for Hebrew Day Schools) serves as the preeminent support system for Jewish Day Schools and yeshivas in the United States, providing a broad range of services. Its membership consists of over 800 day schools and yeshivas with a total student enrollment of over 320,000.

*Amici* submit this brief to explain the importance of a religious education to observant Jewish families and their children—an education that even the best public schools cannot provide—and to demonstrate how California's refusal to fund special education at religious schools violates the First Amendment.

## INTRODUCTION

The First Amendment prohibits states from "expressly requir[ing]" a religious organization "to renounce its religious character in order to participate in an otherwise generally available public benefit program." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 (2017). Yet California's special-education funding policy, upheld by the District Court, does exactly that.

California participates in the federal Individuals with Disabilities Education Act (IDEA) and has enacted a state statutory and regulatory framework for administering IDEA funds. Under this framework, the State disburses special-education funding on behalf of qualifying students. When public schools cannot

provide an appropriate education for a special-needs child, the State will fund a private-school alternative selected by the child's individualized educational plan (IEP) team, which includes the child's parents, teachers, and other educators. 20 U.S.C. § 1414(d)(1)(B). Private schools must meet several regulatory requirements to qualify as an alternative placement. Among these is a "nonsectarian" requirement, which categorically bars otherwise-eligible religious schools that are affiliated with a religion from receiving special-education funds. *See* Cal. Educ. Code § 56365(a); *see also* Cal. Code Regs. tit. 5, § 3001(p) (defining a "nonsectarian" school as one not affiliated with "a religious group or sect"). California's nonsectarian requirement thus facially discriminates among private schools—based strictly on religious affiliation, and not the educational services they provide. The Constitution forbids such discrimination.

The District Court nevertheless upheld California's law, holding that there is no entitlement to "generally available special-education funding for private schools," and consequently no religious discrimination. *Loffman v. Cal. Dept. of Educ.*, No. 2:23-cv-01832, slip op. at 47 (N.D. Cal. Aug. 9, 2023). That holding rests on a fundamentally flawed conception of publicly available benefits and misconstrues the nature of California's religious discrimination. The State offers publicly available government contracts and funding to private schools when public schools are unable to offer adequate education to a special-needs child. The District

3

Court's holding ensures that, whenever the State determines that a public school cannot serve a special-needs child, religious schools may never even be considered among the private-school alternatives.

In holding that California may exclude Jewish schools from serving as alternative placements, the District Court also failed to appreciate the significance of Jewish education to Jewish families. Many Jewish parents, especially Orthodox parents such as the individual Plaintiffs, believe their children have a religious duty to study their faith—a requirement that public schools cannot fulfill. Jewish schools provide critical religious teaching while simultaneously offering rigorous secular instruction. Further, Jewish schools are equipped to accommodate Jewish students' religious practices—such as diet, or observance of holy days and festivals—in ways that public schools simply are not. Upholding California's blanket disqualification of religious schools from special-education funding when public schools cannot meet students' needs thus deprives Jewish special-needs children of the educational environment best suited to their academic and spiritual flourishing.

Beyond these practical harms, California's "categorical ban" on funding special education at religious schools is unconstitutional "discrimination against religious schools and the families whose children attend them." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261–62 (2020). California may not require religious schools to shed their identity and practices in order to qualify for state

contracts or funding for which they otherwise would be eligible. Nor may the State put its Jewish families to the unconstitutional choice of pursuing a Jewish education in accordance with their deeply held religious convictions on one hand, or receiving special-education funding for their children, on the other.

In an effort to avoid that result, California argued below that the Establishment Clause mandates its nonsectarian requirement and prohibits it from funding and monitoring even secular special-education programs at religious schools. In California's view, Jewish schools' Free Exercise right to compete for otherwise available special-education funds must give way to the State's interest in avoiding a purported Establishment Clause violation. This argument manufactures a false conflict between the Religion Clauses, which the District Court erroneously accepted. The Supreme Court's recent string of religious school-funding decisions instructs that the First Amendment does not forbid, but indeed *requires*, states to make funding for secular education available to religious schools that are otherwise eligible. California's sole asserted interest therefore is legally groundless.

Because California's Establishment Clause fears are unfounded, its exclusion of religious schools from participation in IDEA funding raises the concern that the State may have been motivated by religious animus. The State's record of hostility toward religion, as recognized on several recent occasions by the Supreme Court and this Court, exacerbates this concern.

In sum, California's nonsectarian requirement facially discriminates against religious schools, to the detriment of Jewish families and special-needs children. The policy grossly offends the First Amendment and warrants reversal of the District Court's decision.

## ARGUMENT

**I. Jewish Schools Meet Critical Religious Needs That Public Schools Cannot Fulfill.**

**a.  Orthodox Judaism Mandates a Religious Duty for Children to Learn About Their Faith.**

"Religious education is a matter of central importance in Judaism." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065 (2020). Orthodox Judaism instructs parents to provide a religious education for their children. Mishneh Torah, Hilchos Talmud Torah 1:3 ("[O]ne is obligated to hire a teacher for one's son … "). Moreover, the Torah *commands* parents to transmit their knowledge and religious values from generation to generation—in Hebrew, *l'dor v'dor*. *See, e.g.*, Deuteronomy 6:7 (Stone Edition, The Chumash, ArtScroll Translation) (1993) ("You shall teach them thoroughly to your children."). Therefore, "for most modern Orthodox Jews, the enrollment of their children in a dual curriculum Jewish school … is virtually mandatory." *Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 545 (S.D.N.Y. 2006), *aff'd*, 504 F.3d 338 (2d Cir. 2007); *see also* Marvin Schick, *A Census of Jewish Day Schools in the United States 2003–2004*, Avi Chai Foundation, at 1 (Jan. 2005), https://tinyurl.com/33y5kstr.

To fulfill their obligation to provide a religious education to their children, the overwhelming majority of Orthodox Jews send their children to a Jewish day school where clergy, counselors, and experienced teachers work to instill Jewish values. Although Orthodox Jews make up only nine percent of the American Jewish population, they constitute roughly 90 percent of the nearly 300,000 children who attend Jewish day schools, and more than 85 percent of Orthodox parents send their children to Jewish day school. *Jewish Americans in 2020*, Pew Research Center (May 2021), https://tinyurl.com/4k38wvza; Mordechai Besser, *A Census of Jewish Day Schools in the United States 2018–2019*, Avi Chai Foundation (Aug. 2020), https://tinyurl.com/5n7vvapj. Some parents are unable to send their children to Orthodox Jewish day schools—often because they live in areas where the Jewish community is too small to support these schools—and they choose to educate their children at synagogues or informally. Where Jewish day schools are available, however, they serve a vital need.

Jewish day schools provide an in-depth religious curriculum and comprehensive theological education—in addition to rigorous secular instruction. The religious curriculum usually includes the study of the Hebrew language, Jewish history and philosophy, and a "close textual study of a canon of ancient and medieval texts central to Jewish life: the Torah, the Talmud, and a near infinite body of commentaries on both." Moshe Krakowski, *What Yeshiva Kids Are Actually*

*Studying All Day*, Forward Magazine (Dec. 26, 2018), https://tinyurl.com/4mpzkany. In addition to the formal academic curriculum, a Jewish day school education typically will also include the socialization of students into the calendric rhythms and functions of an Orthodox Jewish communal lifestyle, including the preparation for and celebration of holidays and other days of religious significance.

This religious immersion explains why Orthodox Jewish schools play a crucial role in education for Orthodox families. The schools offer kosher meals and inculcate values such as reciting blessings before and after meals and praying during scheduled times and within the expected frameworks. Only an Orthodox Jewish school can provide this religious immersion to Orthodox Jewish families. *See* Boruch Werdiger, *Why I Choose a Yeshiva Education for My Children*, Lubavitch International Magazine (May 15, 2023), https://tinyurl.com/yw56wtzn ("I want to transmit to them a magnificent tradition, not only as an object of study or a family relic, but as a vital and life-giving experience. I want them to feel how it lives, and to know how beautiful it is when it breathes within them."). Public schools, in contrast, are unable to offer (and are often constitutionally prohibited from offering) these religious experiences. *See* David Benkoff, *No, Orthodox Jews cannot 'Just send their kids to public school,'* Jewish Journal (Feb. 6, 2017), https://tinyurl.com/259k6xy8.

**b.      Jewish Schools Enable Orthodox Jewish Children to Succeed Academically and Grow Spiritually.**

Religious schools help fulfill the religious obligations of students in a competitive academic setting that shapes them to be community leaders.  That is why Orthodox Jewish parents often believe that sending their children to a Jewish school is "the sine qua non of 'serious Jewish child-rearing.'"  Rona Sheramy, *The Day School Tuition Crisis: A Short History*, Jewish Review of Books (2013), https://tinyurl.com/3p6rv2rx.  As the Supreme Court has recognized, religious education is of "central importance in Judaism" and is "an obligation of the highest order."  *Our Lady of Guadalupe*, 140 S. Ct. at 2065 (quotation marks omitted).

Orthodox Jewish schools provide a unique setting that allows students to flourish spiritually and fulfill the religious obligations dictated by their faith while also studying important secular subjects such as math, history, and English literature. Typically, the school day includes a full day of secular classes and an additional half-day of instruction in Hebrew language, Jewish history, Torah, and rigorous Talmud study.  The school year is also structured to allow students to observe their religious practices.  For example, school is closed on major Jewish holidays.  During these holidays, Orthodox Jews are generally prohibited from writing, using electricity, or traveling by vehicle—and school calendars are structured to accommodate those spiritual needs.  School closures on these holidays allow children to celebrate these holidays with their entire family and congregations.

9

Not only do Orthodox Jewish schools nourish a student's spiritual needs, but they also provide an education that competes on an equal footing with public schools. Although students at Orthodox Jewish schools study additional religious subjects, their school days are often longer than those of their public-school counterparts; secular instruction is supplemented, not shortchanged. Evidence shows that their secular education generally is just as rigorous—if not more so. For example, Jewish students at New York yeshivas outperform their public-school peers on the statewide Regents exams "despite the fact that they have Jewish studies classes in the morning and secular classes in the afternoon." Christina Daly, *Our schools ace the publics in secular studies*, The Jewish Star (Dec. 19, 2018), https://tinyurl.com/4vz3nj3s; *see also* Jason Bedrick & Jay P. Greene, *The New York Times's Botched Attack on Jewish Schools*, Heritage Foundation (Sept. 20, 2022), https://tinyurl.com/bdjr55w3. Thus, students who graduate from Orthodox Jewish schools have the opportunity to attend "the full spectrum of institutions of higher education including the most highly selective." Fern Chertok *et al.*, *What Difference Does Day School Make? The Impact of Day School: A Comparative Analysis of Jewish College Students*, Brandeis University (2007), https://tinyurl.com/swufkvzz. Students who have attended Orthodox Jewish schools also obtain "regular admission to first-rate graduate and professional schools" and are equipped with "an entrepreneurial spirit that has created thousands of successful businesses." Marvin

Schick, *As New York Once Again Targets Religious Schools, A History Lesson in Communal Resistance*, Tablet Magazine (Aug. 12, 2019), https://tinyurl.com/2vpb369c.

Attending a Jewish day school enriches students' Jewish identity in the long term, shaping them into leaders in the Jewish community. Among different forms of Jewish education, attending a day school "exerts the most powerful positive impact upon Jewish identity." Steven M. Cohen *et al.*, *The Impact of Childhood Jewish Education on Adults' Jewish Identity*, United Jewish Cmtys. (Jul. 1, 2004), https://tinyurl.com/4a6wzzs7. Students who attended Jewish day schools are more integrated in their Jewish communities. They are more likely to make Jewish friends, engage in Jewish ritual practices, maintain synagogue membership, embrace the importance of being Jewish, and form an emotional attachment to Israel. *Id.*

Learning about Israel is a particularly important feature common to Jewish day schools. Students are taught to "love" and take "pride and a sense of ownership of Israel" as "the Jewish homeland and the site of Biblical narratives." Alex Pomson *et al.*, *Hearts and Minds: Israel in North American Jewish Day Schools*, Avi Chai Foundation, at 10 (Apr. 2014), https://tinyurl.com/t52hzmuz. In fact, Israel serves

as "'the glue' bonding the school community together." *Id.* at 13.  To students, Israel is the place where they will "'always be accepted no matter what.'" *Id.*[2]

Adults who attended Jewish day schools are also more likely to marry a Jewish spouse and raise children with a strong Jewish identity.  *See* Bruce A. Phillips, *Re-examining Intermarriage: Trends, Textures and Strategies* 14–15, 17, 30, 32 (1997).  The strong ties to the community shaped by Jewish education "help forge a committed Jewish professional leadership, as well as an engaged Jewish

---

[2] Some domestic reactions to the recent unprovoked terrorist attacks by Hamas on Israel—where Islamist extremists slaughtered, raped, and kidnapped innocent Jews, including babies and grandparents—remind us that anti-Semitism still exists in the United States.  *See* Anti-Defamation League, *ADL Records Dramatic Increase in U.S. Antisemitic Incidents Following Oct. 7 Hamas Massacre* (Oct. 24, 2023), https://tinyurl.com/3vmeavmr.  California is no exception.

In the wake of the Hamas attacks, a lecturer at Stanford University reportedly asked Jewish and Israeli freshmen to identify themselves, "separated them from their belongings, and instructed them to stand in a corner," before declaring that "'[o]nly six million'" Jews died in the Holocaust.  Eliana Jordan, *Stanford professor suspended for calling Jewish students 'colonisers,'* The Jewish Chronicle (Oct. 13, 2023), https://tinyurl.com/ys56yvax; *see also* Anti-Defamation League, *Support for Hamas Terror at Anti-Israel Rallies Across the U.S.* (Oct. 8, 2023), https://tinyurl.com/46pntcec (quoting one speaker at a rally in Anaheim as saying that Palestinians will not "kick our feet back and act like we're gonna celebrate and be happy … No, we continue the struggle," and depicting another with "a sign that read: 'Congress is Israeli occupied territory,' amplifying an historic antisemitic trope about Jews and power").  This ominous rise in anti-Semitism prompted the California Office of Emergency Services to issue a statement warning of domestic threats.  Alex Baker, *California Office of Emergency Services aware of 'potential threats' related to Israel, Gaza*, KRON4 (Oct. 12, 2023), https://tinyurl.com/4kbd9ash.  Jewish education is necessary to combat such bigotry, now more than ever.

public." *The Jewish Education of Today's Jewish Leadership*, Research Success Technologies Ltd., at 2 (2021), https://tinyurl.com/5n6zh53p. Indeed, "the adults now in Jewish leadership positions were widely exposed in their youth to numerous educational experiences." *Id.* Jewish schools therefore are essential to the continued survival of the Jewish community from generation to generation.

### c. Public Schools Cannot Meet The Religious And Spiritual Needs of Orthodox Jewish Children.

Although public schools often excel at secular instruction, they do not allow Orthodox Jewish students to balance their secular studies with their religious practices or their Jewish education. Orthodox Jewish students who attend public school face special burdens that they would not otherwise face at a Jewish school. For instance, because public-school calendars are not structured around the religious practices of minority groups, Orthodox Jewish students frequently must take time off school to observe Jewish holidays. Jewish schools, by contrast, are closed for those holidays. Furthermore, because public schools do not incorporate religious teachings like Jewish day schools, Orthodox Jewish students must attend separate synagogue services and classes at other locations before or after school, which imposes significant burdens on both parents and children.

Public schools also cannot accommodate the needs of Orthodox students during the school day. For example, public schools often do not offer kosher food. Joe Hong, *Not on the Menu: Halal, Kosher Options Limited in California School*

*Lunches*, Cal Matters (Oct. 19, 2021), https://tinyurl.com/yws4nt6n. In addition, although Orthodox Jewish students are able to attend school during the intermediate days of Sukkot, public schools generally cannot provide the temporary outdoor dwelling known as a Sukkah in which such students are required to eat their meals. Public schools also often struggle to provide single-sex spaces when necessary for religiously required bodily modesty. And they rarely have teachers or counselors who can relate to the specific struggles that Orthodox Jews might face in American society and can thus serve as mentors or role models for impressionable youth.

Public schools also fail to afford students the opportunity to develop their Jewish identity. There is a "strong correlation between Jewish education and enhanced Jewish identification in later life." Arnold Dashefsky & Cory Lebson, *Does Jewish Schooling Matter? A Review of the Empirical Literature on the Relationship Between Jewish Education and Dimensions of Jewish Identity*, 23 Contemporary Jewry 96, 111 (2002). Jewish students who attend public schools are more likely to define themselves as "secular Jews" later in life. *Id.* They are also less likely to observe Jewish rituals in the home, be members of Jewish organizations, give to Jewish philanthropies, and marry another Jew. *Id.* at 111–12. True, students who attend public school can receive Jewish education in other forms, but studies have consistently shown that "day school education was most effective" in fostering a Jewish education later in life. *See, e.g.*, *id.* at 113–14.

14

Indeed, Orthodox Jewish schools have "prove[n] [to be] the most practical manner of securing the Jewish heritage." Gilbert Klaperman, *The Story of Yeshiva University* 20 (1969). This form of Jewish education is "firmly rooted in American soil today," in part because other education models—which segregated essential religious studies from secular teaching—proved insufficient to inculcate the Jewish faith in future generations. *See id.* at 20–21. Orthodox Jewish parents thus consider Jewish education vital—not only to teach their children about the Jewish faith, but to ensure they fully maintain their core identity as Orthodox Jews.

## II. California's Refusal To Fund Special Education at Jewish Schools is Unlawful.

California's exclusion of religious schools from special-education funding fails to satisfy the strict scrutiny that the First Amendment demands. The requirement "expressly discriminates" on the basis of religion, and if "one thing [is] clear, it is that such a [requirement] imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Trinity Lutheran*, 582 U.S. at 462. The requirement therefore violates the Free Exercise Clause unless it furthers governmental "interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993).

California has no interest, much less an interest of the "highest order," in excluding qualified religious schools from receiving funds that help educate the

State's most vulnerable children.  California concedes that, if strict scrutiny applies, its sole interest is in "avoiding" an Establishment Clause violation.  ECF No. 31–1 at 32.  The First Amendment does not prohibit states from funding the secular activities of religious schools; rather, the First Amendment often *requires* it.

Because California's only proffered explanation for its nonsectarian requirement directly contravenes Supreme Court precedent, there are serious concerns that the State's categorical exclusion of religious schools instead may be motivated by constitutionally impermissible religious animus.  California has a regrettable record of enacting legislation and policies overtly hostile to religion.  The Supreme Court recently has recognized as much, chastising the State for its disparate treatment toward people of faith.  *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) (*per curiam*) (condemning California for treating "hair salons" and "private suites at sporting events" "more favorably than at-home religious exercise").  To the extent that similar animus might likewise have motivated California here, such animus only exacerbates its violation of cardinal First Amendment principles.

### a. The First Amendment Allows The Funding of Secular Special-Education Programs at Religious Schools.

California attempts to justify its discrimination against religious schools—a violation of the Free Exercise Clause—as necessary to comply with the Establishment Clause.  ECF No. 31–1 at 32–36.  Put differently, the State essentially "contends that its Establishment Clause concerns trump [Appellants'] free

exercise … rights." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022). That contention is false. The Free Exercise Clause requires California to allow religious schools to receive special-education funding on equal footing with nonsectarian private schools, and the First Amendment cannot possibly "*forbid* what its text plainly *requires*." *Schuette v. BAMN*, 572 U.S. 291, 316 (2014) (Scalia, J., concurring).

As Appellants correctly argue, the First Amendment *requires* California to allow religious schools to receive special-education funds on the same terms as their secular counterparts. Appellants' Br. at 27–47. The Free Exercise Clause does not tolerate California's exclusion of religious schools from generally applicable state benefits. California cannot fund special education "at private schools—so long as the schools are not religious. That is discrimination against religion." *Carson v. Makin*, 142 S. Ct. 1987, 1998 (2022); *see also Espinoza*, 140 S. Ct. at 2262 (concluding that the Constitution "condemns discrimination against religious schools and the families whose children attend them").

California tries to escape its obligations under the Free Exercise Clause by invoking the purported limitations of the Establishment Clause. The State claims that its nonsectarian requirement is necessary to prevent three purported Establishment Clause violations. Each is imagined.

17

*First*, California asserts that, in the absence of its nonsectarian requirement, "government officials … would be able to steer public school children with the most severe disabilities toward particular (favored) religious institutions for daily instruction." ECF No. 31–1 at 31. California purportedly fears that, by contracting with religious schools, the State would violate both its overarching constitutional obligation to be "neutral toward and among religions," *id.* at 32, and a more specific prohibition under the Establishment Clause against "programs or practices in its public schools or colleges which 'aid or oppose' any religion," *id.* (quoting *Epperson v. Arkansas*, 393 U.S. 97, 103, 106 (1968)).

California's fear is unfounded. The Supreme Court has quelled concerns that the Establishment Clause prohibits states from funding the secular activities of religious organizations. The Court recently has clarified that states may not "categorically disqualify[] churches and other religious organizations from receiving grants" that promote secular objectives. *Trinity Lutheran*, 582 U.S. at 453. *Trinity Lutheran* concerned the constitutionality of a Missouri program that awarded grants to nonprofit organizations that sought to resurface playgrounds with safe materials. Like California's law, Missouri's "rule [was] simple: No churches need apply." *Id.* at 465. Missouri's "strict and express policy of denying [funding] to any applicant owned or controlled by a church, sect or other religious entity … expressly discriminate[d] against otherwise eligible recipients by disqualifying them from a

public benefit solely because of their religious character" in violation of the Free Exercise Clause. *Id.* at 455, 462. The Supreme Court held that such discrimination violated the Free Exercise Clause, explaining that states cannot "expressly requir[e]" a religious organization "to renounce its religious character in order to participate in an otherwise generally available public benefit program, for which it is fully qualified." *Id.* at 466.[3]

*Second*, California frets that placements at religious schools would "expose[] vulnerable and impressionable children, whose parents enrolled them in public

---

[3]Astonishingly, the District Court held that the two Plaintiff Orthodox Jewish schools lack standing to challenge their facial exclusion from participation in a governmental program because the schools had not alleged any "steps that [they] have taken to apply for and receive [non-public school] certification." *Loffman*, slip op. at 32 (C.D. Cal. Aug. 9, 2023). The District Court's theory—that plaintiffs have standing to challenge facially discriminatory denials from benefits only if they take concrete and futile steps to obtain the benefit—cannot be correct. As in *Trinity Lutheran*, "the express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow [Jewish schools] … to compete with secular organizations for a grant." 582 U.S. at 465. Their "injury in fact is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.* at 463 (internal quotation marks omitted).

Indeed, the District Court's contrary theory would produce untenable results. For example, a minority-owned business hoping to vie for government contracts apparently would lack standing to challenge a law that expressly makes such contracts available to "whites only" unless the plaintiff business undertook pointless and costly steps to apply for and prepare to perform a contract it is legally ineligible to obtain. That is not the law. *See Teamsters v. United States*, 431 U.S. 324, 365–66 (1977) ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").

school districts expecting a secular education, to substantial risks of the inculcation of particular religious beliefs." ECF No. 31–1 at 34. California relies entirely on dicta in *Edwards v. Aguillard*, 482 U.S. 578 (1987), a case that applied the now-abandoned *Lemon* test in holding that the Establishment Clause does not allow states to teach creationism in public schools. *See Kennedy*, 142 S. Ct. at 2428 (recognizing that the Court has "long ago abandoned" *Lemon v. Kurtzman*, 403 U.S. 602 (1971)). California fails to cite any binding cases holding that secular educational instruction is unconstitutionally tainted just because it is offered by organizations holding religious values or otherwise affiliated with a religion. To be sure, there are circumstances under which special education of certain students at particular religious schools might violate the *Free Exercise Clause*; for example, the Constitution would not tolerate governmental efforts to force Jewish special-needs children to receive secular instruction at a Catholic school. However, *Trinity Lutheran* makes clear that there is no *Establishment Clause* violation when states fund secular programs at religious institutions on the same footing as non-religious schools. 582 U.S. at 458. That holding is binding on this Court, notwithstanding California's alarmism.[4]

---

[4] In any event, given California's hostility toward religious schools and the presence of parents on IEP teams that help select which private school will provide special-education services, 20 U.S.C. § 1414(d)(1)(B), it is very unlikely that children would be forced to attend a religious school against the will of their parents.

*Third*, California portrays the "nonsectarian requirement [a]s necessary to avoid the serious problems caused when government is put in the position of supervising, evaluating and auditing religious institutions." ECF No. 31–1 at 36. *Amici* appreciate that governmental micromanagement of religious institutions is deeply problematic—a principle that California often has overlooked in recent years. *See infra* at II.B. But no such "serious problems" necessarily arise—and California has substantiated none—when the government evaluates these institutions' *secular* activities. That evaluation is all that allowing religious schools to compete on an equal footing for alternative placements would entail.

The California Education Code requires nonpublic schools seeking special-education funding to "provide the appropriate special educational facilities, special education, or designated instruction and services required by the individual with exceptional needs." Cal. Educ. Code. § 56365(a). These requirements are entirely secular. They are also commonplace. As the Supreme Court has noted, government may—indeed, it often must—"supervis[e], evaluat[e] and audit" religious institutions' adherence to secular and neutral standards for grant eligibility. *Trinity Lutheran*, 582 U.S. at 455 (recognizing that Missouri must evaluate the applications of religious institutions for grants awarded on a "competitive basis to those scoring highest based on several criteria."). As long as these standards do not implicate

21

religious practices—and secular special-education guidelines do not—there is no Free Exercise Clause violation.

In categorically banning religious schools from receiving special-education funding, California "effectively created its own vise between the Establishment Clause on one side and the Free Speech and Free Exercise Clauses on the other, placed itself in the middle, and then chose its preferred way out of its self-imposed trap." *Kennedy*, 142 S. Ct. at 2427. California conjures "a [c]onstitutional duty to avoid" an Establishment Clause violation that it imagines would result from abolition of the nonsectarian requirement. ECF No. 31–1 at 32. In doing so, the State defaults on its actual "constitutional duty to avoid" facial discrimination against religious groups. *See Lukumi*, 508 U.S. at 533 ("[T]he minimum requirement of neutrality is that a law not discriminate on its face.").

### b. California's Discrimination Against Religious Schools Raises The Specter of Unconstitutional Animus Toward Religion.

California's sole asserted justification for its facially discriminatory nonsectarian requirement is that the Establishment Clause forbids it from providing special-education funding to religious schools. As explained above, that position contravenes multiple Supreme Court decisions. *See, e.g.*, *Carson*, 142 S. Ct. at 2002; *Espinoza*, 140 S. Ct. at 2262; *Trinity Lutheran*, 582 U.S. at 466. That California's only stated explanation is a legal theory squarely refuted by controlling precedent

raises concerns that the State may be motivated by religious animus, especially in light of its recent history of hostility towards religion.

Even facially neutral government action is unconstitutional when motivated by religious animus.  The First Amendment forbids "[o]fficial action that targets religious conduct for distinctive treatment," *Lukumi*, 508 U.S. at 534, and "official expressions of hostility to religion."  *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018).  The State thus may not "single[] out for discriminatory treatment" people of faith or religious institutions based on animosity toward religion.  *Lukumi*, 508 U.S. at 538.  States cannot "impermissibl[y] target[]" the faithful and their institutions for mistreatment, *id.* at 535, nor can states exclude them from receiving or participating in publicly available benefits and programs, *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 691–92 (9th Cir. 2023) (*en banc*).  States also cannot shield their anti-religious motives by enacting carefully constructed laws that do not openly disfavor religion.  Even facially neutral and generally applicable laws run afoul of the First Amendment when motivated by animus toward religion.  *Lukumi*, 508 U.S. at 533–34 ("The Free Exercise Clause protects against governmental hostility which is masked, as well as overt.").  In short, religious animus is fatal to government action, regardless of form.

If California's approach of excluding religious schools from special-education alternative-placement funding did reflect hostility to religion, it would not be the first time that the State has displayed such animus. California has repeatedly run afoul of the First Amendment by enacting legislation and policies arguably fueled by anti-religious sentiment. California's treatment of religious institutions and people of faith is fraught with examples—many recent—of singling out religious persons and groups for second-class treatment.

During the COVID-19 pandemic, for example, the Supreme Court twice enjoined California's guidelines that restricted religious, but not comparable secular, gatherings. "California [wa]s the only State in the country that [went] so far as to ban *all* indoor religious services"—while permitting secular businesses to open their doors. *S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (2021) (Statement of Gorsuch, J.). The Court unanimously enjoined California's selective prohibition of indoor worship. *Id.* at 716 (order of the Court); *see also id.* at 717 (Statement of Gorsuch, J.) ("When a State so obviously targets religion for differential treatment, our job becomes that much clearer."). It subsequently enjoined the State's discriminatory restrictions on private, indoor religious gatherings. *Tandon*, 141 S. Ct. at 1297 (*per curiam*) (holding that California's COVID-19 restrictions violated the First Amendment by allowing hair salons and

movie theaters "to bring together more than three households at a time" while forbidding more than three households from gathering for worship).

The Supreme Court similarly has rejected California's targeting of religious nonprofits whose views on family planning the State disfavored. Even after the federal Department of Health and Human Services issued a rule exempting a religious order of Catholic sisters from regulations that would otherwise require it to violate its faith by providing contraception and abortifacients, California sued the non-profit to force it to do exactly that. The State, however, did not challenge any of the regulatory exemptions for secular businesses. The Court rebuffed California's efforts. *Compare Little Sisters of the Poor Peter and Paul Home v. Pennsylvania*, 140 S. Ct. 2367 (2020) (rebuking Pennsylvania's attempt to force Catholic nonprofits to fund contraception), *with Little Sisters of the Poor Jeanne Jugan Residence v. California*, 141 S. Ct. 192 (2020) (ordering this Court to reconsider its affirmance of California's identical challenge). Likewise, in *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018), the Supreme Court held that a California law requiring crisis pregnancy centers to advertise state-funded abortions was "wildly underinclusive" and was seemingly designed to "disfavor[] a particular speaker or viewpoint." *Id*. at 2375–76. Justice Kennedy's concurrence highlighted how California "compel[led] individuals to contradict their most deeply

held beliefs, beliefs grounded in … religious precepts." *Id.* at 2379 (Kennedy, J. concurring).

Those cases did not involve "subtle departures from neutrality"—rather, California openly "single[d] out religion for worse treatment" than comparable secular institutions. *S. Bay United Pentecostal Church*, 141 S. Ct. at 717 (Statement of Gorsuch, J.). This Court likewise has chastised the State for overt religious animus. Last month, an *en banc* decision of this Court found that California officials "arguably demonstrate[d] animus … exceeding that present in *Masterpiece Cakeshop* or *Lukumi*." *Fellowship of Christian Athletes*, 82 F.4th at 692 (holding public school officials violated the Free Exercise Clause by revoking school club recognition for Christian student organization based solely on its religious views).

\* \* \* \*

California's recent track record of disfavoring religion is remarkable. That California's pattern has persisted despite a steady stream of Supreme Court decisions repudiating California's misguided view of the Religion Clauses and repeatedly invalidating California's attempts to single out religious groups and persons is of particular concern. Here, the State's legal justification is a nonstarter, and its exclusion of religious schools is unconstitutional. Moreover, to the extent hostility toward religion animates California's IDEA nonsectarian requirement, it further offends the First Amendment.

## CONCLUSION

*Amici* respectfully request that this Court reverse the District Court's dismissal of Petitioners' claims.

Dated: November 1, 2023                    Respectfully submitted,


                                           */s/ Joshua R. Zuckerman*

Katie Rose Talley                          Joshua R. Zuckerman
GIBSON, DUNN & CRUTCHER LLP                Jonathan C. Bond
2011 Ross Ave. Suite 2100                  GIBSON, DUNN & CRUTCHER LLP
Dallas, TX 73201                           1050 Connecticut Avenue, N.W.
Tel.: 214-698-3100                         Washington, DC 20036-5306
Fax: 214-571-2900                          Tel.: 202-955-8500
                                           Fax: 202-467-0539
                                           jbond@gibsondunn.com


                    *Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief contains 6,031 words, excluding the items exempted by Fed. R. App. P. 32(f).  The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I further certify that this brief is an *amicus* brief and complies with the word limit of Fed. R. App. P. 29(a)(5).

*/s/ Joshua R. Zuckerman*
Joshua R. Zuckerman

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2023, I electronically filed this brief with the Clerk of the Court for the U.S. Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

*/s/ Joshua R. Zuckerman*
Joshua R. Zuckerman