No. 23-55714

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

CHAYA LOFFMAN AND JONATHAN LOFFMAN, ET AL.,

*Plaintiffs-Appellants*,

v.

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellees.*

————————————

On Appeal from the United States District Court for the
Central District of California,
No. 2:23-cv-01832

————————————

## BRIEF FOR *AMICUS CURIAE* MANHATTAN INSTITUTE
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

————————————

ILYA SHAPIRO
MANHATTAN INSTITUTE
52 Vanderbilt Avenue
New York, NY 20017

MARIEL A. BROOKINS*
 *Counsel of Record*
ZACHARY J. LUSTBADER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
mariel.brookins@clementmurphy.com

*Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Amicus Curiae Manhattan
Institute*

November 1, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Manhattan Institute certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ....................................................................... iii

INTEREST OF *AMICUS CURIAE* ............................................................ 1

SUMMARY OF ARGUMENT ................................................................... 1

ARGUMENT .................................................................................... 4

I.     California Discriminates Against Students' Educational Programs Expressly and Exclusively Because of Their Religious Affiliation .............. 4

II.    The District Court's Contrary Reasoning Strains Credulity ......................... 11

III.   No Compelling Interest Justifies California's Sweeping, Opportunity-Crushing Rule .......................................................... 14

CONCLUSION ................................................................................. 18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Carson v. Makin*,
    142 S.Ct. 1987 (2022) ................................................................ *passim*

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) ................................................................... 14, 15

*Emp't Div. v. Smith*,
    494 U.S. 872 (1990) ................................................................... 4

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) ..................................................................... 4

*Espinoza v. Montana Dep't of Rev.*,
    140 S.Ct. 2246 (2020) ............................................................. *passim*

*Everson v. Bd. of Educ. of Ewing Twp.*,
    330 U.S. 1 (1947) ....................................................................... 4

*Fulton v. City of Philadelphia*,
    141 S.Ct. 1868 (2021) .............................................................. 3, 12

*Good News Club v. Milford Cent. Sch.*,
    533 U.S. 98 (2001) ..................................................................... 4

*Kennedy v. Bremerton Sch. Dist.*,
    142 S.Ct. 2407 (2022) ............................................................... 16

*Kennedy v. Bremerton Sch. Dist.*,
    4 F.4th 91 (9th Cir. 2021) ......................................................... 1

*McDaniel v. Paty*,
    435 U.S. 618 (1978) ................................................................... 11

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ................................................................... 4

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ................................................................. *passim*

**Constitutional Provision**

Mont. Const., Art. X, §6 ........................................................................ 6

**Statutes**

20 U.S.C. §1400 ............................................................................... 16

20 U.S.C. §1412 .......................................................................... 1, 6, 12

20 U.S.C. §1414 ................................................................................. 3

Cal. Code Regs. tit. 5, §3001 ............................................................... 6

Cal. Educ. Code §56365 ........................................................... 3, 6, 10, 16

Cal. Educ. Code §56366 ..................................................................... 6, 10

Cal. Educ. Code §56505.2 ..................................................................... 2

**Other Authorities**

Brief for Respondents, *Carson v. Makin*, No. 20-1088 (March 2023)
    (May 21, 2021) ............................................................................. 9

Nicole Garnett*, Unlocking the Potential of Private-School Choice*,
    Manhattan Institute Policy Report (March 2023) (available at
    https://shorturl.at/iBJVY) ............................................................. 15

Richard W. Garnett & Jackson C. Blais, *Religious Freedom and Recycled
    Tires: The Meaning and Implications of Trinity Lutheran*, 2016-2017
    Cato Sup. Ct. Rev. 105 (2017) ....................................................... 14

## INTEREST OF *AMICUS CURIAE*[1]

The Manhattan Institute is a nonprofit public policy research foundation whose mission is to develop and disseminate new ideas that foster economic choice and individual responsibility.  It has a longstanding interest in preserving and growing educational freedom.  To that end, it has historically sponsored scholarship supporting individual and parental rights in schooling, including expanding options for educational programs.  This case concerns *amicus* because it involves a blatant violation of First Amendment protections by a state actor in the educational space.

## SUMMARY OF ARGUMENT

This Court is no stranger to the fact that public schools and state governments occasionally require admonishment to "stop being hostile to religion."  *Kennedy v. Bremerton Sch. Dist.*, 4 F.4th 910, 945 (9th Cir. 2021) (Nelson, J., dissenting from denial of rehearing en banc), *rev'd*, 142 S.Ct. 2407 (2022).  This case requires such an admonition: When California places a child with disabilities in a private school "as the means of carrying out" its obligations under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1412(a)(10)(B)(i), it voluntarily provides to students in private schools the same benefits as those given to students in public

---

[1] All parties have consented to the filing of this brief.  Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no party or counsel for a party other than *amicus*, its members, or its counsel authored this brief in any part or made a monetary contribution intended to fund its preparation or submission.

schools.  But once California allows certain services to be used at its "certified" "nonpublic" schools, *see* Cal. Educ. Code §56505.2(a), it favors some nonpublic schools over others solely because of religious affiliation.  The district court's opinion forces parents and students in need of special education into a Hobson's choice: forfeit essential educational benefits available only to those attending secular schools—both public and private—or forfeit a religious education altogether.  That imposition runs headlong into the U.S. Constitution, which allows states and localities to accomplish legitimate objectives while steering a course of religious neutrality but does not require governments to choose between discriminating or withholding benefits.

The Supreme Court faced just that question in *Carson v. Makin*, 142 S.Ct. 1987 (2022), the capstone in a recent trio of cases holding that schools cannot sustain sectarian discrimination under the Free Exercise Clause.  *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017); *Espinoza v. Montana Dep't of Rev.*, 140 S.Ct. 2246 (2020).  *Carson*, in particular, should control here: the Court there considered a program that excluded religious private schools from public benefits and determined that the exclusion violated the Free Exercise Clause.  In other words, the government cannot selectively open up government benefits for use by secular, but not religious, institutions.

2

The district court attempted to circumvent *Carson* by reframing the program at issue as "a framework for certain private schools to contract with the State to provide the State's public education." ER46. But that rejoinder contravenes both *Carson* and *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021). In both those cases, the Court made clear that the government cannot flout the constraints of the Free Exercise Clause by relabeling private institutions public or by embedding express discrimination against religion in its contract policies. California cannot now avail itself of the same, worn-out arguments repeatedly rejected by the Court and expect a different result here.

Finally, there is no valid justification for—let alone a compelling state interest in—categorically preventing disabled students from receiving special education benefits at the school that a local education agency ("LEA") determines is best solely because that school is religious. Individualized education program ("IEP") teams are obligated to holistically consider a child's needs when developing a plan specific to that child. *See* 20 U.S.C. §1414(d)(3)(A). But California's policy bars the child from receiving a placement—no matter how considered, appropriate, or necessary—whenever the proposed school fails to qualify as "nonsectarian." Cal. Educ. Code §56365(a). That policy diminishes opportunities for the very children who are most in need of learning environments tailored to their needs, and it does so when (and

only when) the government otherwise believes that a religious school can best serve a disabled child under the IDEA.

This is not a close case. This Court should reverse.

## ARGUMENT

## I.   California Discriminates Against Students' Educational Programs Expressly and Exclusively Because of Their Religious Affiliation.

The basic command of the Religion Clauses of the First Amendment is neutrality. *See, e.g.*, *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968). States may neither confer benefits on individuals or institutions because of their religious identity nor single them out for disfavored treatment. *See, e.g.*, *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 18 (1947) ("State power is no more to be used so as to handicap religions, than it is to favor them."). Neutrality extends not just to affirmative regulatory legislation, but also to government benefits decisions. *See, e.g.*, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 114 (2001) ("For the 'guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.'" (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 839 (1995)). Thus just as "[t]he government may not . . . impose special disabilities on the basis of religious views or religious status," *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990), the Court has recently—and "repeatedly"—held that a state violates the Constitution

4

whenever it "excludes religious observers from otherwise available public benefits." *Carson*, 142 S.Ct. at 1996.

The Supreme Court confronted a case with facts indistinguishable from the instant case just last year in *Carson*, 142 S.Ct. 1987. Because Maine could not adequately provide for all its students in public schools—Maine's sparsely distributed population made local public schooling impractical in certain rural areas—the state created a program allowing some students to enroll in private schools. *Id.* at 1993. The Court held that Maine's exclusion of religious institutions from that program violated the Free Exercise Clause. *Id.* at 2002. This Court should likewise reject California's restriction of benefits on the basis of religion and its attempt to redefine the benefit as a (private-school delivered) public education.

*First*, California illegally restricts a benefit purely on the basis of religious affiliation. In *Carson*, Maine provided for rural students through a "program of tuition assistance" that parents could direct to private schools. *Id.* at 1993. It conditioned that aid, however, on its use only at "nonsectarian" institutions. *Id.* at 1994. Maine considered sectarian any school "associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith." *Id.* (citation omitted). The Court in *Carson* explained that "Maine offer[ed] its citizens a benefit" in the form of "tuition assistance

payments for any family whose school district does not provide a public secondary school." *Id.* at 1997. And while a "wide range of private schools" were eligible to receive that benefit, religious schools were "disqualified" "solely because of their religious character." *Id.* "By conditioning the availability of benefits in that manner, Maine's tuition assistance program . . . effectively penalize[d] the free exercise of religion." *Id.* (quotation marks and alterations omitted). The law was thus subject to strict scrutiny. *Id.*

The same logic that felled Maine's exclusion in *Carson* also dooms California's restriction here. California, too, provides a benefit to some students in the form of full IDEA benefits at private schools. *See* 20 U.S.C. §1412(a)(10)(B); Cal. Educ. Code §§56365-56366. And California limits its benefit—full-fledged LEA placement of disabled children in private institutions—to "nonsectarian" schools. Cal. Educ. Code §56365(a).[2] A "wide range of private schools," *Carson*, 142 S.Ct. at 1997, can become certified nonpublic schools and thus eligible to

---

[2] Indeed, California defines sectarian institutions even more broadly than Maine did as any school "owned, operated, controlled by, or formally affiliated with any religious group or sect." Cal. Code Regs. tit. 5, §3001(p); *see Carson*, 142 S.Ct. at 1994 ("Affiliation or association with a church or religious institution is one potential indicator of a sectarian school, but it is not dispositive." (alteration and quotation marks omitted)). And California's definition is strikingly similar to the offending provision at issue in *Espinoza*, which prohibited aid to "any church, school, academy, seminary, college, university, or other literary or scientific institution, controlled in whole or in part by any church, sect, or denomination." 140 S.Ct. at 2252 (quoting Mont. Const., Art. X, §6(1)).

receive students placed with California's full IDEA benefits. But religious institutions cannot be among them. "By conditioning the availability of benefits in that manner," California "effectively penalizes the free exercise" of plaintiffs. *Id.* (quotation marks and citation omitted).

By "benefit," the *Carson* Court did not mean solely a parentally directed subsidy—contrary to what the district court erroneously seemed to believe.[3] Instead, *any* benefit running to private institutions, whether designed to "subsidize" private education as such or not, cannot carve out an exception for religious schools. This is plain from the face of *Carson* because the Court there explained that it was merely restating the "unremarkable principles applied" in two other cases, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017), and *Espinoza v. Montana Department of Revenue*, 140 S.Ct. 2246 (2020). *Carson*, 142 S.Ct. at 1997 (quotation marks omitted). In *Trinity Lutheran*, the program at issue was a state grant for nonprofit entities to purchase "rubber playground surfaces made from recycled tires," and the state "categorically disqualif[ied] churches and other religious organizations from receiving grants." 582 U.S. at 454. That was

---

[3] *See, e.g.*, ER47 ("How we define the benefit at issue here is critical . . . If Plaintiffs are correct that [California's system] subsidizes a private education . . . then this case is on all fours with *Carson* . . ."); ER50 (ultimately rejecting the Free Exercise claim because "[c]haracterizing the NPS system as a mechanism for subsidizing private instruction of IDEA-eligible children is erroneous as a matter of law").

impermissible, the Court explained, because it "put" each religious nonprofit "to a choice: It may participate in an otherwise available benefit program or remain a religious institution." *Id.* at 462. In *Espinoza*, weighing a government-backed scholarship program, the Court held that Montana could not "bar[] religious schools from public benefits solely because of the religious character of the schools." 140 S.Ct. at 2255. The provision there "plainly exclude[d] schools from government aid solely because of religious status," *id.*, that is, it barred any religious school from eligibility "simply because of what it is," *id.* at 2257 (quoting *Trinity Lutheran*, 582 U.S. at 464). Thus under *Carson* and the cases on which it relied, a state cannot provide a benefit and then "expressly discriminate against otherwise eligible recipients by disqualifying them . . . solely because of their religious character." *Carson*, 142 S.Ct. at 1996 (alteration omitted) (quoting *Trinity Lutheran*, 137 S.Ct. at 2021); *see id.* at 1997 (similarly citing *Espinoza*, 140 S.Ct. at 2255). The benefit provided by California—tailored special education resources guided by the IEP team—is subject to First Amendment protections just as much as parent-directed tuition assistance.

*Second*, the state wrongly attempts to evade scrutiny by deeming private schools public. The district court adopted California's argument that it may exclude religious schools from IDEA placements in service of providing a "public

education." ER51. That was precisely the argument the Court rejected in *Carson*, and it is just as spurious here.

In *Carson*, Maine too argued that it did "not offer parents a choice of publicly funded alternatives to public schools," but instead was offering parents the ability to "obtain a public education for their children" by selecting "from among a small group of private schools" that had sufficiently "demonstrate[d] to the State" that they provided a "suitable equivalent" to public education. Brief for Respondents at 6-7, *Carson v. Makin*, No. 20-1088 (May 21, 2021); *see also Carson*, 142 S.Ct. at 1998 ("[t]he public benefit Maine [was] offering is a free public education"); *accord* ER51 ("A child's enrollment in [a nonpublic school] is equivalent to enrollment in the State's public education system . . . ."). But whatever Maine opted to call the purposes of its program, it enlisted *private* institutions, which controlled their own operations and directed their own curricula, to aid in its public purpose. "[T]he curriculum taught at participating private schools need not even [have] resemble[d] that taught in the Maine public schools." *Id.* at 1999. Private schools could "be single-sex." *Id.* They could be located outside the state, or even abroad. *Id.* So while the private schools received public support, that did not convert the education within their walls into a public education or render it a fungible good. *See Espinoza*, 140 S.Ct. at 2261 (explaining that under the government's position, "an interest in

public education is undermined by diverting government support to *any* private school, yet the [challenged] provision bar[red] aid only to *religious* ones").

The same is true here. As in *Carson*, certified nonpublic schools can have entirely different curricula from those in public schools; indeed, plaintiffs ably detail several such schools with express ideological commitments. *See* Opening.Br.11-14. Also as in *Carson*, certified schools can be single-sex. *See id.* And—also as in *Carson*—certified schools need not even be located within state borders. Cal. Educ. Code §56365(f)-(i). To be sure, the state provides and directs the special education benefits, just as the state in *Carson* provided and directed funding. But the private school controls the rest of the educational experience. After all, that is why an LEA would deem a public school inadequate and place a student in a private school in the first place—because private schools are different, both from public schools and from each other. *See id.* §56366 (describing nonpublic schools as "an *alternative* special education service"). In reality, California insists that public and private schools be "equivalent" in order to receive tailored IDEA support only selectively, and in the limited sense "that they must both be secular." *Carson*, 142 S.Ct. at 1999.

Nor does it matter that California puts *other* constraints on certified nonpublic schools that may receive IDEA placements. It was not enough, after all, that Maine imposed certain requirements on eligible private schools, similar to California's, that they be accredited, keep small-enough class sizes, and include certain courses from

10

a state-mandated curriculum. *Carson*, 142 S.Ct. at 1993 (noting mandatory private-school courses on "Maine history, including the Constitution of Maine and Maine's cultural and ethnic heritage" (alteration omitted)). What matters is that if a religious school satisfies all other requirements, California still bars it from program participation—the state "condition[s]" eligibility "on the surrender" of religious status. *McDaniel v. Paty*, 435 U.S. 618, 626 (1978); *see also Trinity Lutheran*, 582 U.S. at 462 ("[W]hen the State conditions a benefit in this way, *McDaniel* says plainly that the State has punished the free exercise of religion."). The "administration of that benefit" is thus "subject to the free exercise principles governing any such public benefit program—including the prohibition on denying the benefit based on a recipient's religious exercise." *Carson*, 142 S.Ct. at 2000.

## II. The District Court's Contrary Reasoning Strains Credulity.

None of the distinctions considered by the district court comes close to moving this case outside of the ambit of *Carson*.

*First*, the court seemed to suggest that, because California was merely trying to provide a "public education," it had carte blanche to select private schools with whom to contract as it saw fit. *See* ER49 ("The nonsectarian requirement only affects with what private institutions LEAs in California may contract to provide eligible children with a FAPE when placement in a private institution is necessary to implement the child's IEP."). That argument fails not only because it is irrelevant

whether private schools operate in service of a "public education," *see supra* Part I, but also because the court's argument would imply that the government can discriminate at will when selecting contractors in furtherance of public purposes. That conclusion is untenable.

In *Fulton*, for example, the Court addressed an identical argument that a state has a "freer hand" to impose requirements on contractors than it does the general public. 141 S.Ct. at 1878. Even assuming that a "more deferential approach" was possible in this context, the Court explained, the government still may not "discriminate against religion when acting in its managerial role." *Id*. The upshot is clear: California cannot couch its express discrimination in its power to select contractors. And yet, the state's "rule is simple: No churches need apply." *Trinity Lutheran*, 582 U.S. at 465. So "[r]egardless of how the benefit and restriction are described, the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 142 S.Ct. at 2002.

*Second*, the district court repeatedly remarked on a separate IDEA provision that allows parents to opt out of full IDEA services entirely and place their child in any private school of their choosing, accepting more limited public support instead. *See, e.g.*, ER47 (contrasting public education under IDEA with "some families . . . . opt[ing] for private education"); *see also* ER49. That provision, 20 U.S.C. §1412(a)(10)(A), provides watered-down IDEA benefits and is not the subject of the

challenge here. It would of course *also* be unconstitutional for that limited-services provision to exclude religious schools. But it is *just as* unconstitutional to exclude religious schools from direct, full IDEA benefits and relegate them to second-class status simply because they are religious. *See Carson*, 142 S.Ct. at 1996.

For example, the court summed up its view of the plaintiffs' dilemma by noting that they "have elected that their children receive a FAPE with the support of an IEP at public schools rather than the alternative available to them under the IDEA: enrolling the children in a private school of their choice where they can receive publicly funded equitable services." ER52. But that glib characterization misses that there is *another* alternative under the IDEA in the form of full-fledged IEP team placement in private schools—just not, in California, religious ones. Similarly, the court reasoned that "[a]ccepting an LEA's FAPE offer limits all parents' ability to enroll their children in private school, regardless of whether their private school of choice is religious or not." ER53. But those limitations, of course, are different in kind. Deferring to an LEA's decision leaves the *option* of a secular private school on the table, but it removes the possibility of a religious private school altogether. "The express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow [a religious school]—solely because it is [religious]—to compete with secular organizations for a grant." *Trinity Lutheran*, 582 U.S. at 463.

13

\*     \*     \*

"[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). And while Free Exercise jurisprudence has come a long way from the opacity of permitting books, not maps, and maybe atlases, *see* Richard W. Garnett & Jackson C. Blais, *Religious Freedom and Recycled Tires: The Meaning and Implications of Trinity Lutheran*, 2016-2017 Cato Sup. Ct. Rev. 105, 105 (2017), *Carson* and the precedents on which it relied make plain that California's law does not meet even this Nation's minimum neutrality precondition.

## III.  No Compelling Interest Justifies California's Sweeping, Opportunity-Crushing Rule.

Because the district court concluded that California was just a proprietor selecting among schools with which to contract, and that its bar on religious schools' eligibility for those contracts did not trigger a Free Exercise analysis, it did not consider whether the state's regime survives strict scrutiny. It emphatically does not.

"[A] law targeting religious beliefs as such is never permissible." *Lukumi*, 508 U.S. at 533. When a law excludes institutions from a benefit "solely because they are religious," the law must survive the "strictest scrutiny." *Carson*, 142 S.Ct. at 1997 (quoting *Espinoza*, 140 S.Ct. at 2261). To do so, "government action must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Espinoza*, 140 S.Ct. at 2260 (quotation marks omitted). That

14

standard "is not watered down but really means what it says." *Lukumi*, 508 U.S. at 546 (quotation marks and alterations omitted). Applying that test, the Court has made clear that when the "State pursue[s] its preferred policy to the point of expressly denying a qualified religious entity a public benefit solely because of its religious character," "that goes too far." *Trinity Lutheran*, 582 U.S. at 466.

There is no legitimate basis for California's law. At the outset, the state cannot justify its policy based on a purported desire to give all students the same secular education. "Saying that [California] offers a benefit limited to private secular education is just another way of saying" that California does not extend special education benefits "to religious schools." *Carson*, 142 S.Ct. at 1999. Indeed, the law's special disfavor for religion is palpable, as California allows other schools with expressly ideological commitments to operate consistent with those commitments, while prohibiting sectarian-affiliated schools from operating with IDEA placements at all. *See* Opening.Br.11-14.

But what makes California's discriminatory policy especially egregious is that it limits opportunity for the very students who need tailored, individualized educational programs the most of all. *See* Nicole Garnett, *Unlocking the Potential of Private-School Choice*, Manhattan Institute Policy Report, at 8 (March 2023) (available at https://shorturl.at/iBJVY) ("students with disabilities" are chief among the "children who are not well served by district public schools"). The entire point

of the IDEA was to satisfy disabled children's "unique needs" and adapt their educational experiences to their specific disabilities. 20 U.S.C. §1400(d)(1)(A). And California's *private* placement scheme is designed to individualize those accommodations even further, enrolling students in nonpublic schools when "no appropriate public education program is available." Cal. Educ. Code §56365(a). Religious schools are, in appropriate cases, uniquely suited to provide that tailoring.

The plaintiff children here provide a perfect example because public schools have proven wholly unable to satisfy their needs. The schools' shortcomings can be quotidian—including repeatedly serving plaintiff children nonkosher food, *see* ER166-67, ER174, ER262, ER266-67; depriving them of special education days because of lack of coordination with the Jewish holidays, *see id.*; and reprimanding plaintiff parents for their children's absence on those holidays, even to the point of questioning their "interpretation" of the requirements of Judaism, *see* ER166-67, ER266-67. But the programs' deficiencies also run deep, by not equipping plaintiff children with the tools they need to navigate the institutions and Jewish faith permeating their families' religious lives. *See, e.g.*, ER157. An appropriate Orthodox Jewish school would be distinctively well-suited to meet plaintiff children's special needs, both secular and spiritual, each school day. *See Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022) ("The Clause protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most

16

important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life . . . .").

In any event, that is not a determination for the Court, or even exclusively the children's parents, to make. Instead, as the district court recognized, "parents must work with the LEA in charge of the public schools their children would attend" in order "[f]or their children to receive the full benefits of the IDEA." ER48. IEP teams still have ultimate control over whether to place a student in a private school, and, if so, which one. All the Court must hold is that California cannot take religious school options off the table, even when those schools are in the best interests of the child, merely because the schools are religious. That holding would place religious schools on the same footing as other educational models that California fully tolerates for IDEA private placement, including single-sex schools and schools with other, nonsectarian ideological commitments.

## CONCLUSION

For the reasons set forth above, and those stated by the appellants, this Court should reverse.

Respectfully submitted,

ILYA SHAPIRO
MANHATTAN INSTITUTE
52 Vanderbilt Avenue
New York, NY 20017

MARIEL A. BROOKINS*
 *Counsel of Record*
ZACHARY J. LUSTBADER*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
mariel.brookins@clementmurphy.com

*Supervised by principals of the firm who are members of the Virginia bar

*Counsel for* Amicus Curiae

November 1, 2023

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Circuit R. 32-1 because this brief contains 4,053 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

November 1, 2023

s/Mariel A. Brookins
Mariel A. Brookins

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system.  I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Mariel A. Brookins
Mariel A. Brookins