No. 23-55714

# United States Court of Appeals for the Ninth Circuit

CHAYA LOFFMAN AND JONATHAN LOFFMAN, ET AL.,

*Plaintiffs-Appellants,*

v.

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of California, No. 23-cv-01832-JLS-MRW

## BRIEF OF AGUDATH ISRAEL OF AMERICA AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS

Daniel Kaminetsky
AGUDATH ISRAEL OF AMERICA
42 Broadway
New York, NY 10004
(212) 797-9000

Yehudah L. Buchweitz
David Yolkut
Shai Berman
Daniel M. Lifton
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
yehudah.buchweitz@weil.com

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel for amicus curiae certify that Agudath Israel of America has no parent corporation, and there is no publicly held corporation owning 10% or more of its stock.

**TABLE OF CONTENTS**

Interest of Amicus Curiae ............................................................... 1

Introduction ................................................................................... 4

Argument ....................................................................................... 7

   I.   Contrary to the District Court's Characterization, Attending a
       Religious School Is not a Mere "*Religious Want*" for Plaintiffs'
       and their Children .................................................................. 7

      A.  For Orthodox Jews, Religious Schooling Is a Matter of Duty,
          not Preference.................................................................. 7

      B.  For Orthodox Jewish Children with Disabilities, Attending
          a Religious Schools Is a Developmental and Educational
          Imperative .................................................................... 11

Conclusion.................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*A.H. v. French (In re A.H.)*,
999 F.3d 98 (2d Cir. 2021) .......................................................... 4

*Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*,
512 U.S. 687 (1994) ............................................................... 14, 15

*Bd. of Educ. of Monroe–Woodbury Cent. Sch. Dist. v. Wieder*,
72 N.Y.2d 174 (1988) ............................................................... 15

*Carson v. Makin*,
142 S. Ct. 1987 (2022) ................................................................ 4

*Connors v. Mills*,
34 F. Supp. 2d 795 (N.D.N.Y. 1998) ...................................... 13

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020) ................................................................ 4

*Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*,
510 U.S. 7 (1993) ...................................................................... 12

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) .......................................................... 7, 11

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
582 U.S. 449 (2017) .................................................................... 4

*Westchester Day Sch. v. Vill. of Mamaroneck*,
417 F. Supp. 2d 477 (S.D.N.Y. 2006) ...................................... 11

**Statutes**

20 U.S.C. § 1400 .................................................................. 11, 12

**Other Authorities**

Bailey Kadian, *A Free Appropriate Public Education: Examining What "Appropriate" Means for Students with Disabilities in a Global Pandemic*, 32 Health Matrix 557 (2022) .................................. 13

Maimonides, *Mishne Torah, Hilchot Talmud Torah* ............................ 8, 10

Mishnah, *Avot* ........................................................................... 8

*Orthodox Judaism: Yeshiva*, Jewish Virtual Library,
https://www.jewishvirtuallibrary.org/yeshiva ..................................... 10

*Project Learn*, Agudath Israel of America,
  https://agudah.org/project-learn/ ...................................................... 2, 13

Rabbi Joseph Karo, *Shulchan Aruch, Yoreh Deah* ............................... 8, 10

*Shema*, Chabad.org, https://www.chabad.org/library/article_cdo/
  aid/705353/jewish/The-Shema.htm......................................................... 7

Talmud Bavli,

  *Bava Batra* ............................................................................................. 9

  *Kiddushin* ......................................................................................... 8, 9

  *Succah* .................................................................................................. 8

Talmud Yerushalmi, *Ketubot* ...................................................................... 9

The Bais Ya'akov Project, *The Movement*, Soc. Scis. Humans. Rsch.
  Council of Can., https://thebaisyaakovproject.religion.
  utoronto.ca/bais-yaakov-movement/ ............................................... 10, 11

*Yahalom, Agudath Israel of America,* https://agudah.org/yahalom/ ......... 2

## INTEREST OF AMICUS CURIAE[1]

Agudath Israel of America is a 101-year-old nonprofit Orthodox Jewish umbrella organization. Agudath Israel's headquarters are located in New York City, and it serves over 30 states, including California, with its network of regional and state offices, affiliated synagogues, summer camps, special education, youth services, and religious study programs across the country. Agudath Israel regularly intervenes at all levels of government—federal, state and local; executive, legislative, administrative and judicial (including through the submission of, or participation in, amicus curiae briefs in this Court)—to advocate and protect the interests of the Orthodox Jewish community in the United States. Agudath Israel is particularly assiduous in seeking to prevent any governmental action that, inadvertently or otherwise, might restrict the ability of Orthodox Jews to practice their religion freely, or to participate fully and equally in the public life of this country.

One of Agudath Israel's roles is to advocate for Jewish schools and Jewish education, which Orthodox Jews see as both a personal religious obligation and a critical factor—perhaps the critical factor—in ensuring

---

[1] No party or party's counsel authored this brief in whole or in part. No party, party's counsel, or person other than amicus curiae, its members, and its counsel made a monetary contribution to fund the preparation or submission of this brief. All parties have consented to the filing of this brief.

Jewish religious identity and continuity. The overwhelming majority of Agudath Israel's constituents send their children to the approximately 750 Orthodox Jewish day schools across the country that collectively educate over 260,000 students.

Special education sits among the top items on Agudath Israel's agenda. Agudath Israel's Washington D.C. and state offices have spent decades advocating on the federal, state, and local levels for greater access to special education funding and services for families sending their children to Jewish day schools. This has included working on the reauthorization of the Individuals with Disabilities Education Act (IDEA) and on state programs that offer private school scholarships for students with special needs.

Through its Project Learn and Yahalom programs, moreover, Agudath Israel works closely with parents, schools, and government agencies in New York, New Jersey, Illinois, Florida, and Maryland to ensure children with disabilities receive the educational support they need and are entitled to under law. *See Project Learn*, Agudath Israel of America, https://agudah.org/project-learn/ (last visited November 1, 2023); *Yahalom,* Agudath Israel of America, https://agudah.org/yahalom/ (last visited November 1, 2023). Thanks in part to Project Learn, 1,400 students have attended special education schools and another 14,000 have received the

support services they require in their mainstream religious schools. *See Project Learn, supra.* Given the success it has seen supporting children with disabilities in those mainstream religious schools, Agudath Israel has a particular interest in this case. Aside from ending Defendants' discrimination, a ruling in Plaintiffs' favor would further Agudath Israel's mission to maximize the potential of each and every Orthodox Jewish student in the State of California.

## INTRODUCTION

The facts of this case are simple. In many scenarios, Defendants provide funding to private schools to help deliver a free appropriate public education, known as a FAPE, to students with disabilities. "Sectarian" schools, however, need not apply. Their religious character alone suffices to disqualify them from the program. In turn, religious parents who otherwise would have the ability to send their children to a private school with the full benefit of FAPE funding are put to a choice: the funding or the religious school. This arrangement thus denies religious schools and parents the ability to access an otherwise available public benefit simply because of their religious practices, and, in the process, conditions the receipt of a benefit on parents' suspension (or compromise) of their religious exercise.

The Supreme Court has now tried three times to stamp out this type of naked discrimination. *See Carson v. Makin,* 142 S. Ct. 1987 (2022); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449 (2017). Yet states continue their resistance to the Court's rulings, and like others before it, the district court gave Defendants a free pass. *See, e.g., A.H. v. French* (*In re A.H.*), 999 F.3d 98 (2d Cir. 2021) (granting mandamus to remedy Vermont's refusal to comply with *Espinoza*).

One need look no further than the district court's summary of its ruling to appreciate its error. All Plaintiffs alleged, the court said, was that "LAUSD has not provided … special accommodations that take into account the families' religious wants" and, the court held, "said accommodations are not available under the IDEA." ER-53. But Plaintiffs do not seek "special accommodations." They merely seek to access a benefit that is available to students in a similar posture and not be disqualified due to their religious practice. That is a request for equal treatment, not special accommodations.

Plaintiffs' brief on appeal ably demonstrates why the district court's contrary conclusion is wrong as a matter of law. Amicus Agudath Israel of America submits this brief, however, to correct an apparent misunderstanding that bubbles beneath the surface of the district court's opinion. In its summary, the district court appears to characterize Plaintiffs' goal to educate their children in a religious school as a matter of religious preference. Defendants' exclusion of religious schools from the special education program, the district court said, fails to "accommodat[e] … the families' *religious wants.*" *Id.* (emphasis added). That choice of language stands in stark contrast with how the district court described the general importance of a FAPE and an Individualized Educational Program (IEP) for

children with disabilities. Those are required, in the district court's formulations, to "meet th[e] varied *needs*" of students with disabilities. ER-10-11; *see also* ER-16 (discussing the "needs of … pupil[s]" with disabilities); ER-38 (discussing "M.L.'s special education needs"); ER-50, 52. Not once did the district court label the provision of tailored, special education to children with disabilities a "want." And rightly so.

Yet the district court felt comfortable discounting Plaintiffs' goal to send their children with disabilities to a religious school as a mere "religious want." That errant characterization reflects a lack of understanding that calls for correction. As amicus demonstrates below (and as the Complaint pleads, *see* ER 255-57), sending children to a religious school is a matter of religious duty—not preference—for Orthodox Jews. And more than that, religious schooling is crucial, not just to fulfilling that religious duty, but also to meeting the general developmental and educational needs of those children consistent with the IDEA.

# ARGUMENT

## I. Contrary to the District Court's Characterization, Attending a Religious School Is not a Mere "*Religious Want*" for Plaintiffs' and their Children

### A. For Orthodox Jews, Religious Schooling Is a Matter of Duty, not Preference

As the Supreme Court has recognized, "[r]eligious education is a matter of central importance in Judaism," and "the Torah is understood to require Jewish parents to ensure that their children are instructed in the faith." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065 (2020); *see also* ER-255 ("Jewish parents have a duty to transmit Jewish religious beliefs and practices to their children."); Br. at 4 ("At Sinai, G-d charged Jews with instructing their children in the faith.").

For over three thousand years, Orthodox Jews have twice daily recited the *Shema* prayer,[2] which recounts G-d's command to "[t]ake to heart these instructions with which I charge you this day [and i]mpress them upon your children." *Deuteronomy* 6:6-7. The same prayer relays G-d's exhortation that "you shall teach th[ese words] to your children." *Deuteronomy* 11:19.

The Talmud—the primary repository of Jewish law and theology—explains that these verses place on every "father [an] obligat[ion] … to

---

[2] *See The Shema*, Chabad.org, https://www.chabad.org/library/article_cdo/aid/705353/jewish/The-Shema.htm (last visited November 1, 2023).

teach his son Torah," that is, Jewish scripture and law. Talmud Bavli, *Kiddushin* 29a, 29b.[3] So central is that duty to educate that a parent's obligation to teach their child Torah begins from the moment the child "knows how to speak." Talmud Bavli, *Succah* 42a.[4] Both Maimonides and Rabbi Joseph Karo—the two most influential codifiers of Jewish law—set out this parental obligation and dedicate entire sections of their compendiums to the laws of religious education. *See* Maimonides, *Mishne Torah, Hilchot Talmud Torah* 1:1 ("[A] father is obligated to teach his son Torah while he is a minor.");[5] Rabbi Joseph Karo, *Shulchan Aruch, Yoreh Deah* 245:1 ("There is a positive commandment for a father to teach his son Torah.").[6]

The parental duties to educate also extend beyond religious texts and tradition. Just like a parent must teach his child Torah, the Talmud instructs, so too he must "teach him a trade." Talmud Bavli, *Kiddushin* 29a.[7] Only then can a parent ensure their child can "enjoy life." *Id.* 30b (quoting Ecclesiastes 9:9);[8] *see also* Mishnah, *Avot* 2:2 ("Rabban Gamaliel … said:

---

[3] *See* https://www.sefaria.org/Kiddushin.29a.10; https://www.sefaria.org/Kiddushin.29b.8.

[4] *See* https://www.sefaria.org/Sukkah.42a.10.

[5] *See* https://www.sefaria.org/Mishneh_Torah%2C_Torah_Study.1.1.

[6] *See* https://www.sefaria.org/Shulchan_Arukh%2C_Yoreh_De'ah.245.1.

[7] *See* https://www.sefaria.org/Kiddushin.29a.10.

[8] *See* https://www.sefaria.org/Kiddushin.30b.11.

excellent is the study of the Torah when combined with a worldly occupation.").[9] The Talmud similarly relays that parents are obligated to teach children to swim because they would otherwise be lacking a basic survival skill. Talmud Bavli, Kiddushin 30b.[10] In short, the Jewish tradition is unambiguous that parents have a duty to educate their children.

Of course, it is theoretically possible for parents to carry out these commandments on their own. Yet as Orthodox Jews recognized two millennia ago, without a robust religious school system, too many children fall through the cracks. The Talmud recounts how the absence of a developed school system left many children behind, especially those already at a disadvantage, and extolls the virtue of Yehoshua ben Gamla (d. 69/70 C.E.) for averting the impending crisis. *See* Talmud Bavli, *Bava Batra* 21a. Yehoshua ben Gamla "instituted an ordinance that teachers of children should be established in each and every province and in each and every town" and that children should be brought "in to learn at the age of six." *Id.*[11] "If not for [that ordinance]," the Talmud explains, "the Torah would have been forgotten from the Jewish people." *Id.*;[12] *see also* Talmud Yerushalmi, *Ketubot* 8:11 ("Simeon ben Sheṭaḥ decreed … that children

---

[9] *See* https://www.sefaria.org/Pirkei_Avot.2.2.

[10] *See* https://www.sefaria.org/Kiddushin.30b.12.

[11] *See* https://www.sefaria.org/Bava_Batra.21a.4.

[12] *See* https://www.sefaria.org/Bava_Batra.21a.2.

have to go to school.").[13] Following that edict, Maimonides and Rabbi Joseph Karo provide that, by the age of six, a parent should "take" their child "to a teacher of young children." Maimonides, *Mishne Torah*, *Hilchot Talmud Torah* 1:6;[14] Rabbi Joseph Karo, *Shulchan Aruch, Yoreh Deah* 245:5.[15]

For centuries upon centuries Jews have adhered to their religious duty to establish religious schools for their children. *See Orthodox Judaism: Yeshiva*, Jewish Virtual Library, https://www.jewishvirtuallibrary.org/yeshiva (last visited November 1, 2023). In the early 1900s, Sarah Schenirer took up Yehoshua ben Gamla's mantle and, seeing the rising tide of assimilation, launched the Bais Yaakov movement to establish religious girls' schools in communities across Europe. *See* The Bais Ya'akov Project, *The Movement*, Soc. Scis. Humans. Rsch. Council of Can., https://thebaisyaakovproject.religion.utoronto.ca/bais-yaakov-movement/ (last visited November 1, 2023). That movement—buoyed from its beginnings by amicus' affiliate World Agudath Israel—has achieved resounding success and today is responsible for the education of thousands of Jewish

---

[13] *See* https://www.sefaria.org/Jerusalem_Talmud_Ketubot.8.11.5.

[14] *See* https://www.sefaria.org/Mishneh_Torah%2C_Torah_Study.1.1.

[15] *See* https://www.sefaria.org/Shulchan_Arukh%2C_Yoreh_De'ah.245.5.

girls across the globe. *See id.*; *see generally* Naomi Seidman, Sarah Schenirer and the Bais Yaakov Movement (2019).

As the above discussion demonstrates, the district court was wrong to imply that Plaintiffs' goal to send their children to religious schools is merely a matter of religious preference. *See* ER-53. It is a religious "require[ment]" "of central importance." *Our Lady of Guadalupe*, 140 S. Ct. at 2065; *see also Westchester Day Sch. v. Vill. of Mamaroneck*, 417 F. Supp. 2d 477, 497 (S.D.N.Y. 2006) ("[F]or modern Orthodox Jews, enrolling their children in a dual curriculum Jewish day school is 'virtually mandatory.'"), *aff'd*, 504 F.3d 338 (2d Cir. 2007). Defendants' "nonsectarian" requirement thus puts Orthodox Jewish parents of children with disabilities to an impossible choice: compromise your religious duty or forgo the financial support necessary to meet your child's developmental needs.

## B. For Orthodox Jewish Children with Disabilities, Attending a Religious Schools Is a Developmental and Educational Imperative

The central mission of the IDEA is clear: to "provide for the education of all children with disabilities." 20 U.S.C. § 1400(d)(1)(C). In pursuit of that mission, IDEA provides federal funding for specialized services and instruction to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." *Id.*

§ 1400(d)(1)(A); *see also Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 13 (1993) ("IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free.").

For Orthodox children, stark cultural differences can make it all but impossible for them to receive an appropriate education in anything but a religious school environment. Consider an Orthodox student with disabilities raised in an exclusively Yiddish-speaking home. He could only receive a meaningful education in a school in which Yiddish was a language of instruction—most likely, a Jewish religious school. By the same token, an Orthodox student with disabilities (even one raised in an English-speaking home) can maximize her potential only if she receives an education in a religious setting—one that follows the same daily practices and routines with which she is familiar from her house and community.

The entire premise of the IDEA is that children with special needs, more so than other children, require an educational setting that is appropriate for their specific circumstances. Placement in a setting ill-suited for a child could have far-reaching detrimental consequences for the healthy development of that child. "Given the fragile state of many disabled children, and their dire need for constant and consistent care, even brief peri-

ods of inappropriate schooling could lead to tremendous educational, social, emotional, and psychological deterioration." *Connors v. Mills*, 34 F. Supp. 2d 795, 804 (N.D.N.Y. 1998).

***Educational regression.*** First and foremost, educational regression can occur when children with disabilities are placed in inappropriate school environments. *See, e.g.*, Bailey Kadian, *A Free Appropriate Public Education: Examining What "Appropriate" Means for Students with Disabilities in a Global Pandemic*, 32 Health Matrix 557, 571-574 (2022). The progress they have made in their learning and development can be eroded due to a lack of tailored teaching methods and accommodations. Even brief periods in a classroom that does not cater to their specific needs can lead to setbacks that are challenging to overcome. Through its Project Learn program, amicus has helped 1,400 students attend special education schools and another 14,000 students receive the support services they require in their mainstream religious schools. *See See Project Learn*, Agudath Israel of America, https://agudah.org/project-learn/ (last visited November 1, 2023). Time and again, amicus sees that students with disabilities who do not receive their tailored special education support and services fall further behind their peers and sometimes even experience regression in the skills they have already achieved.

***Social, emotional, and psychological impact.*** Social, emotional and psychological deterioration manifests when a child's educational environment does not meet their unique requirements. The toll can be profound, affecting not only the child's academic performance but also their overall mental health. Inappropriate schooling can result in feelings of isolation, stigmatization, and difficulty forming relationships with peers. For many Orthodox Jewish students, their distinctive garb, dietary requirements, and language make them culturally divergent from their classmates, and the lack of a supportive social network can exacerbate their sense of exclusion and hinder their overall social development. Similarly, schooling in the wrong environment can create stress, anxiety, and low self-esteem as students feel perpetually out of place or misunderstood, and worse, are sometimes the subject of ridicule and ostracization.

Consider, for example, "the Satmar's way of life," which "springs out of their strict religious beliefs, [and] conflicts in many respects with mainstream American culture." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 724 (1994) (Kennedy, J, concurring). This community "do[es] not watch television or listen to radio; they speak Yiddish in their homes and do not read English-language publications; and they have a distinctive hairstyle and dress." *Id.* Attending secular schools, "where they were exposed to much different ways of life, caused the handicapped

Satmar children understandable anxiety and distress." *Id.*; *see also id.* at 692 (majority opinion) (discussing "the panic, fear and trauma [the children] suffered in leaving their own community and being with people whose ways were so different" (quoting *Bd. of Educ. of Monroe–Woodbury Cent. Sch. Dist. v. Wieder*, 72 N.Y.2d 174, 180-181 (1988))).

Moreover, children with special needs who must attend public schools to receive appropriate services, while their siblings attend private religious schools, feel further marginalized by not being able to attend the same school. Amicus often see a breakdown in socially and emotionally appropriate behaviors after such placements are made, as they disconnect from their community. If these students can attend their community school, their development—socially, emotionally, and academically—will progress in a much more effective and timely way.

***

For these reasons, the district court was wrong to characterize Plaintiffs' goal to send their children to religious schools as stemming from a uniquely "*religious want.*" ER-53 (emphasis added). Placement in a religious school does not only accord with Plaintiffs' religious *duty*, it is essential to providing their children with the educational and developmental support that lies at the core of the IDEA. Defendants' discriminatory "nonsectarian" requirement thus presents a compounding evil. By forcing

15

Plaintiffs to compromise their religious exercise to receive a public benefit, Defendants simultaneously compromise that benefit's efficacy. The stakes for religious children with disabilities are too high to allow Defendants' discriminatory and self-defeating policies to continue.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's decision.

Respectfully submitted,

Daniel Kaminetsky
AGUDATH ISRAEL OF AMERICA
42 Broadway
New York, NY 10004
(212) 797-9000

*/s/ Yehudah L. Buchweitz*

Yehudah L. Buchweitz
David Yolkut
Shai Berman
Daniel M. Lifton
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
yehudah.buchweitz@weil.com

November 1, 2023

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel of record certifies pursuant to Fed. R. App. P. 32(g) that the Brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the Brief exempted by Fed. R. App. P. 32(f), this document contains 2,974 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(6) because this document has been prepared in a proportionally spaced type-face using Century Schoolbook font in 14 point size.

*/s/ Yehudah L. Buchweitz*
Yehudah L. Buchweitz
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
yehudah.buchweitz@weil.com

November 1, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2023, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/ Yehudah L. Buchweitz*

Yehudah L. Buchweitz
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000
yehudah.buchweitz@weil.com

November 1, 2023