No. 23-55714

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

CHAYA LOFFMAN, ET AL.,

Plaintiffs-Appellants,

*v.*

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of California
Honorable Josephine L. Staton
(No. 2:23-cv-01832-JLS-MRW)

BRIEF OF *AMICUS CURIAE*
CALIFORNIA CATHOLIC CONFERENCE
IN SUPPORT OF PLAINTIFFS-APPELLANTS

JOHN A. MEISER
MEREDITH HOLLAND KESSLER
NOTRE DAME LAW SCHOOL
RELIGIOUS LIBERTY CLINIC
1338 BIOLCHINI HALL
Notre Dame, IN 46556
jmeiser@nd.edu
Telephone: (574) 631-3880

*Counsel for* Amicus Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* certifies that it has no parent corporation and no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT.............................................i

TABLE OF CONTENTS ............................................................ii

TABLE OF AUTHORITIES.................................................... iii

INTEREST OF *AMICUS CURIAE*..............................................1

INTRODUCTION .................................................................2

ARGUMENT ......................................................................4

   I.  California's exclusion of "sectarian" schools reflects a long history of efforts to suppress and demean disfavored religious groups in the United States. ...............................................4

      A.  Laws denying benefits to "sectarian" groups are rooted in a history of bigotry against religious minorities. ..........................4

      B.  California's history reflects the same discrimination against "sectarian" communities. ............................................10

      C.  Hostility toward "sectarian" religious communities persisted well after the 19th century. .........................................14

  II.  Today, Supreme Court precedent rejects laws like California's that discriminate against disfavored "sectarian" groups. .............18

CONCLUSION ...................................................................23

CERTIFICATE OF COMPLIANCE ......................................24

CERTIFICATE OF SERVICE ...............................................25

# TABLE OF AUTHORITIES

## Cases

*Carson v. Makin*, 142 S. Ct. 1987 (2022) .................................................. 21

*Church v. Bullock*, 109 S.W. 115 (Tex. 1908) ........................................... 14

*Colo. Christian Univ. v. Weaver*, 534 F.3d 1245 (10th Cir. 2008) ........ 2, 18

*Conrad v. City of Denver*, 656 P.2d 662 (Colo. 1982) ........................... 14

*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020) ............ *passim*

*Evans v. Selma Union High Sch. Dist.,* 222 P. 801 (Cal. 1924) ............... 15

*Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203 (1948) ................ 10

*Lynch v. Donnelly*, 465 U.S. 668 (1984) .................................................. 17

*McDaniel v. Paty*, 435 U.S. 618 (1978) ................................................... 16

*Mitchell v. Helms*, 530 U.S. 793 (2000) .................................... 3, 9, 18, 19

*People ex rel. Vollmar v. Stanley,* 255 P. 610 (Colo. 1927) ..................... 14

*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) ................ 16

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) .......................................................................... 20

*Zorach v. Clauson*, 343 U.S. 306 (1952) ................................................. 15

## Statutes and Constitutional Provisions

Cal. Const. art. IX, § 8 ............................................................................. 13

Mo. Const. art. I, § 7 ................................................................................ 20

Mont. Const. art. X, § 6(1) ........................................................................ 20

20 U.S.C. §§ 1400–1482 ........................................................................... 21

20 U.S.C. § 1412(a)(10)(B) ................................................................ 21

Cal. Educ. Code § 56336.1(a) ............................................................ 21

**Other**

E. B. Willis & P. K. Stockton, Debates and Proceedings of the
Constitutional Convention of the State of
California (1880) .......................................................................... 11, 13

Horace Mann, An Historical View of Education; Showing Its Dignity
and Its Degradation, *in 2 Life and Works of Horace Mann* 241
(Mary Mann ed., Cambridge 1867) ...................................................... 7

Jay S. Bybee & David W. Newton, *Of Orphans and Vouchers: Nevada's
"Little Blaine Amendment" and the Future of Religious
Participation in Public Programs*, 2 Nev. L.J. 551 (2002) ........ 8, 10

John Hemphill, *The Public Schools: A Lecture by Rev. Mr. Hemphill on
the President's Message*, The Daily Alta Cal., Dec. 13, 1875 ......... 12

Kevin Starr, Americans and the California Dream,
1850-1915 (1986) ...................................................................... 10, 11

Lyman Beecher, A Plea for the West (1835) .......................................... 11

Luke Ritter, *Inventing America's First Immigration Crisis* (2021) ......... 6

Margaret C. DePalma, *Dialogue on the Frontier: Catholic and
Protestant Relations, 1793–1883* (2004) .......................................... 6

Mark J. Hurley, *Church State Relationships in Education in
California* (1948) .............................................................................. 7

*Our Common School Law*, The Pacific, Feb. 10, 1854 ........................... 11

Paul Goda, *The Historical Background of California's Constitutional
Provisions Prohibiting Aid to Sectarian Schools*, 46 Cal. Hist.
Soc'y Q. 149 (1967) ................................................................... 12, 13

iv

Philip Hamburger, *Separation of Church and State* (2002)...............7, 10

*Religious*, Vt. Chron., Mar. 2, 1842 ...........................................................9

Richard A. Baer, Jr., *The Supreme Court's Discriminatory Use of the Term "Sectarian"*, 6 J.L. & Pol. 449 (1990) ...................................2, 7, 8, 17

Robert G. Natelson, *Why Nineteenth Century Bans on "Sectarian" Aid Are Facially Unconstitutional: New Evidence on Plain Meaning*, 19 Federalist Soc'y Rev. 98 (2018) ....................................................9

Samuel F.B. Morse, *Foreign Conspiracy Against the Liberties of the United States* (N.Y., Leavitt, Lord & Co 1835) ...............................6

Steven K. Green, *The Bible, the School, and the Constitution* (2012).........................................................................6, 8

Steven K. Green, *The Blaine Amendment Reconsidered*, 36 Am. J. Legal Hist. 38 (1992) .......................................................................10

*The Attack upon the Common Schools*, Sacramento Daily Union, Apr. 15, 1861......................................................................................12

*The Nation*, Milwaukee Daily Sentinel, Dec. 7, 1880 ..............................9

Tyler Anbinder, *Nativism and Slavery: The Northern Know Nothings and the Politics of the 1850s* (1992) .................................................5

The Sacramento Bee, Dec. 13, 1875............................................................12

The S.F. Chron., Oct. 20, 1878....................................................................12

*What Is Sectarianism?*, Ohio Observer, Mar. 26, 1845 ...........................9

4 Cong. Rec. (1875) .....................................................................................8

## INTEREST OF *AMICUS CURIAE*

The California Catholic Conference (CCC) is the official voice of the Catholic community in California's public policy arena. The staff office of the California Catholic Conference of Bishops, the CCC advocates to advance the Catholic vision of human life and dignity, to enhance the honorable and good in society, and to uplift those who are poor and vulnerable.

In keeping with this mission, the CCC supports educational policies that increase learning opportunities, provide families with options for schooling, and promote successful academic outcomes for both religious and public-school students. The CCC also opposes all efforts to discriminate against, demean, and exclude people of any faith from full participation in public life. The CCC therefore seeks to ensure the meaningful protection of the rights of families and schools of all faith traditions to serve all members of their communities, including those with disabilities.[1]

---

[1] All parties have consented to the filing of this brief. This brief was not authored in whole or in part by a party or counsel to a party. No person other than amicus curiae, its members, and its counsel contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

Under California law implementing the Individuals with Disabilities Education Act (IDEA), the State invites any nonpublic school to apply to help serve the special educational needs of students with disabilities—so long as that school is "nonsectarian." As the appellants have well explained, the exclusion of schools from California's IDEA program merely because they are religious violates basic tenets of First Amendment law. But worse still, California's exclusion of so-called "sectarian" schools also reflects a pernicious and hateful 19th century movement that sought to stamp out a growing population of immigrants whose beliefs differed from the prevailing Protestantism of the time.

Indeed, California's very choice of the word "nonsectarian" betrays the law's invidious nature. Far from a simple synonym for "religious," the term "sectarian" is derogatory—imparting, solely by its use, a "negative connotation" against the religious schools that California describes with that term. *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1258 n.5 (10th Cir. 2008) (McConnell, J.). It is "a term that has been used throughout much of American history to keep religious and social 'untouchables' in their proper place" by "exclud[ing] and marginaliz[ing]

those . . . whose religious or philosophical beliefs . . . did not correspond to [the ruling elites'] own vision." Richard A. Baer, Jr., *The Supreme Court's Discriminatory Use of the Term "Sectarian"*, 6 J.L. & Pol. 449, 451 (1990). And it is a term that reflects a bigoted and painful history of oppression that the California Catholic Conference—like the Jewish families and schools in this case—knows all too well.

To invoke that law to deny religious schools the ability to participate in California's program would continue this "shameful pedigree" of invidious religious discrimination, a result which the U.S. Supreme Court has "not hesitate[d] to disavow." *Mitchell v. Helms*, 530 U.S. 793, 829 (2000) (plurality opinion). This Court must do the same. It is long past time for states to stop denying people of faith—and especially those, like the Jewish community, which have been marginalized throughout our history—the freedom to participate fully in our political community. Exclusionary laws like California's "should be buried now." *Id.*

## ARGUMENT

I.  **California's exclusion of "sectarian" schools reflects a long history of efforts to suppress and demean disfavored religious groups in the United States.**

A shameful legacy of hatred and bigotry against religious minorities underlies California's exclusion of so-called "sectarian" schools from the State's program serving children with disabilities. It is a legacy that lays bare the law's invidious nature.

### A.  **Laws denying benefits to "sectarian" groups are rooted in a history of bigotry against religious minorities.**

Laws disfavoring "sectarian" groups cannot be understood without appreciation of the period of "virulent prejudice" against religious minorities in which that term came into prominence. *See Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2268 (2020) (Alito, J., concurring). Indeed, the term "sectarian" developed in American law specifically as a mechanism to divide, to exclude, and to suppress.

In the 19th century, a wave of immigration brought with it the rapid growth of religious communities from faiths outside the predominant Protestant mainstream. That, in turn, prompted a wave of nativist hostility against these growing populations of religious minorities—particularly, in many parts of the country, against both

Catholics and Jews. *See id.* at 2269–70. Indeed, "[a]n entire political party, the Know Nothings"—something of a precursor to the Ku Klux Klan—"formed in the 1850s 'to decrease the political influence of immigrants and Catholics,' gaining hundreds of seats in Federal and State Government." *Id.* at 2269 (quotation omitted). The Know Nothings and their allies spread fear that Catholics and other immigrants "would attempt to subvert" the U.S. political system and undermine the social order out of loyalty to their home countries. *Id.* (quotation omitted); *see also* Tyler Anbinder, *Nativism and Slavery: The Northern Know Nothings and the Politics of the 1850s*, 135–36 (1992).

That nativist paranoia often boiled over into violence. In Massachusetts, Catholic children in public schools were physically beaten for refusing to read the King James translation of the Bible. *Espinoza*, 140 S. Ct. at 2272 (Alito, J., concurring). In New York, a mob destroyed the home of a Catholic Bishop. *Id.* In Philadelphia, anti-Catholic rioters fired cannons at and burned two Catholic churches, leaving several people dead. *Id.* And in Cincinnati, a mob besieged the Archbishop's residence, burned a visiting Cardinal in effigy, and attacked the German immigrant neighborhood of "Over the Rhine," clashing with

Catholic residents, firing a cannon in the streets, and destroying ballot boxes. Luke Ritter, *Inventing America's First Immigration Crisis* 148 (2021); Margaret C. DePalma*, Dialogue on the Frontier: Catholic and Protestant Relations, 1793–1883*, at 110 (2004).

These fears also sparked a political movement to push religious minorities out of public life. Independent religious schools were particularly targeted. Groups like the Know Nothings warned that Catholics or other religious minorities would undermine the social order by building a system of independent schools through which they could teach their own messages to the next generation. DePalma*, supra*, at 82.[2] Notably, their concern was not with religion in education *generally*.

---

[2] Contemporary news reports publicized a variety of these fears, often in lurid language. *See, e.g.*, Steven K. Green, *The Bible, the School, and the Constitution* 97 (2012) (describing Cincinnati newspaper article, which "declared that Catholic opposition to Bible reading was part of a 'Romanist policy' that sought 'the overthrow, the abolition, of the whole American scheme of Common School Education'"); Samuel F.B. Morse, *Foreign Conspiracy Against the Liberties of the United States* 102–03 (N.Y., Leavitt, Lord & Co 1835) (stating that "Popery is the natural enemy of general education" and describing Catholic schools as the "prisons of the youthful intellect of the country" (emphasis omitted)); *Espinoza*, 140 S. Ct. at 2269 (Alito, J., concurring) (quoting 1873 *New York Times* article that decried "[s]ectarian [e]ducation" as a "[c]rusade" that would undermine "the admirable system of public school education").

To the contrary, the existing system of public education at the time was effectively a *Protestant* education—with government-funded schools that were operated by Protestant Christian organizations. Mark J. Hurley, *Church State Relationships in Education in California*, at ix (1948).[3] The concern instead was that the growing population of immigrants from other faiths might receive public support to operate schools outside this prevailing majority—"sectarian" schools, as they were described. *See, e.g.*, Green, *supra* at 96–97 (describing Cincinnati's "Bible War" over whether to remove—at the behest of Catholic immigrants—reading of the King James Bible in public schools); Philip Hamburger, *Separation of Church and State* 220 (2002) (describing New York City's funding of "broadly Protestant" public schools while denying similar funding to Catholic or other denominational schools).

---

[3] As Horace Mann, the leader of the Common School Movement, explained, the preference at the time was that public education indeed *should* be religious—so long as that religion was a preferred Protestant faith. Horace Mann, An Historical View of Education; Showing Its Dignity and Its Degradation, *in 2 Life and Works of Horace Mann* 241, 289–90 (Mary Mann ed., Cambridge 1867); *see also* Baer, *supra*, at 456 ("[Mann] fervently believed that religion should be taught in the compulsory common schools, but it should be of a nonsectarian variety—a religion that he thought was common to all Christians, but that, when all was said and done, looked almost identical to his own Unitarianism.").

Ultimately, this culminated in a nationwide legal effort to suppress the growth of "sectarian" schools outside a broadly Protestant mainstream. *Espinoza*, 140 S. Ct. at 2270 (Alito, J., concurring). In 1875, President Ulysses S. Grant called for Congress to ensure that "[n]o sectarian tenets shall ever be taught in any school supported in whole or in part by the [government]." 4 Cong. Rec. 181 (1875). Grant's choice of the term "sectarian" signified religions that deviated from generally accepted forms of Protestant Christianity. *Cf.* Jay S. Bybee & David W. Newton, *Of Orphans and Vouchers: Nevada's "Little Blaine Amendment" and the Future of Religious Participation in Public Programs*, 2 Nev. L.J. 551, 554–58 (2002). The term "always implies that there exists a contrasting mainstream, a right way of thinking, a common position that deserves to be accepted." Baer, *supra*, at 451; *see also Espinoza*, 140 S. Ct. at 2270 (Alito, J., concurring) ("Dictionaries defined a 'sectarian' as a member 'of a party in religion which has separated itself from the established church, or which holds tenets different from those of the prevailing denomination in a kingdom or state'—a heretic." (citations omitted)). Indeed, in many places, "it was an open secret that 'sectarian' was code for 'Catholic.'" *Mitchell v. Helms*, 530 U.S. 793, 828 (2000)

(plurality opinion).  And elsewhere, that term was also used to tar other disfavored groups, including Mormons, Jews, and Muslims.  Robert G. Natelson, *Why Nineteenth Century Bans on "Sectarian" Aid Are Facially Unconstitutional: New Evidence on Plain Meaning*, 19 Federalist Soc'y Rev. 98, 104 (2018); *see also id.* at 100 ("[D]ictionary definitions and newspaper usage . . . show that *sectarian* referred specifically to religions and religious people the speaker deemed bigoted or out of the mainstream.")[4]

President Grant's urging did not fall on deaf ears, as a "wave of state laws withholding public aid from 'sectarian' schools" swept across the country.  *Espinoza*, 140 S. Ct. at 2270 (Alito, J., concurring).  Most notably, Congressman James Blaine heeded the President's call by proposing a federal constitutional amendment to bar all states from using public funds "for the support of the public schools . . . under the control of any religious sect."  Steven K. Green, *The Blaine Amendment Reconsidered*, 36 Am. J. Legal Hist. 38, 50 (1992) (quotation omitted); *see*

---

[4] *See, e.g.*, *The Nation*, Milwaukee Daily Sentinel, Dec. 7, 1880, at 2 ("The Mormon sectarian organization"); *Religious*, Vermont Chronicle, Mar. 2, 1842, at 33 ("Jewish sectarians"); *What is Sectarianism?*, Ohio Observer, Mar. 26, 1845 (describing sectarians as "Roman Catholics and the Mohammedans").

*also* Hamburger, *supra*, at 324–25. Although the proposal fell just two Senate votes short of passing, similar "Little Blaine Amendments" spread across state constitutions over the next two decades. Bybee & Newton, *supra*, at 559. By 1890, a majority of states had adopted some version of Blaine's amendment; nearly all of these exclusionary provisions contain the "bigoted code language" "sectarian." *Espinoza*, 140 S. Ct. at 2270 (Alito, J., concurring); *see also Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 219–20 (1948) (Frankfurter, J., concurring) (states admitted to the Union after 1876 required to include nonsectarian provision in constitution).

### B. California's history reflects the same discrimination against "sectarian" communities.

The history of California reflects this same exclusionary animus. For one early American visitor to the region, gaining control of California from Catholic Spain in the early 19th century was needed to free its people from the "degrading shackles of ignorance and superstition." Kevin Starr, *Americans and the California Dream, 1850-1915*, at 15–16 (1986). As California experienced its own influx of immigration in the 1830s, it too became home to nativist paranoia that a "foreign" "army" educated by the "despotic governments of Catholic Europe" would

threaten American ideals. Lyman Beecher, *A Plea for the West* 57 (1835). Protestant preachers implored Americans to move west to make "California the Massachusetts of the Pacific"—a state founded on Puritan values. Starr, *supra*, at 86 (emphasis omitted).

Once again, religious schools were the familiar battleground. As elsewhere in the country, publicly funded common education included Bible reading and prayer, and many sought to stamp out disfavored "sectarian" beliefs that differed. *See* Beecher, *supra*, at 12; James Caples, *Remarks of Mr. Caples*, *in* 2 E. B. Willis & P. K. Stockton, *Debates and Proceedings of the Constitutional Convention of the State of California*, at 785 (1880); John P. West, *Remarks of Mr. West*, *in* 2 E. B. Willis & P. K. Stockton*, supra*, at 802. In the 1850s, for example, the Know Nothings gained political control across the state, including the governor's office, by seizing on public outrage at a recently enacted law that briefly allowed public funds to go to Catholic schools. *See* Starr, *supra*, at 94; *Our Common School Law*, Pacific, Feb. 10, 1854, at 60 (arguing that schools must be "free from sectarian influence and prejudice"). Those prejudices

persisted throughout the 19th century,[5] and ensured significant support for the Blaine movement.  Reverend John Hemphill, a pastor in San Francisco, praised Blaine's proposal for reining in "sectarian" Jewish citizens.  John Hemphill, *The Public Schools: A Lecture by Rev. Mr. Hemphill on the President's Message*, The Daily Alta Cal., Dec. 13, 1875, at 1.  Editors at the *Sacramento Bee* apparently agreed, though observed that the amendment was largely unnecessary in the political climate of the time.  The newspaper reprinted the following quotation from the New York *Tribune*: "Every politician knows the average well-to-do citizen" is sensitive to "the possibility of Roman Catholic aggression[,] particularly with reference to the schools."  Goda, *supra*, at 159–60 (quoting Sacramento Bee, Dec. 13, 1875).

After the federal proposal narrowly failed, California adopted its own version of Blaine's amendment—passed at a constitutional

---

[5] *See, e.g.*, *The Attack upon the Common Schools*, Sacramento Daily Union, Apr. 15, 1861, at 3 (blaming political divisions on "sectarians" who would "make an attack upon the Common Schools of this State"); Paul Goda, *The Historical Background of California's Constitutional Provisions Prohibiting Aid to Sectarian Schools*, 46 Cal. Hist. Soc'y Q. 149, 157 (1967) (quoting S.F. Chron., Oct. 20, 1878) (discussing failed reelection of a "Jesuitical demagogue" to the Superintendent of Public Instruction).

convention that was openly hostile to immigrants and Catholics.[6]  Even "sectarian" *orphanages* came under fire for being "hostile systems" that gave too much power to Catholic immigrants.  James Caples, *Remarks of Mr. Caples*, *in* 2 E. B. Willis & P. K. Stockton*, supra*, at 785.  Still today, the California Constitution retains the Blaine amendment adopted at the convention, which prohibits funding "sectarian" or "denominational" schools and the teaching of any "sectarian" doctrine in any common school.  *See* Cal. Const. art. IX, § 8.  Because a broad form of Protestantism was not considered to be "sectarian," the amendment had no effect on the operation of existing common schools as functionally Protestant.  *See* Goda, *supra*, at 165–66.  The law—like so many others that targeted "sectarians"—operated to exclude only those religions disfavored by the political majority.

---

[6] *See, e.g.*, John P. West, *Remarks of Mr. West*, *in* 2 E. B. Willis & P. K. Stockton*, supra*, at 802 (constitutional delegate warning that "sectarian" schools served immigrants who "ma[d]e it their business to rob and plunder"); Alphonse P. Vacquerel, *Remarks of Mr. Vacquerel*, *in* 3 E. B. Willis & P. K. Stockton*, supra*, at 1265 (reporting applause after constitutional delegate argued that children "educated in sectarian schools . . . will know everything else but their duties as citizens").

C. **Hostility toward "sectarian" religious communities persisted well after the 19th century.**

Regrettably, political actors continued to demean and suppress "sectarian" religious minorities well beyond the nativist fervor of the 19th century.

This remained true in schools. Following the spread of "Little Blaine" amendments and into the 20th century, some public schools still demanded that students read from the Bible (especially from the King James version)—a demand that courts upheld as consistent with a "nonsectarian" education. *See, e.g.*, *Church v. Bullock*, 109 S.W. 115, 115–17 (Tex. 1908); *People ex rel. Vollmar v. Stanley,* 255 P. 610, 615 (Colo. 1927), *overruled by Conrad v. City of Denver*, 656 P.2d 662, 670 n.6 (Colo. 1982). Meanwhile, "Catholic and Jewish schools sprang up because the common schools were not neutral on matters of religion," yet funding of those schools was denied as violating the laws prohibiting aid to "sectarian" institutions. *Espinoza*, 140 S. Ct. at 2272 (Alito, J., concurring). Indeed, in California, the state Supreme Court permitted public schools to continue to use the King James Bible and yet to exclude other religious practices. *Evans v. Selma Union High Sch. Dist.,* 222 P. 801 (Cal. 1924). The Court reasoned that the state's prohibition on

14

"sectarian" books in public schools was aimed at only those religious texts that were "controversial," "partisan," and "factional"—not those which might be of less concerning religious heritage to the majority population. *Id.* at 802, 803.

The term "sectarian" also persisted elsewhere in the law as a means to ostracize disfavored religious groups—including by members of the U.S. Supreme Court. In *Zorach v. Clauson*, for example, the Court upheld a New York statute permitting public school students to be excused from school to attend religious classes. 343 U.S. 306, 315 (1952). In dissent, Justice Black lamented that "many fighting sects" existed during the Founding, and "[c]olonial history had already shown that . . . zealous sectarians entrusted with governmental power to further their causes would sometimes torture, maim and kill those they branded 'heretics,' 'atheists' or 'agnostics.'" *Id.* at 319; *see also id.* at 323 (Frankfurter, J., dissenting) (commenting that those promoting the effort "to secure public school pupils for sectarian instruction . . . betray[ed] a surprising want of confidence in the inherent power of the various faiths to draw children to outside sectarian classes").

15

In several particularly telling instances, past members of the Court distinguished the pejorative "sectarianism" from the more benign term "religion." For example, in his opinion concurring in a decision which struck down a Pennsylvania law that permitted Bible readings in public schools, Justice Brennan noted that "nonbeliever[s] . . . fear[] the injection of sectarian doctrines and controversies into the civil polity," and contrasted such "sectarian bias" from more benign "religious aims." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 259, 271 (1963) (Brennan, J., concurring). Justice Brennan nonetheless found that benign religious motivations for in-school Bible reading could not forestall dangerous risks of sectarian bias. *Id.* at 294. And in a decision years later, Justice Brennan again lamented "sectarian goals and policies" and "sectarian bickering and strife" when he concurred in the majority's decision holding unconstitutional a Tennessee law that barred ministers from serving as delegates to the State's constitutional convention. *McDaniel v. Paty*, 435 U.S. 618, 636, 641 (1978) (Brennan, J., concurring). Echoing Justice Brennan's special fear over a "sectarian" form of religion, many years later Justice O'Connor likewise cautioned about the "religious and *indeed sectarian* significance of [a] crèche,"

16

which "is not neutralized by the setting." *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring) (emphasis added); *see also id.* at 700, 710 (Brennan, J., dissenting) (observing that "the nativity scene . . . reflects a sectarian exclusivity" and warning against the government's "indiscriminate[] embrace [of] the distinctively sectarian aspects of the [Christmas] holiday"). Indeed, the Court's usage of "sectarian" during decisions of this time routinely was done "in conjunction with other terms of a negative sort." Baer, *supra*, at 453 (collecting examples including sectarian "division," "exclusivity," "controversies," "indoctrination," and "strife").

To be sure, over the years, "the bias . . . against certain religious people and beliefs" that informed the word "sectarianism" "has been extended to religious people in general." *Id.* at 459. And along with it, today's broader reading of "sectarian" to include *all* religion has not made that word less offensive. Indeed, the purpose of the term "sectarian" remains demeaning for the same reason: it is used to alienate disfavored religious believers. This is not merely a rhetorical concern with so-called "judicial 'cussing.'" *Id.* at 462. The problem runs deeper: "So long as one can view religion as that which is 'sectarian'—as essentially parochial,

17

narrow, bigoted, idiosyncratic—it becomes relatively easy to dismiss it as marginal or even injurious to the public life of the nation." *Id.* at 467. And with that view, courts and others may "mistakenly assume that religion in its totality is 'sectarian' and thus also either irrelevant or detrimental to public life." *Id.* Whether still intended today or not, such negative assumptions necessarily flow from the continued use of this disparaging term.

## II. Today, Supreme Court precedent rejects laws like California's that discriminate against disfavored "sectarian" groups.

In more recent years, the Supreme Court has worked to finally end the denigration and exclusion of "sectarian" groups in the law. Indeed, the Supreme Court has denounced the lamentable history of that term— and has stopped using the word itself. *See Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1258 n.5 (10th Cir. 2008) (McConnell, J.) ("We recognize that the term 'sectarian' imparts a negative connotation . . . . [and that] the Supreme Court has not used the term in recent opinions . . . ."). In *Mitchell v. Helms*, a plurality of the Court wrote of the "shameful pedigree" of "hostility to . . . sectarian schools," and "disavow[ed]" the bigoted history that motivated the spread of laws

18

disfavoring them. 530 U.S. 793, 828–29 (plurality opinion). The plurality recognized that these laws' use of the term "sectarian"—or previous courts' often-used derivative, "pervasively sectarian"—is inseparable from the oppression of religious minorities. *Id.* In the words of Justice Alito, "the terms 'sect' and 'sectarian' are disquieting remnants" of a troubling past, which keep exclusionary provisions "'tethered' to [their] original 'bias.'" *Espinoza*, 140 S. Ct. at 2267 (Alito, J., concurring). Thus, the "doctrine, born of bigotry," that excludes religious schools "from otherwise permissible aid programs . . . should be buried now." *Mitchell*, 530 U.S. at 829 (plurality opinion).

Accordingly, recent Supreme Court decisions also make abundantly clear that States may not exclude religious organizations from otherwise available public programs through discriminatory "nonsectarian" requirements. Since 2017, the Supreme Court has invalidated *three* separate attempts to exclude "sectarian" schools from participating in public benefit programs that support K-12 education.

First, in *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449 (2017), the Supreme Court struck down a Missouri policy that barred religious entities from receiving grants to install playground

improvements, rejecting the State's argument that any funding would violate Missouri's constitutional prohibition against giving money to "any church, sect or denomination of religion." *Id.* at 455 (quoting Mo. Const. art. I, § 7). The Court explained that such a prohibition was a "clear infringement on free exercise" of religion and that invoking Missouri's Blaine Amendment to exclude a religious organization from a public benefit "is odious to our [federal] Constitution . . . and cannot stand." *Id.* at 466–67.

Second, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), the Supreme Court held that Montana could not invoke its own Blaine amendment—which bars giving public money for "sectarian purpose," including to schools affiliated with "any church, sect, or denomination," Mont. Const. art. X, § 6(1)—to disqualify religious schools from participating in Montana's scholarship tax credit program. *Id.* at 2261. The Supreme Court made clear that the federal Constitution does not tolerate such a result and acknowledged the "shameful pedigree" of the Blaine movement. *Id* at 2259. The Court explained, "[O]nce a State decides to [subsidize private education], it cannot disqualify some private schools solely because they are religious." *Id* at 2261. Justice Alito

concurred with a thorough account of the sordid history behind the "pejorative" term "sectarian." *Id.* at 2270 (Alito, J., concurring).

And third, in *Carson v. Makin*, 142 S. Ct. 1987 (2022), the Supreme Court held that Maine could not prohibit "sectarian" schools that "promote[] a particular faith" or "present[] academic material through the lens of that faith" from the State's high school tuition assistance program. *Id.* at 2001. The Supreme Court emphasized that denying benefits to schools and children based on their religious "use" of the funds is no different than denying those benefits based on their religious "identity." *Id.* In either case, prohibiting these benefits from flowing to religious schools and religious families "is discrimination against religion" and is unconstitutional. *Id.* at 1996.

Like the laws in *Trinity Lutheran*, *Espinoza*, and *Carson*, California's regulatory scheme impermissibly excludes "sectarian" schools simply because they are religious. The federal Individuals with Disabilities Education Act (IDEA) allocates funding to states to pay for the education of students with disabilities if a public school in the student's district cannot meet the student's needs. *See* 20 U.S.C. §§ 1400–1482. There is no federal requirement that nonpublic schools providing

21

this service be nonreligious. *See id.* § 1412(a)(10)(B). Yet California has declared they must. Cal. Educ. Code § 56336.1(a). And in an unmistakable signal of the exclusionary nature of that decision, California has declared so by specifically invoking the outmoded, derogatory concept of a dangerous "sectarian" education. [7]

The First Amendment prohibits this blatant discrimination. *See, e.g.*, *Carson*, 142 S. Ct. at 2001; *Espinoza*, 140 S. Ct. at 2261; *Trinity Lutheran*, 582 U.S. at 463. The very concept of "sectarianism"—and the effort to push those schools tarred by that concept out of public life— cannot be separated from a lamentable history of fear and suppression of religious minorities. This Court must refuse to permit California to enforce its discriminatory and unconstitutional law. And it should also follow the Supreme Court's lead and "not hesitate to disavow" the shameful pedigree of restrictions like this. *Mitchell*, 530 U.S. at 829

---

[7] Of course, simply replacing "sectarian" with "religious" or another comparable term would not save California's unlawful discrimination against people and organizations of faith. California's use of "sectarian" makes plain the law's invidious nature. But the law is unconstitutionally discriminatory through and through, regardless of the term used to implement that discrimination. *See, e.g.*, *Carson*, 142 S. Ct. at 1997.

(plurality opinion). Laws like California's—and the derogatory term "sectarian" itself—should be put to rest now. *Id.*

## CONCLUSION

States must stop implementing and enforcing laws designed to suppress and exclude disfavored "sectarian" groups like the Jewish families and schools represented in this case. The California Catholic Conference respectfully urges this Court to ensure that California does so by reversing the district court's dismissal of the plaintiffs' claims.[8]

Respectfully submitted,

*/s/ John A. Meiser*
John A. Meiser
Meredith Holland Kessler
NOTRE DAME LAW SCHOOL
RELIGIOUS LIBERTY CLINIC
1338 BIOLCHINI HALL
Notre Dame, IN 46556
jmeiser@nd.edu
Telephone: (574) 631-3880

*Counsel for* Amicus Curiae

November 1, 2023

---

[8] *Amicus curiae* thanks William Clark, Olivia Lyons, and Timothy Steininger, students in the Notre Dame Law School Religious Liberty Clinic, for their work on this brief.

## CERTIFICATE OF COMPLIANCE

I hereby certify that this amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32-1 because it contains 4,554 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

The brief's typesize and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Century Schoolbook font.

*/s/ John A. Meiser*
John A. Meiser
*Counsel for* Amicus Curiae

Dated: November 1, 2023

24

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

*/s/ John A. Meiser*
John A. Meiser
*Counsel for* Amicus Curiae

Dated: November 1, 2023