No. 23-55714

---

# United States Court of Appeals for the Ninth Circuit

CHAYA LOFFMAN AND JONATHAN LOFFMAN, ET AL.,
Plaintiffs-Appellants,

v.

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,
Defendants-Appellees.

On Appeal from the United States District Court
for the Central District of California
No. 2:23-cv-01832-JLS-MRW
Hon. Josephine L. Stanton

## BRIEF OF PROFESSOR THOMAS BOEHM AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS

JOSHUA C. MCDANIEL
  *Counsel of Record*
PARKER W. KNIGHT III
HARVARD LAW SCHOOL
  RELIGIOUS FREEDOM CLINIC
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................ii

INTEREST OF AMICUS CURIAE ........................................................ 1

INTRODUCTION .............................................................................. 2

ARGUMENT .................................................................................... 4

    I.   Religious schools provide unique academic, social, and emotional benefits for children with disabilities and their families. .................................................................................. 4

    II.  Including students with disabilities in religious schools enriches the education of their peers. ......................................... 10

    III. Creating an inclusive school environment for children with disabilities is an essential aspect of religious life. ..................... 14

    IV. California's nonsectarian requirement violates the free-exercise rights of students with disabilities, their families, and religious schools. .................................................................. 18

CONCLUSION .................................................................................. 20

CERTIFICATE OF COMPLIANCE ....................................................... 22

CERTIFICATE OF SERVICE .............................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Carson v. Makin,*
    142 S. Ct. 1987 (2022). ................................................................. 2, 20

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1,*
    580 U.S. 386 (2017) ........................................................................ 18

*Fulton v. City of Philadelphia,*
    141 S. Ct. 1868 (2021). .................................................................... 20

*Sch. Dist. of Abington Twp. v. Schempp,*
    374 U.S. 203 (1963). .......................................................................... 5

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017). ........................................................................ 20

**Statutes**

20 U.S.C. § 1400(c)(1) ............................................................................ 7

20 U.S.C. § 1400(d)(1)(A) ................................................................. 2, 18

20 U.S.C. § 1412(a)(10)(A) ..................................................................... 19

20 U.S.C. § 1412(a)(10)(C) ..................................................................... 19

**Other Authorities**

*Abdullah ibn Umm Maktum,* Alim, https://perma.cc/4AWE-96ST. ...... 16

Brief for Montana Catholic School Parents et al. as Amici Curiae
    Supporting Petitioners, *Espinoza v. Montana,* 140 S. Ct. 2246
    (2020) (No. 18-1195), 2019 WL 4640666 .......................................... 12

Cassandra M. Cole et al., *Academic Progress of Students Across Inclusive and Traditional Settings*,
42 Mental Retardation 136 (2004).................................................... 13

David S. Shapiro, *The Doctrine of the Image of God and Imitatio Dei*,
12 Judaism 57 (1963). ..................................................................... 17

Denise J. Poston & Ann P. Turnbull, *Role of Spirituality and Religion in Family Quality of Life for Families of Children with Disabilities*,
39 Educ. & Training Developmental Disabilities 95 (2004). ............. 9

Eleanor X. Liu, Erik W. Carter, Thomas L. Boehm, Naomi H. Annadale & Courtney W. Taylor, *In Their Own Words: The Place of Faith in the Lives of Young People with Autism and Intellectual Disability*,
52 Intell. & Developmental Disabilities 388 (2014). ..................... 6, 7

Erik W. Carter, Elizabeth Lucas Dombrowski & Thomas L. Boehm, *Creating Communities of Belonging*, ACSI Leading Insights: Special Education and Inclusion (2021)........................................... 10

European Agency for Special Needs and Inclusive Education, *Evidence of the Link Between Inclusive Education and Social Inclusion* (2018), https://perma.cc/9RCH-S893................................ 11

Gabe Freidman, *Students with Disabilities Have Room on the Bench in NY*, The Times of Israel,
https://perma.cc/4BSF-G6MB. ........................................................ 17

Gabriel Petek, California Legislative Analyst's Office, *Overview of Special Education in California* (2019) ........................................... 19

Ghaleb Hamad Alnahdi, *The Positive Impact of Including Students with Intellectual Disabilities in Schools: Children's Attitudes*

iii

*Towards Peers with Disabilities in Saudi Arabia*,
85 Rsch. Developmental Disabilities 1 (2019). ................................. 11

Hefziba Lifshitz, Izhak Weiss, Sara Fridel & Rivka Glaubman, *Why Individuals with Intellectual Disability Turn to Religion: Behavioral and Psychological Motives of Adolescents and Adults*,
44 Educ. & Training in Developmental Disabilities 196 (2009) ........ 6

Janet Goodman et al., *Inclusion and Graduation Rates: What Are the Outcomes?*,
21 J. Disability Pol'y Stud. 241 (2011) ............................................. 13

Jessica Bliss, *Hand in Hand: Catholic Schools' Focus on Education for Students with Special Needs*, The Tennessean,
https://perma.cc/Y23F-ABZC. ........................................................ 7, 8

LAUSD Division of Special Education, *Position Paper on Equity and Access for Students with Disabilities* (2022) ............................. 14

LAUSD, *Benefits of Integration of Students with Disabilities*,
https://perma.cc/397K-69NM .............................................................. 14

Lisa Sharon Cushing & Craig H. Kennedy, *Academic Effects of Providing Peer Support in General Education Classrooms on Students Without Disabilities*,
30 J. Applied Behav. Analysis 139 (1997) ........................................ 13

Maria Georgiadi et al., *Young Children's Attitudes Toward Peers with Intellectual Disabilities: Effect of the Type of School*,
25 J. Applied Rsch. Intell. Disabilities 531 (2012) ........................... 11

Matthew J. Schuelka, *A Faith in Humanness: Disability, Religion and Development*,
28 Disability & Soc'y 500 (2013). ...................................................... 16

iv

Moshe Greenwald, *About*, Chabad of Downtown L.A.,
    https://perma.cc/SAA8-Z4GT. ............................................................ 17

Nat'l Ctr. for Educ. Stat., U.S. Dep't of Educ., *Private School
    Enrollment* (May 2022), https://perma.cc/7Q36-8LJZ. ...................... 5

*Resolution in Support of Access to Lifelong Jewish Learning for
    Jews with Disabilities*, Union for Reform Judaism (2011),
    https://perma.cc/52AE-L9UD. ........................................................... 17

Susie Sokol, *What I Learned from My 4-Year-Old*, Chabad.org,
    https://perma.cc/QBM9-RN4G ......................................................... 13

*The Bible* (New American Standard Bible) ...................................... 15, 16

The Episcopal Church, *Journal of the 78th General Convention of
    The Episcopal Church* (2015). .......................................................... 15

*The Qur'an* (Muhammad Farooq-e-Azam Malik trans., 1997) ............... 16

Thomas L. Boehm & Eric W. Carter, *Family Quality of Life and Its
    Correlates Among Parents of Children and Adults with
    Intellectual Disability*,
    24 Am. J. on Intell. & Developmental Disabilities 99 (2019) ......... 1, 8

Thomas L. Boehm, *A Flourishing Quality of Life Amidst Disability*,
    26 J. Disability & Religion 363 (2021) ................................................ 1

Thomas L. Boehm, *Transformational Cross-Cultural Education: A
    Special Education Perspective on Belonging* (forthcoming) (on
    file with author) ................................................................................. 6

U.S. Conf. of Cath. Bishops, *Guidelines for the Celebration of the
    Sacraments with Persons with Disabilities* (revised ed. 2017). ....... 15

United Methodist Church, *The Book of Discipline of the United
    Methodist Church* (2016) .................................................................. 15

William H. Jeynes, *A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes,* 87 Peabody J. Educ. 305 (2012). ......................................................... 4

William H. Jeynes, *Educational Policy and the Effects of Attending a Religious School on the Academic Achievement of Children,* 16 Educ. Pol'y 406 (2002). .................................................................. 5

## INTEREST OF AMICUS CURIAE[1]

Professor Thomas Boehm is a leading expert on special education and religion. He has authored influential research papers exploring the effects of faith and religion on individuals and families affected by disability. *See, e.g.*, Thomas L. Boehm & Eric W. Carter, *Family Quality of Life and Its Correlates Among Parents of Children and Adults with Intellectual Disability*, 124 Am. J. on Intell. & Developmental Disabilities 99 (2019); Thomas L. Boehm, *A Flourishing Quality of Life Amidst Disability*, 26 J. Disability & Religion 363 (2021). He is also the founding Director of the Center for Faith and Disability at Wheaton College. He submits this brief to highlight the unique and positive effect religious schools can have on children with disabilities as well as their peers, families, and broader communities.

---

[1] All parties have consented to this brief's filing. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part, and no person or entity other than amicus curiae or his counsel contributed money intended to fund preparing or submitting this brief.

## INTRODUCTION

In passing the Individuals with Disabilities Education Act, Congress recognized that the educational needs of millions of children with disabilities were going unmet. To help close the gap, Congress established multiple pathways for those children to get the state funds necessary for an education "designed to meet their unique needs," including state-funded private-school placements whenever a child's Individualized Education Program concludes that a private school is best for the child. 20 U.S.C. § 1400(d)(1)(A). Yet in California, those "otherwise available public benefits" are not available on an equal basis to children in religious and nonreligious schools. *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022).

Social science shows that California's exclusion of religious schools from this program isn't just unconstitutional—it's also a missed opportunity. As this brief will explain, study after study indicates that education at a religious school can be just what many religious students with disabilities need. Students with disabilities who attend religious schools often have higher levels of academic and social success. What's more, religious schools can meaningfully contribute to helping students with disabilities develop a positive sense of self-worth and find a sense of

belonging. These factors go hand in hand with increased emotional well-being and greater success at school.

The benefits of religious education extend to the students' families as well. By emphasizing the importance of community and inclusion, religious schools provide a support network for families. That, in turn, enables families to better support their children with disabilities. In the end, both students with disabilities and their families flourish when they receive robust community support.

Including students with disabilities in religious schools also benefits their peers. Learning to include and support schoolmates with disabilities helps foster better social understanding and corresponds to improved educational outcomes for both students with disabilities and their peers. Depriving children with disabilities of the opportunity to be placed at a religious school withholds those positive outcomes from a large proportion of private schools—to the detriment of both the schools and their students.

For many religious traditions, serving, educating, and empowering children with disabilities is a religious mandate. Christian, Muslim, and Jewish faith traditions alike include an obligation to integrate and care

for those with disabilities. Religious communities meet these obligations by creating communities of belonging for students of all abilities in their schools. By preventing religious schools from receiving IEP-placed students, California hinders religious schools from carrying out this important aspect of their faith.

In this way, California's law undermines religious schools' ability to welcome all members of their communities as well as parents' ability to advocate for the education that best serves their children and their families. The district court's ruling upholding California's discriminatory law should be reversed.

## ARGUMENT

### I. Religious schools provide unique academic, social, and emotional benefits for children with disabilities and their families.

Religious schools have long played a significant role in American education. In fact, for much of our country's history, religious schools were the "primary mode of instruction." William H. Jeynes, *A Meta-Analysis on the Effects and Contributions of Public, Public Charter, and Religious Schools on Student Outcomes*, 87 Peabody J. Educ. 305, 306 (2012) (describing the role of religious charity schools in the 17th to 19th centuries);

*see also Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 238 n.7 (1963) (Brennan, J., concurring) (noting that education in colonial times was frequently provided by churches). And religious schools remain a vital force in American education today. More than three million students attend religious schools every year—about three-quarters of all private-school students. *See generally* Nat'l Ctr. for Educ. Stat., U.S. Dep't of Educ., *Private School Enrollment* (May 2022), https://perma.cc/7Q36-8LJZ.

That's no surprise. Religious schools help many students thrive. In general, students who attend religious schools—especially students of low socio-economic status—tend to have significantly higher levels of academic achievement across subjects than their peers at secular schools. *See* William H. Jeynes, *Educational Policy and the Effects of Attending a Religious School on the Academic Achievement of Children,* 16 Educ. Pol'y 406, 414–17 (2002).

And these benefits are especially salient for students with disabilities. Because of religion's distinctive focus on human purpose and value, religious schools can offer students with disabilities a sense of belonging they might not attain in secular schools. *See* Eleanor X. Liu, Erik W.

5

Carter, Thomas L. Boehm, Naomi H. Annadale & Courtney W. Taylor, *In Their Own Words: The Place of Faith in the Lives of Young People with Autism and Intellectual Disability*, 52 Intell. & Developmental Disabilities 388, 396 (2014). In turn, that sense of belonging benefits children not only socially and emotionally but academically as well. *See* Thomas L. Boehm, *Transformational Cross-Cultural Education: A Special Education Perspective on Belonging* (forthcoming) (manuscript at 4–5) (on file with author).

In school, students can feel as though falling behind academically diminishes their self-worth. As a result, students with disabilities, especially those with learning disabilities, can feel inferior. Religious schools empower students to overcome those feelings by giving them a more complete understanding of self-worth—even helping them see their disabilities not as a defect but as part of their God-given nature. *See* Liu et al., *supra*, at 397; *see also* Hefziba Lifshitz, Izhak Weiss, Sara Fridel & Rivka Glaubman, *Why Individuals with Intellectual Disability Turn to Religion: Behavioral and Psychological Motives of Adolescents and Adults*, 44 Educ. & Training in Developmental Disabilities 196, 203 (2009) (explaining that the belief that "everything is directed by God" helps cultivate a

sense of security among people with disabilities); *cf.* 20 U.S.C. § 1400(c)(1) (congressional finding in IDEA that disability "is a natural part of the human experience and in no way diminishes the right of individuals to participate in or contribute to society").

Rather than focusing on academic challenges, which might isolate students with disabilities from their peers, religious schools encourage students to remember how they are like everyone else. By promoting that changed perspective, religious education can help students with disabilities feel valued, welcomed, and understood.

Students' accounts bear this out. As one child with autism spectrum disorder observed, members of his faith community treat him "no different" than others, seeing him as "like everyone else." Liu et al., *supra*, at 396. Another child said her faith helped her see that "[God] put Asperger's in [her] life for a reason and [she is] wonderfully and perfectly made." *Id.* at 397. Before enrolling in a religious school, Eva, an eighth grader with Down syndrome, told her parents, "I don't have any friends." Jessica Bliss, *Hand in Hand: Catholic Schools' Focus on Education for Students with Special Needs*, The Tennessean (Aug. 27, 2019, 11:17 AM), https://perma.cc/Y23F-ABZC. But within weeks of her enrollment in a

7

local Catholic school, Eva found friends and felt a sense of belonging. *Id.* Her dad noted how "[t]hey all sit together" and "are all eager to be a part of her experience." *Id.* At recess, Eva's classmates save her a swing, because they know that she loves swinging "more than anything else in the world." *Id.*

The benefits of attending religious schools extend beyond students, reaching their families as well. Families of students with disabilities who participate in religious communities tend to have a higher quality of life than those who don't. *See* Thomas L. Boehm & Eric W. Carter, *Family Quality of Life and Its Correlates Among Parents of Children and Adults with Intellectual Disability*, 124 Am. J. on Intell. & Developmental Disabilities 99, 110–11 (2019). That connection between participation in a faith community and higher quality of life likely exists for at least two reasons.

First, just as faith communities provide a positive lens through which children can view their disabilities, they provide parents with values-based support systems. As some parents have put it, church for them is "a place of acceptance and unconditional love," a place to develop positive relationships for themselves and for their children. Denise J. Poston &

Ann P. Turnbull, *Role of Spirituality and Religion in Family Quality of Life for Families of Children with Disabilities*, 39 Educ. & Training Developmental Disabilities 95, 103 (2004). This support system often enables parents to better care for their children.

Second, many religious communities emphasize prayer and trust in a higher power, which can increase parents' sense of peace and perseverance as they support their children. Parents describe belief in God as helping them find "inner peace." *Id.* at 102. And religious practices can also help parents to find meaning—to look at a child with a disability "as a gift from God, as a blessing." *Id.* By helping parents see their children's disabilities in a positive light, religious communities equip them with the tools they need to help their children accept themselves and thrive.

In short, religious schools provide important benefits to both students with disabilities and their families. By excluding religious schools from consideration for placement by a child's IEP team, California's nonsectarian requirement hampers access to those benefits for students with disabilities and their families.

9

## II. Including students with disabilities in religious schools enriches the education of their peers.

California's nonsectarian requirement doesn't just disadvantage students with disabilities and their families. It also deprives religious schools of the benefits that flow from educating students with disabilities. Including students with disabilities in the classroom helps turn religious schools into places of belonging with social and academic benefits that redound to students with and without disabilities alike. *See* Erik W. Carter, Elizabeth Lucas Dombrowski & Thomas L. Boehm, *Creating Communities of Belonging*, ACSI Leading Insights: Special Education and Inclusion 21 (2021) (discussing the importance of "belonging" for children of all abilities).

These benefits are substantial. In the first place, integrating children with disabilities helps their peers become familiar with disability by providing opportunities for positive interaction. This social engagement often helps break down stereotypes. It "has a positive influence on students' attitudes [towards and] acceptance" of those affected by disability. Ghaleb Hamad Alnahdi, *The Positive Impact of Including Students with Intellectual Disabilities in Schools: Children's Attitudes Towards Peers*

10

*with Disabilities in Saudi Arabia*, 85 Rsch. Developmental Disabilities 1, 6 (2019).

Schools have a distinctive role to play in this process because they can offer activities that foster interaction between children with and without disabilities. In fact, attending an integrated school predicts positive attitudes towards peers with disabilities better than having a relative with a disability does. *See id.* at 5; *see also* European Agency for Special Needs and Inclusive Education, *Evidence of the Link Between Inclusive Education and Social Inclusion* 6–7 (2018), https://perma.cc/9RCH-S893 (reviewing research and finding inclusion promotes friendships between students with and without disabilities); Maria Georgiadi et al., *Young Children's Attitudes Toward Peers with Intellectual Disabilities: Effect of the Type of School*, 25 J. Applied Rsch. Intell. Disabilities 531, 538 (2012) (noting that inclusive environments help children develop "more positive attitudes towards their peers with intellectual disabilities").

This is especially true for religious schools, which endeavor to unite students around common values. Take the experience of Kellan, a boy with disabilities who transferred to a Catholic school at the age of nine.

11

*See* Brief for Montana Catholic School Parents et al. as Amici Curiae Supporting Petitioners at 4–7, *Espinoza v. Montana*, 140 S. Ct. 2246 (2020) (No. 18-1195), 2019 WL 4640666. Kellan had struggled for years at the local public school to find community and support. But almost immediately after starting at St. Francis K–8 Catholic School, Kellan found friends who were "accepting and accommodating." *Id.* at 5. With the support of his new community, he eventually participated in the Special Olympics. *Id.* at 6. Kellan received high fives and hugs every morning— his friends made him feel "like a he was a superstar." *Id.* The strength of the school community made Kellan's success his peers' success: friends formed a cheering section that accompanied Kellan to his competition, and the whole religious community was enriched by Kellan's presence. *Id.*

Including children with disabilities in religious schools can help all students in those schools to be more caring and inclusive. A teacher at an Orthodox Jewish school noted that she welcomed students with disabilities "not . . . only for [their sake] but also for the rest of the class. They are our future doctors, teachers, rabbis and neighbors, and they need to

12

know [classmates with disabilities]." Susie Sokol, *What I Learned from My 4-Year-Old*, Chabad.org, https://perma.cc/QBM9-RN4G.

Inclusion brings academic benefits to those peers as well. One study suggests a link between inclusive classrooms and improvements in academic engagement, assignment completion rates, and grade achievement for students without disabilities. *See* Lisa Sharon Cushing & Craig H. Kennedy, *Academic Effects of Providing Peer Support in General Education Classrooms on Students Without Disabilities*, 30 J. Applied Behav. Analysis 139, 147 (1997). When learning in an inclusive classroom, students without disabilities "make significantly greater academic progress in both reading and mathematics" than do peers in traditional schools. Cassandra M. Cole et al., *Academic Progress of Students Across Inclusive and Traditional Settings*, 42 Mental Retardation 136, 142 (2004). And states that promote more inclusive education tend to have higher graduation rates, even for students without disabilities. Janet Goodman et al., *Inclusion and Graduation Rates: What Are the Outcomes?*, 21 J. Disability Pol'y Stud. 241, 248 (2011).

Defendants themselves acknowledge these benefits: LAUSD has noted that the benefits of inclusive education extend to "peers without

13

disabilities" as well as their "parents, teachers, and program administrators." LAUSD, *Benefits of Integration of Students with Disabilities* 1, https://perma.cc/397K-69NM; *see also* LAUSD Division of Special Education, *Position Paper on Equity and Access for Students with Disabilities* 3–7 (2022) (noting that inclusion brings "greater academic gains and social skills" as well as greater empathy and reduced fear of differences to students with and without disabilities).

Thus, California's nonsectarian requirement doesn't just deny students who could benefit from religious education the opportunity to thrive. It also denies their peers and communities the privilege of thriving alongside them.

## III. Creating an inclusive school environment for children with disabilities is an essential aspect of religious life.

The ability to offer the many benefits of religious education to students with disabilities, their families, and their communities is particularly important to communities of faith. Indeed, creating an environment of belonging for those with disabilities is a deeply held religious obligation in many faith traditions.

Core doctrines of Christianity, Islam, and Judaism all reinforce the importance of inclusion. Christian churches believe that integrating

14

those with disabilities is vital to Christian life and worship. For instance, Catholics "recognize[] . . . members with disabilities, and earnestly desire[] their active participation" because "[a]ll members of the Body of Christ are uniquely called by God." U.S. Conf. of Cath. Bishops, *Guidelines for the Celebration of the Sacraments with Persons with Disabilities* 1 (revised ed. 2017). The Episcopal Church likewise strives to guarantee "the spiritual and physical welcome of . . . people with disabilities" and encourages "people with disabilities . . . to take leadership roles." The Episcopal Church, *Journal of the 78th General Convention of The Episcopal Church* 946 (2015). This integration in many Christian churches helps them to become "inclusive societ[ies] without regard to . . . the disabilit[y] of [their] constituents." United Methodist Church, *The Book of Discipline of the United Methodist Church*, at v (2016).

Commitments to inclusion are central to the Christian faith. Many of Jesus' teachings focus on the virtue and necessity of "invit[ing] people who are poor, *who have disabilities*, who are limping, and people who are blind." *Luke* 14:13 (New American Standard Bible) (emphasis added). Communities of belonging are enhanced when members of the

community, although "many, are one body in Christ, and individually parts of one another." *Romans* 12:5 (New American Standard Bible).

Islamic belief, too, affirms inclusion. In Islam, "it is the duty of Muslims to teach the Qur'an to persons with disabilities." Matthew J. Schuelka, *A Faith in Humanness: Disability, Religion and Development*, 28 Disability & Soc'y 500, 505 (2013). This commitment to inclusion traces back to the life of the Prophet Muhammad himself. *Id.* at 505–06. One example is the story of Abdullah ibn Umm Maktum. Abdullah, a blind companion of the Prophet, played a leading role in the early days of the Muslim faith. He governed Medina in the Prophet's absence and was given the honors of carrying the banner of Muhammad's army and calling Muslims to prayer. *Abdullah ibn Umm Maktum,* Alim, https://perma.cc/4AWE-96ST. So, too, the Qur'an encourages broad inclusion, teaching that "[t]here is no blame on the blind, nor is there blame on the lame . . . to eat at your table." *The Qur'an* 24:61 (Muhammad Farooq-e-Azam Malik trans., 1997). The desire for inclusive faith communities represents the fulfillment of Islamic faith.

Judaism is no different. Divine creation in the image of God—a central tenet of Judaism—accords value to each person. *See* David S.

Shapiro, *The Doctrine of the Image of God and Imitatio Dei*, 12 Judaism 57, 57 (1963). Given these beliefs, Jewish congregations "affirm[] that access to a Jewish education, worship at the congregation, . . . attendance at a day school, making Jewish friends and becoming leaders of the [religion] should not be limited by disability." *Resolution in Support of Access to Lifelong Jewish Learning for Jews with Disabilities*, Union for Reform Judaism (2011), https://perma.cc/52AE-L9UD. In short, they seek to create places "where every Jewish person is welcome." Moshe Greenwald, *About*, Chabad of Downtown L.A., https://perma.cc/SAA8-Z4GT.

This inclusive mandate can help those with and without disabilities flourish within the Jewish community. As one parent noted, her son who attended a Jewish school "[didn't] even realize" students with disabilities are often treated differently elsewhere. Gabe Freidman, *Students with Disabilities Have Room on the Bench in NY*, The Times of Israel (Feb. 22, 2015, 4:12 PM), https://perma.cc/4BSF-G6MB. At his Jewish school, "[t]hey are all just one of the friends." *Id.*

Across these and other faith traditions, religious communities share a deep interest in welcoming those with disabilities. Thus, in addition to the secular benefits of inclusive learning—like improved social and

17

educational outcomes—religious schools have spiritual motivations driving them to create inclusive classroom environments. By excluding these schools from receiving IEP-placed students, California undercuts their efforts to live out their faith.

## IV. California's nonsectarian requirement violates the free-exercise rights of students with disabilities, their families, and religious schools.

By excluding religious schools from receiving IEP-placed students and the funds that follow those placements, California prevents many children with disabilities from receiving the educational services that would best meet their needs, just because those services come from a religious school. That discrimination not only runs contrary to IDEA's purpose but violates the Constitution's free-exercise guarantee.

To start, the ban undermines IDEA's basic purpose. Congress passed IDEA to ensure that all children with disabilities receive an education "designed to meet their unique needs and prepare them for future education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Under IDEA, the "unique circumstances of the child" should define how and where that child should be educated. *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017). Yet while

18

California allows for state-sponsored placements in private secular schools, it forbids placement in private religious schools—even when a religious school would be best equipped to meet a child's unique educational needs.

Worse still, without the funding that accompanies an IEP placement, many California parents cannot afford to send their children with disabilities to religious schools. "[S]tudents with disabilities cost on average more than two times as much to educate" as their peers. Gabriel Petek, California Legislative Analyst's Office, *Overview of Special Education in California* 17 (2019). California schools, for example, are estimated to "annually spend between $15,000 and $100,000 per student who is deaf or hard of hearing." *Id.* The district court suggested that children with disabilities should either enroll in religious schools at their own expense and then plead their case for reimbursement before an administrative officer or court, or content themselves with whatever "equitable services" the state makes available. ER-49, 52–53 (district court opinion); *see* 20 U.S.C. § 1412(a)(10)(A), (C). But students with disabilities in California are especially likely to come from low-income households. Petek, *supra*, at 8. Thus, for many families whose needs would be best met at a

religious school, the burden of independently placing their children with no guarantee of funding is simply too great.

Blocking placement in religious schools not only subverts IDEA's purpose—it also violates the Free Exercise Clause. The Supreme Court has repeatedly held that "a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 142 S. Ct. at 1996; *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017); *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1879 (2021). And there can be no doubt California violates that clear standard. Because California does not consider religious schools for IEP placement, the otherwise available benefit of guaranteed full funding of tuition and disability support services is denied to students whose needs would be best served by IEP placement in a religious school.

## CONCLUSION

As social-science research confirms, religious schools are uniquely positioned to help many students with disabilities thrive. California's ban on placing those students in religious schools thus not only violates the

Constitution but deprives students of what for many would be the best opportunity to succeed. The district court's decision should be reversed.[2]

Respectfully submitted,

/s/ *Joshua C. McDaniel*
JOSHUA C. MCDANIEL
   *Counsel of Record*
PARKER W. KNIGHT III
HARVARD LAW SCHOOL
  RELIGIOUS FREEDOM CLINIC
6 Everett Street, Suite 5110
Cambridge, MA 02138
(617) 496-4383
jmcdaniel@law.harvard.edu

*Counsel for Amicus Curiae*

---

[2] Amicus thanks Brecken Denler, Michelle Jaquette, Matt Rohrback, and Juliette Turner-Jones, students in the Harvard Law School Religious Freedom Clinic, for helping to prepare this brief.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**

I am the attorney or self-represented party.

**This brief contains _____ words,** including _____ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☐ complies with the word limit of Cir. R. 32-1.

☐ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

☐ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

☐ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

☐ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    ☐ it is a joint brief submitted by separately represented parties.
    ☐ a party or parties are filing a single brief in response to multiple briefs.
    ☐ a party or parties are filing a single brief in response to a longer joint brief.

☐ complies with the length limit designated by court order dated         .

☐ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**                             **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                          *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I certify that on November 1, 2023, I served this document on all parties or their counsel of record via CM/ECF.

Dated: November 1, 2023

/s/ *Joshua C. McDaniel*
Joshua C. McDaniel