No. 23-55714

# In the United States Court of Appeals for the Ninth Circuit

———————————

CHAYA LOFFMAN AND JONATHAN LOFFMAN, ET AL.,

*Plaintiffs-Appellants*,

v.

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellees*.

———————————

On Appeal from the United States District Court
for the Central District of California
Case No. 2:23-cv-01832-JLS-MRW

———————————

## BRIEF OF NEW CIVIL LIBERTIES ALLIANCE AS AMICUS CURIAE IN SUPPORT OF THE PLAINTIFFS-APPELLANTS

———————————

MARK CHENOWETH
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210 (phone)
mark.chenoweth@ncla.legal

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

Table of contents ..........................................................................i

Table of authorities .....................................................................ii

Interests of amicus curiae ...........................................................iv

Statement of compliance with Rule 29 ......................................... v

Summary of argument ................................................................. 1

Argument .................................................................................... 5

    I.    The school plaintiffs alleged Article III standing ................. 5

    II.    Even if the school plaintiffs had failed to allege Article III standing, the district court was obligated to consider their free-exercise claims under the one-plaintiff rule .........................13

    III.    The "nonsectarian" requirement indisputably violates the school plaintiffs' free-exercise rights under *Carson*, *Espinoza*, and *Trinity Lutheran* .........................................................15

Conclusion ............................................................................... 16

Certificate of service ............................................................... 18

Certificate of compliance ........................................................ 19

i

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................ 13

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................ 13

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................ 13

*Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) ........................... 3

*Carney v. Adams*, 141 S. Ct. 493 (2020) ................................................. 8, 9

*Carson v. Makin*, 142 S. Ct. 1987 (2022) ..................................................... 4

*Christopher v. Harbury*, 536 U.S. 403 (2002) ............................................. 9

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019) ........................11

*Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004) ................. 3

*Ellison v. American Board of Orthopaedic Surgery*,
  11 F.4th 200 (3d Cir. 2021) ...................................................................... 9

*Espinoza* v. *Montana Department of Revenue*, 140 S. Ct. 2246 (2020) ........ 4

*Fulton v. Philadelphia*, 141 S. Ct. 1868 (2021) ......................................... 16

*Heckler v. Mathews*, 465 U.S. 728 (1984) ..................................................11

*International Brotherhood of Teamsters v. United States*,
  431 U.S. 324 (1977) ................................................................................ 10

*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022) .................... 4

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) .................................................... 4

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  140 S. Ct. 2367 (2020) ............................................................................ 14

*Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019) ..... 5

*Meek v. Pittenger*, 421 U.S. 349 (1975) ....................................................... 4

*Mitchell v. Helms*, 530 U.S. 793 (2000) ....................................................... 4

*Nat'l Ass'n of Optometrists & Opticians v. Brown*,
  567 F.3d 521 (9th Cir. 2009) .................................................................. 13

*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978) ........ 12

*Rotkiske v. Klemm*, 140 S. Ct. 355 (2019) ................................................................ 12

*Sherbert v. Verner*, 374 U.S. 398 (1963) ..................................................................... 3

*Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449 (2017) ......................... 4

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669 (1973) .............................................................................. 6

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) ........................................................ 2

**Constitutional Provisions**

Cal. Const. article IX, § 8 .......................................................................................... 1

Cal. Const. article XVI, § 5 ........................................................................................ 1

U.S. Const. amend I ................................................................................................... 2

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................................... 12

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ................... 2

Philip Hamburger, *Separation of Church and State* (2002) .......................................... 2

William C. Porth & Robert P. George, *Trimming the Ivy: A Bicentennial Re-Examination of the Establishment Clause*, 90 W. Va. L. Rev. 109 (1987) ................................................................................................................. 3

Steven D. Smith, *Foreordained Failure: The Quest For A Constitutional Principle Of Religious Freedom* (1995) ..................................................................... 3

iii

## INTERESTS OF AMICUS CURIAE

The New Civil Liberties Alliance (NCLA) is a nonpartisan, nonprofit civil-rights organization and public-interest law firm devoted to defending constitutional freedoms from the administrative state's depredations. The "civil liberties" of the organization's name include rights at least as old as the U.S. Constitution itself, such as jury trial, due process of law, and the right to be tried in front of an impartial and independent judge. However, these selfsame civil rights are also "new"— and in dire need of renewed vindication—precisely because state attorneys general and other executive-branch entities have arrogated legislative power unto themselves and failed to respect vital civil liberties in the process.

NCLA therefore aims to defend civil liberties—primarily by reasserting constitutional constraints on administrative and executive actors, including state attorneys general. Although Americans still enjoy the shell of their Republic, there has developed within it a different sort of government—a type, in fact, the Constitution was designed to prevent. This unconstitutional administrative state within the Constitution's United States is the focus of NCLA's concern.

NCLA is particularly disturbed that California in this day and age would try to exclude sectarian schools from public benefits. That special-education funds are implicated makes this case all the more appalling. The U.S. Supreme Court's modern Free Exercise Clause precedents appropriately prohibit governments from withholding public benefits in response to a school's religious beliefs or practices.

iv

## STATEMENT OF COMPLIANCE WITH RULE 29

All parties have consented to the filing of this brief. No counsel for a party authored any part of this brief. And no one other than the amicus curiae, its members, or its counsel financed the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The California statutes that allow only "nonsectarian" schools to provide federally funded special-education services reflect the ideology of the Blaine Amendments, which categorically prohibit religious institutions from participating in social-welfare programs or receiving government benefits simply because they are religious. Blaine Amendments still appear in many state constitutions (including California's[1]), and relics of this backward way of thinking continue to rear their ugly heads in statutes that restrict the ability of religious schools to obtain benefits or privileges that the government offers to their "nonsectarian" counterparts. The provisions of the California Education Code cited in the addendum to the appellants' brief[2] are prime examples of the Blaine Amendments in action—and they could very well have been motivated by a belief that the state constitution (or even the First

---

1. *See* Cal. Const. article IX, § 8 ("No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools"); Cal. Const. article XVI, § 5 ("Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever; provided, that nothing in this section shall prevent the Legislature granting aid pursuant to Section 3 of Article XVI.").

2. *See* Appellants' Br. at 79–81.

Amendment's Establishment Clause) requires California to exclude religious schools from participating in any state-funded education program or receiving any form of taxpayer assistance.

The Blaine Amendments were initially rooted in nativist, anti-immigrant, and anti-Catholic sentiments,[3] but their present-day defenders rely on a separationist philosophy that regards any form of taxpayer assistance to religious institutions as a breach in the so-called wall of separation between church and state. *See, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639, 686–717 (2002) (Souter, J., dissenting) (advocating for a federal constitutional rule of "no aid" to religious schools).

This rationale was untenable from the get-go. Separation of church and state is a constitutional myth, as this phrase in nowhere to be found in the Constitution, and the text of the First Amendment's Establishment Clause was carefully written to *protect* established churches in the states from disestablishment by the federal government. *See* U.S. Const. amend I ("Congress shall make no law *respecting* an establishment of religion" (emphasis added)); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 34 (1998) (noting that the Establishment Clause "is not antiestablishment but pro-states' rights; it is agnostic on the substantive issue of establishment versus nonestablishment and simply calls for the issue to be decided locally."); *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 45–54 (2004)

---

3.    *See* Philip Hamburger, *Separation of Church and State* (2002).

(Thomas, J., concurring in the judgment).[4] The no-aid principle advocated by separationists also leads to absurdities, as taken to its logical conclusion it would prohibit governments from providing even police and fire protection to churches and religious institutions.

But the more serious problem with the Blaine Amendments—as well as the provisions in the California Education Code that embody this separationist mentality—is that they cannot be squared with the present-day understanding of the constitutional right to the free exercise of religion, which prohibits governments from withholding public benefits on account of an individual's or institution's religious beliefs or practices. *See Sherbert v. Verner*, 374 U.S. 398, 403 (1963) (finding it "clear" that a "disqualification for benefits … burden[s] the free exercise of appellant's religion."); *id.* at 405 ("[C]onditions upon public benefits cannot be sustained if they so operate, whatever their purpose, as to inhibit or deter the exercise of First Amendment freedoms."); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2014) (federal government cannot require merchants to "either give up the right to seek judicial protection of their religious liberty or forgo the benefits, available to their competitors, of operating as corporations."). For this reason, the Supreme Court has repeatedly and emphatically held that the Blaine Amendments (and Blaine-inspired statutes) violate the Free Exercise Clause

---

4.  *See also* Steven D. Smith, *Foreordained Failure: The Quest For A Constitutional Principle Of Religious Freedom* 17–34 (1995); William C. Porth & Robert P. George, *Trimming the Ivy: A Bicentennial Re-Examination of the Establishment Clause*, 90 W. Va. L. Rev. 109, 133–40 (1987).

whenever they exclude or disqualify religious schools from public benefits that the government offers to their secular counterparts—the antithesis of the "no-aid" principle that formerly animated the Court's Establishment Clause jurisprudence[5] and continues to undergird the Blaine Amendments and the statutes that embody this separationist mindset. *See Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022) ("[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits."); *Espinoza* v. *Montana Department of Revenue*, 140 S. Ct. 2246, 2255 (2020) ("[D]isqualifying otherwise eligible recipients from a public benefit solely because of their religious character imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." (citations and internal quotation marks omitted)); *Trinity Lutheran Church of Columbia v. Comer*, 582 U.S. 449, 462 (2017) (government may not "discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character.").

This case can and should be resolved with a simple and straightforward syllogism:

> **Major Premise**: The Free Exercise Clause prohibits California from withholding a "public benefit" from sectarian schools that it offers to nonsectarian schools. *See Carson*, 142 S. Ct. at 1996; *Espinoza*, 140 S. Ct. at 2255; *Trinity Lutheran*, 582 U.S. at 462.

---

5.  *See Meek v. Pittenger*, 421 U.S. 349 (1975), overruled in *Mitchell v. Helms*, 530 U.S. 793 (2000); *Lemon v. Kurtzman*, 403 U.S. 602 (1971), overruled in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022).

> **Minor Premise**: Certification as a nonpublic school under section 56366.1 of the California Education Code is a "public benefit."

> **Conclusion**: California is violating the Free Exercise Clause by allowing only "nonsectarian" schools to be certified as nonpublic schools under section 56366.1.

The district court did not deny either the major premise or the minor premise of this syllogism. Yet the district court though it could escape the conclusion by holding that: (1) The sectarian-school plaintiffs lack Article III standing to sue the defendants, so these institutions cannot assert their Free Exercise rights under *Carson*, *Espinoza*, and *Trinity Lutheran*;[6] and (2) The Taxons and the Peretses—the only remaining plaintiffs that the district court found to have Article III standing—failed to allege that *their own* Free Exercise rights have been violated by the school plaintiffs' exclusion from certification under section 56366.1.[7] Each of these holdings is wrong and must be reversed.

## ARGUMENT

### I. The School Plaintiffs Alleged Article III Standing

A plaintiff needs only to allege and not prove Article III standing at the motion-to-dismiss stage, and all factual allegations in the complaint must be assumed true. *See Manhattan Community Access Corp. v. Halleck*, 139 S. Ct. 1921, 1927 (2019) ("Because this case comes to us on a motion to dismiss, we

---

6. ER 33–37.
7. ER 44–53.

accept the allegations in the complaint as true."). The school plaintiffs needed only to allege in their complaint that they are suffering injury in fact from California's decision to disqualify them from certification on account of their sectarian status. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) ("[A]n identifiable trifle is enough for standing" (citation and internal quotation marks omitted)). The allegations in the complaint easily clear this threshold.

The Jean & Jerry Friedman Shalhevet High School alleged:

> 152. Shalhevet seeks the opportunity to qualify to provide a distinctively Orthodox Jewish education to children with disabilities. . . .

> 156. On information and belief, Shalhevet either otherwise meets or is capable of meeting California's other certification requirements to become an NPS [nonpublic school] . . . .

> 158. . . . California law categorically prohibits Shalhevet from becoming certified as a NPS solely because it is religious.

> 159. As a result, Shalhevet cannot be considered for placement as part of a student's FAPE [free appropriate public education] for the sole reason that it is religious, nor can it receive the reimbursement that would result from such a placement.

> 160. Because California law prohibits the use of generally available public funds at private religious schools, Shalhevet is currently unable to provide its services and religious education to all children with disabilities.

ER 267–69. All of this describes an Article III injury in fact. Shalhevet specifically alleges that it: (1) wants to obtain certification as a nonpublic school;[8] (2) meets or can meet all requirements of certification apart from the "nonsectarian" criterion;[9] (3) is categorically disqualified from certification as a nonpublic school on account of its sectarian status;[10] and (4) has been harmed by this exclusion because it cannot be considered for placement as part of a student's free appropriate public education (FAPE), and it cannot receive the reimbursement that would result from such a placement.[11]

The Samuel A. Fryer Yavneh Hebrew Academy alleged as follows:

165. . . . Yavneh seeks the ability to qualify as a certified NPS.

166. On information and belief, Yavneh either otherwise meets or is capable of meeting California's other certification requirements to become an NPS. . . .

168. Thus, California law categorically prohibits Yavneh from becoming certified as a NPS solely because it is religious.

169. As a result, Yavneh cannot be considered for placement as part of a student's FAPE for the sole reason that it is religious, nor can it receive the reimbursement that would result from such a placement.

170. Because California law prohibits the use of generally available public funds at private religious schools, Yavneh is currently

---

8.   ER 267 (¶ 152).

9.   ER 268 (¶ 156).

10.  ER 268 (¶ 158).

11.  ER 268–269 (¶¶ 159–160).

> unable to provide its services and religious education to all children with disabilities.

ER 269–270. Here, too, we have clear and indisputable allegations of injury in fact, which must be accepted as true when deciding a motion to dismiss. Like Shalhevet, Yavneh alleges that it: (1) wants to obtain certification as a nonpublic school;[12] (2) meets or can meet all requirements of certification apart from the "nonsectarian" criterion;[13] (3) is categorically disqualified from certification as a nonpublic school on account of its sectarian status;[14] and (4) has been harmed by this exclusion because it cannot be considered for placement as part of a student's free appropriate public education (FAPE), and it cannot receive the reimbursement that would result from such a placement.[15]

Yet the district court held that these allegations of injury were insufficient to establish standing, and that Shalhevet and Yavneh were required to produce "concrete facts showing" that they stand able and ready to apply for certification. ER 28 ("A mere affirmation that one is 'able and ready to apply' is insufficient—concrete facts showing that readiness and ability are necessary. (citing *Carney v. Adams*, 141 S. Ct. 493, 501–02 (2020)). That is simply untrue at the motion-to-dismiss stage, where allegations unaccompanied by factual support are all that are needed, and all factual allegations must

---

12.  ER 269 (¶ 165).
13.  ER 270 (¶ 166).
14.  ER 270 (¶ 168).
15.  ER 270 (¶¶ 169–170).

be assumed true and construed in the light most favorable to the non-moving party. *See Christopher v. Harbury*, 536 U.S. 403, 406 (2002) ("Since we are reviewing a ruling on motion to dismiss, we accept Harbury's factual allegations and take them in the light most favorable to her.").

The district court's citation of *Carney v. Adams*, 141 S. Ct. 493 (2020), is inapposite because that case was reviewing a final judgment entered for the plaintiff—which must be supported by *proof* and not mere allegations of Article III standing. *See id.* at 497 ("The District Court . . . granted summary judgment to [the plaintiff] on the merits"). *Carney* rightly demanded that the plaintiff identify evidence in the record showing that he stood "able and ready" to apply. *See id.* at 501 ("[T]he record evidence fails to show that, at the time he commenced the lawsuit, Adams was 'able and ready' to apply for a judgeship in the reasonably foreseeable future."). The district court was wrong to demand a similar showing of Shalhevet and Yavneh at the motion-to-dismiss stage. Shalhevet and Yavneh will eventually need to produce "concrete facts" showing the existence of Article III standing, but they do not need this at the pleading stage, where mere allegations of Article III injury will defeat a motion to dismiss.

The district court was equally wrong to claim that Shalhevet and Yavneh must allege that they took "some actual steps that demonstrate a real interest in seeking the alleged benefit." ER 30 (quoting *Ellison v. American Board of Orthopaedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021)); *see also* ER 34 ("The Complaint does not include any allegations about concrete steps the School

9

Plaintiffs have taken to become certified as NPSs."). Shalhevet and Yavneh are *categorically excluded* from certification on account of their sectarian status, so it would be a waste of time for them to take "actual steps" or "concrete steps" to begin the application process. And the Supreme Court has long held that litigants need not begin the process of applying for something from which they are categorically excluded to establish injury in fact:

> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977). California has effectively posted a "Nonsectarian Schools Only" sign rather than a "Whites Only" sign, but the analysis remains the same. A sectarian school that wishes to apply for certification under section 56366.1 need not "prove" its interest by taking "actual steps" that amount to nothing more than a futile gesture. That is especially true at the motion-to-dismiss stage, where all allegations must be assumed true and the courts cannot question the sincerity of the plaintiffs' stated desires to seek and obtain certification as nonpublic schools.

The district court further erred by denying standing on the ground that Shalhevet and Yavneh "likely would not be able to satisfy NPS certification

requirements that are independent from the nonsectarian requirement." ER 33; *see also* ER 34 ("The Complaint . . . does not explain on what grounds the schools believe that they would be able to meet the other certification requirements for becoming an NPS."). It does not matter whether Shalhevet and Yavneh would ultimately obtain certification as nonpublic schools in the absence of the "nonsectarian requirement," and it does not matter whether they can satisfy the other requirements for certification as an NPS. The Article III injury comes from not from the denial of certification, but from the fact that Shalhevet and Yavneh will encounter discriminatory obstacles and treatment in the application process on account of their status as sectarian schools. *See Heckler v. Mathews*, 465 U.S. 728, 737 (1984) ("[B]ecause the right asserted by appellee is the right to receive 'benefits . . . distributed according to classifications which do not without sufficient justification differentiate among covered [applicants] solely on the basis of sex,' *Weinberger v. Wiesenfeld,* 420 U.S. 636, 647 (1975), and not a substantive right to any particular amount of benefits, appellee's standing does not depend on his ability to obtain increased Social Security payments."); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) ("[The] inability to compete on an even playing field constitutes a concrete and particularized injury."). Shalhevet and Yavneh have standing to challenge the nonsectarian requirement regardless of whether they would obtain certification in its absence, just as a litigant challenging a university's racially discriminatory admissions practices need not show that he would win admission to the university in the absence of the

unlawful race or sex preferences. *See Regents of University of California v. Bakke*, 438 U.S. 265, 280 n.14 (1978) ("[E]ven if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing.").

Finally, the district court erred by refusing to accept Shalhevet's and Yavneh's allegations that they "otherwise meet" or "are capable of meeting" the remaining requirements for certification as nonpublic schools. ER 35. The district court complained that these allegations were "vague" and "conclusory," *id.*, but complaints do not need detailed factual allegations unless they are alleging fraud or mistake. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). And allegations in a complaint must be assumed true at the motion-to-dismiss stage even if a judge considers them "vague" or "conclusory." *See Rotkiske v. Klemm*, 140 S. Ct. 355, 359 n.1 (2019) ("Because this case comes to us from a decision granting a motion to dismiss, we assume the truth of the facts alleged in Rotkiske's operative complaint."). The Supreme Court has repeatedly held that detailed factual allegations are not required in a complaint—even after *Twombly* and *Iqbal*—and district courts cannot convert the rules of civil procedure into a fact-pleading regime that extends the requirements of Rule 9(b) beyond the categories of fraud and mistake. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] complaint . . . does not need detailed factual allegations");

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations"). Both Shalhevet and Yavneh allege that they "meet" or are "capable of meeting" the remaining requirements for certification,[16] and the district court cannot doubt the truth of those allegations at this stage of the case.

## II. Even If the School Plaintiffs Had Failed to Allege Article III Standing, the District Court Was Obligated to Consider Their Free-Exercise Claims Under the One-Plaintiff Rule

There is a more serious problem with the district court's standing analysis. Even if the district court correctly ruled that Shalhevet and Yavneh had failed to allege Article III standing, it *still* could not dismiss their claims because the district court acknowledged that the Taxons and the Peretses had alleged standing,[17] and only one plaintiff needs standing when the co-plaintiffs are seeking the same declaratory and injunctive relief. *See, e.g.*, *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023) ("If at least one plaintiff has standing, the suit may proceed."); *Nat'l Ass'n of Optometrists & Opticians v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) ("[I]n an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing.").

The one-plaintiff rule is not a discretionary doctrine. The Supreme Court held in *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylva-*

---

16.  ER 268 (¶ 156); ER 270 (¶ 166).

17.  ER 41–44.

*nia*, 140 S. Ct. 2367 (2020), that it is "error" for a court to dismiss a litigant for lack of standing—or even inquire into whether a litigant can independently demonstrate Article III standing—if that litigant is seeking the same relief as another litigant that indisputably has standing:

> The Third Circuit also determined *sua sponte* that the Little Sisters lacked appellate standing to intervene because a District Court in Colorado had permanently enjoined the contraceptive mandate as applied to plans in which the Little Sisters participate. *This was error.* Under our precedents, at least one party must demonstrate Article III standing for each claim for relief. An intervenor of right must independently demonstrate Article III standing if it pursues relief that is broader than or different from the party invoking a court's jurisdiction. *See Town of Chester* v. *Laroe Estates, Inc.*, 581 U.S. ––––, –––– (2017). Here, the Federal Government clearly had standing to invoke the Third Circuit's appellate jurisdiction, and both the Federal Government and the Little Sisters asked the court to dissolve the injunction against the religious exemption. The Third Circuit accordingly *erred by inquiring into the Little Sisters' independent Article III standing*.

*Id*. at 2379 n.6 (emphasis added).

Shalhevet and Yavneh are seeking the same relief as the Taxons and the Peretses: a declaratory judgment pronouncing California's "nonsectarian" requirement unconstitutional and a preliminary and permanent injunction against its future enforcement. ER 278–279. And each of these litigants is demanding a universal remedy; they are not pursuing as-applied relief that would exempt only themselves from the "nonsectarian" requirement. *See id*. Because Shalhevet and Yavneh are requesting the exact same remedy as the Taxons and the Peretses, it was "error" for the district court to independent-

14

ly inquire into Shalhevet and Yavneh's standing after determining that the Taxons and the Peretses had cleared the Article III standing threshold.[18]

So Shalhevet and Yavneh must remain in the case regardless of whether this Court agrees with the district court's analysis of their standing allegations, and the courts cannot avoid their Free Exercise claims by attempting to dispose of them on jurisdictional grounds.

### III. The "Nonsectarian" Requirement Indisputably Violates the School Plaintiffs' Free-Exercise Rights Under *Carson*, *Espinoza*, and *Trinity Lutheran*

With Shalhevet and Yavneh back in the case, the Free Exercise analysis becomes more straightforward. Regardless of whether California is violating the Free Exercise rights of the Taxons and the Peretses,[19] it is assuredly violating the Free Exercise of the school plaintiffs by withholding a "public benefit" from them on account of their sectarian status. Certification as a nonpublic school is a "public benefit" that allows Shalhevet and Yavneh to be considered for placement as part of a student's free appropriate public education (FAPE), and to receive the reimbursement that would result from such a placement. The district court never denied that certification as a nonpublic

---

18. It was also error for the district court to independently inquire into the Loffmans' standing given its holding that the Taxons and the Peretses had alleged standing. ER 37–41.

19. ER 44–53 (denying that the Taxons and the Peretses had alleged a violation of their Free Exercise rights).

school qualifies as a "public benefit" under *Carson*, *Espinoza*, and *Trinity Lutheran*.

Even if one tries to characterize the students and families as the ultimate beneficiaries of this program, the participating schools are still being deprived of a "public benefit" if they are categorically excluded from partnering with the state in administering a social-welfare program. *Fulton v. Philadelphia*, 141 S. Ct. 1868 (2021), holds that the Free Exercise Clause applies to government-contracting decisions, and the government may not discriminate between "sectarian" and "non-sectarian" entities when it chooses to administer its social-welfare programs through private institutions. The opportunity to participate in these programs on the same terms as similarly situated secular entities is as much a "public benefit" as the programs at issue in *Carson*, *Espinoza*, and *Trinity Lutheran*, and the Free Exercise Clause does not tolerate the categorical exclusion of "sectarian" institutions from publicly funded special-education services.

## CONCLUSION

The judgment of the district court should be reversed, and the case remanded with instructions to enter the preliminary injunction requested by the plaintiffs and a declaratory judgment pronouncing California's "nonsectarian" requirement unconstitutional.

Respectfully submitted.

/s/ Jonathan F. Mitchell

| | |
|---|---|
| Mark Chenoweth | Jonathan F. Mitchell |
| New Civil Liberties Alliance | Mitchell Law PLLC |
| 1225 19th Street NW, Suite 450 | 111 Congress Avenue, Suite 400 |
| Washington, DC 20036 | Austin, Texas 78701 |
| (202) 869-5210 (phone) | (512) 686-3940 (phone) |
| mark.chenoweth@ncla.legal | (512) 686-3941 (fax) |
| | jonathan@mitchell.law |

Dated: November 1, 2023                   *Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that this document has been filed with the clerk of the court and served by CM/ECF on November 1, 2023, upon all counsel of record. I further certify that all participants in the case are registered CM/ECF users and will be served through the appellate CM/ECF system.

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Amicus Curiae*

# CERTIFICATE OF COMPLIANCE

with type-volume limitation, typeface requirements,
and type-style requirements

1.  This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 4,039 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This motion complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

/s/ Jonathan F. Mitchell

Jonathan F. Mitchell
*Counsel for Amicus Curiae*

Dated: November 1, 2023