**Case No. 23-55714**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CHAYA LOFFMAN, ET AL.,

*Plaintiffs – Appellants,*

*v.*

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

*Defendants – Appellees.*

On Appeal from the United States District Court for the
Central District of California
District Court No. 2:23-cv-001832-JLS-MRW
The Honorable Josephine L. Staton

## THE STATE APPELLEES' ANSWERING BRIEF

LEN GARFINKEL, State Bar No. 114815
General Counsel
BRUCE YONEHIRO, State Bar No. 142405
Assistant General Counsel
THOMAS H. PROUTY, State Bar No. 238950
Deputy General Counsel
California Department of Education
1430 N Street, Room 5319
Sacramento, California 95814
Telephone: 916-319-0860
Facsimile: 916-322-2549
*Attorneys for the State Appellees*
*The California Department of Education*
*and Superintendent of Public Instruction*

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... i.

TABLE OF AUTHORITIES ...................................................................v.

JURISDICTIONAL STATEMENT ..........................................................1

ISSUES PRESENTED.............................................................................1

STATEMENT OF THE CASE...................................................................2

I.  THE PLAINTIFFS AND COMPLAINT ........................................2

II. THE HIGHLY RELEVANT LEGAL FRAMEWORK..................................3

A. Under the IDEA, Families Have a Choice to Enroll Their Child in Private School or Accept Their State's Free Public Education; in Either Case the IDEA Provides Services............................3

B. The IDEA's Provision of Services Differs Based on a Family's Choice, but Plaintiffs do Not Challenge That Difference, and its Constitutionality has Been Upheld............................4

C. When a Family Accepts the State's Free Public Education, the State Directs Provision of Public Education, even in the Rare Case Where the Law's "Least Restrictive Environment" Rules Permit NPS Placement by the State ............................5

D. The IDEA's "Free Appropriate Public Education" Need Not Account for a Family's Religious Needs; and Ultimately, Placement Decisions are Made by LEAs, With Courts Deferring to Their Expertise............................8

E. When an LEA Places a Child With a Contractor, IDEA Funds Benefit the Child Whose Family has Accepted the State's Free Public Education (Not the Contractor) and May Not be Used for Religious Instruction ............................10

F. California's "Nonsectarian" Requirement Only Comes into Play When a Family has Accepted the State's Public Education, and Only When No "Appropriate" Public Program is Otherwise Available............................11

G. An NPS Assists an LEA in Providing a FAPE – including Through the use of State-Approved Textbooks and Curriculum – Pursuant to a Contract; However, the Child is Deemed Enrolled in Public School and Graduates With a Diploma From the LEA............................12

i

H. NPS Placement Involves Extensive and Continuing State Monitoring and Direction, With the Goal of Transitioning a Pupil Back to Less Restrictive Environments in the LEA ......................15

III. PROCEDURAL HISTORY ....................................................................17

SUMMARY OF THE ARGUMENT ............................................................18

ARGUMENT ...............................................................................................19

I. THE LAW AND THE RECORD CONTROL; NOT MISCHARACTERIZATIONS AND UNFOUNDED EXTRA-RECORD ASSERTIONS..........................................................................19

II. NONE OF THE PLAINTIFFS ESTABLISHED STANDING ....................27

A. Standards of Review.....................................................................27

B. The Schools' Complaint was Insufficient to Establish Standing.............28

C. The District Court Erred in Finding that the Remaining Families Alleged Standing ..................................................37

III. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE REMAINING FAMILIES FAILED TO STATE A CLAIM ..............42

A. Standard of Review ...................................................................42

B. The Free Exercise-Based Claims Failed ...............................43

1. The Challenged Requirement Does Not Impose a Legally Cognizable Burden on Plaintiffs' Exercise of Religion. .................43

2. Counts II and III do Not State a Claim...........................50

3. The "Unconstitutional Conditions" Count Fails.............53

4. The "Right to Religious Education" Count Fails. ...........56

5. The Challenged Requirement Satisfies Strict Scrutiny. .................57

C. The Equal Protection Claim Fails ...........................................60

IV. PRELIMINARY INJUNCTIVE RELIEF WAS PROPERLY DENIED...........................................................................64

A. Standard of Review ...................................................................64

B. Plaintiffs' Motion Underscored Their Lack of Standing .........65

C. Plaintiffs Did Not Establish Likely Success or Irreparable Harm ...........67

D. The Remaining Factors Favored Denial ....................................................68

CONCLUSION...............................................................................................70

STATEMENT OF RELATED CASES .................................................................71

CERTIFICATE OF COMPLIANCE.....................................................................72

CERTIFICATE OF SERVICE ............................................................................73

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)..................................................................55, 60

*Al Saud v. Days*,
    50 F.4th 705 (9th Cir. 2022) .................................................63

*America Unites for Kids v. Rousseau*,
    985 F.3d 1075 (9th Cir. 2021) ..............................................27

*American Freedom Defense Initiative v. King County*,
    796 F.3d 1165 (9th Cir. 2015) ...........................................67, 69

*Anspach v. City of Philadelphia*,
    503 F.3d 256 (3rd Cir. 2007) ...............................................43

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..........................................................29, 35

*Associated Builders & Contractors Western Penn. v. Community*
    *College of Allegheny County*,
    81 F.4th 279 (3rd Cir. 2023) .............................................35, 39

*Barnes-Wallace v. City of San Diego*,
    704 F.3d 1067 (9th Cir. 2012) ..............................................61

*Bauchman v. West High Sch.*,
    132 F.3d 542 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 2370 (1998) ................43

*Bd. of Ed. of Kiryas Joel Village Sch. Dist. v. Grumet*,
    512 U.S. 687 (1994)..........................................................57, 59

*Benisek v. Lamone*,
    138 S.Ct. 1942 (2018).....................................................68, 69, 70

*Bingham v. Holder*,
    637 F.3d 1040 (9th Cir. 2011) ..............................................55

*Bowen v. Roy*,
    476 U.S. 693 (1986)..........................................................43, 50

*Estate of Boyland v. U.S. Dept. of Agric.*,
13 F.3d 117 (D.C. Cir. 2019) ...............................................................41

*Bras v. Calif. Pub. Utilities Com'n*,
59 F.3d 869 (9th Cir. 1995) ..................................................................33

*Bruckner v. Biden*,
__F.Supp.3d __, 2023 WL 2744026 (M.D. Fla. Mar. 31, 2023) ......................36

*California Parents for the Equalization of Educational Materials v.
Torlakson*,
973 F.3d 1010 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2583 (2021) .....43, 44, 57

*Capistrano Unified Sch. Dist. v. S.W.*,
21 F.4th 1125 (9th Cir. 2021) ...........................................................8, 9

*Carney v. Adams*,
592 U.S. 53 (2020)..................................................................28, 29, 30, 34

*Carroll v. Nakatani*,
342 F.3d 934 (9th Cir. 2003) ...............................................................34

*Carson v. Makin*,
596 U.S. 767 (2022)..................................................................*passim*

*Carson v. Makin*,
979 F.3d 21 (1st Cir. 2020)..................................................38, 39, 40, 42

*Carter v. Fleming*,
879 F.3d 132 (4th Cir. 2018) ...............................................................43

*Cook v. Taylor*,
2019 WL 1938794 (M.D. Ala. May 1, 2019)..................................................42

*Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day
Saints v. Amos*,
483 U.S. 327 (1987)..................................................................63

*CTIA – The Wireless Association v. City of Berkeley, Calif.*,
928 F.3d 832 (9th Cir. 2019) ...............................................................67

*D.L. v. Baltimore Bd. of School Com'rs*,
706 F.3d 256 (4th Cir. 2013) ...............................................................46

v

*Dish Network Corp. v. Federal Communications Commission*,
653 F.3d 771 (9th Cir. 2011) .................................................67

*Doe v. Snyder*,
28 F.4th 103 (9th Cir. 2022) ..........................................65, 67

*Dowdy v. New York Dept. of Sanitation*,
2023 WL 6258536 (S.D.N.Y. Sept. 26, 2023) ....................36

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) ...........................................70

*Dreher v. Amphitheater Unified Sch. Dist.*,
22 F.3d 228 (9th Cir. 1994) ..........................................21, 22

*Droz v. C.I.R.*,
48 F.3d 1120 (9th Cir. 1995) ........................................63, 64

*Edwards v. Marin Park, Inc.*,
356 F.3d 1058 (9th Cir. 2004) ..............................................1

*Ellison v. American Bd. of Orthopaedic Surgery*,
11 F.4th 200 (3rd Cir. 2021) ...............................................35

*Emp. Div. v. Smith*,
494 U.S. 872 (1990) ............................................................56

*Endrew F. v. Douglas County School District RE-1*,
580 U.S. 386 (2017) ..............................................................9

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ..............................................................57

*Espinoza v. Montana Dept. of Revenue*,
140 S.Ct. 2246 (2020) ...............................44, 46, 50, 68

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*,
82 F.4th 664 (9th Cir. 2023) ...............................................68

*Fields v. Palmdale Sch. Dist.*,
427 F.3d 1197 (9th Cir. 2005), *opinion affirmed and amended in part on denial of rehearing*, 447 F.3d 1187 (9th Cir. 2006), *cert. denied*, 127 S.Ct. 725 (2006) ................................................57

*Fleischfresser v. Directors of Sch. Dist. 200*,
15 F.3d 680 (7th Cir. 1994) ...............................................................43

*Florence County Sch. Dist. Four v. Carter*,
510 U.S. 7 (1993).......................................................................22, 23

*Fulton v. City of Philadelphia*,
141 S.Ct. 1868 (2021)...............................................................48, 49

*Gallinger v. Becerra*,
898 F.3d 1012 (9th Cir. 2018) ..........................................................64

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .....................................................68, 69

*Gary S. v. Manchester Sch. Dist.*,
374 F.3d 15 (1st Cir. 2004), *cert. denied*, 543 U.S. 988 (2004)..............5, 45, 50

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012), *cert. denied*, 133 S.Ct. 856 (2013) ................43

*Get Outdoors II, LLC v. City of San Diego*,
506 F.3d 886 (9th Cir. 2007) .............................................................40

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021), *overruled on other grounds by* 598
U.S. 617 (2023)....................................................................................1

*Gratz v. Bollinger*,
539 U.S. 244 (2003)....................................................................32, 33

*Gregory K. v. Longview Sch. Dist.*,
811 F.2d 1307 (9th Cir. 1987) .............................................................9

*Johnson v. Robison*,
415 U.S. 361 (1974).............................................................61, 62, 64

*K.M. v. Tustin Unified Sch. Dist.*,
775 F.3d 1088 (9th Cir. 2013), *cert. denied*, 571 U.S. 1237 (2014) ...................9

*Kirshner v. Uniden Corp. of America*,
842 F.2d 1074 (9th Cir. 1988) ..........................................................27

*Koontz v. St. Johns River Mgmt. Dist.*,
570 U.S. 595 (2013) ................................................................54

*LA Alliance for Human Rights v. County of Los Angeles*,
14 F.4th 947 (9th Cir. 2021) ...................................................65

*Locke v. Davey*,
540 U.S. 712 (2004).................................................................61

*Long Beach Area Chamber of Commerce v. City of Long Beach*,
606 F.3d 684 (9th Cir. 2010) ..................................................27

*M.L. v. Smith*,
867 F.3d 487 (4th Cir. 2017), *cert. denied*, 138 S.Ct. 752 (2018) .........10, 29, 66

*Martinez v. Newsom*,
46 F.4th 965 (9th Cir. 2022) ...................................................26

*Mbonyunkiza v. Beasley*,
956 F.3d 1048 (8th Cir. 2020) .................................................43

*Menders v. Loudoun County Sch. Bd.*,
65 F.4th 157 (4th Cir. 2023) ...................................................35

*Mitchell v. Helms*,
530 U.S. 793 (2000).................................................................58

*Ms. S. v. Vashon Island Sch. Dist.*,
337 F.3d 1115 (9th Cir. 2003) ...................................................8

*Norbert v. City and County of San Francisco*,
10 F.4th 918 (9th Cir. 2021) ...................................................64

*Northeastern Fla. Chapter of the Associated General Contractors of America v. City of Jacksonville*,
508 U.S. 656 (1993).............................................................31, 32

*Nuclear Info. & Resource Service v. Nuclear Regulatory Commission*,
457 F.3d 941 (9th Cir. 2006) ..................................................40

*Opiotennione v. Facebook, Inc.*,
2020 WL 5877667 (N.D. Cal. Oct. 2, 2020) ...........................35

*Orion Wine Imports, LLC v. Applesmith*,
    440 F.Supp.3d. 1139 (E.D. Cal. 2020), *aff'd*, 837 Fed. Appx. 585
    (9th Cir. 2021)....................................................................................41

*Parents for Privacy v. Barr*,
    949 F.3d 1210 (9th Cir. 2020) ..........................................................57

*Parker v. Hurley*,
    514 F.3d 87 (1st Cir. 2008), *cert. denied*, 129 S.Ct. 56 (2008).........43

*Pierce v. Society of Sisters*,
    268 U.S. 510 (1925)...........................................................................56

*Pinkert v. Schwab Charitable Fund*,
    48 F.4th 1051 (9th Cir. 2022) ...........................................................27

*Regan v. Taxation With Representatives of Wash.*,
    461 U.S. 540 (1983).......................................................................7, 44

*Sabra v. Maricopa County Community College Dist.*,
    44 F.4th 867 (9th Cir. 2022) ..............................................................43

*San Diego County Gun Rights Committee v. Reno*,
    98 F.3d 1121 (9th Cir. 1996) .........................................................36, 40

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)...............................................................28, 29, 34

*St. John's United Church of Christ v. City of Chicago*,
    502 F.3d 616 (7th Cir. 2007) .........................................................61, 63

*Tandon v. Newsom*,
    593 U.S. 61 (2021)..........................................................................52, 53

*Teen Ranch, Inc. v. Udow*,
    479 F.3d 403 (6th Cir. 2007), *cert denied*, 128 S.Ct. 653 (2007) ...............45, 62

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)...........................................................................27

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449, 453-54 (2017) .........................................................47, 68

*U.S. v. American Library Ass'n, Inc.*,
539 U.S. 194 (2003)..............................................................44, 50

*U.S. v. Grant*,
117 F.3d 788 (5th Cir. 1997) ...............................................43

*U.S. v. Scott*,
450 F.3d 863 (9th Cir. 2006) ...........................................54, 55

*Weston Family Partnership LLLP v. Twitter, Inc.*,
29 F.4th 611 (9th Cir. 2022) ................................................43

*White v. U.S.*,
601 F.3d 545 (6th Cir. 2010) ...............................................41

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)...............................................................67

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)........................................................56, 57

*WMX Technologies, Inc. v. Miller*,
104 F.3d 1133 (9th Cir. 1997) ..............................................1

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002)........................................................58, 59

**Federal Statutes**

20 U.S.C.
§ 1400(d)(1) ...............................................................3
§ 1401(9)...............................................................4, 5, 22
§ 1401(a)(18) ...............................................................22
§ 1412(a)(10)(A)...........................................................4, 7, 12
§ 1412(a)(10)(A)(vi) ......................................................10
§ 1412(a)(10)(B) .........................................................7, 11, 21
§ 1412(a)(10)(B)(i)-(ii)...................................................21
§ 1412(a)(10)(C)(ii) ......................................................20
§ 1415(b)(6)(A), (f)(1)(A) ...............................................20
§ 7801(23)(A)(ii)(I)(bb)................................................25, 26

28 U.S.C.
    § 1291.................................................................................................1
    § 1331.................................................................................................1

Individuals with Disabilities Education Act ("IDEA") ...................................*passim*

**California Statutes**

Cal. Educ. Code
    § 51225.3(a)(1)-(2) ..........................................................................25
    § 51225.31 .........................................................................................26
    § 56026(c)(4) .....................................................................................25
    § 56028.5 ............................................................................................51
    § 56034......................................................................2, 23, 52, 68
    § 56101 ...............................................................................................51
    § 56101(a) ..........................................................................................51
    § 56345(a)(2), (a)(8), (b)(1) ............................................................25
    § 56365.................................................................................2, 68
    § 56365(a) ......................................................................11, 12, 24
    § 56365(b) ..........................................................................................12
    § 56365(d) .................................................................................12, 24
    § 56366........................................................................................24, 68
    § 56366(a)(2)(A) ...............................................................................12
    § 56366(a)(2)(B) ...............................................................................15
    § 56366(a)(3)(A) ...............................................................................13
    § 56366(a)(8) .....................................................................................13
    § 56366.1(i)(3) ..................................................................................17
    § 56366.1(a)(1) ..................................................................................14
    § 56366.1(a)(3) ..................................................................................14
    § 56366.1(e)(1) ..................................................................................16
    § 56366.1(e)(3) ..................................................................................16
    § 56366.1(e)-(f) .................................................................................69
    § 56366.1(f) ........................................................................................14
    § 56366.1(h) .......................................................................................14
    § 56366.1(j) ........................................................................................16
    § 56366.1(n) .......................................................................................13
    § 56366.2................................................................................51, 52, 53
    § 56366.4 ............................................................................................17
    § 56366.5 ............................................................................................12
    § 56366.10(b)(1) .........................................................................13, 29
    § 56366.10(c) .....................................................................................15

**Federal Regulations**

34 C.F.R.

§ 76.532......................................................................................10, 29

§ 300.17.......................................................................................3, 4

§ 300.28..........................................................................................6

§ 300.41..........................................................................................6

§ 300.101(a)......................................................................................3

§ 300.102(a)(3)(i)..............................................................................25

§ 300.102(a)(3)(iv)............................................................................25

§ 300.114..........................................................................................6

§ 300.115.....................................................................................6, 11

§ 300.116..........................................................................................7

§ 300.118......................................................................................6, 7

§ 300.121..........................................................................................8

§ 300.130..........................................................................................4

§ 300.130-300.144............................................................................12

§ 300.131-300.138..............................................................................4

§ 300.137(a)......................................................................................4

§ 300.137(b)-(c).................................................................................5

§ 300.138(a)(2)..................................................................................4

§ 300.138(b)......................................................................................5

§ 300.138(c)(2)................................................................................10

§ 300.145........................................................................................11

§ 300.145-300.147...........................................................................11

§ 300.146......................................................................................8, 11

§ 300.146(b).....................................................................................21

§ 300.147..........................................................................................8

§ 300.320(a)(1)(i)...............................................................................5

§ 300.325(c)......................................................................................7

§ 300.600..........................................................................................6

**California Regulations**

Cal. Code Regs., Title 5

§ 3001(a) ..................................................................................13, 29
§ 3001(p) ...........................................................................................59
§ 3060(a) ...........................................................................................13
§ 3060(a)(4) ......................................................................................14
§ 3060(c)(8) ......................................................................................15
§ 3060(c)(9) ................................................................................13, 29
§ 3060(d) ...........................................................................................14
§ 3061(a) ...........................................................................................15
§ 3062(a), (d). ...................................................................................12
§ 3062(b) ...........................................................................................12
§ 3062(g) ...........................................................................................14
§ 3063(a) ...........................................................................................16
§ 3063(a)-(c) .....................................................................................69
§ 3063(e)(2) ......................................................................................16
§ 3063(e)-(h) .....................................................................................16
§ 3064(a) ...........................................................................................13
§ 3070..........................................................................................14, 24, 26

**Constitutional Provisions**

First Amendment....................................................................35, 55, 67

**Other Authorities**

Ninth Circuit Rule
28-2.7 ..................................................................................................2

Fed. R. Civ. P.
Rule 12(b)(6)................................................................................2, 43

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. When this appeal (ER-281) of the district court's August 9, 2023 order (ER-5) was filed, this Court had jurisdiction only over the denial of preliminary injunctive relief. *WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1135-37 (9th Cir. 1997). That nonfinal order gave the Plaintiff-Schools leave to amend. (ER-37.) After the Schools elected not to amend, the court entered judgment. (ER-4.) The post-appeal judgment vested this Court with jurisdiction under 28 U.S.C. § 1291. However, given the Schools' election, assessment of their standing is restricted to the Complaint's existing allegations. *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1064-66 (9th Cir. 2004) (because plaintiff declined leave, she "chose to take her chances that we would find the [claims] viable as pled"); *Gonzalez v. Google LLC*, 2 F.4th 871, 907 (9th Cir. 2021) ("We do not consider whether the identified defects…could be cured by further amendment because the Gonzalez Plaintiffs were given leave to amend those claims and declined to do so."), *overruled on other grounds by* 598 U.S. 617, 621 (2023).

# ISSUES PRESENTED

1.      Whether the Complaint properly alleged the Schools' standing.

2.      Whether the district court correctly ruled that one of the Plaintiff-Families lacked standing and the two other Plaintiff-Families ("Remaining Families") sufficiently alleged standing.

3.      Whether the district court erred in concluding that the Remaining Families failed to state a claim under Rule 12(b)(6).

4.      Whether the district court abused its discretion in denying Plaintiffs' motion for preliminary injunction.

The Rule 28-2.7 addendum is concurrently filed.

## STATEMENT OF THE CASE

### I.   THE PLAINTIFFS AND COMPLAINT

The Plaintiffs – two Orthodox Jewish schools ("Schools") and three sets of Orthodox Jewish parents suing for themselves and their children ("Families") – brought suit alleging that a California law implementing an aspect of the federal Individuals with Disabilities Education Act ("IDEA") violates their rights under the Free Exercise and Equal Protection Clauses.  (ER-243.)  Plaintiffs challenged California's requirement that "nonpublic, nonsectarian schools" ("NPSs") – statutory creatures certified to help the State provide its free public education to public-school students with disability-related needs so severe that no existing public program is appropriate – be nonsectarian (*i.e.*, not owned, controlled or formally affiliated with a religious sect).  Educ. Code §§ 56034, 56365.  The

Complaint outlined six "Counts" – five based on the Free Exercise Clause, and one on the Equal Protection Clause.  (ER-270-77.)

## II.    THE HIGHLY RELEVANT LEGAL FRAMEWORK

The district court understood that properly adjudicating this case required a complete understanding of the IDEA and California law implementing it.  (ER-39: "Again, it is important to focus on the legal framework….")  Following extensive legal analysis (ER-6-17), the court concluded that Plaintiffs' characterization of the challenged law was not only "erroneous" (ER-50, ln.27), but "a gross mischaracterization" of it (ER-51, lns.17-20).

A complete understanding of the legal framework is also essential on appeal.

### A. Under the IDEA, Families Have a Choice to Enroll Their Child in Private School or Accept Their State's Free Public Education; in Either Case the IDEA Provides Services

The IDEA's primary purpose is to ensure that all children with disabilities "have *available* to them a free appropriate *public* education" that includes supports.  (Emphasis added.)  20 U.S.C. § 1400(d)(1).  To receive IDEA funds, States must make a "free appropriate public education" (or "FAPE") available to all eligible children.  34 C.F.R. §§ 300.100, 300.101(a).

A FAPE is special education and related services that are "provided at public expense, under public supervision and direction, and without charge[,]" that meet *the State's* educational standards, and that are provided in accordance with a

3

proper individualized education program ("IEP"). 20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.

While a State must make its public FAPE option available, the IDEA recognizes that families may choose a private education, including a religious education. 20 U.S.C. § 1412(a)(10)(A); 34 C.F.R. § 300.130 (defining "parentally-placed private school children with disabilities" to include placement in "religious schools").

The IDEA does not ignore families that choose a private education. It requires a State-government's local educational agencies ("LEAs") to locate "parentally-placed private school children with disabilities" and to spend a proportionate share of their IDEA funds on providing special education and related services to those children, based on a plan developed by the LEA in consultation with representatives of such students' parents and private schools. 34 C.F.R. §§ 300.131-300.138.

## B. The IDEA's Provision of Services Differs Based on a Family's Choice, but Plaintiffs do Not Challenge That Difference, and its Constitutionality has Been Upheld

While the IDEA supports all eligible children, an LEA's obligations and a family's rights differ based on whether the family has chosen private education or the State's public system. 34 C.F.R. §§ 300.137(a), 300.138(a)(2); ER-9. For children whose parents have chosen ***private*** school, an LEA creates a "services

4

plan" describing services that the LEA will provide based on its IDEA-mandated

consultation with relevant stakeholders.  34 C.F.R. §§ 300.137(b)-(c), 300.138(b).

For children enrolled in *public* school, the LEA oversees development of an **IEP**

that, *inter alia*, describes what will be provided to enable the child to advance

toward meeting specified annual goals and to participate and make "progress *in the*

*general education curriculum* (*i.e.*, the **same** curriculum as for nondisabled

children)."  (Emphasis added.)  34 C.F.R. § 300.320(a)(1)(i).

 Plaintiffs do not challenge those IDEA distinctions, and federal courts have

rejected claims that the IDEA's differences based on family choice of private over

public education offend the Constitution, even when families choose religious

school for religious purposes.  *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 19-

21 (1st Cir. 2004), *cert. denied*, 543 U.S. 988 (2004) (rejecting Free Exercise and

Equal Protection challenges).

### C. When a Family Accepts the State's Free Public Education, the State Directs Provision of Public Education, even in the Rare Case Where the Law's "Least Restrictive Environment" Rules Permit NPS Placement by the State

 When families choose the State's free public education, IDEA-sponsored

special education is provided along with and in the context of the State's public

curriculum standards, and it is directed, controlled, and supervised by the State's

public educational agencies.  *See*, *e.g.*, 20 U.S.C. § 1401(9) (FAPE definition

requiring, *inter alia*, that the education and related services "meet the standards of

the State educational agency" and are provided "under public supervision and direction"); 34 C.F.R. § 300.600 (requiring State to monitor implementation of, and to enforce the IDEA's requirements, including LEAs' "[p]rovision of FAPE in the least restrictive environment" and "exercise of general supervision"); 34 C.F.R. §§ 300.28, 300.41 (defining "local educational agencies" and "state educational agency" as public governmental agencies responsible under State law for administering "public" education).

The IDEA requires LEAs to ensure that, to "the maximum extent appropriate," their eligible children are "educated with children who are nondisabled" and that learning in anything other than the LEA's regular classes "occurs *only* if the nature or severity *of the disability* is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." (Italics added.) 34 C.F.R. § 300.114. Because of the broad range of possible disabilities, the IDEA requires States to "ensure that a continuum of alternative placements is available" to meet disability-related needs, and it states that such placements may include "private institutions." 34 C.F.R. §§ 300.115, 300.118. However, LEAs must ensure that all placement decisions comply with the above-described "least restrictive environment" rules, are based on the child's IEP, result in placement "as close as possible to the child's home" and, unless some other arrangement is required, provide that "the child is educated

6

in the school that he or she would attend if nondisabled." 34 C.F.R. § 300.116.

The IDEA requires States to ensure that these requirements are "effectively

implemented," including, if necessary, by "making arrangements with public and

private institutions (such as a memorandum of agreement or special

implementation procedures)." 34 C.F.R. § 300.118.  Thus, the IDEA expressly

contemplates States contracting with entities to help the State provide necessary

and specialized support to families that have chosen the State's free public

education. *Id*.

But, critically, in this context, the necessary placement of a child in the

private institution is "**by the State**" – in contrast to the above-discussed

"parentally-placed" scenario where the child's parents have chosen a private

education. *See* and *compare* 20 U.S.C. § 1412(a)(10)(B) (children placed in

private institutions "by the State or appropriate [LEA]") *with* § 1412(a)(10)(A)

(children "enrolled in private schools by their parents").  In this context of

placement "by the State," responsibility under the IDEA "remains with the public

agency" that placed the child.  34 C.F.R. § 300.325(c).  Significantly, the IDEA

requires the State to ensure that the child: (a) is "provided <u>an education that meets

the standards that apply to education provided by</u>" <u>the State's *public* educational

agencies</u>; (b) has "all of the rights of a child with a disability who is served by a

public agency"; and (c) is provided, at no cost, special education and related

services that conform to a properly-developed IEP. (Emphasis added.) 34 C.F.R. § 300.146. To satisfy those responsibilities States must, *inter alia*, "[m]onitor compliance through procedures such as written reports, on-site visits, and parent questionnaires." 34 C.F.R. § 300.147.

### D. The IDEA's "Free Appropriate Public Education" Need Not Account for a Family's Religious Needs; and Ultimately, Placement Decisions are Made by LEAs, With Courts Deferring to Their Expertise

LEAs develop IEPs for eligible public-school children using "IEP Teams" composed of one or more of the child's teachers, other LEA representatives that are knowledgeable and qualified to make decisions, as well as the child's parents. 34 C.F.R. § 300.121. While LEAs must consider parents' views, the LEA: should develop its own views; must abide by the IDEA's above-discussed "least restrictive environment" rules; and can ultimately disagree with the parents about specifics, including placement. *Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1134 (9th Cir. 2021) (the law "does not require school authorities automatically to defer to [parents'] concerns" and school authorities can listen, consider and "just disagree[]."); *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1131-33 (9th Cir. 2003) (recognizing that the LEA and parents may have "a difference of educational philosophy," but that LEAs "have expertise in educational methods that may be given appropriate weight in addressing an IEP's compliance with the IDEA" and that an LEA "has no obligation to grant [the

parents] a veto over any individual IEP provision."); *K.M. v. Tustin Unified Sch. Dist.*, 775 F.3d 1088, 1101 (9th Cir. 2013), *cert. denied*, 571 U.S. 1237 (2014).

Under the IDEA, "[a]n 'appropriate' public education does not mean the absolutely best or 'potential-maximizing' education for the individual child." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987). Rather, an LEA must offer a program reasonably calculated to enable the child to make progress in the LEA's general education curriculum considering the child's circumstances. *Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 399-401 (2017). If a parent challenges an LEA's decision, then the court "must focus primarily on the District's proposed placement, not on the alternative that the family preferred." *Gregory K.*, 811 F.2d at 1314. That is because even if the parent's preferred placement "was better for [the student] than the District's proposed placement, that would not necessarily mean that the placement was inappropriate." *Id*.

In assessing an LEA's proposed IEP's appropriateness, courts "are not free to substitute [their] own notions of sound educational policy for those of the school authorities which [they] review.'" *Capistrano USD*, 21 F.4th at 1132. Courts "must defer" to the school authorities' "'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies." *Id*.

9

Importantly, while an IEP Team considers the child's needs for progressing in the LEA's general education curriculum due to their disability, the family's religious and cultural needs do <u>not</u> require the LEA to include religious or cultural services in an IEP. *M.L. v. Smith*, 867 F.3d 487, 495-98 (4th Cir. 2017), *cert. denied*, 138 S.Ct. 752 (2018).

### E. When an LEA Places a Child With a Contractor, IDEA Funds Benefit the Child Whose Family has Accepted the State's Free Public Education (Not the Contractor) and May <u>Not</u> be Used for Religious Instruction

When an LEA's IEP Team determines that it is both permissible and appropriate to involve a private contractor, the LEA (and via contract, the contractor) is bound by federal regulations that prohibit use of IDEA funds for "[r]eligious worship, instruction, or proselytization." 34 C.F.R. § 76.532; *M.L.*, 867 F.3d at 496 ("[F]ederal regulations support the conclusion that states may not use IDEA funds to provide religious and cultural instruction.")

Even where LEAs provide services to "parentally-placed" children whose families have chosen religious school, the IDEA requires that funds are only used for "secular" and "neutral" education and to benefit the eligible child, as opposed to the private school itself or its general student population. 20 U.S.C. § 1412(a)(10)(A)(vi) (education and services, including materials and equipment, "shall be secular, neutral, and nonideological."); 34 C.F.R. §§ 300.138(c)(2)

10

(same) and 300.141(a)-(b) (funds may not be used "to finance the existing level of instruction in a private school or to otherwise benefit the private school").

### F. California's "Nonsectarian" Requirement Only Comes into Play When a Family has Accepted the State's Public Education, and Only When No "Appropriate" Public Program is Otherwise Available

Recognizing the broad range of possible disabilities, and in accordance with the IDEA's requirement that States provide for "a continuum of alternative placements" (34 C.F.R. § 300.115), California enacted law to allow for "NPSs" to provide IEP-designated special education services to children placed there by the LEA under a contract "if no appropriate public education program is available" and various other requirements are met. Educ. Code § 56365(a).

Such services must be provided "in accordance with section 300.146 of title 34 of the Code of Federal Regulations" (*id*.) – an IDEA regulation imposing oversight obligations on a State Educational Agency with respect to children placed with a private entity "by a public agency" (34 C.F.R. § 300.146), which applies "*only to* children with disabilities who are or have been placed in or referred to a private school or facility ***by a public agency*** as a means of providing special education and related services" (34 C.F.R. § 300.145, emphasis added). Thus, California's provision for NPSs only has application where families have chosen their State's public education (addressed by 20 U.S.C. § 1412(a)(10)(B) and 34 C.F.R. §§ 300.145-300.147), rather than invoke their right to obtain a

private education (addressed by 20 U.S.C. § 1412(a)(10)(A) and 34 C.F.R. §§ 300.130-300.144).

### G. An NPS Assists an LEA in Providing a FAPE – including Through the use of State-Approved Textbooks and Curriculum – Pursuant to a Contract; However, the Child is Deemed Enrolled in Public School and Graduates With a Diploma From the LEA

An LEA's placement of a student in an NPS allows the LEA to receive state education funding for the student, because such students are "deemed to be enrolled in public schools" for such purposes. Educ. Code § 56365(b). The NPS is paid by the LEA "pursuant to" a contract, which must meet legal requirements. Educ. Code § 56365(d); Educ. Code § 56366.5 (payment provisions, and requirement that NPSs only use funds to provide the contract's specified services). Before placing a student, an LEA must enter a "master contract" with the NPS. Educ. Code § 56365(a); Cal. Code Regs. tit. 5 ("5 C.C.R.") § 3062(a), (d).

A "master contract" must "specify the administrative and financial agreements" between the LEA and NPS, and must include, *inter alia*, provisions for "inspection and audits, compliance with applicable state and federal laws and regulations, attendance, record-keeping," "reporting requirements[,]" and "right to withhold and audit exceptions[.]" 5 C.C.R. § 3062(b). It also must include an "individual services agreement" for each pupil "placed by" the LEA to cover the services "specified in" the LEA-developed IEP. Educ. Code § 56366(a)(2)(A). An NPS is prohibited from making changes in the instruction or services it provides

12

unless they are based on revisions to the IEP. Educ. Code § 56366(a)(3)(A). NPSs also must agree that they are subject to the state's accountability system "in the same manner as public schools" and that each pupil placed in the NPS "by" an LEA shall be tested by qualified staff at the NPS in accordance with that system. Educ. Code § 56366(a)(8).

An NPS must be certified by the Superintendent of Public Instruction ("SPI") (5 C.C.R. § 3060(a)), but to receive certification, the NPS must meet several requirements. The NPS must certify that it will utilize the State Board of Education (SBE)-adopted, standards-aligned core curriculum and instructional materials for kindergarten and grades 1 to 8 and will utilize the State standards-aligned core curriculum and instructional materials used by an LEA that contracts with the NPS for grades 9-12. Educ. Code § 56366.10(b)(1); 5 C.C.R. § 3001(a). To that end, an NPS's application must describe, *inter alia*, the "SBE-adopted core curriculum (K-8) and standards-aligned core curriculum (9-12) and instructional materials used by general education students." 5 C.C.R. § 3060(c)(9).

An NPS's staff must "hold a certificate, permit, or other document equivalent to that which staff in a public school are required to hold." Educ. Code § 56366.1(n); 5 C.C.R. § 3064(a). Thus, an NPS's application must include the names of its teachers with a credential authorizing service in special education, and

copies of the credentials.  Educ. Code § 56366.1(a)(3); 5 C.C.R. § 3060(a)(4); *see also* 5 C.C.R. § 3062(g) (requiring credentials for non-teaching staff).

An NPS applicant must agree to "maintain compliance" with not only the IDEA, but other federal laws including the Civil Rights Act, Fair Employment Act, and Section 504 of the Rehabilitation Act.  5 C.C.R. § 3060(d).

An NPS's application must include other information to assist the SPI in making a certification decision, including "a description of the special education and designated instruction and services provided to individuals with exceptional needs[.]"  Educ. Code § 56366.1(a)(1).

The SPI is authorized to "certify, conditionally certify, or deny certification."  Educ. Code § 56366.1(f).  Certification may last for one year, however, an NPS may annually update its application for potential renewal.  *Id.*; Educ. Code § 56366.1(h).

Finally, underscoring that a child's NPS-placement is enrollment in the State's public education system, when a child placed by an LEA in an NPS "meets public education agency requirements" for graduation, "the public education agency which developed the IEP shall award the diploma."  5 C.C.R. § 3070.

14

**H. NPS Placement Involves Extensive and Continuing State Monitoring and Direction, With the Goal of Transitioning a Pupil Back to Less Restrictive Environments in the LEA**

NPSs must agree to continued oversight by the State and its LEAs and to provide specified services with the goal of transitioning pupils back to less restrictive environments in LEAs.  For example, a master contract must "include a description of the process being utilized by the [LEA] to oversee and evaluate placements in [NPSs], as required by federal law[,]" which must "include a method for evaluating whether each pupil is making appropriate educational progress."  Educ. Code § 56366(a)(2)(B).  Such evaluation must occur at least once every year and must include whether pupils' needs "continue to be best met" at the NPS, and whether changes to IEPs are necessary, "including whether the pupils may be transitioned to a public school setting."  *Id.*  An NPS must certify that it will provide services "with the goal of integrating pupils into the least restrictive environment pursuant to federal law."  Educ. Code § 56366.10(c).  Thus, an NPS's application must describe the school's "exit criteria for transition back to the public school setting."  5 C.C.R. § 3060(c)(8).

An NPS must agree to "make available any books and records associated with the delivery of" services "for audit inspection" by the SPI.  5 C.C.R. § 3061(a).

15

The SPI must conduct an initial "validation review" before granting "an initial conditional certification," and then must conduct an "on-site review" within 90 days. 5 C.C.R. § 3063(a). The SPI must conduct further on-site reviews at least every three years, or at least annually, where an NPS has been the subject of a complaint. *Id*.; Educ. Code § 56366.1(e)(1). On-site reviews must include, *inter alia*, "a review and examination of files and documents, classroom observations and interviews with the site administrator, teachers, students, volunteers and parents to determine compliance with all applicable state and federal laws and regulations." 5 C.C.R. § 3063(e)(2). Such reviews are followed by written reports detailing any noncompliance findings. 5 C.C.R. §§ 3063(e)-(h).

An LEA must conduct "at least" one on-site monitoring visit during each school year, which must include, *inter alia*, "a review of progress the pupil is making toward the goals set forth in the pupil's [IEP]," "an observation of the pupil during instruction, and a walkthrough of the facility." Educ. Code § 56366.1(e)(3).

The SPI is required to "monitor" NPSs with respect to: "facilities, the educational environment, and the quality of the educational program, including the teaching staff, the credentials authorizing service, the standards-based core curriculum being employed, and the standards-focused instructional materials used[.]" Educ. Code § 56366.1(j). The SPI also is required to "conduct an

16

investigation," which "may include an unannounced onsite visit," if the SPI receives evidence of certain matters, including "a significant deficiency in the quality of educational services provided[.]"  Educ. Code § 56366.1(i)(3).  The SPI "may revoke or suspend the certification" of an NPS for any one of ten enumerated reasons, including: (a) violation of an applicable state or federal rule; (b) contract noncompliance; (c) "[f]ailure to implement recommendations and compliance requirements following an onsite review"; and (d) failure to implement an IEP.  Educ. Code § 56366.4.

## III.  PROCEDURAL HISTORY

Plaintiffs filed their Complaint on March 13, 2023.  (ER-241-80.)  Plaintiffs moved for a preliminary injunction on May 22.  (ER-292.)  The LAUSD-Appellees and State-Appellees moved to dismiss on May 23 and 24, respectively.  (ER-293.)  There was oral argument on July 21.  (ER-56.)  On August 9, the district court issued an order granting Defendants' motions to dismiss and denying Plaintiffs' motion for preliminary injunction ("Decision").  (ER-5.)  The court determined that the Complaint failed to sufficiently allege the Schools' standing, but granted the Schools 21-days leave to amend.  (ER-27-37, 55.)  The court found that the Loffmans lacked standing (ER-37-41), but that the Remaining Families sufficiently alleged standing (ER-44).  Consequently, the court proceeded to the merits of the

17

Remaining Families' claims and determined that they failed to state a claim. (ER-44-54).

Plaintiffs appealed the Decision on August 14, 2023. On August 25, Plaintiffs advised the district court that they would be appealing "instead of amending their complaint." (CDE-SER-010, lns.6-7.) Nonetheless, the district court waited until well after its Decision's 21-day leave period expired before entering judgment. (ER-4.)

## SUMMARY OF THE ARGUMENT

The Opening Brief contains mischaracterizations and unfounded assertions that do not control over the record and law. (§I, below.) When the challenged nonsectarian NPS requirement is considered in context, with a complete understanding of the IDEA and NPS system, one finds, as the district court did, that Plaintiffs' portrayal is a "gross mischaracterization" that "misstates" the nature of the law. (ER-51, lns.17-20.)

This case starts and ends with standing. The district court correctly determined that the Schools failed to properly allege standing (§II.B.), and given the Schools' decision not to amend, they are limited to their insufficient pleading (p.1, *supra*). While the court made several correct determinations bearing on the Families' standing, it erred in finding standing for the Remaining Families through reliance on an inapposite out-of-circuit decision. (§II.C.)

18

Employing a proper and complete understanding of the challenged requirement in context, the court correctly concluded that the Remaining Families failed to state a claim.  (§III.)

Given its determinations, and the lack of evidence supporting relief, the court did not abuse its discretion in denying preliminary injunctive relief.  (§IV.)

## ARGUMENT

**I.   THE LAW AND THE RECORD CONTROL; NOT MISCHARACTERIZATIONS AND UNFOUNDED EXTRA-RECORD ASSERTIONS**

Plaintiffs assert that the "district court recognized" that this case "is on all fours with *Carson*" "if placement in nonpublic schools were a 'benefit' made available to" IDEA-eligible children.  (AOB at 35, citing ER-47.)  The court actually said that the case turned on whether the NPS system is "a program for subsidizing private education[.]"  (ER-47.)  Following extensive analysis, the court determined that it was not.  (ER-6-17, 44-53.)

Plaintiffs assert that the IDEA and California law grant "the substantive right to a FAPE" to all children with disabilities.  (AOB at 9-10.)  But the statutes Plaintiffs cite require California to make its FAPE "available to" all eligible children, and if families choose a private education, then, *instead of* providing its FAPE pursuant to an IEP, the State must provide "special education and related

19

services" in accordance with *other* federal requirements geared toward that situation. (pp.3-5, *supra*.)

Plaintiffs obfuscate IDEA differences based on family choice between the State's FAPE or private education. As discussed (pp.3-5, *supra*), a family can choose private school instead of public school (the "parentally-placed" context) and receive IDEA services under a "services plan" (which is different from an IEP). If a family chooses public school but later believes that its LEA has *violated the IDEA* by failing to provide an appropriate IEP, then it can initiate *legal action*. 20 U.S.C. § 1415(b)(6)(A), (f)(1)(A). If the family risked enrolling their child in private school pending adjudication (the "unilaterally-placed" context) then, *as a legal remedy for the LEA's violation*, the family may be awarded the cost of that schooling if the family proves that the LEA violated the IDEA and that its unilateral placement was reasonable. 20 U.S.C. § 1412(a)(10)(C)(ii).

Plaintiffs refer to *those* two situations ("parentally-placed" and "unilaterally-placed") as proof that "Defendants already permit public funding to flow to religious schools when parents place children at private schools[.]" (AOB at 25.) They also refer to them as two distinct IDEA "methods for obtaining public funding" for special education at private religious schools. (AOB at 6-9.) That is misleading. With respect to "parentally-placed," no public money is given to private schools or parents; rather, LEAs spend their IDEA funds to provide

services, and funds may only be used for education that is "secular" and to benefit the eligible children, as opposed to the private school.  (pp.10-11, *supra*.)  And with respect to "unilateral placement," it is not an IDEA program to fund religious school education, but rather a legal remedy for an IDEA violation.  (ER-48.)

Plaintiffs concede that "[t]his case concerns" placement under 20 U.S.C. § 1412(a)(10)(B), but they characterize it as a "method" "for obtaining public funding" "of FAPE" at "private schools."  (AOB at 6-7, 9.)  Plaintiffs overreach.  This placement only involves families that have chosen the State's free public education, and it is placement "by the State or appropriate local educational agency as the means of" providing a free appropriate public education, where the State has determined and will continue to ensure that the child will be "provided an education that meets standards that apply to" the State's public educational agencies.  20 U.S.C. §1412(a)(10)(B)(i)-(ii); 34 C.F.R. § 300.146(b); *see* pp.5-8. 10-11, *supra*.

The Opening Brief repeatedly cites to dicta in a footnote to argue that the word "public" in the defined statutory phrase "free appropriate public education" *only* refers to "public expense."  (AOB at 5, 34, citing *Dreher v. Amphitheater Unified Sch. Dist.*, 22 F.3d 228, 233 n.10 (9th Cir. 1994).)  That argument is meritless.  *Dreher* involved "unilateral placement" – parents seeking reimbursement for private tuition as a remedy for their LEA's IDEA violation.  22

F.3d at 233-34. *Dreher* affirmed dismissal of the parents' claim because they did not prove that the LEA's proposed IEP was inappropriate. *Id*. The opinion set forth the statutory definition of FAPE (***then*** at 20 U.S.C. § 1401(a)(18), ***now*** at § 1401(9)), which not only includes the concept of services being provided "at public expense," but also "under *public supervision and direction*" so that they "meet *the standards of the State educational agency*" and "are provided in conformity with" a properly-developed IEP. *Id*. The *Dreher* court did <u>not</u> hold that "free appropriate public education" means *any* education that is paid for with public funds; indeed, that proposition conflicts with its actual holding that the LEA was not liable for the cost of the parents' preferred education. The only authority mentioned in the cited dicta is the above-discussed FAPE definition and *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993). *Dreher*, 22 F.3d at 233, n.10. But like the actual FAPE definition, *Florence County* undermines Plaintiffs' assertion.

*Florence County* also involved parents seeking "unilateral placement" remedies. 510 U.S. at 12-14. The LEA argued that it was not liable for the cost of tuition at the parent-selected private school, because that school did not provide a "free appropriate public education" because its education was not "under public supervision and direction" and was not pursuant to an LEA-developed IEP. *Florence County*, 510 U.S. at 13. The Court held that while a FAPE provided

22

*pursuant to* the IDEA ***did*** have to, *inter alia*, be provided "under public supervision and direction" and "meet the standards of the state educational agency," those requirements did not apply to fashioning a *remedy* for a State's *breach* of the IDEA. *Id*. at 13-15. Moreover, the Court recognized that when a State places a public-school student in a private setting to assist it in providing FAPE, such "public placement" would be "in an appropriate private setting *of the State's choice*." (Emphasis added.) *Id*. at 15. And if such "public placement" is appropriate and the State meets its continuing duties, then parents who "change their child's placement…without the consent of the state or local school officials, do so at their own financial risk." *Id*.

Plaintiffs assert that "California defines" an NPS "as a 'private' school that 'enrolls individuals with exceptional needs pursuant to an individualized education program.'" (AOB at 10.) Plaintiffs' quotation of the definition is incomplete and misleading – it does not end with the word "program," as reflected in the AOB. Educ. Code § 56034. An NPS is not any "private school" that enrolls students pursuant to an IEP. Rather, NPSs are statutory creations referring to nonpublic entities that become "certified by" State and that "meet standards as prescribed by" the State to enroll public-school students with disabilities "pursuant to an [IEP]" in very rare circumstances. *Id*.

23

Plaintiffs assert that the NPS system was intended as an "alternative" "for parents and students with disabilities" that provides "public funding to reimburse" private school tuition. (AOB at 11, citing Educ. Code §§ 56365, 56366.) Plaintiffs misconstrue the statutes. California Education Code section 56366 describes NPSs as an alternative special education service "available ***to a local educational agency and*** parents" only in the context where the parents have enrolled their children in the public LEA and the NPS will be certified, meet all State standards, and provide FAPE pursuant to the LEA-developed IEP. Moreover, that "alternative" only comes into play if the IDEA's "least restrictive environment" rules allow (p.6, *supra*) and "if no appropriate public education program is available." Educ. Code § 56365(a). Additionally, the NPS system does not "reimburse" parents for private tuition: the LEA that the parents enrolled their child in "pay[s] to the nonpublic, nonsectarian school" an amount for the child's attendance "pursuant to the contract." Educ. Code § 56365(d).

Plaintiffs proffer a new and erroneous interpretation of a California regulation that states: "When an individual with exceptional needs meets public education agency requirements for completion of prescribed course of study designated in the pupil's IEP, the public education agency which developed the IEP shall award the diploma." 5 C.C.R. § 3070. Plaintiffs assert, without citation or explanation, that this regulation merely "refers to an IEP diploma – an

alternative diploma issued by the state to signify only that the student has completed their own personalized course of study under the IEP." (AOB at 37-38.) Not so. States must continue to make a FAPE available to eligible pupils under age 22 until the pupil has "graduated from high school with a regular high school diploma." 34 C.F.R. § 300.102(a)(3)(i); Educ. Code § 56026(c)(4). "Regular high school diploma" means "the standard high school diploma awarded to the preponderance of students in the State that is fully aligned with State standards" but "does not include a recognized equivalent of a diploma, such as a general equivalency diploma…or similar lesser credential." 34 C.F.R. § 300.102(a)(3)(iv). Moreover, in addition to stating the pupil's goals for progressing in the LEA's general education curriculum, for students in the high school grades, IEPs must include the "courses of study" needed to assist the pupil in meeting their *postsecondary* goals, as well as "modes necessary for the pupil to complete *the prescribed course of study of the district* and to meet or exceed proficiency standards *for graduation*." (Emphasis added.) Educ. Code § 56345(a)(2), (a)(8), (b)(1). California has statewide minimum course requirements for receiving "a diploma of graduation" from an LEA; however, individual LEAs may impose additional requirements. Educ. Code § 51225.3(a)(1)-(2). California law provides that, despite an LEA's additional requirements, the LEA may award "a diploma of graduation from high school, as described in [20 U.S.C. § 7801(23)(A)(ii)(I)(bb)]

25

in certain limited circumstances.  Educ. Code § 51225.31.  The referenced federal statute provides that such a diploma must be, *inter alia*, "aligned with the State requirements for the regular high school diploma" as opposed to some other "lesser" certificate.  20 U.S.C. § 7801(23)(A)(ii)(I)(bb).  Thus, the IDEA and California law provide for IEPs describing how the eligible child will progress through the LEA's/State's prescribed coursework to obtain a LEA-issued high school diploma.  There is no merit to Plaintiffs' unsupported interpretation of 5 C.C.R. § 3070.

The Opening Brief is littered with assertions about alleged NPS programs that are unsupported by record citations and only allegedly supported by webpages that were never presented below.  (AOB 11-14, 32-34.)  Some are CDE webpages that expressly state that the information in them is "voluntarily self-reported" by LEAs and "may be outdated or have errors, omissions, typos and other inaccuracies" and that, therefore, the "information, or the absence of information," "should not be relied upon for any purpose[.]"  The others are non-party webpages, which do not state that the information Plaintiffs rely upon are part of any California-certified NPS program.  Plaintiffs' reliance on these extra-record propositions is improper, and their argument should be stricken.  *Martinez v. Newsom*, 46 F.4th 965, 975-76 (9th Cir. 2022) (in appeal of Rule 12(b)(6) dismissal, recognizing that appellate "review is limited to 'the original papers and

26

exhibits filed in the district court,' Fed. R. App. P. 10(a)(1), and the documents

Plaintiffs submitted for the first time on appeal are not part of the record.");

*America Unites for Kids v. Rousseau*, 985 F.3d 1075, 1099 (9th Cir. 2021)

(rejecting judicial notice of document on school district website that was not

presented below); *Long Beach Area Chamber of Commerce v. City of Long Beach*,

606 F.3d 684, 698 (9th Cir. 2010) (rejecting reliance on extra-record ordinances

and reports); *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074, 1077-78 (9th

Cir. 1988) (striking improperly referenced records and "giv[ing] them no

consideration in adjudicating th[e] appeal").

## II.    NONE OF THE PLAINTIFFS ESTABLISHED STANDING

### A. Standards of Review

Standing determinations are reviewed *de novo*.  *Pinkert v. Schwab*

*Charitable Fund*, 48 F.4th 1051, 1054 (9th Cir. 2022).

Federal courts must dismiss a case where the plaintiff lacks standing.

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 422-24 (2021).

For standing, "a plaintiff must show (i) that he suffered an injury in fact that

is concrete, particularized, and actual or imminent; (ii) that the injury was likely

caused by the defendant; and (iii) that the injury would likely be redressed by

judicial relief." *Id*.

Plaintiffs must establish standing at the time they bring suit. *Carney v. Adams*, 592 U.S. 53, 59-60 (2020). At the pleading stage, plaintiffs must "clearly" "allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

**B. The Schools' Complaint was Insufficient to Establish Standing**

The district court correctly ruled that the Schools insufficiently alleged standing. (ER-27-37.) The Schools are "Orthodox Jewish schools" (ER-243, ¶3) that exist to provide a Jewish religious education (ER-248, ¶¶31, 33) – the "primary goal" of which is "the study of the Torah[,]" which is to the Schools "itself a form of religious worship" (ER-256, ¶71). The Schools "help parents to meet their obligation to provide Jewish education to their children[,]" and "inculcation and transmission of Jewish religious beliefs and practices to children is the very reason that [they] exist." (ER-257, ¶76.) Their "religious beliefs and identity permeate their entire school and mission." (ER-271, ¶177.) Thus, the Schools allege interest in qualifying as an NPS *to provide a Jewish religious education*. (ER-248, ¶¶32, 34; ER-267-68, ¶¶152, 154; ER-269-70, ¶¶162, 170.)

The premise underlying the Schools' alleged interest is that if the nonsectarian requirement were removed, then they could provide their religious education to LEA-placed children. That premise is false. As discussed (pp.5-16, *supra*), NPSs only work with students whose families have enrolled in public

28

school and accepted the State's free public education, and NPSs must provide an education that meets the State's public standards under State direction and supervision.  An NPS must use State-adopted and State standards-aligned curriculum and instructional materials.  Educ. Code § 56366.10(b)(1); 5 C.C.R. § 3001(a).  And an NPS application must describe the State-adopted and State standards-aligned curriculum and instructional materials that are "used by general education students."  5 C.C.R. § 3060(c)(9).  And, significantly, federal regulations prohibit use of IDEA funds for "[r]eligious worship, instruction, or proselytization."  34 C.F.R. § 76.532; *M.L.*, 867 F.3d at 496.

While the Schools challenge the nonsectarian requirement, their alleged purpose and interest suggests ignorance of the many other NPS requirements. Critically, <u>the Complaint's **_only_** reference to such other requirements</u> is the general and conclusory allegation – made only on "information and belief" – that the Schools "either otherwise meet[] or [are] capable of meeting" them.  (ER-268, ¶156; ER-270, ¶166; ER-30.)  That is insufficient.  *Spokeo*, 578 U.S. at 338*; Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  This is particularly true here, where other allegations reflect an intention counter to certification requirements.

But, more fundamentally, the fact that the Schools could or might apply for certification if the nonsectarian requirement were removed is insufficient.  *Carney*, 592 U.S. at 59-64.  The Schools were required to show that they are "likely" and

"able and ready" to apply, and if selected to serve as NPSs, in the "reasonably imminent future" but for the nonsectarian requirement. *Id*. at 60-66.

*Carney* is instructive. A lawyer registered as an independent brought a constitutional challenge against a law disqualifying lawyers with his party affiliation from judicial appointment to state courts. Even though the plaintiff-lawyer was otherwise eligible to apply for appointment and testified that he believed he was qualified and that he "would seriously consider and apply for" judicial positions if the law were changed, the Supreme Court determined that he lacked standing. *Id.* at 60-61. The Court found that the plaintiff's words – that he "would apply" – stood alone without supporting evidence and anticipated timeframes. *Id*. at 63-64. It observed that the plaintiff's primary motivation appeared to be vindicating his legal view, rather than actual intent to serve. *Id*. The Court explained that "some day intentions" "do not support a finding of the 'actual or imminent' injury that [its] cases require[,]" and that a holding that plaintiff's "few words of general intent" to apply sufficed "would significantly weaken the longstanding legal doctrine preventing this Court from providing advisory opinions at the request of one who, without other concrete injury, believes that the government is not following the law." *Id*. at 64. Thus, the plaintiff could not show that "he was 'able and ready' to apply for a vacancy in the reasonably imminent future." *Id.*

30

Plaintiffs assert that mere "identification of a discriminatory barrier in a benefits scheme suffices to demonstrate standing for potential claimants[.]" (AOB 54.) That is not the law. The cases Plaintiffs cite explain that when there is an allegedly discriminatory barrier to some competitive or discretion-based process for obtaining an arrangement, the plaintiff need not plead and prove that they would have secured the arrangement. However, the district court's ruling was not based on failure to allege that the SPI would have exercised his discretion to certify the Schools. It was based on failure to allege facts showing the Schools' ability, readiness and desire to apply and fulfill the arrangement by performing as an NPS, if the nonsectarian requirement were removed.

When Plaintiffs acknowledge the "able and ready" standard (AOB at 58-59), they misconstrue it to render it meaningless. They argue that it suffices for the Schools to say that, while they understand that there are a bunch of *unchallenged* NPS requirements, and that they "intend to explore" those things later on, they currently have a "belief" based only on unspecified "information," that they could, at some unspecified time in the future, meet all requirements and obligations. (AOB 59.) That is insufficient.

Plaintiffs rely on *Northeastern Fla. Chapter of the Associated General Contractors of America* v. *City of Jacksonville* ("*AGC*"), 508 U.S. 656 (1993). But while *AGC* recognized that a plaintiff need not prove that it would have ultimately

31

prevailed in a competition to secure an arrangement, it held that the plaintiff _is_
required to "demonstrate that it is able and ready" to meet the arrangement's
nonchallenged obligations. *AGC*, 508 U.S. at 666. The court noted that the
plaintiff (challenging preferences for city construction contracts) was "an
association of individuals and firms in the construction industry" and "alleged that
many of its members '*regularly bid on and perform construction work for the City*
of Jacksonville,' [citation], <u>and</u> that they '***would have bid*** on…designated set aside
contracts ***but for*** the restrictions imposed' by the ordinance[.]" *Id.* at 659
(emphasis added). Thus, the complaint presented a willing performer that well
understood the nonchallenged contractual obligations, with a history of bidding on,
successfully obtaining, and performing such contracts. Such allegations ensured
an injury "of sufficient immediacy" "to warrant judicial intervention." *Id*. at 668-
69.

    *Gratz v. Bollinger*, 539 U.S. 244 (2003) does not aid Plaintiffs' position.
The court rejected an argument that because one of the plaintiffs, a current
undergraduate college student, did not actually apply *to **transfer*** to the defendant-
college, he lacked standing to challenge the college's allegedly discriminatory
undergraduate admission policy. *Gratz*, 539 U.S. at 260-262. However, the court
emphasized that the student ***had*** unsuccessfully applied to the college's
undergraduate program and that the district court had concluded that the student

had *an actual present intent* "to transfer" (not just "apply" to transfer) to the defendant-college if the policy were changed and his transfer application granted. *Id*.

Nor does *Bras v. Calif. Pub. Utilities Com'n*, 59 F.3d 869 (9th Cir. 1995) support Plaintiffs' position.  In *Bras*, another competitive bidding case with allegedly discriminatory preferences, the Ninth Circuit held that the plaintiff satisfied *AGC's* "able and ready" standard because: (a) he performed work for the defendant in the past; (b) the defendant expressed in writing that it was pleased with plaintiff's work and was willing to work with him again; and (c) plaintiff testified under oath:  "I *earnestly desire* to reinstate my long term business relationship with Pacific Bell…in the future *and stand ready, willing and able* to provide such services should I be given an opportunity to do so."  (Italics and ellipses in original.)  *Bras*, 59 F.3d at 874.

The sworn desire and readiness to provide "such services" in *Bras* underscores an important point also evident from *ACG*, *Gratz* and other "able and ready" decisions:  standing is not established by an ability and readiness to *apply* for an arrangement if there is no ability, readiness or intent to *perform* if selected.  This renders the Schools' already impermissibly vague and conclusory allegation doubly insufficient: the Schools sought qualification to provide their Orthodox

33

Jewish religious education (p.28, *supra*), which unchallenged laws prohibit (pp.5-10, *supra*).

Like *Carney*, other decisions show that the "able and ready" standard is not met by an asserted "interest in" or "intent to explore" applying. In the case of a non-native Hawaiian challenging law restricting business loan benefits to native Hawaiians, the Ninth Circuit found that plaintiff lacked standing even though he **did**, in fact, apply. *Carroll v. Nakatani*, 342 F.3d 934, 938, 941-43 (9th Cir. 2003). The plaintiff sought a loan to start a copy shop business, had spoken with "a sales clerk at Office Depot" about his desire to do so, and had submitted a loan application stating his contact information, the requested loan amount, and that he was "0% Hawaiian." *Id*. at 941. Nonetheless, the Court concluded that "[e]ven assuming" the plaintiff "had a legitimate intention to apply for a loan, he has done essentially nothing to demonstrate that he is in a position to compete equally with other OHA loan applicants." *Id*. at 942-43 ("[The plaintiff's] declaration of 'interest' in starting a copy shop, and submission of a meritless application falls short of being 'able and ready' to compete.")

Plaintiffs take issue with the district court only citing a few cases applying the "able and ready" standard at the pleading stage. (AOB at 61; ER-30-31, 36.) But given that a complaint must "clearly" "allege facts demonstrating each element" of standing (*Spokeo*, 578 U.S. at 338) and that vague, conclusory and

implausible allegations are insufficient (*Iqbal*, 556 U.S. at 678-79), there are

unsurprisingly numerous decisions dismissing complaints for not meeting the

standard. *See, e.g., Ellison v. American Bd. of Orthopaedic Surgery*, 11 F.4th 200,

203, 206-08 (3rd Cir. 2021) (discussed at ER-30-32); *Menders v. Loudoun County

Sch. Bd.*, 65 F.4th 157, 163 (4th Cir. 2023) (dismissing parents' claim challenging

school district's Student Equity Ambassador Program because, although parents

alleged a "discriminatory barrier," their complaint failed to allege facts showing

that their student-children were "able and ready" to participate; among other

things, it was not alleged that "their children applied for *or even wanted to be* a

Student Equity Ambassador." Italics added.); *Associated Builders & Contractors

Western Penn. v. Community College of Allegheny County*, 81 F.4th 279, 285-90

(3rd Cir. 2023) (holding that complaint alleging that defendants' Project Labor

Agreements [PLAs] violated non-union contractors' and non-union employees'

First Amendment rights should have been dismissed at the pleading stage for lack

of standing, because complaint failed to allege that plaintiffs desired to and would

bid on the construction projects covered by the subject PLAs, which rendered any

injury not "imminent" and "certainly impending"); *Opiotennione v. Facebook,

Inc.*, 2020 WL 5877667, **3-4 (N.D. Cal. Oct. 2, 2020) (dismissing complaint

challenging Facebook's policy of allowing advertisers of financial services

products to direct advertisements only to users of certain ages and genders, because

although plaintiff identified a discriminatory policy that resulted in her not being able to view specific advertisements that "she 'would have been interested in receiving in order to consider pursuing the opportunity'" she did not allege facts showing that she was both qualified for, and actually interested in purchasing the products); *Dowdy v. New York Dept. of Sanitation*, 2023 WL 6258536, *6 (S.D.N.Y. Sept. 26, 2023) (dismissing employment discrimination complaint for lack of standing because even if it would have been futile for plaintiffs to apply for positions, they still needed to plead facts establishing that they were "able and ready" to serve in the positions, which "must go beyond a 'few words of general intent'" and include allegations reflecting: an understanding of the unchallenged requirements; that plaintiffs meet such requirements; and that they "actually intend to and want to" "apply to and become" employed in the positions); *Bruckner v. Biden*, __F.Supp.3d __, 2023 WL 2744026, **4-6 (M.D. Fla. Mar. 31, 2023) (dismissing equal protection complaint challenging federal program because plaintiffs' bare statement of intent to apply for program contracts and "conclusory" assertions that they are "able and ready" to pursue such contracts were insufficient.); *Cf. San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996) (affirming pleadings-stage dismissal for lack of standing because "plaintiffs merely asserted that they 'wish and intend to engage in activities prohibited by' [the challenged law]" without specifying timeframe or

concrete plans to do so, rendering the complaint one of "'some day' intentions" that does "not support a finding of the 'actual or imminent' injury that our cases require.").

In sum, the district court did not err in concluding that the Schools' Complaint failed to demonstrate standing.  As discussed *infra* (p.65), the Schools later gave credence to that conclusion by declaring that they *had not even begun to explore* what it takes to serve as an NPS.

## C. The District Court Erred in Finding that the Remaining Families Alleged Standing

The district court made several correct determinations related to the Families' standing.  It recognized that:

- The Families sued because they "wish to provide their children with disabilities an Orthodox Jewish education" and their Complaint was premised on the challenged nonsectarian requirement allegedly forcing them "to forgo a religious education."  (ER-50, lns.5-13.)

- "When an LEA determines that it is appropriate to involve a private contractor in a child's public education, the LEA and the private contractor are bound by federal regulations prohibiting the use of IDEA funds for '[r]eligious worship, instruction, or proselytization.'" (ER-12.)

- The IDEA does not require an LEA to include religious or cultural instruction in an IEP (ER-12), or to provide "special accommodations that take into account the families' religious wants" (ER-53).

- Given unchallenged laws prohibiting NPS placement unless *no* existing LEA program would be appropriate, it may be "unlikely" that the Families' children could *ever* be placed in ***any*** NPS. (ER-42, lns.23-28.)

Nonetheless, the court concluded that the Remaining Families' loss of an opportunity to suggest that their child's IEP Team propose placement in a sectarian NPS sufficed for Article III standing. This was error.

To find such loss sufficient, the court relied entirely upon the First Circuit's decision in *Carson v. Makin* ("*Carson I*"), 979 F.3d 21 (1st Cir. 2020). That case involved Maine's tuition assistance program, which allowed parents to direct public funds to their preferred private school. The plaintiff-families challenged Maine's prohibition on parents choosing sectarian schools, arguing that it infringed their "free exercise of religion" because they sought enrollment in private religious schools whose educational programs "align[ed] with their sincerely held religious beliefs[.]" *Carson I*, 979 F.3d at 25, 27.

While the First Circuit determined that the families had standing, it repeatedly defined the families' injury ***not*** as a lost opportunity to direct payment

for *some* education, but rather for a "religious" education. *Id.* at 30 ("the 'opportunity' to find religious secondary education for their children that would qualify for public funding."); *id*. at 30 ("the plaintiffs' injury in fact inheres in having lost the 'opportunity' to find religious secondary education for their children that would qualify for public finding"); *id*. at 31 ("opportunity to find religious education for their children").

That made sense because, under Article III, the injury-in-fact requirement for a constitutional claim is not satisfied by "*some* factual injury[.]" *Associated Builders & Contractors Western Penn. v. Community College of Allegheny County*, 81 F.4th 279, 288 (3rd Cir. 2023). There must be a "legally cognizable" injury, which "turns on the nature and source of the claim asserted." *Id*. A plaintiff suffers a legally cognizable injury for a constitutional claim when they allege an actual or imminent harm to a constitutionally protected interest. *Id*. In *Carson I*, the plaintiffs sought a *religious* education, and they had standing to pursue their Free Exercise claim because, under the relevant legal framework in *that* case, if the challenged law were struck down, the plaintiff-families would have been able to direct payments for a religious education.

Here, the Families alleged that California infringed their religious obligation to provide their children with an Orthodox Jewish *religious* education and sued seeking such a religious education for their children. (ER-257-264 at ¶¶74-75, 84,

100, 124.) And as discussed *infra* (p.66), in moving for a preliminary injunction, they confirmed their desire for a religious education and argued that their proposed order would "allow" their "children with disabilities" "to obtain the religious education" that they "deserve." However, unlike in *Carson I*, if the challenged law were struck down, the Families could not obtain a religious education at an NPS (even in the "unlikely" event that the law allowed for placement in *any* NPS and the Families were successful in suggesting placement in a sectarian one). As discussed (pp.5-10, *supra*), there are independent, unchallenged laws precluding it. Thus, *Carson I* does not support the conclusion that a lost opportunity *to suggest* a certain **NPS** placement for a ***secular*** *public* education suffices for the Families' claims.

Numerous decisions recognize that when independent unchallenged laws frustrate a plaintiff's desired result, there is a lack of standing. *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 893-94 (9th Cir. 2007) (plaintiff lacked standing to challenge permit application denial based on allegedly unconstitutional ordinance provision due to effect of unchallenged provision); *Nuclear Info. & Resource Service v. Nuclear Regulatory Commission*, 457 F.3d 941, 955 (9th Cir. 2006) (even if rule regulating transportation of nuclear material caused it legally cognizable injury, plaintiff lacked standing because independent unchallenged regulation barred result plaintiff sought); *San Diego County Gun Rights Committee*

*v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (economic injuries were not "fairly traceable" to challenged federal firearm restrictions due to effect of unchallenged state legislation); *Estate of Boyland v. U.S. Dept. of Agric.*, 13 F.3d 117, 124 (D.C. Cir. 2019) (affirming pleadings-stage dismissal of complaint alleging race-based discrimination in federal program eligibility, because even if challenged barrier was illegal, independent and unchallenged law would have precluded plaintiffs from obtaining the benefit they sought; and rejecting argument that accounting for unchallenged constraints impermissibly folded the merits into standing analysis: "We must provisionally treat the conduct plaintiffs challenge as in fact unlawful, but we do not assume away other, unchallenged constraints – whether of fact or law."); *White v. U.S.*, 601 F.3d 545, 552-53 (6th Cir. 2010) (affirming pleadings-stage dismissal because alleged economic injuries of gamefowl sellers and breeders challenging federal Animal Welfare Act were not fairly traceable to Act, and were not redressable by favorable judgment, because unchallenged state laws imposed restrictions); *Orion Wine Imports, LLC v. Applesmith*, 440 F.Supp.3d 1139, 1146-47 (E.D. Cal. 2020), *aff'd*, 837 Fed. Appx. 585, 586 (9th Cir. 2021) (in affirming pleadings-stage dismissal, holding that plaintiffs lacked standing for constitutional challenge to specified provisions in Alcoholic Beverage Control Act, which plaintiff alleged prevented it from shipping wine directly to a California retailer without the added burden of consigning it to an importer or public

warehouse, because plaintiffs' desired result would still be barred by other unchallenged provisions); *Cook v. Taylor*, 2019 WL 1938794, *7 (M.D. Ala. May 1, 2019) ("unchallenged laws that keep a plaintiff from getting what she wants vitiate standing.")

*Carson I* also is distinguishable because under the legal framework there, the plaintiffs were unquestionably qualified to begin directing funds to their preferred private school. The "lost opportunity" injury there was concrete and particularized, and actual or imminent: as soon as the parents identified a participating religious school, they could achieve their desired result. Here, however, achieving ***any** change* (let alone the desired result) is speculative due to the above-discussed and unchallenged "least restrictive environment" laws prohibiting any NPS placement unless no existing public program would be appropriate. Indeed, as noted, the district court recognized that achieving any change may be "unlikely." (ER-42, lns.23-28.) That is inconsistent with Article III, which requires nonspeculative, and actual or imminent injury.

## III. THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE REMAINING FAMILIES FAILED TO STATE A CLAIM

### A. Standard of Review

Rule 12(b)(6) dismissals are reviewed *de novo*, and this Court may affirm on any ground supported by the record.  *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 617 (9th Cir. 2022).

## B. The Free Exercise-Based Claims Failed

### 1. The Challenged Requirement Does Not Impose a Legally Cognizable Burden on Plaintiffs' Exercise of Religion.

The Free Exercise Clause "'is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government'" and it does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family."  (Italics in original.)  *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986).

To state a Free Exercise claim, the plaintiff must show that the challenged state action substantially burdens their exercise of religion.  *Sabra v. Maricopa County Community College Dist.*, 44 F.4th 867, 809 (9th Cir. 2022); *California Parents for the Equalization of Educational Materials v. Torlakson* ("*CAPEEM*"), 973 F.3d 1010, 1019-20 (9th Cir. 2020), *cert. denied*, 141 S.Ct. 2583 (2021).[1]

---

[1] The other Circuits are in accord.  *Anspach v. City of Philadelphia*, 503 F.3d 256, 272 (3rd Cir. 2007); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1256-58, n.25-26 (11th Cir. 2012), *cert. denied*, 133 S.Ct. 856 (2013); *Parker v. Hurley*, 514 F.3d 87, 99 (1st Cir. 2008), *cert. denied*, 129 S.Ct. 56 (2008); *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018); *Fleischfresser v. Directors of Sch. Dist. 200*, 15 F.3d 680, 689-90 (7th Cir. 1994); *Mbonyunkiza v. Beasley*, 956 F.3d 1048, 1053-54 (8th Cir. 2020); *Bauchman v. West High Sch.*, 132 F.3d 542, 557-58 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 2370 (1998); *U.S. v. Grant*, 117 F.3d 788, 792-93 (5th Cir. 1997).

Being offended by an action is insufficient; the action must operate as a legally cognizable burden on one's religious exercise. *Id*.

It is easy to see how laws affirmatively regulating public conduct can burden religious exercise. In addition, the Supreme Court has recognized that disqualifying otherwise eligible recipients from *generally available public benefits or rights* based on their religious exercise may burden such exercise. *Espinoza v. Montana Dept. of Revenue*, 140 S.Ct. 2246, 2254-55 (2020). At the same time, however, the Supreme Court has recognized that when the government appropriates funds to establish a program it is entitled to define the program's limits, and that a State's decision not to subsidize the exercise of a fundamental right does not equate to an infringement of that right. *U.S. v. American Library Ass'n, Inc.*, 539 U.S. 194, 211-212 (2003); *Regan v. Taxation With Representatives of Wash.*, 461 U.S. 540, 549-50 (1983).

Plaintiffs characterize the nonsectarian NPS requirement as limiting Plaintiffs' access to generally available public funds for the providing/receiving of one's preferred private education. However, California's provision for NPSs is not to subsidize such private education. Rather, it is California securing *for itself* the help *it* needs to meet *its* IDEA obligations to provide *its* free *public* education to eligible children *whose families decided to enroll in public school **instead of*** enrolling in a private school.

This does not violate the Free Exercise Clause. For example, the Sixth Circuit rejected a religious organization's Free Exercise claim based on the argument that the ability to contract with Michigan to provide youth residential services was a "public benefit." *Teen Ranch, Inc. v. Udow*, 479 F.3d 403, 409-410 (6th Cir. 2007), *cert denied*, 128 S.Ct. 653 (2007). The court affirmed the district court's conclusion that "[u]nlike unemployment benefits or the ability to hold public office, a state contract for youth residential services is not a public benefit" and that "[t]he *Sherbert v. Verner* line of cases does not stand for the proposition that the State can be required under the Free Exercise Clause to contract with a religious organization." 389 F.Supp.2d 827, 838 (W.D. Mich. 2005), *aff'd* 479 F.3d at 409-10.

The First Circuit held that a religious family choosing to enroll its child with disabilities in a private religious school for religious purposes was not denied a "generally available public benefit" by the IDEA's provisions that granted different rights to eligible children that enrolled in public school. *Gary S.*, 374 F.3d at 19-21, *cert. denied*, 543 U.S. 988 (2004).

The Fourth Circuit rejected the argument that a public agency placed an unconstitutional burden on families wishing to attend private religious schools by conditioning receipt of educational services under the Rehabilitation Act to public

school students.  *D.L. v. Baltimore Bd. of School Com'rs*, 706 F.3d 256, 257-58, 262-64 (4th Cir. 2013).

Plaintiffs' cited cases are inapposite.  *Espinoza* involved a Montana "scholarship program," intended "to provide parental and student choice in education," which "provide[d] tuition assistance to parents who send their children to private school."  140 S.Ct. at 2251-52.  A family whose child was awarded a scholarship could direct funds to virtually any private school in the State, of their own private choice.  *Id*.  Plaintiffs challenged a rule prohibiting recipient-families from selecting a religious school.  *Id*. at 2252.  The Court concluded: "A State need not subsidize private education.  But once a State decides to do so, it cannot disqualify some private schools solely because they are religious."  *Id*. at 2261.

*Carson v. Makin* involved "a program of tuition assistance for parents" whose local school district did not operate a public secondary school *or contract with a private* or public entity for such schooling.  596 U.S. 767, 771-73 (2022).  The program directed funds for tuition at the private or public school *of the parents' choice*; however, a subsequent rule disqualified sectarian schools.  *Id*. at 772-75.  After noting that "the curriculum taught at participating private schools need not even resemble that taught in the Main public schools" and that those private schools "need not administer state assessments" and "need not hire state-

46

certified teachers[,]" the Court characterized the program as a public benefit program where "[t]he benefit is tuition at a public or private school, selected by the parent, with no suggestion that the 'private school' must somehow provide a 'public' education." *Id*. at 782-84.

*Trinity Lutheran Church of Columbia, Inc. v. Comer* involved a "grant" program to help public and private entities purchase rubber playground surfaces, but that excluded otherwise eligible religious entities. 582 U.S. 449, 453-54 (2017).

The "through line" in those cases is a State program intended to broadly bestow "public benefits" to the public such that a religious-based disqualification is properly seen as having a State-imposed coercive effect against private religious exercise. That line does not extend to this case. As to the Schools, the Complaint characterizes their loss as one of the ability "to provide a ***religious*** education" with "generally available public funds ***for** children to receive* a free appropriate ***public*** education[.]" (Emphasis added.) (ER-248, ¶¶32, 34.) But that self-contradictory allegation reveals a fundamental flaw. California's NPS system is not a means to subsidize the public's provision/receipt of private education. Certified NPSs *contract* with the State knowing that they ***cannot*** provide religious instruction and that they ***must*** provide State-directed and State-supervised public education and services specified in *the LEA-developed* IEP to benefit the eligible

47

child whose family has chosen the State's free public education instead of private school. The ability to contract for *that* is not a "generally available public benefit" the loss of which could be said to burden a would-be NPS's exercise of religion.

Plaintiffs cite *Fulton v. City of Philadelphia*, 141 S.Ct. 1868 (2021). However, *Fulton* is distinguishable and does not support finding an unconstitutional burden here. In *Fulton*, the City had long contracted with both sectarian and secular entities to place foster children. 141 S.Ct. at 1875. The threshold burden on religious exercise was not a disqualification from a public benefit program, but the City's enforcement of a conduct-proscribing contract rule that could have been waived and that required the contractor-plaintiff to act contrary to its religious beliefs. *Id*. at 1881-82 ("The contractual non-discrimination requirement imposes a burden on CSS's religious exercise[.]"). Because *Fulton* involved such conduct-proscribing rule and was not analyzed as a "disqualification from a public benefit" case, it does not hold that any inability to contract with the State, regardless of the legal framework and purpose, constitutes a legally cognizable burden on private religious exercise.

Moreover, in *Fulton*, the very purpose of the City's program and contracts – finding homes for foster children – was itself also the plaintiff's religiously motivated "mission." *Id*. at 1874-75 (recognizing that plaintiff continued the

48

Catholic Church's two centuries' long mission of serving foster children in the city).  Here, the NPS system's purpose is to facilitate the State's IDEA-required provision of a free public education to families who have enrolled their children in public school, where unchallenged federal law prohibits use of IDEA funds for religious instruction.  Plaintiffs seek to provide/receive an Orthodox Jewish religious education, due to their religious belief that Orthodox Jewish parents are required to transmit Orthodox Jewish teachings to their children.  Thus, unlike in *Fulton*, the State contract's purpose and Plaintiffs' religiously motivated mission are not aligned.  Plaintiffs cannot plausibly claim that their ability to provide/receive Orthodox Jewish religious teachings is impeded by an inability to provide/receive the State's public and secular education.

Finally, unlike the conduct-proscribing provision in *Fulton*, California has no ability to waive any of the federal regulations that define the NPS system's contours and prohibit use of funds for religious instruction.

The Families' exercise of religion is not substantially burdened by the nonsectarian NPS requirement, because they do not allege to be entities seeking certification.  While they allege that their faith requires them to provide their children a religious education, the IDEA allows parents to choose a religious education and requires LEAs to spend a proportionate amount of their IDEA funds on such parents' children.  The challenged requirement only comes into

49

play for families who have chosen the State's public education. The Families may not *choose* the State's free appropriate *public* education *and also* expect IDEA funds to pay for a *private religious* education. Setting aside the fact that any NPS placement is only possible in very rare circumstances, and that families do not get to select the NPS of their choice, the fact remains that IDEA funds may not be used for religious education and NPSs are contracted to provide a State-directed public education. (pp.5-14, *supra*.) For families that choose the State's public education, a religious education at an NPS would not be "available" even if the nonsectarian requirement did not exist. *Gary S.*, 374 F.3d at 19-20.

Plaintiffs' position suggests that because States spend public money to make a free public and secular education available, and it is burdensome for religious families to pay for religious school, States must fund those families' religious education. However, the Supreme Court has never endorsed that revolutionary concept. *Espinoza*, 140 S.Ct. at 2261 ("A State need not subsidize private education."); *American Library Ass'n, Inc.*, 539 U.S. at 211-212; *Bowen*, 476 U.S. at 699-700.

### 2. Counts II and III do Not State a Claim.

With the above-discussed principles in mind, it is evident that Counts II and III fail. Count II alleged that California's NPS system is "not generally applicable" because NPSs must be nonsectarian, and religious private schools cannot request a

waiver of certain certification requirements under California Education Code section 56366.2. (ER-273.) Count III alleged a lack of "general applicability" because the State may waive Education Code provisions if certain criteria is met. (ER-275.) However, both counts fail because even if some aspect of the NPS system is not "generally applicable," a plaintiff must satisfy the threshold element of that aspect substantially burdening their religious exercise. (p.43, *supra*; AOB at 3, conceding that *Fulton's* "discretionary exemptions" analysis applies to "a law that burdens religion"; ER-273-74 at ¶¶185 and 197, alleging that general applicability is relevant to laws "burdening religious practice.") As discussed, the nonsectarian NPS requirement itself does not constitute such a burden. And Plaintiffs have not argued how these counts' referenced waiver requirements do so.

Count III deals with the State's ability to waive "any provision" of the Education Code if it aids in implementing a pupil's IEP and would not adversely affect compliance with federal law. Educ. Code § 56101; AOB at 43. Requests for such waivers may only be made by "public agencies," a term that does **not** include **_any_** private school, *religious or not*. *Id*., §§ 56101(a), 56028.5. Plaintiffs do not argue or explain how permitting "public agencies" to request a waiver of any Education Code provision under Section 56101 substantially burdens their religious exercise; they only pled and argued lack of "general applicability."

51

Count II deals with California Education Code section 56366.2's waiver process. (ER-273, ¶189; AOB at 15, 51.) That statute allows an LEA and a "nonpublic, nonsectarian school" to petition for a waiver of certain certification requirements if "necessary to the content and implementation of a specific pupil's [IEP] and the pupil's current placement" and would not adversely affect federal law compliance. Educ. Code § 56366.2. Plaintiffs assert that this statute is not "generally applicable" because it treats a "comparable secular activity more favorably than religious exercise[,]" citing *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). (AOB at 51; ER-273-74.) But neither in the proceedings below, nor in the AOB, do Plaintiffs explain how that statute substantially burdens their religious exercise, let alone treats "comparable secular activity" better than "religious exercise." *Id*. Nor could they. Because "nonpublic, nonsectarian school" is a defined term that only applies to already certified NPSs that enroll pupils pursuant to an IEP (Educ. Code § 56034) and the waiver statute is for implementing a "specific pupil's" IEP and that pupil's "current placement," Plaintiffs' insinuation that the statute favors nonreligious "private schools" over religious "private schools" is incorrect: *no* non-certified institution, *religious or not*, may request a waiver. Furthermore, as Plaintiffs concede (AOB at 15, citing statute and ER-15 [district court analysis]), the challenged nonsectarian requirement is **_not_** among the requirements that may be waived. *Tandon* involved law placing *affirmative*

52

*restrictions* on various forms of *private* activity (including religious activity), but religious activity (*i.e.*, gathering to worship) was restricted more harshly than "comparable" secular activities. 593 U.S. at 62-64. The restrictions on private worship substantially burdened religious exercise, and because *those* restrictions were *stricter*, the State could not argue "general applicability." *Id*. Here, the waiver statute places no restrictions on private religious activity. Plaintiffs complain that no "religious school interested in becoming" an NPS can "petition for a waiver of the nonsectarian status requirement" (AOB at 15), *but **no** private school interested in becoming an NPS (religious or not) can do that*. Moreover, Plaintiffs offer nothing to make sense of *Tandon's* comparability element in this context; but certified NPSs that enroll pupils pursuant to IEPs are not "comparable" to uncertified private schools for purposes of a §56366.2 waiver for specific public-school pupils' IEPs.

### 3. The "Unconstitutional Conditions" Count Fails.

Count V characterizes California's nonsectarian requirement as an "unconstitutional condition" that violates Free Exercise rights by requiring private religious schools to "give up their religious identity and certify themselves as 'nonsectarian'" to become an NPS. (ER-276-77.) The district court correctly observed that Count V does not apply to the Families, because the alleged condition only applies to would-be NPSs. (ER-53, lns.26-28.) Plaintiffs insist that

53

all Plaintiffs brought Count V; however, neither the Complaint nor the AOB

identifies a condition imposed on the Families. (AOB at 50-51; ER-276-77.)

Regardless, Count V fails as to all.

Plaintiffs' Complaint cites two cases regarding the "unconstitutional

conditions doctrine" (AOB-276), but neither involved Free Exercise rights, religion

or education: *Koontz v. St. Johns River Mgmt. Dist.*, 570 U.S. 595 (2013) (Fifth

Amendment "takings clause" context) and *U.S. v. Scott*, 450 F.3d 863 (9th Cir.

2006) (Fourth Amendment unreasonable searches context). Those cases teach that

the doctrine is *not* a simple and separate mechanical rule, but a principle that

derives from, and must account for, the precise constitutional right and

circumstances raised. In *Koontz*, the Court did *not* hold that conditioning approval

of a land use permit on the dedication of property is always unconstitutional;

rather, it held that doing so was unconstitutional only if there was no "nexus" and

"rough proportionality" between the government demands and the applicant's

proposal's social costs. 570 U.S. at 605-606. And in *Scott*, the Court noted that

the "government *may* sometimes condition benefits on waiver of Fourth

Amendment rights – for instance, *when dealing with contractors*[.]" (Emphasis

added.) *Scott*, 450 F.3d at 867.

The doctrine limits conditions that are "impermissible" because they seek

surrender of constitutional rights through "coercive pressure." *Koontz*, 570 U.S. at

607. A condition on even "a valuable government benefit" does not violate the doctrine unless it results in denial "on a basis that infringes [one's] constitutionally protected interests." *Bingham v. Holder*, 637 F.3d 1040, 1046 (9th Cir. 2011). "Also, the government may condition the grant of a discretionary benefit on a waiver of rights 'if the condition is rationally related to the benefit conferred." *Id*.

The AOB cites three cases in support of Count V (AOB at 50), but all deal only with Free Speech rights (*not* Free Exercise rights) and none conflict with the above-discussed principles. Indeed, the most recent case emphasized the doctrine's limits. *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.* ("*AOSI*"), 570 U.S. 205, 214-15 (2013). In *AOSI*, the Court reaffirmed its *repeated* **rejection** of "the notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State," and held that, in the Free Speech context at issue there, "conditions that define the limits of the government spending program – those that specify the activities Congress wants to subsidize" are permissible, and it is only when conditions "seek*"* to regulate speech in a manner not fairly tied to "the contours of the program itself" that there is a constitutional issue. *Id*. This tracks the doctrine's purpose, which is protecting against government "abus[ing] its power by attaching strings strategically" and "striking lopsided deals." *Scott*, 450 F.3d at 866.

Given the relevant legal framework (pp.3-17, *supra*) and State interests (pp.57-60, *infra*), it cannot be said that California enacted the nonsectarian NPS requirement to get people to refrain from practicing their religion.

### 4. The "Right to Religious Education" Count Fails.

Count VI (denominated "Free Exercise Clause Right to Religious Education") invokes parents' right "to direct the religious upbringing of their children" and claims that any state action that interferes is subject to strict scrutiny. (ER-277.) Plaintiffs misapprehend the law. Plaintiffs cite *Wisconsin v. Yoder*, 406 U.S. 205 (1972), however, that case involved application of a *criminal statute requiring school attendance* after age 16 as applied to the Amish. Count VI cites *Emp. Div. v. Smith*, 494 U.S. 872 (1990), noting that that case cites *Yoder* and *Pierce v. Society of Sisters*, 268 U.S. 510 (1925). (ER-277.) However, *Emp. Div.* involved a state *criminalizing* peyote use, not parents' rights or education, and it famously *denied* plaintiffs' Free Exercise claim. 494 U.S. at 890. And *Pierce* (which makes no reference to religion) applied the Due Process Clause to hold that while a State could reasonably regulate all schools and require all children to attend "some school," it could not *criminalize* a family's decision to attend a private school instead of public school. 268 U.S. at 534-35.

Decisions analyzing the right invoked in Count VI have limited it to the right to choose a private education (which may cost money) instead of the State's free

public education, and they have emphasized that if the family chooses the State's public system, they have no right to dictate the school's policies or to "expect the state to modify its curriculum to accommodate the[ir] personal, moral or religious concerns[.]" *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1206-07 (9th Cir. 2005), *opinion affirmed and amended in part on denial of rehearing*, 447 F.3d 1187 (9th Cir. 2006), *cert. denied*, 127 S.Ct. 725 (2006); *CAPEEM*, 973 F.3d at 1020; *Parents for Privacy v. Barr*, 949 F.3d 1210, 1230, n.16 (9th Cir. 2020) (analyzing *Yoder*).

### 5. The Challenged Requirement Satisfies Strict Scrutiny.

Without the nonsectarian requirement, certain religious groups (those with sufficient resources and whose beliefs allow) could be certified, and government officials would be able to steer public-school children with severe disabilities toward particular (favored) religious institutions for instruction. Officials would also be required to audit whether and how those institutions were, *inter alia*, meeting public education standards, performing LEA-developed IEPs, and complying with federal law prohibiting religious instruction.

That presents several problems that California has a compelling interest in avoiding. The principle that the government must be neutral toward and among religions is "rooted in the foundation soil of our Nation" and "fundamental to freedom." *Epperson v. Arkansas*, 393 U.S. 97, 103 (1968); *Bd. of Ed. of Kiryas*

*Joel Village Sch. Dist. v. Grumet* ("*Grumet*"), 512 U.S. 687, 696 (1994) ("[P]roper respect for both the Free Exercise and the Establishment Clauses compels the State to pursue a course of 'neutrality' toward religion[.]")

While the Supreme Court has upheld programs resulting in government aid going to religious schools, it has repeatedly stressed that what saved them was the neutrality ensured by the fact that they were programs "of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals[.]" *Zelman v. Simmons-Harris*, 536 U.S. 639, 648-52 (2002) (discussing cases); *Mitchell v. Helms*, 530 U.S. 793, 810 (2000) (when aid flows "only as a result of the genuinely independent and private choices of individuals" it "assur[es] neutrality" by removing government officials' ability to direct aid and to "grant special favors," and by "mitigating the preference for pre-existing recipients that is arguably inherent in any government aid program," which "could lead to a program inadvertently favoring one religion[.]")

Here, funds do **not** reach NPSs "only as a result of the genuine and independent choices of private individuals." *Zelman*, 536 U.S. at 649; *id*. at 652 ("wholly as a result of" such choices). An NPS *only* receives government funds if LEA officials decide that a student should be placed with it. While a guardian must consent to the LEA's decision, that consent is not independent. It comes

58

after the LEA tells the guardian what it believes is the "appropriate" way to provide FAPE, where courts give considerable weight to LEA expertise. (*See* pp. 5-10, *supra*.)

The programs upheld in the past are also distinguishable because here, the private school must provide a State directed/supervised public education, not its own private education. *Zelman*, 536 U.S. at 648-52 (discussing cases). Thus, California's nonsectarian requirement is necessary to avoid the problematic delegation of authority over public schooling to an institution "defined by" its religious beliefs. *Grumet*, 512 U.S. at 696 (striking down creation of a school district because it departed from the "constitutional command" of neutrality "by delegating the State's discretionary authority over public schools to a group defined by its character as a religious community," in a context that gave "no assurance that governmental power has been or will be exercised neutrally.")

California's nonsectarian requirement does not preclude religious *individuals* from operating an NPS: the definition excludes organizations operated by *a religious group or sect*. 5 C.C.R. § 3001(p). That distinction is material because when a group specifically organizes and defines itself by and for its religious commitments, there is a recognized concern that such commitments will manifest in a school's operation in non-neutral ways. Courts recognize that "[e]ducating young people in their faith, inculcating its teachings, and training

59

them to live their faith are responsibilities that *lie at the very core* of the mission of a private religious school[.]" *Carson*, 596 U.S. at 787.

Finally, the requirement is needed to avoid serious problems when government supervises, evaluates and audits religious institutions. (pp.7-8, 12-17, *supra*.) Indeed, *Carson* reaffirmed the principle that "scrutinizing whether and how a religious school pursues its educational mission" would "raise serious concerns about state entanglement with religion and denominational favoritism." *Carson*, 596 U.S. at 787.

The nonsectarian requirement is narrowly tailored because the deeply rooted neutrality principle is violated **as soon as** government officials have any significant ability to steer aid to particular sectarian NPSs. Plaintiffs claim that "a categorical prohibition on **all** 'sectarian' schools" is not narrowly tailored (AOB at 25, emphasis added); however, the government prohibiting only *some* religious sects raises greater neutrality concerns. Plaintiffs offer no specific adjustment to resolve all compelling interests. There is none.

### C. The Equal Protection Claim Fails

The district court observed that Plaintiffs' Equal Protection claim was "predicated on the same theory of discrimination against religion as their Free Exercise Claims." (ER-54; ER-275-76, alleging "discrimination based on religion" because California "prohibits Plaintiffs from utilizing generally available, public

60

funds to send their children to private religious schools[.]")  Because a Complaint's
legal conclusions are not accepted (ER-50), the court determined that the
Remaining Families' claim failed because, for previously-discussed reasons, its
premise "mischaracterizes the nature of the available benefits," and because
"California's nonsectarian requirement applies to schools, not IDEA-eligible
children and their parents" (ER-54).

The court's conclusion was correct.  First, with limited exceptions not
applicable here, a plaintiff must show that the challenged law discriminates against
*them* by classifying and treating *them* differently.  *Barnes-Wallace v. City of San
Diego*, 704 F.3d 1067, 1085 (9th Cir. 2012).  The nonsectarian requirement only
applies to entities seeking NPS certification.  The Families are not such entities.
They have the same choices and rights as all other families, regardless of their
beliefs.

Second, because Plaintiffs' Free Exercise claim fails, analysis of their Equal
Protection claim is limited to rational basis review, which is easily satisfied for
above-discussed reasons (pp.57-60, *supra*).  *Johnson v. Robison*, 415 U.S. 361,
375, n.14 (1974) (strict scrutiny inapplicable to claim premised on interference
with Free Exercise rights where Free Exercise claim failed); *Locke v. Davey*, 540
U.S. 712, 720, n.3 (2004); *St. John's United Church of Christ v. City of Chicago*,

61

502 F.3d 616, 638 (7th Cir. 2007); *Teen Ranch*, 389 F.Supp.2d at 841, *aff'd* 479 F.3d 403.

Third, considering the challenged requirement within the relevant legal framework, "sectarian would-be NPS applicants" are not a "suspect class." The Supreme Court has taken a limited approach in recognizing suspect classifications, focusing on the case's context and the suspect classification theory's "underlying rationale," which is that where a law targets "discrete and insular minorities" for unequal treatment, "the presumption of constitutionality fades because traditional political processes may have broken down." *Johnson*, 415 U.S. at 375, n.14. The requirement does not classify based on traditional indicia, such as membership in a "class 'saddled with such disabilities or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.'" *Id*. The IDEA and California law have long recognized the right of parents to send their eligible children to religious schools, and they *expressly require* LEAs to spend *a proportionate* amount of their funds on such children. In this context, private schools controlled by *any* religious group is not a historically/politically powerless class.

Plaintiffs' suggestion that any legal classification that relates in some way to "religion" must undergo strict scrutiny is unsupported and erroneous. Plaintiffs

cite *Al Saud v. Days*, 50 F.4th 705 (9th Cir. 2022). (AOB at 49.) However, that decision involved the question of a prison deciding to house prisoners based on their specific religion (*e.g.*, housing a Muslim prisoner only with other Muslims, because they are Muslims). 50 F.4th at 708-10. The case does not support treating "sectarian would-be NPS applicants" as a "suspect class" here. In cases relating to "religion," courts have reserved "suspect" status for laws that discriminate against people because of their particular religious beliefs. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 338-39 (1987) (in rejecting strict scrutiny for disparate treatment between employees of religious-employers and employees of nonreligious-employers, emphasizing that prior decisions have held that laws "discriminating *among* religions are subject to strict scrutiny," italics in original); *Droz v. C.I.R.*, 48 F.3d 1120, 1124-1125 (9th Cir. 1995) ("For equal protection purposes, heightened scrutiny is applicable to a statute that applies selectively to religious activity only if the plaintiff can show that the basis for the distinction was religious, not secular."); *St. John's United Church of Christ*, 502 F.3d at 638 (recognizing that some classifications relating to religion do not "fit the bill" for strict scrutiny).

Here, the challenged distinction is made solely for purposes of the NPS system. Considering the relevant legal framework (pp.3-17, *supra*) and State

interests (pp.57-60, *supra*), the basis for the distinction is secular. *Droz*, 48 F.3d at 1124-1125.

In addition, because of this context, "sectarian would-be NPS applicants" and "nonsectarian would-be NPS applicants" are not "similarly situated" for the NPS system's objectives. *Johnson*, 415 U.S. at 375, n.14 (recognizing that the right to equal protection only denies "the power to legislate that different treatment be accorded to persons placed by a statute into different classes *on the basis of criteria wholly unrelated to the [legitimate] objective of that statute*." Emphasis added.); *Gallinger v. Becerra*, 898 F.3d 1012, 106 (9th Cir. 2018) (viable claim depends on control group and classified group being similarly situated "in respects that are relevant to the state's challenged policy.").

Finally, the requirement survives strict scrutiny (pp.57-60, *supra*).

## IV. PRELIMINARY INJUNCTIVE RELIEF WAS PROPERLY DENIED

### A. Standard of Review

Orders denying preliminary injunctive relief are reviewed for abuse of discretion. *Norbert v. City and County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021).

Preliminary injunctions are an "extraordinary remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." (Italics in original.) *Id.*

A "plaintiff must establish a likelihood of success on the merits, irreparable harm in the absence of preliminary relief, a balance of equities in the movant's favor, and that the injunction is in the public's interest." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).

## B. Plaintiffs' Motion Underscored Their Lack of Standing

Standing must be established before issuance of a preliminary injunction. *LA Alliance for Human Rights v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021).

While Plaintiffs' burden to clearly show standing increased from stating specific, well-pleaded allegations to providing evidence (*id.* at 956-57), Plaintiffs' motion confirmed a lack of standing. The Schools declared the centrality of the Orthodox Jewish religion to their respective educational programs, and that each School "seeks the opportunity to qualify to provide a distinctively Orthodox Jewish education to children with disabilities" (ER-180-82, ¶¶4, 14; ER-186-87, ¶¶4, 13; CDE-SER-004, lns.11-13.) The Schools also declared that while they would like "to explore" what it takes to become an NPS in the future, they *have not even begun to explore* that topic. (ER-181-82, ¶¶9, 16; ER-187-88, ¶¶10, 15; CDE-SER-001, lns.19-21.) While it was unclear why the Schools had not done so, Plaintiffs' motion notably included a declaration attaching a lengthy blank NPS

application calling for specific information and referencing applicable statutes and regulations. (ER-191-214.)

Similarly, a parent in each of the Families declared that they "believe firmly in the importance of sending our children to an Orthodox Jewish school, where they will not only receive an education in secular subjects, but also in the faith." (ER-156, ¶4; ER-163, ¶4; ER-171, ¶4.) And in arguing for their proposed order, Plaintiffs asserted that it will "***allow***[] parent Plaintiffs ***to obtain the religious education*** their Plaintiff children with disabilities deserve, and Plaintiff schools the right to serve them." (CDE-SER-003, lns.10-13.) A parent from each of the Remaining Families confirmed that their IDEA-eligible children have been receiving special education services within LAUSD for many years. (ER-165, ¶¶19-21; ER-173-74, ¶¶19-21.) Although they asserted that they "do not believe [their child] is currently a receiving a FAPE" (*id*. at ¶21), they did not declare that they invoked the IDEA's due process procedures to challenge LAUSD's FAPE offers, and they apparently based their belief on LAUSD's lack of religious/cultural services, which an IEP need not account for. *M.L.*, 867 F.3d at 495-98.

## C. Plaintiffs Did Not Establish Likely Success or Irreparable Harm

For above-discussed reasons, Plaintiffs failed to demonstrate likely success, and a court may end the analysis there. *Dish Network Corp. v. Federal Communications Commission*, 653 F.3d 771, 776-77 (9th Cir. 2011).

Plaintiffs' argument on the remaining factors is based entirely on their supposed strength on the merits and the mistaken belief that the remaining factors must be taken for granted. (AOB at 47-49.) However, this Court has rejected the proposition that likely success alone suffices in a First Amendment case. *Id.* at 776. A movant "must demonstrate that it meets all four of the elements of the preliminary injunction test[.]" *Id.*; *American Freedom Defense Initiative v. King County*, 796 F.3d 1165, 1172 (9th Cir. 2015) (same).

The second factor is whether Plaintiffs are "likely to suffer irreparable harm" without relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). While the actual "loss of First Amendment freedoms*"* constitutes irreparable injury, "the mere assertion of First Amendment rights does not automatically require a finding of irreparable injury." *CTIA – The Wireless Association v. City of Berkeley, Calif.*, 928 F.3d 832, 851 (9th Cir. 2019). It is a *harmful effect on the plaintiff* that constitutes relevant harm – not a legal violation in the abstract. *Snyder*, 28 F.4th at 112-113 (plaintiff alleging unconstitutionally discriminatory policy failed to show policy would likely injure him pending

67

adjudication, even accepting claim's merits); *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist.*, 82 F.4th 664, 695 (9th Cir. 2023) (focusing on how challenged policy "has and will continue to hamper [plaintiff's] ability to recruit students, constituting an enduring harm that will irreparably risk the club's continued existence on campus.")

There was no evidence establishing any plaintiff was "likely to suffer" irreparable harm pending adjudication. The Schools have not explored what it takes to be an NPS and have not decided if they would apply, but given their sworn purpose, it is unlikely (and the Schools declined to amend). Additionally, there is no evidentiary showing that an injunction would likely result in *any* change in the Families' children's placements (let alone the legally prohibited result they sought).

### D. The Remaining Factors Favored Denial

A plaintiff's lack of diligence in suing and moving for relief is an important factor in balancing the equities and may justify denial. *Benisek v. Lamone*, 138 S.Ct. 1942, 1944 (2018); *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015). California's nonsectarian requirement has stood for decades. Educ. Code § 56034 (defining "nonpublic, nonsectarian school," enacted in 1993) and Educ. Code §§ 56365-56366 (enacted in 1994). *Carson*, *Espinoza* and *Trinity Lutheran* were published in June 2017, June 2020 and June 2022, respectively. Both

Schools have operated for decades. (ER-180, ¶3; ER-186, ¶3.) Plaintiffs K.T. and

N.P. have been enrolled in LAUSD with IEPs for several years. (ER-165, ¶19;

ER-173-74, ¶19.) Plaintiffs do not explain why they did not sue before March 13,

2023, or waited until May 22, 2023 to move for relief.

Plaintiffs' requested injunction would not only overturn decades-old State

policy, but also require State action. At minimum, it would require analyzing NPS

application materials received from any sectarian applicants, conducting an on-site

review of each applicant's facility and program, and making a certification

decision. Educ. Code § 56366.1(e)-(f); 5 C.C.R. § 3063(a)-(c). And if a sectarian

NPS is certified, and contracts with an LEA, and the LEA places a child, it would

require payment for performance. Such relief is a disfavored mandatory injunction

to be denied unless necessary to prevent *extreme* harm and both the law and facts

tilt *sharply* in plaintiff's favor. *Garcia*, 786 F.3d at 740; *American Freedom*

*Defense Initiative*, 796 F.3d at 1173.

By seeking to disrupt the status quo, Plaintiffs' proposed injunction

contravenes the very purpose of preliminary relief, which "is merely to preserve

the relative positions of the parties" until the merits are resolved. *Benisek*, 138

S.Ct. at 1945.

"The plaintiffs bear the initial burden on showing that the injunction is in the

public interest." *Id.* at 1139. "However, the district court need not consider public

consequences that are 'highly speculative.'" *Id*. Plaintiffs presented no evidence that there is a sectarian entity desiring to serve as an NPS. And Plaintiffs ignore that if relief is granted but defendants prevail, disabled students' educational programs could be disrupted, and government contracts may have to be unwound.

Finally, relief is appropriately denied where there are difficult-to-weigh public interests on both sides. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The compelling reasons that have supported the unchallenged nonsectarian NPS requirement for decades should not be disregarded.

## CONCLUSION

The Court should affirm the judgment.

Dated: January 8, 2024                 Respectfully submitted,

                            LEN GARFINKEL
                            General Counsel
                            BRUCE YONEHIRO
                            Assistant General Counsel

                     By: /s/ Thomas H. Prouty
                        THOMAS H. PROUTY
                        Deputy General Counsel
                        Attorneys for the State Appellees
                        The California Department of Education
                        and Superintendent of Public Instruction

## STATEMENT OF RELATED CASES

The State-Appellees are not aware of any related cases pending in this Court.

Dated: January 8, 2024       By: /s/ Thomas H. Prouty
                                     THOMAS H. PROUTY
                                     Attorney for the State Appellees
                                     The California Department of Education
                                     and Superintendent of Public Instruction

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55714

I am the attorney or self-represented party.

**This brief contains** | 15,398 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☑ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Thomas H. Prouty | **Date** | 1/8/2024
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                              *Rev. 12/01/22*

72

## CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2024, I caused the foregoing to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: January 8, 2024          By: /s/ Thomas Prouty
                                    THOMAS H. PROUTY
                                    Attorney for the State Appellees
                                    The California Department of Education
                                    and Superintendent of Public Instruction