No. 23-55714

# In the United States Court of Appeals for the Ninth Circuit

———————————

CHAYA LOFFMAN, ET AL.,

*Plaintiffs-Appellants*,

v.

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellees*.

———————————

**On Appeal from the United States District Court
for the Central District of California
District Court No. 2:23-cv-001832-JLS-MRW
The Honorable Josephine L. Staton**

———————————

**BRIEF OF *AMICI CURIAE*
NATIONAL ALLIANCE FOR PUBLIC CHARTER SCHOOLS
AND CALIFORNIA CHARTER SCHOOLS ASSOCIATION
IN SUPPORT OF DEFENDANTS-APPELLEES**

———————————

CHRISTOPHER A. BROOK
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: (919) 942-5200
cbrook@pathlaw.com

*Counsel for* Amici Curiae

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici curiae* certify that it has no parent corporation and no stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES .............................................................. iii

INTEREST OF *AMICI CURIAE* ..........................................................1

ARGUMENT ...............................................................................2

    I.    Charter Schools are Public Schools Committed to Serving All Families and Students Seeking a Quality, Innovative Education ........4

    II.   Plaintiffs Attempt to Re-Cast Recent Public Benefit Free Exercise Case Law Into a Mandate for Religious Instruction in Public Education ...............................................................6

    III.  Plaintiffs' Arguments Have Been Rejected by Courts Because They Would Upend the IDEA Program, with Broader Implications for Public Education and, Particularly, Public Charter School Education ....................................................14

        A.  Implications for IDEA Program .................................15

            1.  Public Education in Religious Schools ...............................15

            2.  Religious Instruction in Public Schools ..............................17

            3.  The Religion Clauses Do Not Permit Religious Instruction in Public Education .........................................19

        B.  Implications for Public Education More Broadly and Public Charter Schools Particularly.....................................21

CONCLUSION ...........................................................................28

CERTIFICATE OF COMPLIANCE .................................................29

CERTIFICATE OF SERVICE .........................................................30

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
    143 S. Ct. 2298 (2023) ................................................................5

*Bowen v. Roy*,
    476 U.S. 693 (1986) ...............................................................19

*Capistrano Unified Sch. Dist. v. S.W.*,
    21 F.4th 1125 (9th Cir. 2021) ..................................................10

*Carson v. Makin*,
    142 S. Ct. 1987 (2022) ..................................................*passim*

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ...............................................................21

*Espinoza v. Mont. Dep't of Revenue*,
    140 S. Ct. 2246 (2020) ..................................................*passim*

*Fulton v. City of Philadelphia, Penn.*,
    141 S. Ct. 1868 (2021) ...................................................... 23, 24

*Gary S. v. Manchester Sch. Dist.*,
    374 F.3d 15 (1st Cir. 2004) ................................................. 21, 22

*Good News Club v. Milford*,
    533 U.S. 98 (2001) ................................................................21

*Goodall v. Stafford Cty. Sch. Bd.*,
    60 F.3d 168 (4th Cir. 1995) .....................................................19

*Lee v. Weisman*,
    505 U.S. 577 (1992) ...............................................................24

*Lund v. Rowan Cty., N.C.*,
    863 F.3d 268 (4th Cir. 2017) ...................................................24

*M.L. v. Smith*,
    867 F.3d 487 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 752 (2018) ........*passim*

*Marchi v. Bd. of Coop. Ed. Serv. of Albany*,
    173 F.3d 469 (2d Cir. 1999) ....................................................27

*Mozert v. Hawkins Cty. Bd. of Educ.*,
    827 F.2d 1058 (6th Cir. 1987) ............................................. 18, 22

*Ms. S. v. Vashon Island Sch. Dist.*,
    337 F.3d 1115 (9th Cir. 2003) ...................................................................10

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    140 S. Ct. 2049 (2020)............................................................................20

*Sherbert v. Verner*,
    374 U.S. 398 (1963)................................................................................19

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981)........................................................................ 23, 24

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017)...................................................................... 6, 8, 12

*Widmar v. Vincent*,
    454 U.S. 263 (1981)................................................................................21

*Wilson v. State Bd. of Educ.*,
    75 Cal. App. 4th 1125 (Cal. Ct. App. 1999) ..................................4

*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002)...............................................................................13

## Constitutional Provisions

Cal. Const. Art. IX, § 8 .........................................................................5

Cal. Const. Art. XVI, § 5 .......................................................................5

## Statutes and Regulations

20 U.S.C. § 1400(d)(1).............................................................................8

20 U.S.C. § 1401(9) ..................................................................................8

20 U.S.C. § 1401(9)(a)..............................................................................8

20 U.S.C. § 1412(a)(5)..............................................................................9

20 U.S.C. § 1412(a)(5)(A)......................................................................12

20 U.S.C. § 1412(a)(10)(B) ....................................................... 10, 13, 15

20 U.S.C. § 7221i(2)(B)............................................................................4

5 C.C.R. § 3001(a) .........................................................................11, 13

5 C.C.R. § 3060......................................................................................12

5 C.C.R. § 3060(a) ...........................................................................9, 10

iv

5 C.C.R. § 3060(c)(4) ................................................................ 10, 13

5 C.C.R. § 3060(c)(8) ........................................................................12

5 C.C.R. § 3060(c)(9) ........................................................................11

5 C.C.R. § 3061(a) ............................................................................16

5 C.C.R. § 3063(e)(2) ........................................................................16

5 C.C.R. § 3064(a) ..................................................................... 10, 13

5 C.C.R. § 3069(c)(9) ........................................................................13

5 C.C.R. § 3070 ..................................................................................12

34 C.F.R. § 104.4 ................................................................................4

34 C.F.R. § 300.114 ..........................................................................11

34 C.F.R. § 300.114(a). ......................................................................9

34 C.F.R. § 300.115 .......................................................................9, 12

34 C.F.R. § 300.116 ..........................................................................10

34 C.F.R. § 300.118 ............................................................................9

34 C.F.R. § 300.147(a) ......................................................................11

34 C.F.R. § 300.2 ................................................................................8

34 C.F.R. § 300.209(b)(1)(i) ..............................................................5

34 C.F.R. § 300.320(a)(1)-(3) ............................................................9

34 C.F.R. § 300.320(a)(1)(i) ..............................................................9

34 C.F.R. § 300.321 ..........................................................................10

34 C.F.R. § 300.325(c) ......................................................................11

Cal. Educ. Code § 220 ....................................................................4, 5

Cal. Educ. Code § 47601 ..................................................................28

Cal. Educ. Code § 47601(b) ...............................................................4

Cal. Educ. Code § 47601(c) ..............................................................27

Cal. Educ. Code § 47602 ..................................................................28

Cal. Educ. Code § 47605(c) ...............................................................4

Cal. Educ. Code § 47605(e)(1) .............................................. 5, 22, 23

Cal. Educ. Code § 47607(f)(4) ..........................................................26

Cal. Educ. Code § 47640 ...........................................................................9

Cal. Educ. Code § 47646 ...........................................................................5

Cal. Educ. Code § 56034 .........................................................................10

Cal. Educ. Code § 56365(b) .....................................................................11

Cal. Educ. Code § 56366(a)(2)(B)(ii) ......................................................12

Cal. Educ. Code § 56366.1(a)(3) ........................................................ 10, 13

Cal. Educ. Code § 56366.1(e)(3) ....................................................11, 13, 15

Cal. Educ. Code § 56366.1(h) ..................................................................13

Cal. Educ. Code § 56366.1(i)(3) ..............................................................16

Cal. Educ. Code § 56366.1(j) ...................................................................16

Cal. Educ. Code § 56366.1(n) ............................................................. 10, 13

Cal. Educ. Code § 56366.10(b)(1) ......................................................11, 13

Me. Rev. Stat. Ann. tit. 20-A, § 6209 .....................................................7, 8

Wash. Rev. Code § 28A.642.010 ...............................................................5

Wash. Rev. Code § 28A.710.010(1) ...........................................................5

Wash. Rev. Code § 28A.710.020(1)(a) (2022) ..........................................4

Wash. Rev. Code § 28A.710.040(2a) .........................................................5

Wash. Rev. Code § 28A.710.040(4) ...........................................................5

## Other Authorities

Alison Heape Johnson, et al.,
   *Charter School Funding Disparities: Los Angeles, California*,
   School Choice Demonstration Project,
   University of Arkansas, Mar. 2023, https://bpb-us-
   e1.wpmucdn.com/wordpressua.uark.edu/dist/9/544/files/2023/04/chart
   er-school-funding-disparities-los-angeles.pdf ........................................26

Brief for National Jewish Commission on Law and Public Affairs, et al.,
   as Amici Curiae Supporting Plaintiffs-Appellants,
   *M.L. v. Smith*, 867 F.3d 487 (4th Cir. 2017) (No. 15-1977) ..........................17

Brief of Defendants-Appellees California Department of Education,
   *Loffman v. Cal. Dep't of Educ.*, No. 23-55714
   (9th Cir. appeal docketed Aug. 15, 2023) .....................................................13

Brief of Defendants-Appellees Los Angeles Unified School District,
*Loffman v. Cal. Dep't of Educ.*, No. 23-55714
(9th Cir. appeal docketed Aug. 15, 2023) .................................. 13, 15, 20, 26

Brief of Plaintiffs-Appellants,
*Loffman v. Cal. Dep't of Educ.*, No. 23-55714
(9th Cir. appeal docketed Aug. 15, 2023) ....................................... 18, 23, 24

*Charter School Report*,
Washington State Board of Education, 2023,
https://www.sbe.wa.gov/sites/default/files/public/documents/2023%20
Charter%20School%20Report%202021-22%20School%20Year.pdf ..........25

Complaint,
*Woolard v. Thurmond*, No. 23-02305 (E.D. Cal. filed Oct. 11, 2023) ..........22

Lauren Camera,
*Oklahoma OKs First Religious Charter School,*
*Teeing Up Legal War Over Separation of Church and State*,
U.S. News & World Report (June 6, 2023),
https://www.usnews.com/news/education-news/articles/2023-06-
06/oklahoma-oks-first-religious-charter-school-teeing-up-legal-war-
over-separation-of-church-and-state ...................................................... 22, 27

*Minutes of Board of Education Regular Meeting*,
San Diego Office of Education, Aug. 9, 2017,
https://www.sdcoe.net/board-of-education/agenda-minutes .........................26

Pew Research Center,
*2014 Religious Landscape Study: Adults in California*,
https://www.pewresearch.org/religion/religious-landscape-
study/state/california/ ..................................................................................25

Pew Research Center,
*2014 Religious Landscape Study: Adults in Washington*,
https://www.pewresearch.org/religion/religious-landscape-
study/state/washington/ ...............................................................................25

Scott R. Bauries,
*The Education Duty*, 47 Wake Forest L. Rev. 705, 719 (2012) ....................22

*State-Level Demographics by Charter Status*,
CCSA, 2023, https://www.ccsasnapshots.org/enrollment ...................... 19, 25

## INTEREST OF *AMICI CURIAE*[1]

The National Alliance for Public Charter Schools ("National Alliance") is the leading national organization committed to supporting students attending or hoping to attend a public charter school. The National Alliance supports students through federal and state advocacy efforts, research, and elevating national awareness of the charter school movement. These efforts include legal advocacy to safeguard the rights of charter school students, of which there are 3.3 million nationwide.

The California Charter Schools Association ("CCSA") is a statewide, non-profit membership and advocacy organization. Its mission is to meet the needs of students, parents, educators, and communities for great public school options. It does so by supporting and advocating for high quality non-profit charter public schools and sharing their successes with other public schools in the state.

National Alliance and CCSA advocate on behalf of charter schools that prepare their students for success in college, career, community, and life–especially those schools that provide our most historically underserved and vulnerable students with the high-quality public education they deserve. Charter public schools are committed to innovative educational solutions that can serve students from all

---

[1] All parties have consented to the filing of this brief. This brief was not authored in whole or in part by a party or counsel to a party. No person other than *amici curiae*, its members, and its counsel contributed money that was intended to fund preparing or submitting this brief.

backgrounds. But that is possible only in appropriately focused school environments that respect and include all students and families.

National Alliance and CCSA submit this brief as *amici curiae* in support of Defendants-Appellees. Their interest in this matter aligns with that of traditional public schools in California but is independently important. A ruling for Plaintiffs-Appellants would have serious and negative day-to-day consequences for all public schools. But those consequences would be particularly problematic for charter public schools and their students.

## ARGUMENT

The freedom to practice one's religion is fundamental to our constitutional order. It necessarily includes the freedom to raise one's child in the tenets and practices of one's faith, a duty and source of pride and strength for many in our nation.

But it is not a license for people of faith and religious institutions, respectively, to seek or provide religious instruction in the public education system. The Supreme Court has repeatedly held that states may provide secular educations. That is all California seeks to do when it implements the Individuals with Disabilities Education Act ("IDEA") in its schools.

Yet Plaintiffs seek to transpose recent Supreme Court decisions from the context of public benefit programs to the quite distinct context of public education. This is explicitly foreclosed by the same precedent upon which Plaintiffs rely.

And for good reason. Plaintiffs' arguments today are about IDEA. But, at bottom, they sweep far more broadly. Taken to their logical end, as Plaintiffs acknowledge, they would fundamentally re-make the public education system. These arguments would ultimately require public schools to delegate their educational responsibilities to religious schools and engage in religious instruction themselves.

This would harm religious and public education. It would mire secular authorities in the affairs of religious institutions and schools, to say nothing of religious doctrine. All of this would inevitably sow division on religious grounds.

While harmful to all public schools, accepting Plaintiffs' arguments would deal a hammer blow to public charter schools like those *amici* represent. These charter schools pride themselves on serving exceptionally diverse student bodies. Ruling for the Plaintiffs, at the very least, would greatly complicate these schools' mission of providing a quality public education to all their students. Truth be told, however, Plaintiffs' arguments contain the seeds that could spell the end of a movement to make accessible a quality public charter school education to all those who seek it.

This Court must affirm the district court's dismissal of Plaintiffs' claims.

## I.    Charter Schools are Public Schools Committed to Serving All Families and Students Seeking a Quality, Innovative Education.

At the heart of *amici*'s interest in this case is a simple fact: charter schools are public schools. Cal. Educ. Code § 47605(c) ("[C]harter schools are and should become an integral part of the California educational system[.]"); *see also* 20 U.S.C. § 7221i(2)(B) ("[C]harter school means a public school . . . operated under public supervision and direction[.]"); *Wilson v. State Bd. of Educ.*, 75 Cal. App. 4th 1125, 1139 (Cal. Ct. App. 1999) ("[C]harter schools *are* public schools because . . . charter schools are part of the public school system[.]") (emphasis in original).[2] This is not merely a semantical legal reality. States create charter schools for the dual purposes of serving all comers while bringing new ideas into the public school system. *See, e.g.,* Cal. Educ. Code § 47601(b) (noting legislative intent in creating charter schools to "[i]ncrease learning opportunities for all pupils" and "[e]ncourage the use of different and innovative teaching methods").

"Public" means treating each family and student who wishes to attend a public charter school equally. California public charter schools, for instance, cannot discriminate against students with disabilities. 34 C.F.R. 104.4; Cal. Educ. Code

---

[2] Because this case is about California public schools, the brief focuses on the California charter school legal regime and day-to-day experience. That being said, that charter schools are public schools is a generally unremarkable proposition. *See, e.g.,* Wash. Rev. Code § 28A.710.020(1)(a) (2022) ("A charter school . . . [i]s a public school that is [o]pen to all children free of charge[.]").

§§ 220, 47605(e)(1). Most pertinent to this case, students with disabilities who attend public charter schools are entitled to a free and appropriate public education under the IDEA just as they would receive it in a traditional public school. 34 C.F.R. 300.209(b)(1)(i); Cal. Educ. Code § 47646.

Charter schools' non-discriminatory mandate stretches beyond students with disabilities. In addition, California public charter schools cannot discriminate on the basis of "gender, gender identity, gender expression, nationality, race, or ethnicity, religion, [or] sexual orientation[.]" Cal. Educ. Code. §§ 220, 47605(e)(1). Related to this, like all other public schools, charter schools are strictly non-religious.[3] Cal. Const. Art. IX, § 8, Art. XVI, § 5; Cal. Educ. Code § 47605(e)(1); *see also 303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2308 (2023) (noting religious beliefs can include opposition to same-sex marriage). This underlines the public nature of the enterprise by ensuring that charter schools are equally accessible and offer equal treatment to all California families and students.

---

[3] These features too are commonplace. *See, e.g.,* Wash. Rev. Code § 28A.710.040(2a) ("A charter school must . . . [c]omply with . . . state . . . nondiscrimination laws applicable to school districts and to the same extent as school districts[.]"); Wash. Rev. Code § 28A.642.010 ("Discrimination in Washington public schools on the basis of race, creed, religion, color, national original, . . . veteran or military status, sexual orientation including gender expression or identity, the presence of any sensory, mental, or physical disability . . . is prohibited."); Wash. Rev. Code §§§ 28A.710.010(1), .040(4) (noting charter schools cannot be religious organizations or otherwise engage in any religious practices).

II.     **Plaintiffs Attempt to Re-Cast Recent Public Benefit Free Exercise Case Law Into a Mandate for Religious Instruction in Public Education.**

Plaintiffs argue that recent Supreme Court Free Exercise jurisprudence means that states must allow religious instruction as part of a public education. But they can do so only by fundamentally misconstruing these public benefits cases and ignoring their express limitations.

*Trinity Lutheran*, *Espinoza*, and *Carson* each involved private actors' access to widely available public benefits. In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 453 (2017), "[t]he Missouri Department of Natural Resources offer[ed] state grants to help public and private schools, nonprofit day care centers, and other nonprofit entities purchase rubber playground surfaces from recycled tires." Religious organizations were categorically excluded from grants through the program. *Id.* at 454. "The Montana Legislature established a program to provide tuition assistance to parents who send their children to private schools" in *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2251 (2020). The Montana Supreme Court held this violated the state constitution by providing aid to religious schools. *Id.* Similarly, *Carson v. Makin*, 142 S. Ct. 1987, 1989 (2022), involved Maine's limitation of "a program of tuition assistance for parents who live in school districts that do not operate a secondary school of their own" to non-religious private schools. In each instance, conditioning access to a wide-ranging benefit program on an entity's religious character violated the Free Exercise Clause. *Id.* at 1996-97.

Just as these cases were clear about what they were about, they were clear about what they were not about—any requirement that states "subsidize private education"—religious or otherwise. *Espinoza*, 140 S. Ct. at 2261. *Carson*, in particular, is instructive on this point. Responding to Maine's argument that the program offered "'a free public education[,]'" the Court retorted that the authorizing "statute does not say anything like that." *Carson*, 142 S. Ct. at 1998 (quoting Brief for Respondent 1-2). The benefit at issue instead was "*tuition* at a public *or* private school selected by the parent, with no suggestion that the 'private school' must somehow provide a 'public' education." *Id.* at 1998-99 (emphasis in original).

The program's operation made that plain. First, "the free public education that Maine insist[ed] it [was] providing through the tuition assistance program [were] often *not* free" as private schools could and did charge more than the benefit. *Id.* at 1999 (emphasis in original). Participating schools also did not need to hire state-certified teachers. *Id.* And, where Maine public schools had to "abide by certain 'parameters for essential instruction in English language arts; mathematics; science and technology; social studies; career and education development; visual and performing arts; health, physical education and wellness; and world languages[,]'" private voucher-eligible schools were "exempt from these requirements[.]" *Id.* at 1999 (quoting Me. Rev. Stat. Ann. tit. 20-A, § 6209). Likewise, voucher-eligible schools did not have to "administer annual state assessments in English language,

mathematics, and science" as public schools were required to do. *Id.* "In short, it [was] simply not the case that these schools, to be eligible for state funds, [had to] offer an education that [was] equivalent—roughly or otherwise—to that available in the Maine public schools." *Id.*

The statutory regimes at issue here are starkly distinct from the widely-available monetary grants in *Trinity Lutheran*, *Espinoza*, and *Carson*. To start, the primary purpose of the federal statute at issue, the IDEA, is ensuring all "children students with disabilities have available to them a *free* appropriate *public* education[,]" or a "FAPE." 20 U.S.C. § 1400(d)(1) (emphasis added). A FAPE is a special education "provided at *public* expense, under *public* supervision and direction, and *without charge*[.]" *Id.* at § 1401(9)(a) (emphasis added).

While Plaintiffs deride focusing on IDEA's stated public purpose as analysis by "magic words[,]" ER-46, this was pertinent in *Carson*. 142 S. Ct. at 1998 (noting voucher "statute does not say anything" about providing a free public education). Moreover, the substance of the complementary federal and state programs at issue confirms this "public" label. Local education agencies ("LEAs") oversee the development of individual education plans ("IEPs") for students with disabilities enrolled in public schools. 20 U.S.C. § 1401(9); 34 C.F.R. §§ 300.2,

8

300.320(a)(1)(i).[4] The IEP analyzes present level of performance and areas of need to identify the services and placements necessary to enable the student to make progress in the "general education curriculum" while also meeting the student's individual educational needs. 34 C.F.R. § 300.320(a)(1)-(3).

A guiding principle of IDEA, which is top of mind for school special education teams, is that LEAs must educate students with disabilities in the "least restrictive environment" ("LRE"). 20 U.S.C. § 1412(a)(5). This means that, "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled[.]" *Id.* An LEA may utilize special classes, separate schooling, or otherwise remove students with disabilities from the regular educational environment "only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a).

Only when even this is not possible can an LEA seek an alternative placement, including at "private institutions[,]" 34 C.F.R. §§ 300.115, 300.118, which are also referred to as "nonpublic schools" ("NPSs"). California first decides whether an institution qualifies to serve as an NPS. 5 C.C.R. § 3060(a). An NPS must meet the standards prescribed in federal and state statutes and regulations pertaining to special

---

[4] As used here, an LEA "also means a charter school that is responsible for complying with all provisions of the [IDEA] . . . and implementing regulations as they relate to local educational agencies." Cal. Educ. Code § 47640.

education, as well as standards prescribed by the State Superintendent of Public Instruction and the State Board of Education. Cal. Educ. Code § 56034; 5 C.C.R. § 3060(a). For instance, their staff must hold credentials authorizing them to provide special education equivalent to that which public school staff must hold. Cal. Educ. Code § 56366.1(a)(3), (n); 5 C.C.R. §§ 3060(c)(4), 3064(a).

In determining the alternative educational placement of a student with a disability, LEAs rely upon expert IEP teams. These teams are comprised of the student's general education teacher(s), special education teacher(s), an LEA representative, persons qualified to interpret the instructional implications of evaluation results, parents, and, at the discretion of the parent or the LEA, other persons who have knowledge or special expertise regarding the child. 34 C.F.R. §§ 300.116, 300.321. While parents provide input in placement decisions, LEAs ultimately make the choice. 20 U.S.C. § 1412(a)(10)(B); *see also Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1134 (9th Cir. 2021) (affirming law "does not require school authorities automatically . . . defer to [parents'] concerns"); *Ms. S. v. Vashon Island Sch. Dist.*, 337 F.3d 1115, 1131-33 (9th Cir. 2003) (recognizing LEAs and parents may have differing "educational philosoph[ies][,]" LEAs have "no obligation to grant" parents "a veto of any individual IEP provision[,]" and courts should give "appropriate weight" to LEA "expertise in educational methods" in assessing "an IEP's compliance with the IDEA").

Crucially, California retains responsibility for ensuring the student receives a public education even when placed in an NPS. "Even if a private school or facility implements a child's IEP, responsibility for compliance" with the IDEA's requirements "remains with the [State and local agencies]." 34 C.F.R. § 300.325(c). More than this, NPSs in California must provide each child placed with them by an LEA with a special education that follows the State curriculum and standards. 5 C.C.R. § 3060(c)(9). An NPS must certify that it will utilize the California State Board of Education-adopted core curriculum and instructional materials for kindergarten through grade eight and the state standards-aligned core curriculum and instructional materials used by the LEA contracting with it for grades 9-12. Cal. Educ. Code § 56366.10(b)(1); 5 C.C.R. §§ 3001(a), 3060(c)(9). California monitors this and broader IDEA compliance "through procedures such as written reports, on-site visits, and parent questionnaires[.]" 34 C.F.R. § 300.147(a). These on-site monitoring visits must occur at least each school year and include "a review of progress the pupil is making towards the goals set forth in the pupil's [IEP]" as well as "an observation of the pupil during instruction, and a walkthrough of the facility." Cal. Educ. Code § 56366.1(e)(3).

Underlining the ongoing public nature of this educational enterprise, students placed in NPSs remain "enrolled in public schools[.]" *Id.* at § 56365(b). Consistent with IDEA's guiding principle of LRE, 34 C.F.R. § 300.114, LEAs also monitor

whether privately-placed "pupil[s] may be transitioned [back] to a public school setting." Cal. Educ. Code § 56366(a)(2)(B)(ii); *see also* 5 C.C.R. § 3060(c)(8) (requiring NPS application describe school's "exit criteria for transition back to a public school setting"). And even when students must remain in an NPS to complete their IEP, they receive a diploma from the LEA who developed and supervised their IEP. 5 C.C.R. § 3070.

The distinctions between California's implementation of the IDEA program and the widely-available public benefit programs Plaintiffs seek to analogize this case to are "numerous and important." *Carson*, 142 S. Ct. at 1999. First, NPS placements are rare, something of a last resort for a small population of high needs students with disabilities who cannot be educated alongside students who are not disabled and for whom the LEAs cannot otherwise provide a FAPE through special-education programs on their public school campuses. 20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. § 300.115. This in contrast to the "wide range" of grant beneficiaries in *Trinity Lutheran*, *Espinoza*, and *Carson*. *Carson*, 142 S. Ct. at 1997.

And in *Espinoza* and *Carson* families alone decided where to spend state tuition assistance. *Espinoza*, 140 S. Ct. at 2251; *Carson*, 142 S. Ct. at 1993. Here, the government decides first which institutions qualify to serve as an NPS, 5 C.C.R. § 3060, then if an NPS is a necessary placement, and, finally, which NPS is best suited to carry out the State's and LEA's duty to provide the student in question a

public education. 20 U.S.C. § 1412(a)(10)(B).[5] This is by no means "a benefit program under which private citizens 'direct government aid to religious schools wholly as a result of their genuine and independent choice[.]'" *Carson*, 142 S. Ct. at 1994 (quoting *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002)).

Most importantly, the benefit at issue here is not "tuition assistance" but instead "the provision of a [free] public education or its equivalent." ER-52 (district court contrasting program at issue here with that in *Carson*). Consistent with this, and in stark contrast with the voucher program in *Carson*, 142 S. Ct. at 1998-99, an NPS must, *inter alia*, employ educators certified by the state to provide special education, Cal. Educ. Code § 56366.1(a)(3), (n); 5 C.C.R. §§ 3060(c)(4), 3064(a), follow California public school curriculum, Cal. Educ. Code § 56366.10(b)(i); 5 C.C.R. §§ 3001(a), 3069(c)(9), and open itself to intensive, ongoing state monitoring. *See, e.g.,* Cal. Educ. Code § 56366.1(e)(3), (h).

---

[5] Given their particular interests in this case, *amici* focus their arguments on the merits. *Amici*, however, agree with Defendants that Plaintiffs do not have standing to pursue their constitutional claims. Defendants persuasively argue that the family Plaintiffs have not adequately pled that their children qualify for NPS placement, while school Plaintiffs have not adequately pled that they qualify to serve as NPSs. Brief of Defendants-Appellees Los Angeles Unified School District at 29-32, *Loffman v. Cal. Dep't of Educ.*, No. 23-55714 (9th Cir. appeal docketed Aug. 15, 2023) [hereinafter "Br. of LAUSD"]; Brief of Defendants-Appellees California Department of Education at 28-37, *Loffman v. Cal. Dep't of Educ.*, No. 23-55714 (9th Cir. appeal docketed Aug. 15, 2023). In short, neither has been harmed or treated differently than any similarly situated actor based on their faith.

These distinctions make plain that California's implementation of IDEA is not born of religious animus but simply its best effort to fulfill *its* duty to educate. On those rare occasions when an LEA decides that an NPS is necessary, the State is not choosing to "subsidize private education[,]" *Espinoza*, 140 S. Ct. at 2261; it is choosing the best means of furthering a student's public education. ER-50 (District court: "[NPS system] is a regime whereby the State contractually delegates its responsibility to educate eligible children . . . in accordance with IDEA requirements and the same State educational standards that apply to the LEA itself."). And, of course, California "may provide a strictly secular education[.]" *Carson*, 142 S. Ct. at 2000.

## III.    Plaintiffs' Arguments Have Been Rejected by Courts Because They Would Upend the IDEA Program, with Broader Implications for Public Education and, Particularly, Public Charter School Education.

If accepted, Plaintiffs' arguments would fundamentally change programs like IDEA and make them unworkable. And the logic of Plaintiffs' arguments does not stop with religious schools serving as NPSs. They all but admit they apply to the whole of public education. But case law roundly rejects their sweeping arguments and with good reason. Adopting them would harm both religious and public education, with particular consequences in the context of charter public schools.

14

### A. Implications for IDEA Program

#### 1. Public Education in Religious Schools

The Plaintiffs directly argue that public schools must delegate their educational responsibilities for students with disabilities to religious schools. This would pose enormous challenges every step of the way.

Start with the creation of an IEP for a student with disabilities whose parents want him or her to have a religious education. Again, the decision whether to place a student with an NPS—and, if so, which NPS to ultimately place the student with—currently rests with the State. 20 U.S.C. § 1412(a)(10)(B). Must the IDEA's grant of statutory authority to the expert IEP team give way to the families' wishes (religious or not)? What if the IEP team who determine placements conclude that the family's preferred school placement (religious or not) cannot meet the student's unique needs and provide the FAPE to which the student is entitled by law? *See* Br. of LAUSD at 42-43 ("LEAs would . . . require guidance as to IEP team's obligations in light of inevitable advocacy from parents asserting that their children require a private religious education in order to receive a FAPE under the IDEA.").

That's only the beginning. Once a student is placed with an NPS, the LEA is required to audit, monitor, and assess the NPS at least annually to determine whether the NPS is adequately implementing the LEA-developed IEP. Cal. Educ. Code § 56366.1(e)(3). This is on top of the State's regular inspection, review, and

investigation rights, including whether the NPS is, *inter alia*, meeting California's public education standards. Cal. Educ. Code § 56366.1(j).

This oversight is rigorous. It includes "a review and examination of files and documents, classroom observations and interviews with the site administrator, teachers, students, volunteers and parents to determine compliance with all applicable state and federal laws and regulations[.]" 5 C.C.R. § 3063(e)(2). And it can include state authorities inspecting "any books and records associated with the delivery of education and related services to individuals with exceptional needs[,]" as well as the NPS's financial records to assess its costs of providing services. *Id.* at § 3061(a). If California "receives evidence of a significant deficiency in the quality of educational services provided[,]" then it must conduct an investigation that can "include an unannounced onsite visit[.]" Cal. Educ. Code § 56366.1(i)(3). The State inspecting religious books and records during unannounced visits to religious entities should send a shiver down the spine of anyone who truly values religious liberty.

Plaintiffs' arguments would repeatedly place schools between a rock and a hard place, struggling to discern their legal obligations to students in light of parental wishes and religious practices that demand healthy respect. So either Plaintiffs' argument for a religious public education or the IDEA and the California rules implementing it must give way.

16

### 2. Religious Instruction in Public Schools

Plaintiffs' arguments for public education in religious schools also support mandating religious instruction in public schools. After all, the State cannot force families to choose between religion and access to a government benefit if public education is just another program.

The idea that Plaintiffs' arguments will lead to calls for religious instruction by public educators is not farfetched. In *M.L. v. Smith*, 867 F.3d 487, 490 (4th Cir. 2017), *cert. denied*, 138 S. Ct. 752 (2018), the parents of a child with Down Syndrome rejected an IEP prepared for their son by his LEA. Their rejection focused on the fact that the IEP did "not provide functional instruction to prepare [M.L.] for life in the Orthodox Jewish community." *Id.* Specifically, the parents sought to have the LEA "teach M.L. about the laws and customs of Orthodox Judaism[,]" including instruction on the Torah, kosher rules, Orthodox Jewish garments, and the reading of Hebrew. *Id.* at 491.

Failure to provide this instruction in a public school setting violated the Free Exercise Clause, according to M.L.'s parents and supportive amici. *Id.* at 499 n.11. They argued as the plaintiffs do here: that a public education is a public benefit program and, hence, the State must allow religious instruction within it. *Compare* Brief for National Jewish Commission on Law and Public Affairs, et al., as Amici Curiae Supporting Plaintiffs-Appellants at 11, *M.L. v. Smith*, 867 F.3d 487, 490 (4th

Cir. 2017) (No. 15-1977) (arguing LEA had put the family "in the position of choosing between their religion and the receipt of otherwise available significant government benefit") *with* Brief of Plaintiffs-Appellants at 4, *Loffman v. Cal. Dep't of Educ.*, No. 23-55714 (9th Cir. appeal docketed Aug. 15, 2023) [hereinafter "Br. of Plaintiffs-Appellants"] ("California cannot force Jewish children to choose between their Jewish education that is their birthright and the governmental special-education assistance that they are entitled to as Americans.").

While lauding it for making reasonable accommodations for M.L.'s religious beliefs, the Fourth Circuit held the LEA had no obligation to provide him with religious instruction. *M.L.*, 867 F.3d at 497, 499. Though the Fourth Circuit did so exclusively on statutory grounds because the Plaintiffs did not preserve their Free Exercise argument, *id.* at 499 n.11, other courts have rejected similarly styled free exercise arguments. *See, e.g., Mozert v. Hawkins Cty. Bd. of Educ.*, 827 F.2d 1058, 1075, 1079 (6th Cir. 1987) (Boggs, J., concurring in the result) ("[P]laintiff may 'want' a school system tailored exactly to their religious beliefs (this is why many people chose religious education), but they very well know that is constititutionally impermissible."); ("[T]he key fact is that the [Supreme] Court has almost never interfered with the prerogative of school boards to set curricula, based on free exercise claims.").

One can sympathize with the parents in *M.L.,* respect their deeply held convictions, and recognize the remedy they seek takes us down a fraught, unworkable path. In 2023, nearly 91,000, or approximately one in seven, California charter school students had a disability. *State-Level Demographics by Charter Status*, CCSA, 2023, https://www.ccsasnapshots.org/enrollment (click "Demographics" link) [hereinafter "CCSA, *State-Level Demographics*"]. Providing all those who desired religious instruction from this universe would be no mean feat. Beyond logistics, the substance of the interaction between secular authorities and religion countenanced is, again, troubling. If there are more significant entwinements of church and state than public educators instructing students on how to follow religious texts and customs, they are few and far between. This is untenable.

### 3. The Religion Clauses Do Not Permit Religious Instruction in Public Education.

The governing jurisprudence makes plain that it is Plaintiffs' expansive arguments that must give way. The Free Exercise Clause "is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government." *Bowen v. Roy*, 476 U.S. 693, 700 (1986) (quoting *Sherbert v. Verner*, 374 U.S. 398, 412 (1963) (Douglas, J., concurring)). It does not "require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family." *Id.* at 699 (italics in original); *see also Goodall v. Stafford Cty. Sch. Bd.*, 60 F.3d 168, 172 (4th Cir.

19

1995) ("The Supreme Court has . . . repeatedly held that the fact that a person has a constitutional right . . . does not necessarily impose upon the government an obligation to subsize that right."). So, of course, California "may provide a strictly secular education" without violating the Free Exercise Clause. *Carson*, 142 S. Ct. at 2000.

That is especially so here where, if accepted, Plaintiffs' arguments would mire public school officials in religious affairs. Governmental employees would need "to evaluate the role religious beliefs play in a student's life" before NPS placements. Br. of LAUSD at 43. After placement with a religious NPS, the government would have to "scrutinize[e] whether and how a religious school pursues its educational mission[.]" *Carson*, 142 S. Ct. at 2001. And the entwinement in public educators instructing students on how to follow religious texts and customs, *see M.L.*, 867 F.3d at 491, is nigh perfect. All of this would raise "serious concerns about state entanglement with religion and denominational favoritism[,]" *Carson*, 142 S. Ct. at 2001, likely in violation of both Religion Clauses. *See Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020) ("State interference in that sphere [of faith and doctrine] would obviously violate the free exercise of religion, and any attempt to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion.").

Such entwinement is of particular concern in the school context, where the Supreme Court "has been particularly vigilant in monitoring compliance with the Establishment Clause[.]" *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987). Indeed, even if strict scrutiny were applicable here (it is not, *see supra* Part II), "a state interest in avoiding an Establishment Clause violation 'may be characterized as compelling'" enough to satisfy it. *Good News Club v. Milford*, 533 U.S. 98, 112 (2001) (quoting *Widmar v. Vincent*, 454 U.S. 263, 271 (1981)).

## B.    Implications for Public Education More Broadly and Public Charter Schools Particularly

Though the IDEA program provides a useful illustration of the problems with Plaintiffs' proposed religious public education, it is just the tip of the iceberg. Just as the argument for allowing religious schools to serve as NPSs inevitably leads to religious instruction as part of all IEPs, it too would require religious instruction for any public school family that desired it. This would pose myriad challenges for all public schools, but most especially charter public schools.

To start, while Plaintiffs' arguments today are about the IDEA, they apply with equal force to the whole of public education. Again, if public education is just another public benefit program like playground or tuition grants, any limitation on religious participation is suspect. *But see M.L.*, 867 F.3d at 497, 499 (rejecting argument for religious instruction in public schools); *Gary S. v. Manchester Sch. Dist.*, 374 F.3d 15, 20-21 (1st Cir. 2004) (rejecting Free Exercise argument "that

private schools be permitted to share with public schools in state largess on an equal basis"); *Mozert*, 827 F.3d at 1075 (Boggs, J., concurring in the result) ("[P]laintiff may 'want' a school system tailored exactly to their religious beliefs (this is why many people chose religious education), but they very well know that is constitutionally impermissible.").

Practically speaking, this would mean "free exercise violations whenever a state, city, or town refuses to fund programs of other types at religious schools, at least insofar as the absence of funding adversely affects students with parents who believe their faith requires attendance at religious schools." *Gary S.*, 374 F.3d at 20. It would mean mandatory religious instruction within all public schools nationwide for any family wanting it. *See, e.g., M.L.*, 867 F.3d at 499 n.11 (Plaintiffs and *amici* making free exercise argument for such public school religious instruction); Scott R. Bauries, *The Education Duty*, 47 Wake Forest L. Rev. 705, 719 (2012) ("Every state constitution imposes upon the state legislature some obligation to provide for an education system."). And it would mean the advent of heretofore unknown religious public charter schools. *Compare* Cal. Educ. Code § 47605(e)(1) (prohibiting religious charter schools) *with* Lauren Camera, *Oklahoma OKs First Religious Charter School, Teeing Up Legal War Over Separation of Church and State*, U.S. News & World Report (June 6, 2023), https://www.usnews.com/news/education-news/articles/2023-06-06/oklahoma-oks-first-religious-charter-school-teeing-up-

legal-war-over-separation-of-church-and-state [hereinafter "U.S. News, *Oklahoma OKs First Religious Charter School*"]; *see also* Complaint at 3-4, *Woolard v. Thurmond*, No. 23-02305 (E.D. Cal. filed Oct. 11, 2023) (seeking to allow religious instruction in public charter schools).

Plaintiffs do nothing to disavow such sweeping implications. They perhaps suggest in passing that it could be problematic to "finance[e] religion for religion's sake." Br. of Plaintiffs-Appellants at 46. What such a limitation, if intended as one, would actually limit is unclear. It would surely encourage a focus not on the substance of the services at issue but instead how those services were labelled and semantically justified. *But see* ER-46 (district court noting Plaintiffs' objection elsewhere to analysis by "magic words").

The IDEA example provides a (small) window into the challenges that would follow. Teaching students how to practice their faith is presently beyond public schools' mission and competence. *See, e.g.,* Cal. Educ. Code § 47605(e)(1) (mandating strictly non-religious charter schools). To provide that instruction, public schools would have to re-orient their efforts—with implications for everything from hiring to curricula. And it would be curricula. Religious practices, are deeply personal and need not be "logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Fulton v. City of Philadelphia, Penn.*, 141 S. Ct. 1868, 1876 (2021) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450

U.S. 707, 714 (1981)). Any good teacher knows every classroom is actually many in one featuring, for example, students of different capabilities and learning styles. Add to that the need to learn and lead religious instruction, centering on some occasions on personal and even idiosyncratic beliefs, and the scope of the logistical hurdles begins to come into focus.

This points to the next challenge schools will have to manage: the inevitable misunderstandings and disagreements that come with their taking on religious instruction. "Divisiveness, of course, can attend any state decision respecting religion[.]" *Lee v. Weisman*, 505 U.S. 577, 587 (1992). Plaintiffs already allege as much. Br. of Plaintiffs-Appellants at 19 ("School officials have even explicitly questioned the Peretses' interpretation of Jewish law, instructing them to send N.P. to school during the Jewish holiday Sukkot."). Such disagreements are inevitable. *Fulton*, 141 S. Ct. at 1876 (noting religious beliefs are not always "comprehensible to others") (quoting *Thomas*, 450 U.S. at 714). It moreover takes little imagination to envision scenarios in which some parents and students believe the school is not doing enough in its religious instruction while others believe the school is doing so much that it is subjecting impressionable students from other faith traditions to "subtle coercive pressures" to join in. *Lee*, 505 U.S. at 588. Plaintiffs seek to set off down a "rancorous road" indeed. *Lund v. Rowan Cty., N.C.*, 863 F.3d 268, 291 (4th Cir. 2017) (Wilkinson, J.).

24

While all public schools would face challenges managing these new, sensitive responsibilities, they would show up more frequently in and with greater potential consequences for charter public schools. First, charter schools have spectacularly diverse student bodies. For example, where 50.1% of students in traditional public schools in Washington state are students of color, that percentage is 62.2% in Washington's charter schools. *Charter School Report*, Washington State Board of Education, 2023, at 20, Table 5, https://www.sbe.wa.gov/sites/default/files/public/documents/2023%20Charter%20School%20Report%202021-22%20School%20Year.pdf. And more than three-quarters of California public charter students are students of color. CCSA, *State-Level Demographics*. Unsurprisingly then, charter schools educate students of every imaginable faith tradition as well as nonbelievers. *See* Pew Research Center, *2014 Religious Landscape Study: Adults in California*, https://www.pewresearch.org/religion/religious-landscape-study/state/california/ (noting Californians identify as follows: 32% Protestant, 28% Catholic, 1% Mormon, 1% Orthodox Christian, 1% Jehovah's Witness, 2% Jewish, 1% Muslim, 2% Buddhist, 2% Hindu, 27% "unaffiliated," 18% "nothing in particular"); Pew Research Center, *2014 Religious Landscape Study: Adults in Washington*, https://www.pewresearch.org/religion/religious-landscape-study/state/washington/ (noting Washingtonians identify as follows: 40% Protestant, 17% Catholic, 3%

Mormon, 2% Jehovah's Witness, 1% Jewish, 1% Buddhist, 1% Hindu, 32% "unaffiliated," 22% "nothing in particular"). The breadth of potential religious instruction necessary in such student bodies boggles the mind.

Then there is the matter of what happens when schools fail to live up to parental and student expectations. This will take the form of administrative and fiscal burdens, which, as this case makes plain, will include litigation. While, this is a challenge all public schools would face, *see* Br. of LAUSD at 44 (lamenting "inevitable drain of expensive litigation on already limited public funds given to LEAs for [IDEA] obligations"), such additional fiscal stressors again would harm charter schools disproportionately. Alison Heape Johnson, et al., *Charter School Funding Disparities: Los Angeles, California* at 4, School Choice Demonstration Project, University of Arkansas, Mar. 2023, https://bpb-us-e1.wpmucdn.com/wordpressua.uark.edu/dist/9/544/files/2023/04/charter-school-funding-disparities-los-angeles.pdf (noting traditional public schools "in LAUSD have consistently received more funding per pupil than charter schools in LAUSD—anywhere from 22 to 40 percent more"). In addition, charters, unlike traditional public schools, face closure if they do not live up to their legal obligations. Cal. Educ. Code § 47607(f)(4) ("A charter may be revoked . . . if the chartering authority finds . . . that the charter school . . . [v]iolated any law."); *see also Minutes of Board of Education Regular Meeting*, San Diego Office of Education, Aug. 9,

2017, at 7, https://www.sdcoe.net/board-of-education/agenda-minutes (click "August 9, 2017 Regular Meeting Minutes") (rejecting appeal of revocation of charter of Beacon Classical Academy Charter School). It cannot be that schools have to walk a tightrope that moves beneath them and, if their good-faith efforts to carry out their obligations are even slightly off, then they face a mountain of liability or worse. *See Marchi v. Bd. of Coop. Ed. Serv. of Albany*, 173 F.3d 469, 476 (2d Cir. 1999) (noting need to accord schools "some breathing space to regulate in [the] difficult context" of free exercise and establishment concerns).

Finally, Plaintiffs' arguments pose a broader, potentially existential threat to public charter schools. Again, charter schools occupy a unique space in the public school universe. *Amici* strongly believe in the mission of public charter schools to use "different and innovative teaching methods." Cal. Educ. Code § 47601(c). Innovation is not at odds with being public, however. *Amici* just as strongly believe in serving all families and students—whether Black or white, Christian or Jewish, gay or straight—on equal terms.

In seeking to fundamentally change the nature of public education, Plaintiffs imperil the charter school movement. If a religious school can provide a public education, then what is to stop public religious charter schools that can discriminate in admissions on the basis of faith or LGBTQ status? *See* U.S. News, *Oklahoma OKs First Religious Charter School* (noting admission application for first Oklahoma

27

religious charter school indicates it would follow anti-discrimination laws only "to the extent the teachings of the Catholic Church allow"); *see also Carson*, 142 S. Ct. at 1999 ("[P]rivate schools are different by definition because they do not have to accept all students."). At the very least, the fundamental, all-are-welcome nature of public charter schools is at stake. More than this, states that created charter schools, Cal. Educ. Code §§ 47601-02, could decide that a public educational space where their rules for serving all students and families cannot hold sway is not worth having.

## CONCLUSION

California may provide a secular education without violating the First Amendment. The remedy Plaintiffs seek would harm religious and public schools, especially those *amici* represent. The National Alliance and CCSA respectfully request this Court affirm the district court's dismissal of Plaintiffs' claims.

Dated: January 16, 2024                      Respectfully submitted,

<u>s/ Christopher A. Brook</u>
CHRISTOPHER A. BROOK
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: (919) 942-5200
cbrook@pathlaw.com

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

I hereby certify that this amicus brief complies with Federal Rule of Appellate Procedure 29(a)(5) and Circuit Rule 32-1 because it contains 6,498 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f).

The brief's typesize and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in 14-point Times New Roman font.

/s/ Christopher A. Brook
Christopher A. Brook
*Counsel for* Amici Curiae

Dated: January 16, 2024

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I further certify that service was accomplished on all parties via the Court's CM/ECF system.

/s/ Christopher A. Brook
Christopher A. Brook
*Counsel for* Amici Curiae

Dated: January 16, 2024