No. 23-55714

# In the United States Court of Appeals for the Ninth Circuit

CHAYA LOFFMAN AND JONATHAN LOFFMAN, ET AL.,
Plaintiffs-Appellants,

v.

CALIFORNIA DEPARTMENT OF EDUCATION, ET AL.,

Defendants-Appellees.

Appeal from the United States District Court
for the Central District of California
Hon. Josephine L. Staton
(2:23-cv-01832-JLS-MRW)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS

ERIC C. RASSBACH
  *Counsel of Record*
NICHOLAS R. REAVES
DANIEL L. CHEN
LAURA WOLK SLAVIS
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*erassbach@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................. 4

I.   *Carson*, *Espinoza*, and *Trinity Luthern* prohibit California's exclusion of religious families and schools from Section 1412(a)(10)(B) funding. ................................... 4

    *Burden.* ............................................................................ 5

    *Text.* ................................................................................ 6

    *Real operation.* ................................................................. 8

    *Contracts.* ....................................................................... 10

    *Second-class status.* ......................................................... 11

II.  California's nonsectarian requirement violates the First Amendment because it is not generally applicable. .................................................................... 13

III. California's restriction fails strict scrutiny. ..................................... 16

IV.  The remaining injunction factors favor relief. ................................. 21

    *Irreparable harm.* ............................................................ 21

    *Balance of equities / public interest.* ..................................... 21

V.   The district court erred by dismissing Plaintiffs' remaining claims without additional analysis. ................. 25

    *Equal Protection Clause (Count IV).* ................................... 25

    *Unconstitutional Conditions (Count V).* ............................. 26

    Tandon *and* Yoder *(Counts II and VI).* ............................. 28

VI. Plaintiffs have standing. .................................................... 29

   A. Plaintiffs have suffered an injury-in-fact. .................................... 29

   B. Plaintiffs' injury is traceable to Defendants'
      conduct and redressable. ............................................. 34

CONCLUSION ..................................................................... 37

CERTIFICATE OF COMPLIANCE ......................................... 39

CERTIFICATE OF SERVICE ................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Saud v. Days,*
    50 F.4th 705 (9th Cir. 2022) ........................................... 25

*Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.,*
    567 F.3d 278 (6th Cir. 2009) ........................................... 18

*Am. Beverage Ass'n v. City & Cnty. of S.F.,*
    916 F.3d 749 (9th Cir. 2019) ........................................... 22

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ........................................................... 7

*Arc of Cal. v. Douglas,*
    757 F.3d 975 (9th Cir. 2014) ........................................... 22

*Associated Builders & Contractors W. Penn. v.*
*Cmty. Coll. Allegheny Cnty.,*
    81 F.4th 279 (3d Cir. 2023) ............................................. 34

*Associated Press v. Otter,*
    682 F.3d 821 (9th Cir. 2012) ........................................... 21

*Ball v. Massanari,*
    254 F.3d 817 (9th Cir. 2001) ........................................... 25

*Bellflower Unified Sch. Dist. v. Lua,*
    832 F. App'x 493 (9th Cir. 2020) ...................................... 8

*Bras v. Cal. Pub. Utilities Comm'n,*
    59 F.3d 869 (9th Cir. 1995) ............................................. 32

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) ......................................................... 17

*Burwell v. Hobby Lobby Stores, Inc.,*
    573 U.S. 682 (2014) ......................................................... 12

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
   29 F.4th 468 (9th Cir. 2022) ............................................................ 22

*Carney v. Adams,*
   592 U.S. 53 (2020) ............................................................................ 33

*Carroll v. Nakatani,*
   342 F.3d 934 (9th Cir. 2003) ............................................................ 33

*Carson v. Makin,*
   596 U.S. 767 (2022) ..........................1, 4, 5-6, 7, 10, 12, 16, 19, 22, 27

*Carson v. Makin,*
   979 F.3d 21 (1st Cir. 2020) ......................................................... 31-32

*Carson v. Makin,*
   No. 18-cv-327 (D. Me. April 18, 2023) ........................................... 23

*Center for Biological Diversity v. Export-Import Bank,*
   894 F.3d 1005 (9th Cir. 2018) .......................................................... 33

*City of Los Angeles v. Barr,*
   929 F.3d 1163 (9th Cir. 2019) .......................................................... 30

*City of New Orleans v. Dukes,*
   427 U.S. 297 (1976) .......................................................................... 25

*Colo. Christian Univ. v. Weaver,*
   534 F.3d 1245 (10th Cir. 2008) ........................................................ 26

*Lipscomb ex rel. DeFehr v. Simmons,*
   884 F.2d 1242 (9th Cir. 1989) .......................................................... 24

*Dreher v. Amphitheater Unified Sch. Dist.,*
   22 F.3d 228 (9th Cir. 1994) ................................................................ 7

*Espinoza v. Mont. Dep't of Rev.,*
   140 S. Ct. 2246 (2020) ................................4, 10, 12, 17, 18, 19, 27, 29

*Estate of Boyland v. U.S. Dep't of Agric.,*
   913 F.3d 117 (D.C. Cir. 2019) .......................................................... 36

*Fazaga v. FBI,*
965 F.3d 1015 (9th Cir. 2020) ..................................... 5, 25-26

*Fellowship of Christian Athletes v. San Jose Unified Sch.*
*Dist. Bd. of Educ.,*
82 F.4th 664 (9th Cir. 2023) ...........................13, 14, 15, 16, 17, 19, 21

*Friends of the Earth, Inc. v. Laidlaw*
*Env't Servs. (TOC), Inc.,*
528 U.S. 167 (2000) ............................................................ 35

*Fulton v. City of Philadelphia,*
141 S. Ct. 1868 (2021) ..................................... 13-14, 15, 16

*Fulton v. City of Philadelphia,*
No. 18-cv-2075 (E.D. Pa. Oct. 1, 2021) ............................... 15

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015) ............................................. 24

*Gary S. v. Manchester Sch. Dist.,*
374 F.3d 15 (1st Cir. 2004) .............................................. 12

*Get Outdoors II LLC v. City of San Diego,*
506 F.3d 886 (9th Cir. 2007) ............................................ 36

*Hernandez v. Sessions,*
872 F.3d 976 (9th Cir. 2017) ....................................... 23, 24

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ................................. 3, 16, 17, 20, 21, 22

*Lee v. City of Los Angeles,*
250 F.3d 668 (9th Cir. 2001) ..........................................9-10

*Little Sisters of the Poor Saints Peter & Paul Home v.*
*Pennsylvania,*
140 S. Ct. 2367 (2020) .................................................... 30

*Locke v. Davey,*
540 U.S. 712 (2004) ........................................................ 10

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
571 F.3d 873 (9th Cir. 2009) ...................................................... 23

*Maya v. Centex Corp.*,
658 F.3d 1060 (9th Cir. 2011) ............................ 30, 33, 36

*Mitchell v. Helms*,
530 U.S. 793 (2000) .......................................................... 2

*Ne. Fla. Chapter of the Associated Gen. Contractors
of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) ................................................... 29-30

*Nuclear Info. & Res. Serv. v. NRC*,
457 F.3d 941 (9th Cir. 2006) ............................................ 35

*Porretti v. Dzurenda*,
11 F.4th 1037 (9th Cir. 2021) .................................. 21-22

*Rogers v. McMaster*,
No. 19-cv-1567, 2023 WL 7396203 (D.S.C. Sept. 29, 2023) ............... 10

*San Diego Cnty. Gun Rts. Comm. v. Reno*,
98 F.3d 1121 (9th Cir. 1996) ............................................ 35

*Sherbert v. Verner*,
374 U.S. 398 (1963) ...................................................... 27

*Skyline Wesleyan Church v. Cal. Dep't of
Managed Health Care*,
968 F.3d 738 (9th Cir. 2020) ............................................ 32

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ...................................................... 33

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971) ....................................................... 24

*Tandon v. Newsom*,
593 U.S. 61 (2021) ...................................................... 28

*Teen Ranch, Inc. v. Udow,*
   479 F.3d 403 (6th Cir. 2007).............................................................. 10

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,*
   309 F.3d 144 (3d Cir. 2002) ................................................................ 5

*Trigueros v. Adams,*
   658 F.3d 983 (9th Cir. 2011)................................................................ 9

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   582 U.S. 449 (2017)................................................... 1, 5, 10, 20, 27

*U.S. Small Bus. Admin. v. Bensal,*
   853 F.3d 992 (9th Cir. 2017)................................................................ 9

*United States v. Virginia,*
   518 U.S. 515 (1996)..................................................................... 24-25

*White v. United States,*
   601 F.3d 545 (6th Cir. 2010)............................................................. 35

*Ex parte Young,*
   209 U.S. 123 (1908).............................................................................. 4

**Statutes**

20 U.S.C. § 1412 ................................................................................ 6, 20

Cal. Educ. Code § 56034...................................................................... 6

Cal. Educ. Code § 56101.................................................................... 13

Cal. Educ. Code § 56366...................................................................... 6

Cal. Educ. Code § 56366.1................................................................ 37

**Regulations**

34 C.F.R. § 76.52 .............................................................................. 14

34 C.F.R. § 76.532 ..................................................................... 14, 20

## Other Authorities

California Dep't of Trans., A&E Boilerplate Agreement
Language (May 2023) ............................................................ 7

# INTRODUCTION

This case poses a single, straightforward question: May government exclude religious individuals and institutions from public benefits just because they are religious? The Supreme Court has "repeatedly" answered "No," holding in *Carson*, *Espinoza*, and *Trinity Lutheran* that "the exclusion of [a religious entity] from a public benefit for which it is otherwise qualified, solely because it is [religious], is odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 467 (2017).

That "'unremarkable' principle[]" begins and ends this case. *Carson v. Makin,* 596 U.S. 767, 780 (2022). Under California's implementation of the Individuals with Disabilities Education Act, California makes funding available for private schools to serve students with disabilities who are placed there as a means of receiving a free and appropriate public education. And as Defendants concede, California requires that all such schools certify they are "nonsectarian" as part of their application to serve these students.

California thus has joined a long line of governments who have used the word "sectarian" "to push religious minorities out of public life"—particularly disfavored minorities. Cal. Catholic Br.4-10. And so far, it has succeeded. By virtue of its nonsectarian restriction, under no circumstances may a "sectarian" religious school ever be certified, and under no circumstances may a religious family ever successfully have their child

1

placed in such a school. That is a clear-cut violation of the First Amendment, forcing religious individuals and schools to choose between their faith and a public benefit for which they would otherwise qualify. The nonsectarian restriction therefore must be relegated to the dustbin along with the other laws the Supreme Court has "not hesitate[d]" to strike down as part of the "shameful pedigree" of religious discrimination in this country. *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality op.).

In their briefs, Defendants nevertheless contend that, somehow—despite *Carson*, *Espinoza*, and *Trinity Lutheran*—the United States Constitution permits their overt discrimination against Orthodox Jewish families and schools, offering a mishmash of arguments in support.

For example, Defendants insist that they are paying secular private schools to provide a "public education." That contradiction in terms was expressly rejected in *Carson*, where Maine made the same argument. But the argument is even weaker in this case, because "public education" in the context of the IDEA means "publicly funded" not "publicly owned."

If the Court doesn't like those principles, Defendants have others. They say that a detailed government contract turns a private school into a public one. But that argument runs headlong into *Fulton*'s application of the First Amendment. And, despite conceding that the Superintendent has discretion to waive the nonsectarian requirement and even that the scheme is not generally applicable, they say *Fulton* and *Fellowship of Christian Athletes* don't apply at all.

Defendants also offer the Court very little on strict scrutiny. District Defendants make no strict scrutiny defense at all, conceding the question. State Defendants claim they have a compelling interest in avoiding an Establishment Clause violation. But instead of rooting their purported justifications in the "historical practices and understandings" the Supreme Court requires, *Kennedy v. Bremerton School District*, 597 U.S. 507, 535 (2022), State Defendants offer a series of out-of-date arguments that were expressly rejected in *Carson*. Worse still, they invoke long-discredited and bigoted tropes that "sectarian" faiths like Orthodox Judaism are simply not capable of participating fully in public life or complying with the law. *Compare* State Br.59-60 *with* Cal. Catholic Br.15-17. The Court should reject this view of religious people.

Finally, Defendants contort the law of standing beyond all recognition, claiming that Plaintiffs must "prove" (in their complaint, no less), that they will ultimately obtain benefits, despite clear holdings from the Supreme Court and this Court that the identification of a categorical discriminatory barrier is enough. And since Defendants concede the existence of that discriminatory barrier, they concede standing as well.

In short, Defendants are wrong on the law from start to finish. And their mishmash cannot obscure the underlying reality of this case: California has created a public benefit that categorically and permanently excludes otherwise-eligible religious families and schools. That is both

morally wrong and unconstitutional. This Court should apply the "unremarkable" principles of the First Amendment, reverse the grants of Defendants' motions to dismiss, and remand with instructions to enter a preliminary injunction.

**ARGUMENT**[1]

## I. *Carson*, *Espinoza*, and *Trinity Lutheran* prohibit California's exclusion of religious families and schools from Section 1412(a)(10)(B) funding.

As Plaintiffs have explained, Br.28-30, *Carson*, *Espinoza*, and *Trinity Lutheran* all stand for the "unremarkable" proposition that the First Amendment prohibits States from "expressly discriminat[ing] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Carson*, 596 U.S. at 779 (quoting *Trinity Lutheran*, 582 U.S. at 462). Under decades-old precedent, such a program amounts to a "indirect coercion or penalt[y] on the free exercise of religion." *Carson*, 596 U.S. at 778 (collecting cases). And because California's nonsectarian restriction "plainly excludes schools from government aid solely because of religious status," it cannot survive. *Espinoza v. Mont. Dep't of Rev.,* 140 S. Ct. 2246, 2255 (2020).

---

[1] Plaintiffs did not appeal the district court's conclusion that sovereign immunity bars claims against LAUSD and Aguilar in his personal capacity. Br.22 n.7. However, *contra* District Br.27, sovereign immunity does not bar prospective relief against Aguilar in his official capacity. *See Ex parte Young*, 209 U.S. 123, 159-60 (1908).

In response, Defendants offer a grab bag of arguments attempting to distinguish *Carson*. None avail.

**Burden.** Defendants' main argument is that Plaintiffs' free exercise rights have not been substantially burdened because the nonsectarian restriction is not part of "a State program intended to broadly bestow 'public benefits,'" but is instead "public education" provided in a "private school." State Br.47.[2] Defendants cannot so easily convert the education offered in a nonpublic school from *publicly funded* to *publicly owned*.

Indeed, the Supreme Court has already evaluated—and rejected—the same flawed justifications when it considered Maine's similar gambit in *Carson*. Br.30-35; Manhattan Inst. Br.8-10. Looking to the law's text and operation, the Supreme Court concluded that Maine's private schools did not offer the "equivalent" of a public education, notwithstanding Maine's protestations to the contrary, and were thus fully subject to the Free Exercise Clause. *Carson*, 596 U.S. at 784. Using the "magic words" "public education" were not enough—what matters is the "substance," "whether

---

[2] In any event, contrary to State Defendants' assertion, State Br.43, laws that are not "neutral and generally applicable" trigger strict scrutiny "[r]egardless of the magnitude of the burden imposed." *Fazaga v. FBI*, 965 F.3d 1015, 1058 (9th Cir. 2020), *rev'd on other grounds,* 595 U.S. 344 (2022); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 170 (3d Cir. 2002) ("[T]here is no substantial burden requirement when government discriminates against religious conduct."). That's because "a law targeting religious beliefs as such is never permissible." *Trinity Lutheran*, 582 U.S. at 466 n.4.

the prohibited discrimination is in an express provision ... or in a party's reconceptualization of the public benefit." *Id.* at 785.

Like Maine, Defendants' argument here also hinges on ignoring both text and operation.

**Text.** In arguing that nonpublic schools provide a public education, Defendants ask this Court to ignore the plain text of state law that describes nonpublic schools as an "alternative" to public school. Cal. Educ. Code § 56366. They also ask the Court to ignore statutory text defining a nonpublic, nonsectarian school as "a *private*, nonsectarian school that enrolls individuals with exceptional needs pursuant to an individualized education program and is certified by the department." Cal. Educ. Code §§ 56034, 56366 (emphasis added). *See also* 20 U.S.C. § 1412(a)(10)(B) ("private schools"); Br.31, 34.

Defendants believe this plain text should be ignored because nonpublic schools must also comply with numerous other regulations, some of which allow CDE or the LEA to supervise the nonpublic school or set certain credentialing and curricular standards. State Br.23-24; District Br.40-41. Indeed, Defendants toss in lengthy string-cites to government regulations, perhaps trying to prove their point by a flood of trifles. State Br.12-15; District Br.12-14.

But as Plaintiffs have already explained—and to which Defendants offer no response—such extensive regulations of private actors are hardly unique to the nonpublic school context. Br.37. They are the bread-and-

butter hallmarks of every modern government contract. *See id.* (describing the 89-page contract in *Fulton*). Indeed, the State's "boilerplate" contracts are extremely detailed. *See, e.g.*, California Dep't of Trans., A&E Boilerplate Agreement Language (May 2023), https://perma.cc/54ZV-3XBE (39-page sample contract containing detailed inspection, supervision, and safety requirements). That does not mean the contractors have become "public."

Indeed, accepting Defendants' argument that extensive regulation alone is enough to convert a government program from publicly-funded to publicly-owned or -operated would work a seismic shift in the relationship between private actors and the State and, by extension, which private parties qualify as state actors. *Cf. Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 41 (1999) ("the mere fact that a private business is subject to extensive state regulation does not by itself convert its action into that of the State"). What matters is whether the regulations demonstrate that nonpublic schools provide an "educational experience[]" that is "equivalent" to the educational experience in California's public schools. *Carson*, 596 U.S. at 783-84. Here, they do not, Br.31-34, and certainly provide no reason to override plain text.

State Defendants also try to wish away the holding in *Dreher v. Amphitheater Unified School District*, 22 F.3d 228 (9th Cir. 1994), that the word "public" in FAPE is a term of art meaning "public expense," both in the public- and private-school setting. State Br.21-22 (claiming *Dreher's*

holding is dicta). But *Dreher*'s interpretation of the word "public" was essential to its holding. *Dreher* involved parents who believed their child was not receiving a FAPE, placed her in private school, and sought reimbursement. *Dreher*'s definition of "public" thus formed a necessary part of the analysis because it explained why the parents could seek such reimbursement, even though their child currently attended a private school. *Id.* If Defendants were right that "public" means "public schooling," then parents could *never* seek reimbursements for time spent in private schools after successfully showing a FAPE was denied. *See, e.g., Bellflower Unified Sch. Dist. v. Lua*, 832 F. App'x 493, 496 (9th Cir. 2020) (permitting such reimbursements).

**Real operation.** Even more striking is Defendants' treatment of the real operation of the law, which they attempt to ignore altogether. Neither State nor District Defendants question that, in practice, numerous certified nonpublic schools differ markedly in operation from public schools, in enrollment practices, curriculum, tuition, and even the overt presence of religion. *See* Br.11-14, 32-33. Nor do they spend a single word explaining how the certification of these schools does not sound the death knell for their assertion that nonpublic schools simply "provide State-directed and State-supervised public education." State Br.47.

Indeed, District Defendants do not address these schools at all. State Defendants respond by arguing that a statement on the CDE's list of certified nonpublic schools describing the data as "voluntarily self-reported"

means the list should not be considered. State Br.25-26. But that disclaimer applies only to the nonpublic schools' self-reported contact information, not to their certification status, which is controlled and maintained by CDE itself. Thus, "[i]t is appropriate to take judicial notice" of CDE's published list of certified nonpublic schools, "as it was made publicly available by government entities." *U.S. Small Bus. Admin. v. Bensal*, 853 F.3d 992, 1003 n.3 (9th Cir. 2017); *see also Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (judicial notice may be taken on appeal).

The same holds true for citations to individual nonpublic schools. State Defendants have consistently argued that nonpublic school "funding is available under a regulatory and contracting scheme that obligates NPSs to act as adjuncts of public education agencies"—an argument the district court accepted. ER-51; State Br.50 ("NPSs are contracted to provide a State-directed public education"). State Defendants cannot on the one hand attempt to "deem[] private schools public," Manhattan Inst. Br.8, but then complain that standard notions of judicial notice should not apply. And—at a *minimum*—there is no dispute that this information is publicly available on the listed NPS websites and advertised to the public. Even *that* undisputed fact undermines Defendants' claim that nonpublic schools are mere state adjuncts offering education "equivalent" to that at public schools; and Defendants, now aware of this information, have not indicated that they will correct it or that they have initiated investigations into these schools for violations of state law. *Lee v. City of*

*Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (taking judicial notice of documents "not for the truth of the facts recited therein, but for the existence of the opinion"). These certified nonpublic schools put to rest any remaining doubt that already-certified nonpublic schools provide an education "equivalent" to that provided in public schools. *Carson*, 596 U.S. at 784.

**Contracts.** Defendants also argue that because this case involves a contract, it cannot possibly violate the Free Exercise Clause. State Br.45, 48 (citing *Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007)). But *Teen Ranch* predates *Fulton*, which held that "government cannot flout the constraints of the Free Exercise Clause ... by embedding express discrimination against religion in its contract policies." Manhattan Inst. Br.3; Br.37 (citing *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021)); *see also Rogers v. McMaster*, No. 19-cv-1567, 2023 WL 7396203, at *11 (D.S.C. Sept. 29, 2023) (*Fulton* held "Free Exercise Clause is triggered when governments try to sever their partnerships with religious [institutions] because 'religious views ... inform [their] work'." (alterations in original)). *Teen Ranch* also relied on *Locke v. Davey*, 540 U.S. 712 (2004), *see* 479 F.3d at 409-10, which the Supreme Court has all but confined to its facts, *see Carson*, 596 U.S. at 789; *Espinoza*, 140 S. Ct. at 2257; *Trinity Lutheran*, 582 U.S. at 464-465. *Teen Ranch*'s conclusion

that a government may discriminate against religion in its contracts cannot justify the nonsectarian restriction.[3]

District Defendants do not respond to *Fulton*'s prohibitions on discriminatory contracting regimes. State Defendants argue that *Fulton* is distinguishable because it involved "a conduct-proscribing contract rule that could have been waived and that required the contractor-plaintiff to act contrary to its religious beliefs." State Br.48. But that is exactly this case: State law proscribes—subject to waiver—engaging in "sectarian" activity, and that rule forces Plaintiffs to act contrary to their beliefs. *Fulton* is thus on all fours with this case. Nor do Defendants grapple with the consequences of their argument, which would permit the government to "discriminate at will when selecting contractors in furtherance of public purposes." Manhattan Inst. Br.12.

***Second-class status***. Lastly, Defendants repeat their suggestion that Parent Plaintiffs are not burdened because they can always accept second-class status by placing their children directly in private schools and forgoing the opportunity for an individualized IEP. State Br.49; District Br.38-39; *see* Br.6-9 (describing differences between the two methods);

---

[3] District Defendants similarly argue that "public employees" are involved in decisions governing a child's FAPE. District Br.38. But this is no different than the foster care regime in *Fulton* or other scenarios where governmental actors are involved in the disbursement of public benefits.

State Br.4-5 (acknowledging differences). As Plaintiffs explained and amici confirmed, accepting this argument would permit the very "religious gerrymanders" prohibited by the Constitution and would directly conflict with *Carson*, 596 U.S. at 784, where parents similarly could have "avoided" any burden by directly enrolling their children in private schools. Br.38-41; *see also* Manhattan Inst. Br.12-13; *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 691 (2014) (rejecting government's argument that plaintiffs "forfeited" free exercise protection when they chose to organize their businesses "in the manner required by their religious beliefs"). Defendants offer no response.[4]

In short, California has chosen to subsidize private institutions that provide a qualitatively different educational experience to certain disabled students. "A State need not subsidize private education" in this way. *Espinoza*, 140 S. Ct. at 2261. But since California has chosen to do so, "it

---

[4] State Defendants' reliance on *Gary S. v. Manchester School District*, 374 F.3d 15 (1st Cir. 2004) is misplaced. State Br.45, 50. That case upheld the constitutionality of the significantly different services IDEA guarantees to students placed via an IEP versus those placed directly in private schools without an IEP. Putting aside that—as Defendants concede at State Br.5—Plaintiffs "do not challenge" these differences, *Gary S*'s "public benefits" analysis is not good law after *Carson*, which concerned a benefit that was not open to all Maine residents. *See Carson*, 596 U.S. at 793 (benefit provided only to rural residents). *See also* Br.40 n.11.

cannot disqualify some private schools solely because they are religious" unless it can satisfy strict scrutiny. *Id.*

## II. California's nonsectarian requirement violates the First Amendment because it is not generally applicable.

As the opening brief explained, the mere existence of a system of individualized exemptions like the one at issue here triggers strict scrutiny. Br.41-44 (discussing *Fulton* and *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664 (9th Cir. 2023) (en banc)). In response, Defendants agree, conceding (as they did below) that the waiver policy operates in precisely this fashion: "public agencies" like LAUSD may "request a waiver of any Education Code provision," State Br.51, and discretion to grant the waiver "rests with the Superintendent," District Br.18. State Defendants even concede that, as a result, this "aspect of the NPS system is *not* 'generally applicable.'" State Br.51 (emphasis added). And if those concessions weren't damaging enough, both State and District Defendants completely ignore *FCA*, this Court's most recent precedent on general applicability, and District Defendants even fail to cite *Fulton*.

State Defendants offer two arguments with respect to general applicability. First, they claim "California has no ability to waive any of the federal regulations." State Br.49. But they provide no explanation why that has any bearing on their undisputed ability to waive *any* certification requirement upon the request of a public agency like District Defendants

in certain circumstances. Cal. Educ. Code § 56101(a); Br.43. Since Defendants' waiver policy allows exemptions "based on the circumstances underlying each application," *Fulton*, 141 S. Ct. at 1877, and any decisions about exemptions are "made ... at the 'sole discretion' of the" State Board of Education, *id.* at 1878, they are not generally applicable. *See also FCA*, 82 F.4th at 687 ("'broad' and 'comprehensive'" nondiscrimination policies not generally applicable because district exempted numerous programs). The federal regulations, which do not require exclusion of religious schools but only the segregation of funds, are thus a red herring. *See* 34 C.F.R. § 76.532; *see also* 34 C.F.R. § 76.52(a)(1) ("A faith-based organization is eligible to apply for and to receive a subgrant under a program of the Department on the same basis as any other private organization.").

Second, State Defendants say *Fulton* doesn't apply because the waiver mechanism doesn't impose a substantial burden on Plaintiffs' religious exercise. State Br.51-52. But this mischaracterizes the relevant inquiry. In both *Fulton* and *FCA*, the issue was not whether the discretionary waiver *itself* imposed a burden; it was whether the overall operation of the law did. *Fulton*, 141 S. Ct. at 1876; *FCA*, 82 F.4th at 687. And as already explained, Br.27-28, California's law burdens Plaintiffs' religious exercise by preventing them from obtaining a benefit they would otherwise qualify for.

District Defendants' two arguments fare no better. They contend that because discretion "rests with the Superintendent," any injury is "State induced" and they are not liable. District Br.34. This contradicts both State Defendants' arguments and the actual operation of the waiver process. As State Defendants themselves explain, public agencies like the District Defendants are indispensable to the waiver process because without their participation, waivers are impossible. "Requests for such waivers may only be made by 'public agencies,' *a term that does not include any private school, religious or not*." State Br.51 (emphasis in original). Plaintiffs' injury is thus the result of both the State and LAUSD's actions, and District Defendants cannot escape liability by pointing fingers at the State.

District Defendants' blame-the-State argument also ignores *Fulton*. The *Fulton* plaintiffs sued multiple different government actors and agencies, including the City of Philadelphia, the Department of Human Services, and the Philadelphia Commission on Human Relations. *Fulton*, 141 S. Ct. at 1875-76. Only the Commissioner had "sole discretion" to grant exemptions, but the Court ruled against all defendants. *Id*. at 1878. And the resulting permanent injunction ran against each of the defendants. Consented Judgment at 4, *Fulton v. City of Philadelphia*, No. 18-cv-2075 (E.D. Pa. Oct. 1, 2021), ECF No. 79.

*Fulton* and *FCA* also dispose of District Defendants' second general applicability argument. District Defendants argue that Plaintiffs cannot

prevail because a waiver was never requested. District Br.34. But neither *Fulton* nor *FCA* turned on whether a waiver was actually requested. *Fulton*, 141 S. Ct. at 1879; *FCA*, 82 F.4th at 687-88. That's because the mere "creation of a formal mechanism for granting exceptions renders a policy not generally applicable," regardless of whether any exceptions were ever granted. *Fulton*, 141 S. Ct. at 1879; *FCA*, 82 F.4th at 685. Thus, the mere existence of Defendants' waiver authority is what matters. Here, Defendants concede that nonpublic-school certification requirements are waivable and require District Defendants' active participation. Defendants' waiver authority thus renders their policy not generally applicable, and it must undergo strict scrutiny.

## III. California's restriction fails strict scrutiny.

"A law that targets religious conduct for distinctive treatment … will survive strict scrutiny only in rare cases." *Carson*, 596 U.S. at 780-81. This is not that rare case. Br.44-47.

Any anti-establishment interest must be based on "historical practices and understandings." *Kennedy*, 597 U.S. at 535. In this context, the relevant historical practice and understanding is clear: "there is no 'historic and substantial' tradition against aiding private religious schools." *Carson*, 596 U.S. at 770 (cleaned up); *see also* Br.45-46 (recounting history). But California's alleged antiestablishment interest cannot rank as compelling, even separate from historical practice. Defendants concede that California already allows public funds to flow to religious schools

under Section 1412(a)(10)(A) and (C), "leav[ing] appreciable damage to that supposedly vital interest unprohibited," Br.46 (citing *Espinoza*, 140 S. Ct. at 2261); State Br.4; District Br.39.

As explained in the opening brief, Br.47, the nonsectarian restriction is also not narrowly tailored. Rather, Defendants chose the broadest and bluntest possible means of achieving their interest—a categorical prohibition on all "sectarian" schools. This "vastly overinclusive" statute fails narrow tailoring. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011).

District Defendants "essentially concede[] that [they] cannot meet" strict scrutiny because they "ha[ve] offered no arguments to the contrary." *FCA*, 82 F.4th at 694. And State Defendants' arguments don't come close to meeting their formidable burden.

Most importantly, State Defendants completely fail to root their arguments in any "historical practices and understandings" or even cite the governing Establishment Clause standard set out in *Kennedy*. 597 U.S. at 535. Nor do they address the historical practices Plaintiffs identified, Br.44-46, let alone try to justify the restriction in light of them.

Instead, the only history State Defendants invoke is the sordid practice of targeting "sectarian" religions for mistreatment. Cal. Catholic Conf. Br.4-18. For over a century, the term "sectarian" was a dog whistle to keep disfavored religious minorities out of public life, particularly Catholics and Jews. *Id.* at 8, 10, 12. Indeed, the Supreme Court has explained that the term is part of the "checkered history" of the Blaine

Amendment, taking part in a "shameful pedigree" that was "born of bigotry." *Espinoza*, 140 S. Ct. at 2259 (quoting *Mitchell*, 530 U.S. at 828-29). State Defendants refuse to disclaim that history, and instead lean in, claiming that when a religious group or sect "organizes and defines itself by and for its religious commitments, there is a recognized concern that such commitments will manifest in a school's operation in non-neutral ways." State Br.59. But excluding people from public benefits because they are "too religious" is not a justification, it is a self-condemnation.

State Defendants offer three other arguments to support their purported anti-establishment interest. First, they claim that any funding would not reach schools "wholly" through "genuinely" independent private choice. State Br.58-59 (quoting *Zelman v. Simmons-Harris*, 536 U.S. 639, 649, 652 (2002)). But this confuses a safe harbor with a *sine qua non*. The existence of a system of independent private choice means there is no Establishment Clause violation. But that does not mean that independent private choice is required. *See Espinoza,* 140 S. Ct. at 2261 ("[T]his Court has repeatedly upheld government programs that spend taxpayer funds on equal aid to religious observers and organizations, *particularly* when the link between government and religion is attenuated by private choices." (emphasis added)); *see also Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 295 (6th Cir. 2009)

("Although private choice is one way to break the link between government and religion, it is not the only way.").

Second, State Defendants contend that allowing religious schools to serve as nonpublic schools would lead to excessive entanglement due to government supervision of religious institutions. State Br.60. The Supreme Court rejected the same argument in *Espinoza*, holding that schools that were concerned about government intrusion could decide not to participate, "[b]ut we doubt that the school's liberty is enhanced by eliminating any option to participate in the first place." 140 S. Ct. at 2261.

Third, State Defendants worry that "certain religious groups ... could be certified," while others would be denied or not apply. State Br.57. But this argument contradicts *Carson*, where the Supreme Court held that Maine's "rigid[] exclu[sion]" of "any and all sectarian schools regardless of particular characteristics" was overinclusive and therefore *not* compelling. 596 U.S. at 781 n.*. Indeed, accepting this argument would mean that every government program that works with any religious organization would be unconstitutional because no government program works with every single religious group.

Finally, as to narrow tailoring, State Defendants claim, without citation, that no more narrowly tailored options exist and that "Plaintiffs offer no specific adjustment to resolve" the problem. State Br.60. But it

is *Defendants'* burden to prove up their strict scrutiny affirmative defense, including the lack of alternatives. *FCA*, 82 F.4th at 694.

In any event, State Defendants' argument proves too much. For instance, State Defendants repeatedly claim that federal regulations prohibiting the use of funds for "[r]eligious worship, instruction, or proselytization" mean that the nonsectarian restriction is required. *See* State Br.10, 29 (citing 34 C.F.R. § 76.532). But those regulations apply to any "State or subgrantee," meaning they apply to any private school serving a child with a disability, regardless whether the placement is pursuant to an IEP or not. 34 C.F.R. § 76.532; *see also* 20 U.S.C. § 1412(a)(10)(A)(vi)(II) (special education services "shall be secular, neutral, and nonideological."). If those more narrowly tailored alternatives suffice for religious private schools serving disabled students without IEPs, State Defendants must show why their feasibility vanishes once an IEP is involved. The reality is, alternatives exist—including alternatives Defendants already use in other contexts. They just don't want to use them here.

At bottom, Defendants' argument is this: Plaintiffs are just too Jewish and just too religious. Defendants think the Establishment Clause requires Defendants to disqualify Plaintiffs because their "religious commitments ... will manifest ... in non-neutral ways." State Br.59. Indeed, for Defendants, there is no option other than exclusion. *Id.* at 60.

But the "Constitution neither mandates nor tolerates" this kind of bald religious discrimination. *Kennedy*, 597 U.S. at 544. It is a "misconstruction of the Establishment Clause," *id.* at 543, and "odious to our Constitution," *Trinity Lutheran*, 582 U.S. at 467, to discriminate against religious individuals and institutions. "And in no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights." *Kennedy*, 597 U.S. at 543.

## IV. The remaining injunction factors favor relief.

Defendants offer only half-hearted arguments regarding the remaining injunction factors. Each fails.

*Irreparable harm.* State Defendants' only irreparable-harm argument attacks a straw man. *See* State Br.67-68 (claiming Plaintiffs believe that "the remaining factors must be taken for granted"). Plaintiffs of course agree all four factors must be met. But precedent confirms that in the First Amendment context, a likelihood of success on the merits is enough to *satisfy* the additional factors precisely because the violation of First Amendment rights (no matter how brief) is *per se* irreparable and because it is always in the public interest to prevent violations of constitutional rights. *FCA*, 82 F.4th at 695; *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012). State Defendants' response merely relitigates both standing and the merits. But if Plaintiffs have shown a likelihood of success on the merits, State Defendants agree that "loss of First

Amendment freedoms" is irreparable. State Br.67; *cf.* District Br.42-44 (no irreparable harm argument).

***Balance of equities/public interest.*** State Defendants do not contest that the balance of equities and public interest factors "merge" where the government opposes a preliminary injunction. *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021). Nor do they challenge that it is never in the public interest to violate constitutional rights. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022) ("This court has consistently recognized the significant public interest in upholding First Amendment principles." (cleaned up)); *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019) (en banc) ("The fact that Plaintiffs have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in Plaintiffs' favor." (cleaned up)).

Instead, State Defendants argue that Plaintiffs waited too long to challenge this unconstitutional provision and that this injunction would "require State action." State Br.68-69. Neither argument has merit.

First, "delay is but a single factor to consider in evaluating irreparable injury; [and] courts are loath to withhold relief solely on that ground." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (cleaned up). But Plaintiffs did not delay. Plaintiffs filed suit less than a year after two June 2022 Supreme Court decisions made clear that California's nonsectarian restriction is unconstitutional. *Carson* rejected Maine's identical

public-education argument, 596 U.S. at 780, and *Kennedy* invalidated "*Lemon* and its progeny," 597 U.S. at 534. Moreover, *Carson* itself invalidated a Maine policy that had been in place since 1981—*37 years* prior to the complaint seeking preliminary and permanent injunctive relief. *See* Complaint, *Carson v. Makin*, No. 18-cv-327 (D. Me. Aug. 21, 2018), ECF. No. 1 (seeking declaratory and injunctive relief but not damages); Judgment, *Carson v. Makin*, No. 18-cv-327 (D. Me. April 18, 2023), ECF No. 96 (issuing permanent injunction).

Second, requiring the State to "act" to address a constitutional violation does not somehow foreclose preliminary injunctive relief. Plaintiffs ask this Court to require Defendants to conduct nonpublic-school certifications "in accordance with constitutional processes," which would "prevent[] future constitutional violations, a classic form of prohibitory injunction." *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (collecting cases and noting the "inherent contradictions underlying the somewhat artificial legal construct" differentiating mandatory from prohibitory injunctions).

Indeed, State Defendants' own arguments confirm the injunction is prohibitory. They complain that, if enjoined, they will have to "analyz[e] NPS application materials received from any sectarian applicants, conduct[] an on-site review of each applicant's facility and program, and mak[e] a certification decision." State Br.69. Precisely. Plaintiffs do not ask this Court to "order[] a responsible party to 'take action'" it otherwise

would not have taken, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009); they ask that State Defendants engage in their *existing* certification process free from constitutional defect by considering "sectarian" applicants on equal footing. *See Hernandez*, 872 F.3d at 998 (injunction "prohibit[ing] the government from conducting new bond hearings under procedures that will likely result in unconstitutional detentions" was prohibitory). In any event, were this a mandatory injunction, Plaintiffs have carried their burden of showing that the law clearly favors their position—indeed, this is nowhere close to a "doubtful case[]." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

For their part, District Defendants specifically ask that if the Court finds liability, that it "direct[] ... the CDE Defendant to address these concerns prescriptively," District Br.44, *i.e.,* that a mandatory injunction issue against the State Defendants.

District Defendants do complain about "increased cost" and "complexity" and that they would need "further guidance" as to how to run their program. *Id.* at 42-43. But the mere cost of complying with a constitutional command does not justify continuing to violate the Constitution. *Lipscomb ex rel. DeFehr v. Simmons*, 884 F.2d 1242, 1248 (9th Cir. 1989) ("'the cost of protecting a constitutional right cannot justify its total denial.'" (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977) and collecting

cases)). Nor is "complexity" a legitimate obstacle to enforcing constitutional rights. *See, e.g.*, *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 13 (1971) (recognizing "magnitude and complexity" and "difficulties … in implementation of the basic constitutional requirement that the State not discriminate," but still requiring desegregation); *United States v. Virginia*, 518 U.S. 515, 539 (1996) (VMI's "difficulties in attracting females" no justification for excluding women).

## V. The district court erred by dismissing Plaintiffs' remaining claims without additional analysis.

Plaintiffs plausibly alleged their remaining claims in Counts II, IV, V, and VI. Only State Defendants attempt to defend these dismissals, but each of their attempts fail.

***Equal Protection Clause (Count IV).*** As explained in the opening brief, Br.49-50, the nonsectarian restriction violates the Equal Protection Clause by drawing categorical distinctions based on the suspect class of religion. *Al Saud v. Days*, 50 F.4th 705, 710 (9th Cir. 2022). The Equal Protection Clause also protects against "burdens [on] the exercise of a constitutional right," *Ball v. Massanari*, 254 F.3d 817, 823 (9th Cir. 2001), including Plaintiffs' free exercise rights.

State Defendants defend dismissal of Plaintiffs' Equal Protection Clause claim on grounds different than the district court's erroneous conclusion that no Equal Protection violation exists because California has not excluded Plaintiffs from a public benefit. ER-53; *see* Br.35-38

(explaining error). State Defendants claim instead that religion is not a suspect class. State Br.62-63. But religion, like race, is an *"inherently suspect distinction[]." City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (emphasis added). And the Ninth Circuit has held that "intentional religious discrimination is 'subject to heightened scrutiny whether [it] arise[s] under the Free Exercise Clause, the Establishment Clause, or the Equal Protection Clause.'" *Fazaga*, 965 F.3d at 1058-59 (quoting *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1266 (10th Cir. 2008)).

Moreover, Plaintiff Orthodox Jewish families and schools *are* part of a discrete and insular minority—the Jewish people—who have long been, and continue to be, subject to a history of unequal treatment. *See* JCRL Br.13-14; NCYI Br.12 n.2. State Defendants cannot lump Plaintiffs in with all other religions in an effort to escape that obvious conclusion. State Br.62 (citing *Johnson v. Robison*, 415 U.S. 361, 375, n.14).[5]

**Unconstitutional Conditions (Count V).** Plaintiffs are subject to unconstitutional conditions. Br.50. Parent Plaintiffs cannot seek place-

---

[5] Similarly wrongheaded is State Defendants' argument that discrimination against religion matters only if it is discrimination against a particular religion, State Br.62. *See, e.g., Weaver*, 534 F.3d at 1266 ("[S]tatutes involving discrimination on the basis of religion, *including* interdenominational discrimination, are subject to heightened scrutiny [under] the Equal Protection Clause[.]" (emphasis added)).

ment for their children in a religious nonpublic school due to the nonsectarian restriction and School Plaintiffs cannot seek nonpublic-school certification due to that same restriction.

In response, State Defendants contend that Parent Plaintiffs cannot raise this claim because no condition is imposed on the families. State Br.53-54. But the Supreme Court in both *Espinoza* and *Carson* adjudicated almost identical claims brought by similarly situated parent plaintiffs. *Espinoza*, 140 S. Ct. at 2261 ("[T]he prohibition before us today burdens not only religious schools but also the families whose children attend or hope to attend them."); *Carson*, 596 U.S. at 775 (describing plaintiff parents). Here, the unconstitutional condition—the nonsectarian restriction—caused Parent Plaintiffs' injury by restricting the availability of religious nonpublic schools.

Next, State Defendants quibble with Plaintiffs' cases, arguing that none "involved Free Exercise rights, religion or education." State Br.54. But why would the unconstitutional conditions doctrine apply to free speech but not free exercise? In fact, the Supreme Court has invoked the unconstitutional conditions doctrine in many free exercise cases. *See, e.g., Sherbert v. Verner*, 374 U.S. 398, 405 (1963); *Trinity Lutheran*, 582 U.S. at 462-63 (collecting cases).

Finally, State Defendants repeat their erroneous assertion that Plaintiffs are demanding that the government subsidize their religious exercise and require the funding of religious education, State Br.55. But

Plaintiffs are not "claiming any entitlement to a subsidy"; they simply want the "right to participate in a government benefit program without having to disavow [their] religious character." *Trinity Lutheran*, 582 U.S. at 463; *see* Br.34; *Carson*, 596 U.S. at 786. Plaintiffs are "member[s] of the community too," and Defendants' decision to exclude them is unconstitutional. *Trinity Lutheran*, 582 U.S. at 463.

***Tandon* and Yoder *(Counts II and VI).*** The district court erred by dismissing Plaintiffs' *Tandon* and *Yoder* claims without any analysis. And in any event, Counts II and VI are adequately pleaded.

As to *Tandon*, the waiver policy "treat[s] … comparable secular activity"—running a secular school—"more favorably than religious exercise"—running a religious school. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). That violates the Free Exercise Clause.

State Defendants argue that *Tandon* is inapplicable because under Education Code § 56366.2, no nonpublic school applicant can seek waiver of the nonsectarian restriction, "*religious or not*." State Br.52. But this overlooks the fact that, according to State Defendants, nonpublic schools must be nonsectarian, so only nonreligious schools can petition for a waiver of certification requirements while religious schools cannot. That is why the law "treat[s] … comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62.

Plaintiffs also plausibly allege a violation of *Yoder*. Defendants categorically prohibit religious schools from becoming certified as nonpublic

schools, preventing them from providing their religious education to children with disabilities. And Parent Plaintiffs, who are obligated to send their children to Orthodox Jewish schools, cannot do so due to this religious discrimination. Br.51-52.

State Defendants claim that the relevant precedent applies only to decisions criminalizing educational choices. State Br.56. But parental rights are not so narrow. In *Espinoza*, which as here involved a challenge to a civil law barring aid to religious private schools, the Supreme Court explained that courts "have long recognized" as an "'enduring American tradition' ... the rights of parents to direct 'the religious upbringing' of their children," and "[m]any parents exercise that right by sending their children to religious schools, a choice protected by the Constitution." 140 S. Ct at 2261. Like Montana, California's law "penalizes that decision [to send children to religious schools] by cutting families off from otherwise available benefits if they choose a religious private school rather than a secular one, and for no other reason." *Id.*

## VI. Plaintiffs have standing.

Defendants do not dispute that a categorical barrier prevents all Plaintiffs from participating in California's administration of IDEA on equal footing with their nonreligious peers. Yet they vociferously claim that no plaintiff has standing. State Br.27-42; District Br.29-35.

### A. Plaintiffs have suffered an injury-in-fact.

Injury-in-fact is not difficult to establish where, as here, Plaintiffs challenge a discriminatory barrier that categorically excludes them from participating in a governmental program. Br.52-55. The Supreme Court and this Court have repeatedly stated that plaintiffs need only identify a discriminatory barrier that places them on less-than-equal footing, not that they ultimately would prevail in obtaining the benefit. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666-67 (1993); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019). Nor must plaintiffs jump through undisputedly futile hoops before filing suit. Br.57 (collecting cases). They need show only that they are "able and ready" to pursue the benefit, which at the motion-to-dismiss stage merely requires general allegations that a categorical barrier precludes them from participation. *See AGC*, 508 U.S. at 657. When assessing whether this low threshold has been met, courts "must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party," *Maya v. Centex Corporation,* 658 F.3d 1060, 1068 (9th Cir. 2011). And once one plaintiff establishes standing, a court commits "error" when it "inquir[es] into [another plaintiff's] independent Article III standing." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2379 n.6 (2020)).

Applying these standards demonstrates that all Plaintiffs have established injury in fact: the nonsectarian restriction cuts off their ability to

seek nonpublic school placement or certification, and forcing them to proceed through a labyrinthine process with a foregone conclusion would be the ultimate exercise in futility. Br.52-61.

In response, both State and District Defendants concede that Plaintiffs need not "plead and prove" they will ultimately prevail to have standing, State Br.31-32; District Br.30-31, and that the nonsectarian restriction makes pursuing their desired outcome futile. Nevertheless, Defendants offer a hodgepodge of standing-related counterarguments, each of which fails.

*First*, State Defendants argue the district court incorrectly relied on the First Circuit decision in *Carson v. Makin*, 979 F.3d 21 (1st Cir. 2020) (*Carson I*) to find that the Taxons and Peretses possessed standing independently of School Plaintiffs. State Br.38-40; ER-38 (discussing *Carson I*); Br.58 n.12 (same). State Defendants allege this decision is inapplicable because there, "if the challenged law were struck down, the plaintiff-families would have been able to direct payments for a religious education." State Br.39; *see also* State Br.42 (without nonsectarian restriction, *Carson* parents were "unquestionably qualified").

That is the opposite of what *Carson I* held. As here, parents desired to send their children to religious schools, none of which had formally begun the approval process to participate in Maine's tuition-assistance program. 979 F.3d at 26-27. Also as here, the government argued the parents lacked standing because, to be approved, the schools must abide

by antidiscrimination requirements that the state argued would conflict with their religious beliefs and hence bar their approval. *Id.* at 28. The First Circuit concluded otherwise, stating that the parents had demonstrated injury because "the 'nonsectarian' requirement denied them the 'opportunity' to find religious secondary education for their children *that would qualify for public funding* ... even though, if the 'nonsectarian' requirement were struck down, [the schools] might not participate in the tuition assistance program." *Id.* at 30-31 (emphasis added). That is exactly the situation here. State Defendants' revisionist account of the decision is simply wrong. *See also Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d 738, 750 (9th Cir. 2020) (plaintiffs had standing where "predictable effect" of "an order granting the relief Skyline seeks is that at least one insurer would be willing to sell it a plan that accords with its religious beliefs," even though "it is possible no insurer would do this").

*Second*, State Defendants argue that *AGC* does not control School Plaintiffs' able-and-ready analysis because, unlike *AGC*, School Plaintiffs cannot demonstrate a past history of participation in the program. State Br.32; *see id.* at 33 (similarly attempting to distinguish *Bras v. Cal. Pub. Utilities Comm'n*, 59 F.3d 869 (9th Cir. 1995)). This "heads I win, tails you lose" interpretation is wrong. As Plaintiffs noted, Br.61 n.13, State Defendants nowhere explain how School Plaintiffs could possibly show such history in the face of a categorical discriminatory barrier that

has "stood for decades." State Br.68. Nor do State or District Defendants anywhere acknowledge—let alone try to distinguish—the numerous cases showing that this Court does not require plaintiffs to engage in futile actions before vindicating constitutional rights. Br.57; *see* State Br.28-37; District Br.31.

Lastly, Defendants contend that the able-and-ready analysis should be controlled not by *AGC*'s motion-to-dismiss standard, which requires only that Plaintiffs "allege facts demonstrating each element" of standing, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (cleaned up), but by the summary judgment standard, which requires "*evidence* and *specific facts," Center for Biological Diversity v. Export-Import Bank*, 894 F.3d 1005, 1012 (9th Cir. 2018) (emphasis added). State Br.30-34; District Br.30-31. They thus rely on the summary judgments in *Carney v. Adams*, 592 U.S. 53 (2020), and *Carroll v. Nakatani*, 342 F.3d 934 (9th Cir. 2003), to argue that Plaintiffs must set forth their ability to comply with every other nonpublic school requirement in minute detail in order to have standing.

Nothing supports this contention. At the pleadings stage, courts "presume that general allegations embrace those specific facts that are necessary to support the claim," *Maya*, 658 F.3d at 1068 (cleaned up), a low threshold that School Plaintiffs have more than satisfied by alleging that they have reviewed and believe they are capable of meeting all other nonpublic school requirements. Br.60; NCLA Br.8-9, 12-13 (explaining

that Defendants' proposed standard amounts to "a fact-pleading regime" inconsistent with Supreme Court precedent).[6]

Nor do Defendants ever wrestle with the legal consequences of their argument. According to Defendants, School Plaintiffs needed to spend their time and financial resources developing foolproof ways to satisfy each of the nonpublic school certification's numerous requirements, all the while knowing that their application, if filed, would be rejected immediately. Such a requirement not only directly conflicts with this Court's cases rejecting the need for futile gestures (which Defendants never discuss), *see* Br.57-58, it would also render it virtually impossible for a plaintiff to ever seek to "overturn decades-old state policy" that unconstitutionally and structurally discriminates against minorities. State Br.69. That cannot be, and in fact is not, the law. NCLA Br.10 (citing *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365-66 (1977)).

---

[6] State Defendants' cases dismissing for lack of standing at the motion-to-dismiss stage are readily distinguishable. In one, the plaintiffs failed to plead that their children "even wanted" to participate in the challenged program. State Br.35 (quoting *Menders v. Loudoun County Sch. Bd.*, 65 F.4th 157, 163 (4th Cir. 2023). In the other, plaintiffs "plead[ed] themselves out of court by admitting they never experienced and never will experience" injury because they "declare they never have and never will bid on PLA-covered projects." *Associated Builders & Contractors W. Penn. v. Cmty. Coll. Allegheny Cnty.*, 81 F.4th 279, 289 (3d Cir. 2023).

## B. Plaintiffs' injury is traceable to Defendants' conduct and redressable.

Plaintiffs easily satisfy the traceability and redressability elements of standing. Br.62. State Defendants argue that "independent unchallenged laws" prevent this Court from redressing Plaintiffs' injury. State Br.40-41. That argument is triply flawed.

First, it once again rests on Defendants' recharacterization of Plaintiffs' injury as demanding that California certify Plaintiff Schools and immediately place Children Plaintiffs in those schools, as opposed to Plaintiffs' *actual* claimed injury of being placed on unequal footing in the certification and placement process. Striking down that barrier does not "frustrate [Plaintiffs'] desired result," State Br.40; it provides immediate and complete redress. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185-86 (2000).

Second and relatedly, Defendants' argument rests on inapposite cases. Defendants cite only cases where an "identical" unchallenged regulation completely precluded redress because it covered the same conduct in wish plaintiffs wished to engage. *Nuclear Info. & Res. Serv. v. NRC*, 457 F.3d 941, 955 (9th Cir. 2006); *San Diego Cnty. Gun Rts. Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) (no ability to redress injury from federal law where state legislation "also bans" the same conduct); *White v. United States*, 601 F.3d 545, 552 (6th Cir. 2010) (no ability to redress federal

restrictions on bird fighting when it "is banned to a greater or lesser degree in all fifty states and the District of Columbia"). Those cases bear no resemblance to this case, where Plaintiffs merely seek to participate in the nonpublic school certification and placement process free from religious discrimination. The "unchallenged" laws State Defendants identify do not preclude redressing the injury Plaintiffs actually challenge.[7]

Finally, this argument rests entirely on Defendants' unsupported say-so that Plaintiff Schools are just too religious to possibly satisfy the other nonpublic school requirements. At best, this argument fails because it construes the complaint in Defendants' favor and rests on no evidence. *See Maya*, 658 F.3d at 1068. At worst, it echoes a deeply rooted antisemitic trope that suggests Jewish institutions are too separatist to participate in public life. *Supra* at 20-21. Jewish schools can, and do, comply with regulatory requirements consistent with the First Amendment every day in this country. School Plaintiffs are no different, and State Defendants cannot defeat standing by assuming Jewish schools can't or won't follow the law.

---

[7] State Defendants' other cases are even further afield. *Estate of Boyland v. U.S. Department of Agriculture*, 913 F.3d 117 (D.C. Cir. 2019), dealt with issue preclusion and statutes of limitation, while *Get Outdoors II LLC v. City of San Diego*, 506 F.3d 886 (9th Cir. 2007), had nothing to do with unchallenged laws and found the plaintiff had standing.

In a forlorn effort, District Defendants argue this Court can't redress any injury caused by LAUSD because they are just innocent pawns in California's unconstitutional game. District Br.31-34. District Defendants note "the District Court chose not to" address this argument, *id.* at 32, and for good reason. Far from being innocent bystanders, District Defendants are heavily involved in the certification process, including through a required "opportunity to provide input on all required components of the application" Cal. Educ. Code § 56366.1(b)(1), and "hold the power to petition for [the] waiver" of the nonsectarian restriction, which they have made clear they will never do, District Br.33. District Defendants are thus active participants in California's scheme of excluding religious children and schools and could remedy the harm by refusing to enforce the nonsectarian restriction in its contracts—an injury fully redressable by this Court.

## CONCLUSION

This Court should reverse the judgment of the district court and remand the case with instructions to enter Plaintiffs' requested injunction.

Respectfully submitted,

*/s/Eric C. Rassbach*

ERIC C. RASSBACH
  *Counsel of Record*
NICHOLAS R. REAVES
DANIEL L. CHEN
LAURA WOLK SLAVIS
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, DC 20006
(202) 955-0095
*erassbach@becketlaw.org*

*Counsel for Plaintiffs-Appellants*

February 5, 2024

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  23-55714

I am the attorney or self-represented party.

**This brief contains**  8,392  **words,** including  0  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  ☐ it is a joint brief submitted by separately represented parties.

  ☒ a party or parties are filing a single brief in response to multiple briefs.

  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated _____.

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/ Eric C. Rassbach  **Date**  2/5/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 5, 2024. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Eric C. Rassbach*
Eric C. Rassbach